```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
2                        ATLANTA DIVISION

3
      IN RE:                         )
4                                    )
      THE HOME DEPOT, INC., CUSTOMER )
5     DATA SECURITY BREACH LITIGATION,) Case No. 1:14-MD-2583-TWT
                                     )
6                                    ) October 22, 2015
                                     ) 9:34 a.m.
7     _____ ) Atlanta, Georgia

8

9              TRANSCRIPT OF THE MOTIONS HEARING
              BEFORE THE HONORABLE THOMAS W. THRASH, JR.,
10                    U.S. DISTRICT COURT JUDGE

11

12    APPEARANCES OF COUNSEL:

13    On behalf of the Plaintiffs:   Roy Barnes
                                     Kenneth Canfield
14                                   Joseph Guglielmo
                                     Barrett Vahle
15
      On behalf of the Defendant:    Kristine Brown
16                                   Cari Dawson
                                     Joseph Loveland
17                                   Phyllis Sumner

18

19
              Proceedings recorded by mechanical stenography
20              and computer-aided transcript produced by

21                  SUSAN C. BAKER, RMR, CRR
                    2194 U.S. COURTHOUSE
22                  75 SPRING STREET, S.W.
                    ATLANTA, GA  30303
23                    (404) 215-1558

24

25
```

1          (Proceedings held in Atlanta, Georgia, October 22,

2     2015, 9:34 a.m., in open court.)

3          THE COURT:  All right.  This is the case of In Re:

4     Home Depot, Inc., Customer Data Security Breach Litigation,

5     Case Number 14-MD-02583.

6          First let me ask counsel for the parties who expect

7     to be arguing this matter this morning to identify yourselves

8     for the record.  Anybody else that's just here to monitor the

9     proceedings, it's not necessary for you to identify yourself at

10    this time.

11         MR. BARNES:  Your Honor, for the Plaintiff consumers,

12    Roy Barnes and Barrett Vahle.  We will do the arguments this

13    morning.

14         THE COURT:  Good morning, gentlemen.

15         MR. VAHLE:  Morning, Your Honor.

16         MR. LOVELAND:  Good morning, Your Honor.  For The

17    Home Depot, Joe Loveland and Phyllis Sumner will do the

18    arguments this morning.

19         MS. SUMNER:  Good morning, Your Honor.

20         THE COURT:  Morning, Mr. Loveland, Ms. Sumner.

21         MR. CANFIELD:  Good morning, Your Honor.  In the

22    financial institutions track, I'm Ken Canfield, co-lead

23    counsel; and I will be doing one of the arguments for the

24    Plaintiffs.

25         MR. GUGLIELMO:  Good morning, Your Honor.  Joseph

1   Guglielmo with Scott & Scott.  I also represent the financial

2   institution Plaintiffs, and I will be doing certain arguments

3   this morning.

4            THE COURT:  All right.

5            MS. DAWSON:  Good morning, Your Honor.  Cari Dawson

6   for The Home Depot in the financial institution track.  I will

7   be doing part of the argument.

8            THE COURT:  Good morning, Ms. Dawson.

9            MS. DAWSON:  Good morning.

10           MS. BROWN:  Good morning, Your Honor.  Kristy Brown

11  also for The Home Depot in the financial institution cases.  I

12  will be handling part of the argument this afternoon.

13           THE COURT:  All right.

14           MS. BROWN:  Thank you, Your Honor.

15           THE COURT:  I'm going to be optimistic and think

16  maybe this morning.  We'll see.

17           All right.  This is a hearing on the Defendants'

18  motions to dismiss.

19           Ms. Sumner, Mr. Loveland, I assume y'all are going to

20  go first?

21           MR. LOVELAND:  Yes, Your Honor.

22           THE COURT:  All right.

23           MR. LOVELAND:  Thank you.

24           May it please the Court.  Joe Loveland for The Home

25  Depot along with Phyllis Sumner.

1          Your Honor, I'd like to just briefly clarify the

2     logistics.  Our understanding is that the Court will hear all

3     of the arguments on the consumer cases first.  That will be our

4     argument, the Plaintiffs' response and then our rebuttal.  And

5     then after that we will turn to the financial institutions case

6     and hear all of that as a unit assuming that's the way the

7     Court would like to proceed.

8          THE COURT:  That's fine with me.

9          MR. LOVELAND:  Thank you, Your Honor.

10          Let me take a moment then, Your Honor, and just to

11     set the stage why we are here.  We are here because The Home

12     Depot was the subject of a criminal attack in 2014.  Cyber

13     thieves using unique, custom-built malware were able to

14     infiltrate The Home Depot's payment data system and through

15     that system gain access to an amount, a substantial amount of

16     information.

17          As soon as The Home Depot learned that those attacks

18     had occurred, it began working around the clock figuring out

19     what the appropriate response was to make the appropriate

20     notifications both to the consumers and to the authorities and

21     to start that process of trying to bring all of this into

22     action.  Nonetheless, there was criminal activity that was

23     going on during that time.  That criminal activity did result

24     in a number of the Plaintiffs asserting and alleging that they

25     were subjected to various issues, and we will identify and

1    discuss those in detail in a moment.

2              But The Home Depot throughout this time responded

3    appropriately and thoroughly.  The Plaintiffs, however, filed a

4    number of class action complaints; and that, of course, brings

5    us here today.  We are going to talk about the consumer cases

6    within two buckets assuming that it's okay with the Court.

7    First, I am going to take approximately 20 minutes and I am

8    going to discuss the issue of standing in those cases.

9    Ms. Sumner will then take approximately 30 minutes and address

10   the issue of the 12(b)(6) issues and failure to state a claim

11   in the case.

12             So we are going to try and reserve, assuming that we

13   are able to, ten minutes roughly for rebuttal if that's

14   satisfactory with the Court.  And, if so, then I will start

15   with the consumer cases and the notion of the standing within

16   those cases.

17             We start with the decision in the United States

18   Supreme Court, 2013 decision, in the Clapper versus Amnesty

19   International case.  In that case, the Supreme Court reaffirmed

20   what is essentially we believe a four-part -- sometimes it's

21   referred to as three -- but essentially a four-part test for

22   establishing Article III standing.  The injury or Article III

23   standing must be first concrete and particularized, and it must

24   be either actual or imminent.  Imminent is a key term, and we

25   will spend some time talking about what imminent really means

1    within that.  Third, the injury must be fairly traceable to the

2    action of the Defendants.  And, fourth, it must be redressable

3    by a favorable ruling.

4           Now, it's important within this context where we have

5    85 different Plaintiffs to step back and ask yourself the

6    question:  Well, what does that mean here?

7           What it means is each of the Plaintiffs must jump

8    over all four of the hurdles that are set up.  It is not a

9    situation where one Plaintiff can meet one test, another

10   Plaintiff can meet another test and the third Plaintiff can

11   meet another test.  Each Plaintiff must establish that he or

12   she has suffered actual injury sufficient to give rise to

13   Article III standing.  And the burden, of course, is on the

14   Plaintiffs to establish that they have done that.

15          Now, let's then look at what we have here.  We have

16   14 jurisdictions -- those are the ones that are shaded -- that

17   have no Plaintiffs whatsoever.  We have 85 Plaintiffs in the

18   rest of the country.  In the 14 jurisdictions that have no

19   Plaintiffs which are Washington, Oregon, Idaho, Montana,

20   Wyoming, South Dakota, Nebraska, Iowa, Vermont, New Hampshire,

21   Connecticut, Hawaii, the District of Columbia and Puerto Rico,

22   none whatsoever.  That will be important when the Court, of

23   course, looks at the issue of 12(b)(6) and whether claims can

24   be asserted under any of the laws of those jurisdictions in the

25   absence of a Plaintiff from those jurisdictions.

1          But of the other 85 Plaintiffs, none of them
2     ultimately have standing.  I have a cheat sheet that I have
3     prepared I'd like to hand up to the Court if I might that I
4     will walk through.  And I'm not going to go through this in
5     detail, but I think it's helpful to understand the argument
6     that we are making.

7          Of the 85 Plaintiffs, 64 of them, the ones that are
8     identified in the first part of this spreadsheet, allege no
9     monetary harm whatsoever.  What they allege is a series of
10    different issues, including the following.  They say they spent
11    time dealing with and working through issues associated with
12    the data breach.  They say there were attempted charges against
13    their accounts.  Some of them led to they had temporary loss of
14    access to cards or a line of credit that was temporarily frozen
15    or a loss of reward points on one of their cards, and some of
16    them assert that they had charges against the card that were
17    reimbursed in full.

18         All of those are identified in this first sheet with
19    the 64 Plaintiffs who allege no monetary harm.  All of it's
20    drawn directly from the allegations of the complaint.  If the
21    Court looks at the left-hand column, you will see the name of
22    the Plaintiffs and the paragraph of the complaint that
23    references that Plaintiff and then the categorization of the
24    harm that flows from it.

25         We will talk about this in more detail.  But, suffice

```
 1    it to say, we believe that under the applicable standards of
 2    Clapper and the applicable law in the Eleventh Circuit those 64
 3    Plaintiffs have no claim.  They have no actual injury, and they
 4    have not established that they have an imminent injury
 5    whatsoever.
 6              Next we have the remaining 21 Plaintiffs, and we have
 7    broken those into two buckets.  Thirteen of them assert
 8    monetary harm limited to mitigation expenses.  Now, let me be
 9    clear.  These 13 Plaintiffs also assert, many of them, the same
10    thing that the first 64 Plaintiffs said.  So they assert the
11    non-monetary injury or the non-monetary harm, and then they add
12    that they incurred these mitigation expenses with regard to the
13    litigation.
14              Essentially, they are all outlined in the second
15    chart which is the 13 Plaintiffs who allege mitigation
16    expenses; and those expenses are almost exclusively costs
17    incurred to monitor credit or to monitor -- basically, to
18    monitor their credit and to monitor any alleged fraud against
19    accounts.  We will talk about the cases that establish that
20    that does not create actual injury within this context.
21              Finally, there's a group of eight Plaintiffs, the
22    third sheet.  Those eight Plaintiffs claim unreimbursed
23    expenses.  Essentially, they claim that they have unreimbursed
24    late fees.  Some of them incurred -- three of them actually
25    allege that there were charges against their account,
```

1    fraudulent charges against their account.  Two of them say they
2    were not reimbursed for it, and one says he was reimbursed for
3    part but not all of that charge.

4            This group of the remaining Plaintiffs, these eight
5    Plaintiffs, are the ones that I think we would say come closest
6    to having standing.  But they don't meet standing either
7    because as we will show all of them failed the prong of the
8    Clapper test that requires that the injury be fairly traceable
9    back to the action of the Defendant.  All of these, all of
10   these Plaintiffs, also suffer from the problem of the
11   independent criminal activity that intervened after this data
12   breach that caused any alleged injury here and we believe means
13   the activity is not fairly traceable back to The Home Depot.
14   So at the end of the day, we will submit none of the claims
15   will remain.

16           Now, let's go back and talk about Clapper for a
17   moment because this goes to the question of what really is
18   required to be certainly impending.  That's the language that
19   the Supreme Court adopted.  It's important in noting that that
20   what the Supreme Court did was it differentiated what the
21   Second Circuit had done in its decision in the case.  The
22   Second Circuit had said, well, if there is an objectively
23   reasonable risk then we are going to say that meets the
24   standard.  And the Supreme Court said, no, that is not
25   sufficient, that the objectively reasonable likelihood test the

1   Second Circuit had was not high enough to meet the standard of

2   certainly impending injury.  It required more than that.

3          And, specifically, allegations of possible future

4   injury were held to not be sufficient.  And many of the

5   allegations in this case for many of the Plaintiffs in the

6   initial 64 brief are essentially allegations of possible future

7   injury.  They are concerns about what may happen in the future

8   if their data is actually used, and that does not meet the

9   standard or meet the test.

10          Clapper goes on to say alleged injuries that are

11   based on a speculative chain of possibilities do not meet the

12   certainly impending injury or fairly traceable prongs of the

13   analysis and that the Plaintiffs cannot manufacture standing

14   merely by inflicting harm on themselves based on their fears of

15   hypothetical future harm.  In this instance, that last prong

16   attaches to the people who bought the credit monitoring

17   services rather than using the free services.  They in effect

18   made an election to do that because of a concern that they had,

19   and there are a number of cases which we cite to the Court that

20   say that that is not sufficient to create injury.

21          What the Supreme Court actually held in the Clapper

22   case was that it would create a situation if that was the case

23   where Article III standing could be created in a variety of

24   situations when someone took an action which may well be a

25   reasonable action in response to what the Supreme Court called

1    a non-paranoid fear and that that action may be reasonable, it

2    may be something that someone elects to do.  The fear may be,

3    okay, there's a basis for it.  But that does not create Article

4    III standing, and the Supreme Court held that in the Clapper

5    case.

6                So then let's look at some of the other specific

7    aspects of what we are dealing with.  Time spent addressing a

8    data breach does not confer standing.  Reilly versus Ceridian

9    is a Third Circuit case.  It was decided in 2011 and, thus,

10   before Clapper.

11               I should note I think the page number is incorrect

12   here.  I think it may be page 46 rather than page 49 but -- per

13   the actual cite for the case.

14               But the Third Circuit recognized that in -- that we

15   live in an increasingly digitized world and that in that

16   increasingly digitized world there are certain aspects of life

17   and things that can be upsetting and that can cause you to make

18   decisions like I'm going to spend time and money to monitor

19   this situation but that that does not rise to the level of

20   actual injury for purposes of Article III standing.  It doesn't

21   create a legal injury for which you are entitled to recover.

22               THE COURT:  Why wouldn't it?

23               MR. LOVELAND:  I'm sorry?

24               THE COURT:  Why not?  Why wouldn't it?  Why wouldn't

25   that constitute an actual injury?

1           MR. LOVELAND:  Well, I mean, let's take it just as

2      the Third Circuit said and a number of other courts have said.

3           You know, in the world in which we live in now --

4      let's start with this proposition -- it's a reasonable thing to

5      do to check your credit report from time to time.  It's a very

6      reasonable thing to do to check your credit card statement

7      every month when it comes in to see whether there is or is not

8      a fraudulent statement on it or a fraudulent charge on it.

9      Those are things that all, you know, banks and institutions --

10          THE COURT:  So they are saying you'd do that anyway?

11          MR. LOVELAND:  It's part of the normal course of life

12     in a digital world where we are dealing with this situation

13     where we know that information about us is out there.  It's out

14     in cyberspace.  It's available.  So there are things that you

15     should be doing anyway.

16          And then the question is -- and I will acknowledge,

17     Your Honor, there's not a clear line here.  I can't say this is

18     what you do, this is what you don't do.  What the courts have

19     done looking at this is they have basically said this activity

20     alone doesn't generate standing, that doing these things which

21     are part of life and part of what you should be doing doesn't

22     become a legal cause because there was another activity over

23     here in terms of the data breach.  That's the analysis of the

24     cases.

25          Does the Court have any other questions on that

1   issue?

2          I'm not sure -- I'm happy to discuss it further if

3   you'd like to.

4          THE COURT:  I think you have responded adequately to

5   my question, Mr. Loveland.

6          MR. LOVELAND:  Thank you.

7          The Third Circuit in the Ceridian court, by the way,

8   it's a good case, an interesting case to read --

9          THE COURT:  Is that a data breach case?

10         MR. LOVELAND:  I'm sorry?

11         THE COURT:  Is that a data breach case?

12         MR. LOVELAND:  It is a data breach case, Your Honor.

13  It's a case that dealt with laptops that were actually stolen,

14  and then the question was -- the lawsuits were filed.

15         Now, I will say that there is --

16         THE COURT:  Now, this is a laptop stolen out of a

17  car?

18         MR. LOVELAND:  This is one of the -- there's several

19  cases that deal with laptops; but this is one of the laptop

20  cases, yes, Your Honor.

21         THE COURT:  Okay.

22         MR. LOVELAND:  And it had -- the Ceridian Corp. had a

23  whole lot of information on the various -- on the laptops that

24  were stolen.  There was a question in Ceridian, and I will

25  acknowledge, about whether or not there had been actual use of

1    the information.  So it was a step up the line than where we

2    are today.  But, nonetheless, it's a very distinguishing

3    analysis and a very good distinguishing of two of the cases

4    that the Plaintiffs primarily rely on, the Krottner versus

5    Starbucks and the Pisciotta versus Old National Bancorp cases;

6    and it does a good job of distinguishing those cases from our

7    perspective.

8            So let's continue, Your Honor.

9            Reimbursed fraudulent charges do not confer standing.

10   Now, this is a major issue on the group of 64.  A number of

11   them assert that they had charges but that their charges were

12   fully reimbursed.  And what the cases establish, the Burton

13   versus MAPCO case, a decision from the Northern District of

14   Alabama in 2014, and then Magistrate Judge King's opinion in

15   the Willingham case here in the Northern District of Georgia,

16   both dealt with the issue of claims for reimbursed charges and

17   said that those are not sufficient to establish loss, that the

18   charge was, in fact, reimbursed.

19           The Plaintiffs respond to that and say but if you go

20   to the Eleventh Circuit's case in the AvMed case that, in fact,

21   what the AvMed case they say says is, no, no, there's no

22   distinction between reimbursed and unreimbursed.

23           No, what the AvMed case says is only one thing which

24   is if the Plaintiff alleged a loss and didn't assert whether it

25   was reimbursed or not reimbursed then that was sufficient to

1   state at least for pleading purposes that there was a loss.

2          In this case, the Plaintiffs in the 64, they've

3   affirmatively alleged reimbursed charges.  And, therefore, we

4   suggest that those Plaintiffs all fall within the bucket of

5   these cases that establish that a reimbursed charge does not

6   create an actual injury sufficient to generate loss.

7          Lack of access to funds, it's a temporary thing.  A

8   consumer's temporary lack of access to funds or credit and the

9   embarrassment or annoyance of obtaining a family loan are --

10  this is a decision from Maine District Court -- the ordinary

11  frustrations and inconveniences that everyone confronts in

12  daily life with or without fraud or negligence.  It's another

13  way of looking at the same analysis that we were talking about

14  a moment ago with regard to the monitoring services or the time

15  that you spend checking your credit card statement and other

16  things.  These are just parts of life that you have to deal

17  with, and it doesn't create a compensable loss for purposes of

18  Article III standing.

19         Increased risk of future identity theft does not

20  confer standing.  This is at the hub of the cases, Your Honor,

21  is the question of where -- what happens.  You have someone who

22  says, Look, the data was stolen; I'm concerned; I believe I

23  have an increased risk that I am going to be subjected to

24  identity theft in the future.  And the question is does that

25  confer standing or not.  And I think in the final analysis

1    that's really the central question on standing in many of these

2    cases.

3          This case, District of Columbia in 2014, did an

4    analysis of that.  It took the language, an objectively

5    reasonable likelihood of harm is not enough to create standing

6    even if it is enough to engender some anxiety.  Plaintiffs,

7    thus, do not have standing based upon a risk alone even if

8    their fears are rational.

9          So this case from the district court in D.C., Your

10   Honor, is another very interesting case because what the judge

11   does in that case is an extraordinarily detailed sifting of the

12   claims of various Plaintiffs.  And what the judge's analysis

13   shows is -- and I think it's a very important aspect of this

14   case overall -- is that you've really got to get into the weeds

15   of an individual Plaintiff and figure out whether that

16   individual Plaintiff has enough injury to meet the standing

17   requirement and that it is, in fact, something that requires a

18   detailed and sifting analysis.

19         In this case, the district court actually concluded

20   at the end of the day that two out of a whole boatload of

21   Plaintiffs, that two of them did have standing to assert

22   particular claims that they could tie to the particular

23   information about them that they allege was stolen.  And those

24   two claims, the court said, Okay, I think there where they have

25   said here is particular information about me that was stolen,

1    here is a particular thing that happened to me that ties

2    directly to that information --

3              (A telephone interruption occurred, after which time

4    the proceedings continued as follows.)

5              MR. BARNES:  That came in just right.

6              MR. LOVELAND:  This must be Mr. Barnes' insert, Your

7    Honor.

8              THE COURT:  All right.  Whoever is on the phone

9    that's put their phone on hold or whatever that's causing this

10   intervention needs to stop whatever they are doing.

11             All right.  Go ahead, Mr. Loveland.

12             MR. LOVELAND:  Thank you.

13             As I said, this really rests at the hub of all the

14   cases.  And in the final analysis, Your Honor, this Court has

15   the Resnick case from the Eleventh Circuit, Resnick versus

16   AvMed.  That case basically stands for the proposition that if

17   there is actual identity theft and actual monetary loss

18   attached to the identity theft that creates standing.  That's

19   what the Eleventh Circuit has said.

20             What the Eleventh Circuit has not done is then

21   address this whole range of issues, particularly in a

22   post-Clapper world, which is at what point do these other

23   issues -- at what point do these other issues become sufficient

24   to reach the level of Article III standing as opposed to being

25   in the bucket of things that are part of the inconveniences of

1   life that we deal with.

2           And the cases basically fall into two branches on

3   that.  There are cases that say -- the Seventh Circuit's recent

4   decision in Neiman Marcus being a classic example -- that

5   basically say we think that is sufficient, we think these sorts

6   of things do create standing.  But, interestingly, in the

7   Neiman Marcus case, in doing that the Seventh Circuit said the

8   reason we conclude that is because we believe that there was an

9   objectively reasonable likelihood of harm to these individuals

10  and that was, therefore, sufficient to create standing.

11          But those very words, objectively reasonable

12  likelihood, which the Seventh Circuit used this summer, are the

13  very words the Supreme Court rejected in Clapper.  The Supreme

14  Court took that very test from the Seventh Circuit and said

15  that is not the test, that does not equal certainly impending.

16  The Seventh Circuit somehow -- and I don't understand how --

17  actually quotes Clapper and cites to Clapper when quoting

18  objectively reasonable likelihood as the standard even though

19  that's the precise standard that the Supreme Court rejected and

20  said it is not sufficient.

21          So when you take all of this, Your Honor -- and my

22  time for this section is about up; we briefed it extensively --

23  when you take all of this, Your Honor, we believe that in this

24  case virtually all of the Plaintiffs, I think all, but

25  virtually all of the Plaintiffs under any rational application

1    of the Clapper standard fail to demonstrate actual injury that

2    has already existed or that is certainly impending.  And under

3    that standard, they lack standing.

4              Thank you, Your Honor.

5              THE COURT:  Thank you, Mr. Loveland.

6              Ms. Sumner?

7              MS. SUMNER:  May it please your Court.

8              Your Honor, I would like to address the 12(b)(6)

9    arguments because in addition to the standing argument that

10   Mr. Loveland addressed there are a number of reasons why the

11   Plaintiffs' claims fail under the 12(b)(6) analysis.  And we

12   have extensively briefed their failure to state a claim under

13   the state consumer fraud statutes, their failure to state a

14   claim under the state data breach statutes, their failure to

15   sufficiently allege negligence in contract claims, their

16   failure to sufficiently allege unjust enrichment claims and

17   their failure to allege an ongoing dispute that would support

18   declaratory judgment.

19             I would like to start, Your Honor, with the injury

20   issue.  Mr. Loveland addressed it in detail with respect to

21   these Plaintiffs.  But the point here is that the analysis

22   under 12(b)(6) is stricter.  And, in fact, the Plaintiffs' own

23   cases, Pisciotta and Krottner, both recognize that where

24   Plaintiffs establish Article III standing the injuries were not

25   sufficient under the 12(b)(6) standard and those claims had to

1     be dismissed.

2             So, Your Honor, with respect to the individuals, the

3     64 named Plaintiffs that did not allege monetary harm, they

4     would fail under the 12(b)(6) analysis very quickly.  And even

5     the 13 that allege only mitigation expenses would be the same.

6     That leaves, Your Honor, the eight who allege some monetary

7     damage.  Those are the ones that allege, for example, that they

8     were not reimbursed.  That is really more of a causation

9     analysis which the Court would engage in reviewing under the

10    12(b)(6), and those Plaintiffs would fail under that as well.

11            What I'd like to do is to go through a couple of the

12    claims, Your Honor, and really talk about the layering of the

13    different arguments because this is another in-depth analysis.

14    Although the complaint oftentimes refers to the Plaintiffs as a

15    group, refers to certain state statutes as a group, the

16    analysis must occur with respect to each state statute and what

17    the Plaintiffs must establish with respect to those.

18            If we start with the consumer fraud and unfair and

19    deceptive acts and practices statutes and we build this out, we

20    begin similar to the standing argument; and there are a number

21    of states that are backed out immediately because there are no

22    named Plaintiffs in any of those states.  If you move forward

23    then with what is left, you have a couple of states where those

24    claims come out because they are not alleged with respect to

25    Puerto Rico, Wisconsin and D.C.  So those states are backed out

1    as well for purposes of this analysis.

2           What that leaves, Your Honor, are a number of states

3    where we have to revisit the injury analysis and determine

4    whether or not there's an actual injury.  And, as I stated,

5    that analysis here starts with the buckets of Plaintiffs that

6    Mr. Loveland referenced and are included in the charts the he

7    provided.  And we go through each individually, and you can see

8    that a number of states come out very quickly because there is

9    no monetary harm alleged at all.  Then you have the states that

10   come out as a result of the only allegation relates to

11   mitigation expenses to avoid the potential of issues that could

12   arise in the future.

13          And, Your Honor, there is just a very recent decision

14   that came out of the Northern District of California, the Uber

15   decision that came out earlier this week, that relied on

16   Krottner, one of the cases that the Plaintiffs relied upon, and

17   found that mitigation expenses does not equal injury.

18          So those are backed out as well, and what you have

19   left are the states where you have eight remaining Plaintiffs.

20   And that is the causation analysis which the recent decision of

21   Uber also found that there was no causal connection between the

22   breach and a fraudulent credit card application.  So it is a

23   stricter causation analysis than standing.  So all of those

24   states back out as well.

25          Your Honor, what the map now illustrates is there are

1  additional reasons why certain state claims fail even if you

2  find that there is some injury that is appropriate for purposes

3  of these states' statutes.  And here you can see that there are

4  a number of states that require a specific deceptive act or

5  practice to be alleged.  Those are 30 states that require that,

6  and Plaintiffs have failed to identify any specific deceptive

7  communication or practice by Home Depot.

8          It is not sufficient that they simply cite to a

9  privacy policy that may exist and argue that that could be

10  deceptive.  It's not sufficient that they say that the timing

11  of the notification was deceptive because, Your Honor, in the

12  complaint there was no allegation that any named Plaintiff ever

13  reviewed any privacy policy; and there is no other statement

14  regarding the review or reliance upon any security practices

15  with respect to Home Depot.

16          In addition, there's no allegation that any Plaintiff

17  would have changed their shopping behavior as a result of any

18  representations made by Home Depot.  In fact, the reference in

19  the complaint that supports this according to the Plaintiffs is

20  that Home Depot represented that its goods or services have,

21  quote, sponsorship, approval, characteristics, ingredients,

22  uses, benefits or quantities that they do not have and its

23  goods and services are of a particular standard quality or

24  grade but are of another.

25          That's not the issue here.  You know, here we are

1    talking about security.  We are not talking about the quality

2    of the goods and services that these Plaintiffs purchased from

3    Home Depot.

4            In addition, Your Honor, where there is fraud alleged

5    or where there is the requirement of some deception there is

6    also a heightened pleading standard under Rule 9(b).  And the

7    Plaintiffs have failed to provide the type of specificity

8    required under these different state statutes.

9            The Plaintiffs cite a case -- it is in the Southern

10   District of Florida -- the Guerrero versus Target case where

11   the court did not require that a heightened pleading standard

12   applied to the Florida statute.  As you can see, we are not

13   alleging that with respect to Florida, and that court even

14   recognized that it was outside of the norm in the Eleventh

15   Circuit where specificity is required for fraud-based claims.

16   There are many cases that are included in our brief to support

17   this analysis, Your Honor, and support that all of those states

18   come out.

19           In addition, there is another argument that the

20   Plaintiffs failed to allege a specific duty to disclose the

21   security practices under 18 statutes where a specific duty is

22   required.  So here the allegations fail to allege those

23   specific duties, and one example of that is Arizona.  That

24   state requires that the intent that others rely on a

25   concealment be alleged.  There is no such allegation in the

1  complaint.  So that reflects that the Plaintiffs have not

2  provided sufficient allegations to support that there was a

3  duty and that duty was violated in this instance.

4        Your Honor, there's another argument relating to the

5  fact that there's no present case or controversy that would

6  support injunctive relief where there are five states where

7  only injunctive relief is allowed.  I am not going to spend

8  time on that argument as it is briefed, but I did want to

9  mention that in five states that's the only thing that is

10  allowed.

11        And here we are not talking about ongoing issues.  In

12  fact, no Plaintiff has alleged that they have shopped at Home

13  Depot since this issue arose.  This is all related to past

14  conduct.

15        The two cases cited by Plaintiff, the Sony II case

16  and the Adobe case, really reflect specific writings that were

17  in place first where Plaintiffs actually agreed to certain

18  terms of use, agreed to privacy policies relating to

19  interaction concerning licensing agreements and concerning use

20  of online services.  Those do not apply to this situation.

21  There is no writing in place that would support an ongoing case

22  or controversy in the conduct at issue here.  It is all

23  historical.

24        I'd like to move for a minute to the state data

25  breach statutes because the Plaintiffs allege a violation of a

1    number of states where those statutes exist.  Again, there are

2    no named Plaintiffs in a number of states; so those statutes

3    come out.

4            There are 20 additional states where they haven't

5    made a claim, so this boils down to the states reflected on the

6    map.  And what we look at with respect to these particular

7    states is whether or not there is a private right of action

8    with respect to those particular statutes.  And here, Your

9    Honor, eight statutes do not provide a private right of action.

10   These are statutes where the legislature has indicated that the

11   law enforcement or the state AG's office has the right of

12   enforcement, and the Plaintiffs ask Your Honor to recognize a

13   private right of action in those states where none currently

14   exist.

15           So, for example, in Colorado the statute provides the

16   Attorney General authority to bring an action, law or equity to

17   address violations of the data breach statute.  It does not

18   allow for a private right of action in this context for

19   consumers to try to enforce that statute.  As a result, Your

20   Honor, those statutes should come out.

21           When a statute is silent on the enforcement like, for

22   example, the Georgia statute is silent, then, Your Honor, the

23   Georgia courts have found that it is well settled that

24   violating statutes and regulations that do not automatically

25   give rise to a civil cause of action by an individual claiming

1   to have been injured should not be recognized.  We have

2   provided several cases, and Georgia cases in particular, that

3   support that the absence of language creating a private right

4   of action strongly indicates the legislature's intent not to

5   create that private right of action.  And we submit, Your

6   Honor, that it would be inappropriate for the Court to create a

7   private right of action in that context.

8              In addition, there are a number of statutes where the

9   enforcement relies on the consumer protection laws.  So you

10  have to go from the data breach law, then you go to the

11  consumer protection law to determine whether or not enforcement

12  is appropriate; and you have to look at whether or not the

13  injury was sufficient in that context because under the

14  consumer protection laws injury is required.

15             And, in this case, we are talking about whether the

16  Plaintiffs were injured as a result of either not receiving

17  notice or receiving untimely notice.  There's no allegation of

18  injury that the Plaintiffs' behavior changed at all as a result

19  of the timing of the notification that came out.  There's no

20  allegation that they went out and purchased at Home Depot and

21  was injured as a result of the fact of the timing of that

22  notification.  So here the fact that damages are required

23  either because enforcement is through consumer protection laws

24  that require damages or the statute itself requires Plaintiffs

25  to allege damages as a result of the untimely notice, all of

1    the remaining states fall out because they do not sufficiently

2    allege those injuries.

3          Again, the injuries tie to the data breach

4    notification.  That is the issue with respect to the data

5    breach statute.  So that leaves us with no claims that survive

6    under those state statutes.

7          The Plaintiffs also argue that the negligence claim

8    should survive.  Here we go back to our injury arguments after

9    we take out the fact that there are states where there are no

10   named Plaintiffs.  We focus on whether or not these injuries

11   are compensable.

12         I'm not going to go back through the argument

13   relating to the types of injuries because Your Honor is well

14   aware of what's included in these buckets.  I just want to

15   reiterate that here the standard is different than in Article

16   III standing, and we have to go through a separate analysis to

17   determine whether or not these Plaintiffs have cognizable

18   damages.  And we submit to you that they do not.

19         That again leaves the bucket of Plaintiffs that claim

20   some unreimbursed expenses as a result of the data breach, and

21   we have to go back to the causation analysis which is also a

22   stricter analysis in the 12(b)(6) context.  And I would refer

23   Your Honor again to the cases cited by Plaintiffs to support

24   that, the Krottner case and the Pisciotta case; and even AvMed

25   supports this analysis.

1    All of the claims come out after you do the injury

2    analysis under the negligence requirements, but then there's

3    another layer that the Court should consider which is the

4    economic loss rule that overlays the prior arguments.  So the

5    injury argument is enough to knock out the entire negligence

6    claims, but there is the additional issue that the economic

7    loss rule applies in this context.

8         The Plaintiffs argue several exceptions to that.

9    They argue, one, that it only applies where there is some

10   contractual privity.  And we have provided Your Honor with

11   cases that reflect that there is no express contract required

12   for the economic loss rule to apply.  And, in fact, the Global

13   Payments case is a good example of where the Court dismissed

14   negligent claims in a similar data breach case and did not

15   recognize that the contractual privity exception applied.

16        The Plaintiffs also argue an independent duty

17   exception.  The difficulty here, Your Honor, is that the

18   Plaintiffs attempt to use the statutes that I already discussed

19   with you to argue that a duty exists.  So they are essentially

20   circumventing the other requirements under the data breach

21   statutes as well as under the consumer fraud statutes by saying

22   if you've got a duty there that's all that matters and that

23   takes you out of the economic loss rule.  And, Your Honor, we

24   would submit that that does away with the economic loss rule in

25   that context, that what they have to demonstrate is an

 1    independent common law duty in order to be able to prove that

 2    this independent duty exception applies.

 3         They also argue that the misrepresentation exception

 4    applies to take us out of the economic loss rule, but they have

 5    provided no specific misrepresentation or deceptive conduct by

 6    Home Depot.  It goes back to the early analysis that we discuss

 7    under certain state statutes that require a deceptive act, and

 8    they have not raised any claims for negligent misrepresentation

 9    in the context of their complaint.  So it would -- that

10    exception would not apply.

11         The final exception that they argue is the accident

12    exception.  I think they point to one of Your Honor's cases,

13    the Argonaut case, to argue that this was a sudden and

14    calamitous event that posed an unreasonable risk of injury to

15    another person or property.  As I'm sure you will recall, that

16    case involved, I think, the destruction of a truck in a fire.

17    It does not apply to the facts of this case.  Here there is no

18    unreasonable risk of injury to a person or their property as a

19    result of what occurred here.  So, Your Honor, that exception

20    to the economic loss rule would not apply; and no negligence

21    claims remain.

22         There are several other claims, Your Honor, that I

23    want to just briefly touch on; and I'm happy to answer

24    questions.  They argue breach of an implied contract.  And our

25    position here is that there's no contract between Home Depot

1    and the Plaintiffs here -- no express, no implied.  And during

2    the afternoon session, I think Ms. Dawson will provide an

3    outline of where the contractual relationships do exist between

4    the parties which would be between the financial institutions

5    and the consumers but not between Home Depot and the consumers.

6    And unilateral statements by Home Depot about their privacy

7    policy or their security, that does not manifest an intention

8    to enter into an implied contract with the Plaintiffs about the

9    security.

10          The only contract here was when the Plaintiffs came

11   in and purchased a good at Home Depot, whether it was a hammer

12   or saw or some other good from Home Depot.  And there's no

13   allegation that they didn't receive those goods or that Home

14   Depot breached any implied contract with respect to the goods

15   that they purchased.

16          And, in addition, the injury argument applies here

17   too.  In each of these analyses, Your Honor, there is a

18   separate injury analysis that must occur.  So here their

19   implied contract claim failed because they have not alleged a

20   cognizable injury resulting from that breach.

21          I think I have a few more minutes, Your Honor, where

22   I will touch on a couple of other claims briefly.  One is their

23   claim with respect to unjust enrichment.  Here again, there is

24   no credible claim that the Plaintiffs somehow in purchasing a

25   hammer also paid for security.  That is essentially what they

1    are arguing.

2            They argue the AvMed case here that presents an

3    entirely different situation.  The AvMed Plaintiffs claim that

4    the monthly insurance premiums that AvMed received were in part

5    intended to cover administrative costs of data security.

6    There's nothing like that in this case.

7            Again, it goes back to what occurred between the

8    Plaintiffs and Home Depot, and that was the purchase of a good.

9    There's no credible claim that the cost of that hammer also

10   included the cost apportioned to security.  So there was no

11   unjust enrichment provided to Home Depot as a result of these

12   events.

13           Finally, Your Honor, they argue for declaratory

14   judgment.  And here they have not identified any ongoing

15   dispute or threat of future injury sufficient to warrant a

16   declaratory judgment.  The threat has to be real and immediate.

17   The remote possibility that there is some future injury is not

18   sufficient.

19           And here Plaintiffs have not plausibly alleged that

20   their information continues to be at risk given, one, that

21   their payment cards have been cancelled.  Other information

22   like their Social Security numbers they did not allege that

23   that was stolen in this context.  No named Plaintiff claims to

24   have shopped at Home Depot after September 2014.  And any

25   future injury at this point which would not be traceable back

1  to Home Depot, but to the extent any occurs, that would be at

2  the hands of criminal third parties, not at the hands of Home

3  Depot.

4        There's no adverse legal interest here because

5  there's no ongoing relationship that the Plaintiffs have

6  claimed, so this is not appropriate for a declaratory judgment.

7        So, Your Honor, I will pause to see if you have any

8  questions for me at this point.

9        THE COURT:  I don't think so, Ms. Sumner.

10        MS. SUMNER:  Thank you, Your Honor.

11        THE COURT:  Thank you.

12        Governor Barnes?

13        MR. BARNES:  Good morning, Your Honor.

14        This morning the division of arguments that we will

15  take up is I'm going to address standing.  I don't speak quite

16  as quickly as Mr. Loveland, so I will probably take a little

17  longer.  And then Mr. Barrett Vahle will discuss the 12(b)(6)

18  and other matters.

19        I have noticed that there has been an increase in

20  pulp prices since this case started, so I think that we have

21  given you enough paper that I will not reiterate all of the

22  points that we contained in the pleadings that were done.  But

23  I do want to kind of correct some of the facts of my

24  distinguished brother, Mr. Loveland, about what happened here.

25        If you were sitting in the audience, you'd probably

1    say, why, Home Depot had no notice here that they had any kind

2    of problem and this just happened.  A bunch of thieves with not

3    a gun but a hack -- whatever you hack an internet access came

4    in and surprised them.  And the facts that are alleged and the

5    facts that we would prove would be quite different.

6             And in this case -- and I'm going to discuss that in

7    just a moment -- at the time this data breach occurred between

8    April and September of 2014 there are approximately 56 million

9    credit card numbers, plus or minus a couple of million,

10   somewhere out in cyberspace that we know have already been

11   offered -- and this is alleged in the complaint -- have been

12   offered on the black side of the internet for sale.  In fact,

13   that's the way this was all discovered.  And we know that

14   because we have folks that already have suffered injury that it

15   is just a matter of time until your credit card will be used in

16   some kind of fraud.

17            Now, this is not a question of speculativeness or

18   fairly traceable on whether the cards are going to be used.

19   They have been used, and they will continue to be used.

20            Now, we have a different interpretation of whether --

21   as I said, whether Home Depot is the innocent party here.

22   Well, let me just give you some of the facts.  Home Depot's

23   failures we know were years in the making dating back more than

24   a decade.  It made record investments in technology to improve

25   the sale of goods; but over the objection of their own people,

1   their own internal IT people, they refused to spend any money

2   on improving the security of their customers.

3           In 2008 Home Depot identified a data security breach

4   as a risk factor but undertook no efforts to correct it.  The

5   FBI we know that in -- the FBI sent a memo out as discussed in

6   our complaint that says if you have this system which is the

7   one that was breached, if you have this system you are at high

8   risk of a data breach.  And the reason -- and, in fact, they

9   were using software that there was not even -- that was -- and

10  it brought to their attention that was not even being

11  maintained currently by the manufacturer.

12          We know this, that in -- that Frank Blake who is now

13  retired, Home Depot's CEO, we don't have to worry about whether

14  they had notice because this is what he said:  If we rewind the

15  tape, our security systems could have been better.  Data

16  security just wasn't high enough in our mission statement.

17          Amen.  That's what we have alleged in the complaint,

18  and they have admitted it.

19          Now, in fact, when The Home Depot management and

20  their CIO said you've got to do something here -- this is all

21  before the breach -- you've got to do something here or you're

22  going to put millions of folks at risk, you know what the reply

23  was from the folks -- we have the memo, the e-mail -- you know

24  what the reply was from up the chain?

25          We sell hammers.  In other words, we sell hammers.

1    We don't protect our customers' information that is entrusted
2    to them so that they can make a profit.  I'm all for a profit,
3    but I'm also for taking care of my customers.
4            They should have remembered the admonition my daddy
5    used to tell me in the store when he used to say we trade with
6    folks for a lifetime, just not today.  And if you trade with
7    them for a lifetime, you protect their information.
8            It gets worse, Your Honor.  Home Depot continually
9    refused to update their security software to detect and
10   eliminate the malware.  Not only those, when they had folks
11   that spoke up within the IT department, they were either fired
12   or they quit in protest.  Half of the IT department of Home
13   Depot quit because they would not correct what was necessary to
14   keep the information -- keep the information confidential.
15           This data breach was not just foreseeable or fairly
16   traceable.  It was predicted by their own people, and they knew
17   that it was out there as a highest risk.  And Frank Blake said,
18   Listen, we were just more worried about making money for the
19   quarter -- that's what he said in so many words -- than we were
20   about the long term.
21           Now, I want to talk about a little bit on the
22   standing issue about damages and what we -- and here's the
23   summary of it, not that -- this is not all the folks that's
24   going to be harmed here.  This is -- these are the folks that
25   have been harmed so far.  We know that the information was sold

1   on the black market for fifty to a hundred dollars.   That was

2   what was being asked per name, per credit card.

3            And people, even criminals, don't invest money

4   without a hope of return.   It's common sense.   The question is

5   not -- the question is only when that information will be

6   taken.   Let me -- and we can draw a fair inference from what is

7   going to happen by the ones that have already showed up.

8            Now, let me give you a few examples of that.

9            Is Paige here?

10           This is Paige Brantley, Your Honor.   She is from

11   Dallas, Georgia.   She is here in the courtroom.   Her household

12   debit card was exposed, subsequently duplicated and then used

13   to withdraw more than $500 from her checking -- family's

14   checking account at a bank 75 miles away from her home that

15   caused her to have a negative balance and caused her to have

16   bounced checks.

17           Other examples:   Bruce Holdridge in Cave Creek,

18   Arizona, had fraudulent charges of $8,500 and multiple attempts

19   at identity theft.

20           Nathaniel Newton in Indio, California, had fraudulent

21   credit lines opened using the credit card.

22           Ronald Castleberry from Tallahassee had fraudulent

23   internet charges of $1,800.

24           This is the one that my distinguished brother says,

25   well, time, just time, you know, is not compensable.   I'm glad

1    I have got that admission from King & Spalding.  It's not worth

2    anything.  Time is -- I'm glad I have got that admission that

3    time, human time, is not worth anything on the record from a

4    representative of King & Spalding.

5            But, anyway, Catherine Adams from Charlotte, North

6    Carolina, a widow and Army veteran, was stranded on the highway

7    at a gas station because her bank froze her accounts because of

8    the fraudulent charges at a grocery store in Orlando, Florida.

9    So, you know, Ms. Adams, we appreciate what you did for your

10   country and we know that they stole your identity because we

11   didn't listen to our own folks; but you can't recover for your

12   time and energy and your hurt and getting home after you got

13   stranded on the road.

14           We know this, that Home Depot would have you to

15   believe that these and everyone else who shopped at the Home

16   Depot has no injury and, therefore, no standing.  And that is

17   simply not true under both Eleventh Circuit case law and

18   particularly this case of Neiman Marcus.  I call Neiman Marcus

19   Needless Markup.  But the case is very well reasoned, and it

20   sets forth really a destruction of the entire case.

21           Not that district court opinions are immaterial, they

22   are very important and they are the folks that's there seeing

23   the people, but they have cited mostly district court opinions

24   in light of the circuit court opinions like AvMed and like

25   Neiman Marcus -- I almost said Needless Markup -- Neiman Marcus

1      that have articulated and decided all these issues.

2              We know that something -- I want to start at the

3      basic standard.  Your reputation and name is a property right

4      that you have.  You know, there's a -- and it's been recognized

5      at least 5,000 years in Proverbs.  It says a good name is to be

6      treasured more -- it is to be esteemed more than silver or

7      gold.

8              THE COURT:  Great riches I think it says, Governor.

9              MR. BARNES:  Very good.  I think it says a good name

10     is more desirable than riches.  That's right --

11             THE COURT:  Great riches I think it says.

12             MR. BARNES:  Great riches is to be esteemed more than

13     -- I'm glad we are reading out of the same Bible, Your Honor.

14             So they say -- their basic argument is, Well, now,

15     wait just a minute.  We can steal your name.  We can steal your

16     -- or allow to be stole your name or your reputation, and it's

17     just not compensable.  It is just not compensable.

18             We added up all of the time alleged in the complaint

19     that people, the individuals -- of course, this is a putative

20     class.  And, by the way, we think most of the arguments they

21     make are more appropriate not at a motion to dismiss but at a

22     class certification hearing.  We added up all the time of the

23     named Plaintiffs after we interviewed them, and they spent more

24     than 2,000 hours in mitigation or trying to straighten out a

25     mess that they didn't cause.

1          Now, 2,000 hours is a pretty good billable year for

2     an associate in a law firm and it's -- in the first place, it

3     shows that -- it shows me a single person who would willingly

4     swipe their credit card at a terminal.  I want them to show me,

5     show me one person that if they had fairly disclosed to the

6     customer, Listen, we're not keeping your information very good,

7     we've been told by the FBI that they used this system, we

8     ignored that, we have been told by our own folks, do you think

9     anybody would have used that card?

10         Do you think they would have gone to Home Depot,

11    swiped it knowing that really in this case as the proof has

12    shown the hack was so severe and so long because of the faulty

13    maintenance of the system crooks were getting it before they

14    were?

15         Do you think they would have done that?

16         No, they would not.

17         So we suggest to you that there are many more that

18    are at substantial risk, and we already know from the ones that

19    have had the loss that there are others coming.

20         Now, I want to talk just a moment about Clapper.

21    Clapper is this Supreme Court case.  Clapper says that -- what

22    it was, it was not a data breach case.  The ACLU went in.  It

23    was a FISA case.  And they said, Listen, they are about to

24    start spying on us.  This was back in the hysteria of the

25    September 11th.  They are about to start spying and we want you

1    to stop it because -- Judge, because we know that there's going
2    to be some information got that shouldn't have.
3           It was in that context that Clapper was decided --
4    and correctly decided.  It was not on the issue of objective
5    belief.  It said that if -- objective standard.  It was on the
6    issue of where, listen, you got to prove that it was fairly
7    traceable which the court had interpreted to be less than
8    proximate cause.
9           And we say that Clapper is not controlling in the
10   case, and the law has developed much more.  In other words --
11   by that time.  What was sought in Clapper was to stop
12   information from being -- stop a procedure that allowed the
13   gathering of information, not after it was breached, here we
14   say in violation of contract or in negligence.
15          Now, the general principles established in standing,
16   Article III standing is you have to have an injury that is
17   concrete, particularized, actual or imminent.  You have to have
18   -- it has to be fairly traceable to the challenge to action.  I
19   agree this is the law.  And it can be redressed by a favorable
20   ruling.  And we suggest to you that we conform to all of these
21   requirements.
22          Clapper is not the last word even by the Supreme
23   Court.  It has since identified and held that harm having been
24   occurred that as it has here -- harm, we know harm has occurred
25   -- is good evidence of future harm.  That is, if you have --

1    the Supreme Court -- and the name of that case is B. Anthony

2    List against Driehaus -- if you got a group of people and some

3    of them have already suffered the harm that that's a reasonable

4    inference, good evidence that others are going to suffer it

5    also.

6             Now, the case I draw your attention to -- and it's

7    the one that we heavily rely upon, it and the Eleventh Circuit

8    case -- is Neiman Marcus.  And Neiman Marcus takes up all of

9    these issues, and it was written by Chief Judge Wood.  And this

10   is basically what happened in Needless -- I mean, in Neiman

11   Marcus.  The customer sustained the cost to aggravate -- where

12   it says allegation by customers and they had a data breach, and

13   then the court goes on and says:  The customer sustained the

14   cost, aggravation and loss of value of their time needed to

15   reset payment associations after their card numbers were

16   changed and to monitor their accounts -- I'm going to get to

17   that monitoring, come back to that in a minute -- and that

18   there was a reasonable likelihood that customers would be

19   subjected to future fraudulent charges and other injuries as a

20   result of the data breach plausibly alleged the customers -- by

21   the customers gave standing to the putative class action

22   Plaintiffs.

23            Now, what they -- the part I want to bring your

24   attention to is -- and what she said about Clapper, she said:

25   Clapper does not, as the district court thought, foreclose any

1    use whatsoever of future injuries to support Article III

2    standing.   In Clapper the Supreme Court decided that human

3    rights organizations did not have standing to challenge the

4    FISA, Foreign Intelligence Surveillance Act, because they could

5    not show that their communications with suspected terrorists

6    were intercepted by the government.   The Plaintiffs only

7    suspected that such interceptions might have occurred or would

8    occur.   This, the court held, was too speculative to support

9    standing.

10          In so ruling, however, it did not jettison the

11   substantial risk standard.   To the contrary, it stated that our

12   cases do not uniformly require Plaintiffs to demonstrate that

13   it is literally certain that the harm they identify will come

14   about.   In some instances, we have found standing based on a

15   substantial risk that the harm will occur which may prompt

16   Plaintiffs to reasonably incur costs to mitigate or to avoid

17   them.

18          And then she went ahead to say:   At this stage of the

19   litigation, it is plausible to infer that the Plaintiffs have

20   shown a substantial risk of harm from the Neiman Marcus data

21   breach.   Why else would hackers break into a store's database

22   and steal consumers' private information?   Presumably, the

23   purpose of the hack is sooner or later to make fraudulent

24   charges or assume those customers -- consumers' identity.

25          It says:   We recognize the Plaintiffs may eventually

 1    have to show such, but it is sufficient as a motion to dismiss.

 2              And then the court went ahead and said this, and it

 3    came back to Clapper.  They said:  It is telling in this

 4    connection that Neiman Marcus offered one year of credit

 5    monitoring and identity theft protection to all customers for

 6    whom it had contact information who shopped during the period.

 7    It is unlikely that it did so because the risk is so ephemeral

 8    that it safely could be disregarded.

 9              Home Depot did the same thing.  What she's saying is

10    you say that there's no risk, you say there's not going to be

11    any injury, but you sent out this information we are going to

12    give you a year of credit monitoring.  Of course, consumers

13    that had their credit cards stolen could reasonably say I don't

14    believe I trust Home Depot to do my credit monitoring.  And we

15    suggest to you that that alone, the credit monitoring that

16    would reasonably be incurred by a consumer since we already

17    know there are damages that have been suffered, is a sufficient

18    injury and cost to recover in addition to the time.

19              And, in fact, she says so.  She said -- Judge Wood

20    says:  These credit monitoring services come at a price that is

21    more than de minimis.  For instance, Experian offers credit

22    monitoring for 4.95 a month for the first month and then 19.95

23    a month thereafter.  This easily qualifies as a concrete entry

24    -- concrete injury.

25              Then she goes ahead to say -- and she goes ahead to

1    say that the cost that you expend in straightening out all this

2    mess with aggravation and with trying to do something after

3    it's been sold is also a concrete injury.

4            The other case -- and I won't read from it like I did

5    Neiman Marcus -- but it's Target, Judge Magnuson.  Target on a

6    motion to dismiss he says, Listen, there's a cause of action

7    here, there's standing here.  We can go forth on this case

8    because we know and we see that there's already been injury and

9    there's reasonably likely it's going to be in the future.  The

10   cost of straightening it out is compensable.  And so we want to

11   make sure that you are aware of that case which I know you are

12   also.

13           Now, let me talk as I'm running out of time and I

14   don't want to take all of Barrett's time.  Neiman Marcus, one

15   of the quotes I'm going to bring to you, the Plaintiffs concede

16   -- this is another quote -- that they were later reimbursed --

17   this goes back to this where you hadn't suffered a loss.  The

18   Plaintiffs concede they were later reimbursed, and the evidence

19   does not yet indicate that their identities as opposed to the

20   data have been stolen.  But as we already noted, there are

21   identifiable costs associated with the process of sorting out.

22           So what are those costs?

23           Cost of time -- you may have some late charges and

24   other things like that -- and the cost of monitoring.  I won't

25   go further from that right today.  I think there's some other

1    costs too.  But clearly those costs of, Listen, you stole --

2    you had all this information stolen.  We know it was stolen on

3    the black market.  It's reasonable that somebody should be

4    reimbursed or paid or awarded an amount to allow them to do

5    credit monitoring, not for one year but from whatever the

6    evidence shows is reasonable at the time of trial.

7             Now, let me cover just a couple of other things.

8    Then I am going to -- there is one quote from Target I'd like

9    to bring your attention to.  This is what the court says.  It

10   says:  Target ignores much of what is pled -- and I hate to say

11   this, but my distinguished brothers here and sisters do the

12   same thing -- Target ignores much of what is pled, instead

13   contending that because some Plaintiffs do not allege their

14   expenses were reimbursed or say whether they or their bank

15   closed their accounts Plaintiffs have insufficiently alleged

16   injury.  These arguments gloss over the actual allegations made

17   and set too high a standard for Plaintiffs to meet at the

18   motion to dismiss status time.

19            So what we suggest to you is here at the bottom line

20   of concreteness is what else -- as Judge Wood said, what else

21   would hackers do with the information if they were not going to

22   use it.  And that -- you know, a lot of this is just common

23   sense.  When you have hackers that go to this extent, then it's

24   a jury question of whether it's going to be used.  And on a

25   motion to dismiss, we have alleged sufficient injuries as the

1    Supreme Court said to show there will be future injuries and

2    future use of it.  And so the cost of straightening out, the

3    cost of monitoring, the aggravation or maybe even nominal

4    damages to not do it again would be sufficient.

5            Now, I want to -- the other thing I want to talk

6    about just a moment is this AvMed case of the Eleventh Circuit.

7    Now, it was a laptop steal case on the use.  But there had been

8    fraud involved in it.  We knew it had been used, and that's

9    what distinguishes a lot of these cases.

10           When you have a laptop, the case they cited, the -- I

11   can't ever pronounce it -- Sedansy [phonetic] or whatever it

12   is, that was a laptop case where there was no allegation of

13   proof alleged in the complaint that it had ever been used.  I

14   believe it was a fellow that left it in the back seat of the

15   cab.  But the information never had been used or it wasn't

16   proved, not like here where it's been sold on the black market

17   and where we know it has been used.

18           And so we think those cases are absolutely different.

19   In AvMed it says -- the Eleventh Circuit says there's a

20   plausible inference that may arise that a Defendant's failure

21   in securing Plaintiffs' data will result or has resulted in

22   their identities being stolen.  Here that's really not argued.

23           All right.  I'm going to -- Your Honor, and the

24   bottom line of it is this.  Common sense teaches you that if

25   you have your identity stolen in a concerted action it's going

1    to be used.  And we know that it has been used, and we know

2    that there is caused aggravation and damages that result from

3    that.  I'm going to allow Mr. Vahle to talk about it; but I

4    find it a little amusing that my distinguished colleague says,

5    Well, there's no contract, there's no implied contract.  In

6    other words, you can go and give your information, your more

7    sensitive information, to help a merchant and there's no duty

8    to safeguard that information.

9         We think that's not right.  We don't believe it's the

10   law, and I will allow my brother to argue that.

11        Thank you, Your Honor.

12        THE COURT:  Thank you, Governor Barnes.

13        I think what I will do is go ahead and take a

14   15-minute break before we start another section of the

15   argument.  So the consumer Plaintiffs have 21 more minutes of

16   your time, and we will -- I will hear the rest of your argument

17   after the break.

18        Court's in recess for 15 minutes.

19        (A short recess was taken.)

20        THE COURT:  Governor Barnes, I checked and I think I

21   got it pretty close to being right.  It's Proverbs 22, Chapter

22   22, Verse 1, "A good name is rather to be chosen than great

23   riches."

24        MR. BARNES:  You are correct, as you are always, Your

25   Honor.

```
1              THE COURT:  Well, thank you.

2              If you give this argument again, you might want to

3    consider Othello, Act 3, Scene 3:  "Good name in man and woman,

4    dear my Lord, is the immediate jewel of their souls.  Who

5    steals my purse steals trash; 'tis something, nothing; 'twas

6    mine, 'tis his, and has been slave to thousands.  But he that

7    filches from me my good name robs me of that which not enriches

8    him and makes me poor indeed."

9              MR. BARNES:  I will use that, Your Honor, at the

10   Eleventh Circuit in affirming your denial of the motion to

11   dismiss.

12             THE COURT:  Touché.

13             All right.  Mr. Vahle?

14             MR. VAHLE:  Thank you, Your Honor.  Barrett Vahle on

15   behalf of the consumer Plaintiffs.

16             I'd like to primarily address the 12(b)(6)

17   claim-related issues that Ms. Sumner argued this morning.  I

18   want to talk about a couple sort of overriding issues first.

19   Number one is the Target opinion.  It's in the record obviously

20   in the briefing.  Fortunately, we have a roadmap to the claims

21   in this case.  Of course, Your Honor is going to make your own

22   decision about the scope of the case, the claims, any other

23   decisions about the pleading; but the pleading here is based

24   largely on the Target pleading.  We have more facts because

25   frankly we think the facts inside Home Depot were more
```

1    egregious than in that case, but the claims here track the

2    claims in Target.  We did not plead the claims that were

3    dismissed in Target.  And we think that it's, as I say, a good

4    roadmap for the Court to consider.

5         A couple issues that relate to standing but also

6    relate to the arguments raised throughout the 12(b)(6) section.

7    This morning counsel talked about that Plaintiffs did not have

8    standing to bring claims in states where no named Plaintiff

9    resides.  And, respectfully, we just disagree with that.  There

10   is ample case law out there -- some of it is in our brief --

11   that stands for the proposition that that issue is best kept

12   for the class certification stage.  And in similar

13   circumstances, Judge Magnuson in Target answered it that way.

14   He said it's best kept -- the Article III standing analysis

15   state by state is best kept for the class certification stage.

16   It's sufficient at the pleading stage to allege that Home

17   Depot, there Target, operates in all 50 states and that

18   individuals nationwide suffered injury which we did.

19        Everyone here has standing -- and, again, this

20   relates to the injunctive elements in the declaratory judgment

21   act claim -- to seek injunctive relief under many of these

22   claims.  And Home Depot has largely ignored that where they

23   said that we have not alleged any continuing relationship or

24   any possibility of future harm, and that's frankly just

25   ignoring the pleadings.

1          So you need concreteness, so if there's a dispute

2     about the parties' legal relations, including Home Depot's duty

3     to protect the Plaintiffs' personal information.  You need

4     adversity.  So we say, Plaintiffs say, Home Depot's security

5     measures are insufficient.  They say, of course, they are

6     sufficient.  And you need a real dispute.

7          Well, we allege that Home Depot has the class

8     members' data right now.  We allege that they are not

9     protecting it adequately.  We allege that because of the breach

10    and the high profile of it they may be particularly susceptible

11    to additional attacks because of their history of ignoring

12    cyber security threats.  So I think it should be fairly clear

13    from our pleading, Your Honor, that we have both standing and

14    entitlement under the statutes to seek injunctive relief.

15         I think it's easiest to start with negligence because

16    the elements there touch on a lot of the consumer fraud

17    statutes as well.  Home Depot says none of the Plaintiffs have

18    an existing compensable injury and consequent damages, so they

19    are saying no one was injured.  I think Governor Barnes did an

20    excellent job of explaining to the Court what the actual

21    injuries are.

22         The cases that Ms. Sumner relied on, Pisciotta,

23    Krottner, and we have talked a couple times this morning about

24    these stolen laptop cases, the distinguishing factor -- and it

25    is important -- in those cases is that they are based on the

1    exposure of information, mere exposure.  And no one knows where
2    the data is.  The laptop is in a car, or a system is hacked but
3    it does not appear in the black market.
4            Here we have a very different situation.  We have a
5    breach that started in April of 2014, went through September.
6    As soon as the batches of card numbers hit the market, there
7    were massive fraudulent charges tied directly to this data that
8    came from Home Depot.  So I think those cases are really
9    inapposite to this issue and not very persuasive on the issue
10   of damages for negligence.
11           In the briefing, Home Depot went to great lengths to
12   say they have no duty of any kind to their customers.  They
13   backed off a little bit on that this morning.  But I want to
14   make clear it's in the record that we certainly think that
15   there is a tort duty and various duties arising under statute
16   to the consumers in this situation.
17           So when you look at Georgia law generally, the legal
18   duty may arise from general duty one owes to all the world not
19   to subject them to an unreasonable risk of harm.  So if conduct
20   is foreseeable and unreasonable, there is a general duty in
21   tort.  And that's exactly what we allege in paragraph 306.
22           So we specifically allege that Home Depot must
23   exercise reasonable care in attaining -- retaining, securing,
24   safeguarding and deleting and protecting customers' information
25   and to implement processes to quickly detect a data breach,

1   timely act on warnings which they received, did not act,

2   including promptly notifying Plaintiffs of the breach.  They

3   did not promptly notify, among other things.

4          The case law is pretty clear on this point.  Even

5   cases that in these state cases the Defendants tend to rely on

6   are Sony II.  In Sony the Judge wrote:  The existence of a

7   legal duty to safeguard a consumer's confidential information

8   entrusted with a commercial entity is well supported by both

9   common sense and the applicable state law.

10          In Zappos the duty to protect Plaintiffs' private

11   data from electronic theft with sufficient electronic

12   safeguards is clear.  And we have cited various other cases in

13   the briefing.

14          The one point I would really like to emphasize that

15   relates both to negligence, to the economic loss rule and it

16   relates to all of the consumer statutes is the Wyndham case.

17   So in the Wyndham case, the district court opinion is in our

18   briefing and it's affirmed by the Third Circuit in the Wyndham

19   opinion.  They held that under Section 5 of the FTC act a

20   company like Home Depot has a duty to enact and follow

21   reasonable data security measures to prevent data breaches

22   under Section 5 of the FTC act.

23          Just a couple cases.  And I think Ms. Sumner

24   mentioned Reimbursement Technologies.  Their rebuttal to this

25   concept of a common law duty was look at Willingham, look at

1    Worix, look at Reimbursement Technologies, these cases.  In

2    each one of those cases, there was not a direct relationship

3    between the Plaintiff and the Defendant.  So it was a

4    third-party processor.  It was something like that.  It wasn't

5    our client walking into Home Depot entrusting them with the

6    information on your card to further Home Depot's business and

7    do a transaction.

8         So the economic loss rule, we should talk about it.

9    I know Your Honor is quite familiar with it, and you have a few

10   decisions under it.  We are looking at Georgia law here.

11   That's what was briefed.  We think Georgia law applies.

12        Generally, a contracting party who suffers purely

13   economic losses must seek a remedy in contract and not a tort.

14   The purpose of the rule is to distinguish between those

15   actions, cognizable and tort, and those that may be read only

16   in a contract.  The rationale underlying the rule is not

17   applicable where the parties have not expressly allocated risk

18   through contract.

19        And, of course, Home Depot says the commercial

20   transaction is a contract.  Fair enough.  But I would certainly

21   argue that the rationale underlying the rule does not apply

22   here.  We are not talking -- we are not coming in here and

23   saying, Your Honor, there's a problem with my hammer, they

24   negligently sold me this hammer.  That's not the issue.  It's

25   an issue that's unrelated to the product at issue.

 1            But I think the most important point to make is the
 2   special -- not special relationship -- the independent duty
 3   exception.  It applies when we have an appendix on other state
 4   law but certainly in Georgia which you can apply across the
 5   board that the independent duty exception is pretty clear.  If
 6   statutory or common law duty exists, absent an underlying
 7   contract, the exception is that, period.  And that's the
 8   Hanover case from Judge Evans.  And we cited the Liberty Mutual
 9   versus Cagle's case that you wrote, Your Honor.  And that's
10   where there's an insurance contract, but there is also in that
11   particular context an independent duty to act reasonably in
12   good faith in carrying out the insurance relationship.
13            So from that case, however, where an independent duty
14   exists under the law, the economic loss rule does not bar a
15   tort claim because the claim is based on a recognized
16   independent duty of care and, thus, does not fall within the
17   scope of the rule.  Here it's discussed Liberty Mutual owed
18   Cagle's an independent duty separate from the contract; thus,
19   there's no bar to recovery in tort.
20            So on paragraph 312 of the complaint, we allege that
21   they owed us, the Plaintiffs, an independent duty, independent
22   of whatever this transaction was.
23            What is the source of that?
24            Well, very clearly, Section 5 of the FTC act.  And
25   the Wyndham case says that directly.  There is a duty to

1    reasonably safeguard electronic information in the consumer

2    context.

3             Number two, Georgia has a state data breach

4    notification law.  There's a legal duty for data collectors and

5    information brokers to give notice of the data breach.

6             And then just the Georgia Fair Business Practices

7    Act, duty for companies to refrain from unfair or deceptive

8    acts and practices in the conduct of consumer transactions.

9    And, again, an unfair act in this act is based largely on the

10   FTC act.  An unfair act includes not having reasonable security

11   and exposing your customers to a breach of their payment card

12   data or personal information.  In addition to that, of course,

13   is the common law duty to act reasonably and avoid foreseeable

14   harm.

15            Ms. Sumner touched on the accident exception.  The

16   Argonaut case was this Court's decision involving a fire in a

17   dump truck or a garbage truck.  So, as I said, there's a

18   general duty under tort law independent of any contract to

19   avoid causing a sudden and calamitous event which poses an

20   unreasonable risk of harm or injury to person or property.

21            And Home Depot pooh-poohs applying that in this

22   context, but I'm not sure that that's right.  There's a case in

23   Arizona that says exactly that under the Arizona economic loss

24   rule.  So if you expose data and you have this breach which

25   this is a calamity -- I mean, it's on the front page of the

1    newspaper; it's something that certainly a customer would not

2    have expected; although, we know Home Depot did or should have

3    expected it; they were warned for years -- that that court said

4    that that's comparable to a tortious accident and the damages

5    are of a type that caused economic harms to persons and to

6    property.

7           Moving on to the consumer protection statutes, by and

8    large, Home Depot simply ignores the complaint.  As we know,

9    under Rule 8(a) they should not be ignoring the complaint and

10   Your Honor should not ignore the complaint.  It should look at

11   the allegations, give them a reasonable reading in favor of the

12   Plaintiffs.

13          We specifically alleged deceptive and unfair

14   practices, including Home Depot failed to maintain adequate

15   computer systems, failed to disclose their security practices

16   were inadequate, failed to timely and adequately disclose the

17   breach, et cetera.  And numerous cases have looked at that and

18   said, of course, those are violations of these little FTC act

19   consumer protection laws.

20          In Target specifically, the court addressed this

21   under all the states, all the states that we have pleaded here

22   except Puerto Rico which was not raised there, and said these

23   four theories are viable claims based on the facts that were

24   pleaded:  Failing to maintain adequate computer systems and

25   data security practices, failing to disclose material fact that

1    it did not have adequate computer systems and safeguards to

2    adequately protect customers' personal financial information,

3    failing to provide timely notice and accurate notice to

4    Plaintiffs of a material fact of there the Target data breach

5    and continuing to accept credit and debit card payments for

6    purchases at Target after Target knew or should have known of

7    that data breach and before it purged its systems of the hacker

8    malware.

9            So those are all state claims.  Those are laid out

10   specifically in paragraph 287 and 288 of our complaint, and I

11   would assert that that's the basis for the consumer claims here

12   in each of the states.

13           There was one point raised on whether an IB standard

14   applies.  It does not.  We did cite the Guerrero case.  I think

15   we cited -- I think we cited a couple more cases, but I could

16   be called wrong on that.  But there are many cases out there

17   and they say, look, these are not claims where fraud is an

18   element.  So here we are claiming Home Depot essentially

19   negligently unfairly held its data, exposed it to criminals,

20   exposed us to injury and that, in fact, happened.  So it's not

21   an overt fraud that we are claiming here.

22           Although, frankly, we probably could -- not the fraud

23   count.  But as far as the requirements of 9(b), I think if you

24   look at the -- and Mr. Barnes laid out some of this history --

25   but if you look at the depth of the notice in the inaction that

1    Home Depot went through, the ignoring of warnings, the failure

2    to put in place any sort of modern security apparatus, I think

3    those do raise to the level of an IB.  But, again, we do not

4    need to do that at this point.

5              Duty to disclose.  In some states, it's true there's

6    a duty to disclose to raise a claim under the state consumer

7    protection laws.  Those are set out in great detail in our

8    Appendix B.  But suffice it to say we disagree with Home

9    Depot's view of that.  You know, if there was a duty to

10   disclose because we allege that there were security

11   vulnerabilities, Home Depot had exclusive control and knowledge

12   of those vulnerabilities, and they did not disclose them.

13             THE COURT:  Mr. Vahle, five minutes.

14             MR. VAHLE:  Thank you, Your Honor.

15             And just one more time I will mention it again on

16   injunctive relief under the consumer protection statutes we

17   specifically allege -- and Home Depot says no injunctive

18   relief, you have no standing, you have no claims at all.  But

19   we do in each of these states.  We allege that hackers

20   intentionally targeted the information, that Home Depot

21   continues to store our payment card information, that the

22   systems remain insecure and that hackers are aware of that and

23   that Home Depot is a vulnerable target.  And in Sony I, I

24   think, the Court there expressly ruled that, of course,

25   injunctive relief is potentially available under the pleading.

1          For the state data breach statutes, we did not raise

2    the 13 or so claims that Judge Magnuson dismissed in Target; so

3    all of our claims are consistent with the Target ruling.  Home

4    Depot challenges about a dozen more because they argue that

5    they do not allow a private right of action, and we argue that

6    they do.  They are either permissive, they permit AG

7    enforcement but they do not say anything about exclusive AG

8    enforcement, or they expressly provide private right or have

9    language suggesting that consumers can sue.

10          And, of course, some of these statutes are

11   implemented through the state consumer protection law.  We've

12   raised claims that are adequate under the state consumer

13   protection statutes, and so these claims are adequate here.

14          I want to talk just a little bit about Home Depot's

15   allegation that there are no damages arising from delay in

16   notification.  And that's just contrary to the pleading.  In

17   the pleading, paragraph 301:  Had Home Depot provided timely

18   and accurate notice, Plaintiffs could have avoided or mitigated

19   the harm caused by the data breach.

20          Paragraph 222:  Despite having actual knowledge of

21   the breach on September 2nd, 2014, Home Depot sat idly by for

22   six days as hackers openly sold at least 12 massive batches of

23   Home Depot payment card data.  Because of the delay in

24   confirming it was the source of the breach and delay in

25   confirming the period of the data breach, financial

```
 1    institutions were reluctant to preemptively issue replacement
 2    cards to customers with Home Depot purchases resulting in
 3    massive numbers of customers suffering fraud between September
 4    2nd and September 8th.
 5              Now, these are not just customers who shopped in that
 6    time period.  These are customers who shopped anytime between
 7    April and September because that information was there.  It was
 8    being sold.  And our clients were not given the opportunity to
 9    mitigate their damages to try to protect themselves.
10              I think I'd like to close, Your Honor, not to take
11    any more of your time than is necessary.  But just looking at
12    this whole argument today, the most important point we could
13    make is that this case looks just like the Neiman Marcus case.
14    It has similar claims.  It has a similar fact pattern.  And the
15    results should be the same here.
16              That's all I have.  Thank you.
17              THE COURT:  Thank you, Mr. Vahle.
18              Mr. Loveland, Ms. Sumner?
19              MR. LOVELAND:  Yes, Your Honor.
20              Your Honor, did you keep track of our time as well by
21    any chance?
22              THE COURT:  Yes, sir.  You've got 16 minutes left.
23              MR. LOVELAND:  Thank you, Your Honor.
24              Your Honor, may it please the Court.  I'm going to do
25    the rebuttal for both aspects.
```

1          Governor Barnes actually did a good job of

2     demonstrating a key point here which is you have to look at

3     each Plaintiff.  Each Plaintiff has to get over the four

4     hurdles that are set up in the Clapper case.  They must show

5     that they have concrete and particularized entry.  They must

6     show that it's actual or imminent.  They must show that it's

7     traceable to Home Depot, and they must show that it's

8     redressable.

9          And by calling out a couple of people and talking

10    about what they allege, that demonstrates why you have to look

11    at each of these Plaintiffs and look at them all individually.

12    And it's frankly a major distinction from the Target case where

13    Judge Magnuson with due respect basically treated it as a

14    collective, did not really look at Plaintiff by Plaintiff,

15    claim by claim and do the analysis that is required.  And that

16    is a critical, critical aspect here.

17         Let me talk about several things.  Number one,

18    there's a concept of, well, there's an identity theft here.

19    No, that's not really what's at issue here.  No Social Security

20    numbers were taken here.  That was not possible.  In fact, one

21    of the things we outline in our briefing is that the cards were

22    cancelled.  The Plaintiffs' claims basically that many of the

23    Plaintiffs talk about they had issues with their cards being

24    cancelled.  All of the cards were cancelled.

25         Then you have the situation that to have any sort of

 1    identity theft there's additional aspects of information that
 2    have to be obtained that could not have been obtained from the
 3    information that came from Home Depot.  Thus, that issue, if it
 4    occurred, if it's real for anyone, is not fairly traceable here
 5    but is instead the result of the independent actions of the
 6    criminals who did not only this act but then did multiple
 7    criminal acts to get the other information and tag it on.
 8    That's the only conceivable way you get an identity theft here,
 9    and it does not result in something fairly traceable.  Again,
10    Clapper draws the distinction as do many of the cases about
11    what happens when you have this action and then independent
12    actions of independent parties and it breaks the fairly
13    traceable chain of causation.
14            I'd like to talk -- you know, and Mr. Barnes --
15    Governor Barnes, excuse me -- says, well, AvMed deals with
16    identity theft.  It does.  But read AvMed because here's what
17    it does.  There were five Plaintiffs initially in AvMed, then
18    they added two more.  The two they added the court says, the
19    Eleventh Circuit says, have actual identity theft and then have
20    actual monetary loss attributable directly to the identity
21    theft those two sustained.
22            The Plaintiffs dropped the other five Plaintiffs.
23    They are gone because they knew they did not meet that
24    standard.  Not only that, the Eleventh Circuit then goes on and
25    says, We are only dealing with actual identity theft and actual

```
 1    economic loss; we are not reaching anything about prospective
 2    future loss.  They affirmatively declined to do that.
 3              So let's talk about the future risk of harm.  Because
 4    as I said when I put the slide up about that, that's really
 5    what this case comes down to is future risk of harm.  Governor
 6    Barnes says, you know, there's going to be a lot of more people
 7    who are going to have this injury.  Maybe.  Maybe not.  We
 8    don't know that.  What we do know is the cards were all
 9    cancelled.
10              What we also know is they say, you know, just let it
11    go, worry about it later like the Zappos court did.  The Zappos
12    court did that in 2013 in denying a motion.  And in 2015 the
13    Zappos court then has to say, you know, it's been two more
14    years and there's no real harm; I'm dismissing the case.  So
15    you need to address the threshold issue on the threshold.
16              By the way, the question you should defer this, you
17    should wait 'til class certification to decide whether this
18    Court has subject matter jurisdiction, AvMed is directly
19    contrary to that.  Judge Wilson goes on at the very beginning,
20    says we have an independent duty to assess whether we have
21    subject matter jurisdiction over this claim, and that turns on
22    whether there's standing for these individual Plaintiffs.  And,
23    thus, the court has to engage on that as a threshold matter,
24    not defer it subsequently to look at it later down the line
25    when you look at the issue of class certification.
```

1          Of course, the Plaintiffs would like the Court to do

2     that because that means the Court does not really frankly at

3     any time engage in the very disciplined process that

4     unfortunately this case requires which is taking the 85

5     Plaintiffs, looking at their claims, assessing it against the

6     standard and determining which, if any, of them ultimately has

7     standing.  And that is a highly individualized requirement that

8     must go on.

9          Let me talk about a few more things.  Credit

10    monitoring.  The cards again were cancelled.  There's no

11    question about that.  Monitoring is against other risks.  It's

12    trying to chase against the other things.  It's reasonable to

13    do it.  We are not asserting it's not reasonable.

14         But, again, that's what the cases stand for.  The

15    fact that this is a reasonable action you might take and that

16    you may have a reasonable concern for it doesn't translate to

17    actual injury for purposes of Article III standing.  That's

18    what the Supreme Court said in Clapper.  It would transfer the

19    situation at a time any Plaintiff had a situation where what

20    they wanted to do -- where what they did was take a reasonable

21    response to a non-paranoid fear, they all of a sudden create

22    Article III standing.  And the court says that is not proper

23    and not allowed.

24         Now, I want to talk about Neiman Marcus because both

25    counsel spent a substantial amount of time talking about Neiman

1    Marcus, and I think it's important to do that.  Both said

2    Neiman Marcus is the roadmap, and they said Neiman Marcus is

3    what you should read.

4           Well, here is Judge Wood's opinion in Neiman Marcus;

5    and here is what she wrote:  The Neiman Marcus customer should

6    not have to wait until hackers commit identity theft or credit

7    card fraud -- Governor Barnes read this to the Court -- in

8    order to give the class standing because there is, and I quote,

9    an objectively reasonable likelihood that such an injury will

10   occur.

11          That's the entire underpinning of the Neiman Marcus

12   Seventh Circuit opinion.  And, as I said, amazingly they cite

13   Clapper for that.

14          Here is what the Clapper Supreme Court said:  As an

15   initial matter, the Second Circuit's objectively reasonable

16   likelihood standard is inconsistent with our requirement that

17   threatened injury must be certainly impending to constitute

18   injury in fact.

19          Yes, Neiman Marcus is a roadmap for how to ignore the

20   Clapper decision.  It is not a roadmap for how to apply it

21   because the Seventh Circuit actually goes directly contrary to

22   what the Supreme Court says there.

23          Now, Governor Barnes says but even in Clapper you

24   don't really have to have this absolute injury or this concrete

25   or this imminent injury; substantial risk may be enough.  He

1    read from Footnote 5 in Clapper, the first sentence.  The first

2    sentence does say:  Our cases do not uniformly require

3    Plaintiffs to demonstrate that it's literally certain that the

4    harms they identify will come about.  In some instances, we

5    found standing based on substantial risk.

6              And they cite those quotes.

7              Then they go on to say:  But to the extent that the

8    substantial risk standard is relevant and distinct from the

9    clearly impending requirement which is what Clapper identified,

10   respondents fall short of that standard in light of the

11   attenuated chain of inferences necessary to find harm here.

12   Plaintiffs cannot rely on the speculation about unfettered

13   choices by third independent actors not before the court.

14             In other words, the court goes on to say, yeah, it's

15   not just that; you still have to tie it, make it traceable to

16   the conduct that is at issue here, not to other things that

17   happened after that conduct by independent actors.

18             Let me talk briefly about time being spent.  Of

19   course, time has value.  Time has -- you know, time has value

20   whether it's contemplating a sunset, whether it's studying

21   Shakespeare or whether it's writing a brief to respond to the

22   Plaintiffs' complaint in this case or writing a reply to our

23   motion to dismiss.  Of course, time has value.  But not all

24   time because it has value, of course, has intrinsic value,

25   generates a legal claim.

1             Let me give an example.  And I'm glad counsel used
2    the example of a broken hammer from Home Depot.  If I buy a
3    hammer from The Home Depot and it goes -- I get home and it
4    breaks -- it never happens as I understand from The Home
5    Depot -- but, nonetheless, were that amazing circumstance
6    somehow to occur and the hammer broke, I take the hammer back
7    to The Home Depot and I say, I bought this hammer here, I took
8    it home, I was using it and it broke, and The Home Depot gives
9    me a refund for the hammer, I don't have a claim for the time
10   it took me to take the hammer back to The Home Depot.  That's
11   not a legally cognizable claim.  That's part of life, and time
12   in these circumstances is part of life.
13            Mr. Barnes said, I added it all up and it's 2,000
14   hours.  That would be one good associate at King & Spalding in
15   the old days.  Today we spend a little more.  Yeah, that's
16   2,000 hours; but it's not across 85 Plaintiffs.  Some have one
17   or two hours.  That's part of life.  Some say, I was stuck on a
18   highway -- as one woman does and one Plaintiff -- for a period
19   of time.
20            But that, again, you can't look at that and say,
21   okay, it's 2,000 divided by 85 is 23.2 or whatever it is per
22   Plaintiff.  That's not the case.  Time has to be looked at in
23   terms of what it is, what are we talking about, get down again
24   into the weeds which is what is required just as if each of
25   these 85 Plaintiffs had filed a separate case here.

1            Briefly, Your Honor, the Target opinion.  Judge

2    Magnuson's opinion in Target does not really meaningfully

3    discuss or apply the Clapper standard.  And, moreover, what the

4    court didn't do as I said was it didn't do the sort of detailed

5    analysis of the claims of the Plaintiffs, which Plaintiff

6    really has a claim, where do they really have standing, et

7    cetera.  It is an opinion like Neiman Marcus that goes contrary

8    to what we say the weight of the authority is, and we

9    understand why Plaintiffs rely on it.  We think frankly it is

10   not good law that should be relied on by this Court.

11           Very briefly, Your Honor, Plaintiffs say there's a

12   legal duty to safeguard.  We have cited that.  Ms. Sumner

13   discussed it in her argument.  The Willingham case is a strong

14   case indicating that there's not a duty out there in the ether

15   that you can apply here.  You have to look again at what every

16   Plaintiff is asserting and suggesting do they have a claim that

17   invokes a particular legal duty under either some standard or

18   statute or something that could be applied here.  There is not

19   a generalized legal duty.

20           Finally, Your Honor, with regard to the issue of the

21   consumer protection statutes, you know, no deceptive act really

22   is effectively alleged here.  The pleading requirements under

23   9(b) are not met.  All of those standards and many of the

24   statutes as Ms. Sumner again discussed, and counsel largely did

25   not pay attention, don't have a private right of action to

1    begin with and, thus, do not stand.

2              Finally, the Plaintiff says, But we have an

3    injunction claim.  But injunction doesn't provide standing.

4    The Supreme Court decided that in Lyons versus City of

5    Los Angeles effectively by saying, you know, a guy who has been

6    subjected to a chokehold by the Los Angeles Police Department

7    didn't have standing to seek an injunction against the police

8    department using the chokehold technique because there was no

9    reasonable likelihood at the time that that was going to be

10   applied to that person again.

11             You again have to have the actual injury now in order

12   to invoke the claim, and that's where you go back to Clapper

13   one more time.  Clapper itself was, of course, an effort to try

14   and get effectively an injunction, a declaration that actions

15   that the government was contemplating should not go forward

16   because of the harm that might result.  The Second Circuit,

17   like the Plaintiffs, said it was an objectively reasonable

18   likelihood that harm would result.  And the Supreme Court, as

19   we suggest this Court should, said that is not the law and that

20   is not sufficient.

21             Thank you, Your Honor.

22             THE COURT:  Thank you, Mr. Loveland.

23             Mr. Canfield, what's your pleasure?

24             We can take a break for lunch now.  We can go for

25   about 45 minutes or so and then take a break after you get

1   started.   What's your pleasure?

2             MR. CANFIELD:   I'm not going to be the person that's

3   starting, but I have no preference one way or another.   The

4   parties discussed it prior to the argument.   We thought that a

5   lunch break might be -- short lunch break might be appropriate.

6   But my personal preference is whatever suits the Court is fine

7   with me.

8             THE COURT:   Well, Ms. Dawson?

9             MS. DAWSON:   Your Honor, I will be speaking next.

10  And as Mr. Canfield stated --

11            THE COURT:   Sorry.   I totally misspoke there in

12  calling on Mr. Canfield first.   Sorry, Ms. Dawson.

13            MS. DAWSON:   Oh, no problem, Your Honor.

14            And we did discuss taking a short lunch break, and we

15  believe that would be appropriate because we also have to have

16  some logistical moving to do as well.   And so taking a break

17  for lunch makes sense to us, Your Honor.

18            THE COURT:   Okay.   Let's take a lunch break until

19  1:00.

20            Court's in recess until 1:00.

21            MR. BARNES:   Your Honor, I have got another hearing.

22  Can I be excused since we have another --

23            THE COURT:   Anybody that wants to be excused is

24  excused.

25            MR. LOVELAND:   Thank you, Your Honor.

1           THE COURT:  Court's in recess until 1:00.

2           (A lunch recess was taken.)

3           THE COURT:  Ms. Dawson?

4           MS. DAWSON:  Good afternoon, Your Honor.  Ms. Brown

5   and I will be arguing The Home Depot's motion to dismiss for

6   the financial institution's track.  We will be reserving ten

7   minutes of our hour for rebuttal argument.  I will be

8   addressing the financial institution Plaintiffs' lack of

9   standing and ripeness doctrine, and Ms. Brown will address the

10  common law and statutory claims as well as the claim for

11  equitable relief.

12          Your Honor, 50 individual financial institution

13  Plaintiffs from 46 states whom I will refer to in this argument

14  as the banks have brought a class action lawsuit against Home

15  Depot.  They purport to represent all banks, credit unions,

16  financial institutions and other entities in the U.S. that

17  issued payment cards, including credit and debit cards, used by

18  customers to make purchases from The Home Depot during the

19  period April 1st, 2014, to the present.

20          Here the named Plaintiffs and the class they purport

21  to represent are sophisticated commercial entities.  In the

22  ordinary course of their business, these banks deal with all

23  different types of fraud.  Part of the banks' everyday

24  operating expenses go toward fraud investigation and fraud

25  prevention, and the banks collect fees from their customers in

 1   part to cover the cost of those operating expenses.

 2          Data breaches are one of many sources of potential

 3   fraud, and banks themselves such as JPMorgan Chase have been

 4   the object of data breaches.  The fact is that data breaches

 5   are anticipated by the banks and by the card brands such as

 6   Visa and MasterCard with whom the banks contract, and there is

 7   a mechanism and process for banks such as the Plaintiffs here

 8   to recover certain fraud losses and operating expenses from a

 9   data breach through the contracts with those card brands and

10   the card brand operating regulations.

11          The banks expressly refer to the card brand networks,

12   the risk allocation agreements and the card brand operating

13   rules and regulations in their consolidated class action

14   complaint in paragraphs 86, 87, 93 and paragraphs 169 through

15   178.  These contracts and regulations provide an important

16   context and framework in evaluating the banks' claims.  And I'd

17   like to take a few moments to provide the Court with an

18   overview of the relevant entities and the risk allocation

19   agreements between these entities.

20          Next slide, please.

21          Your Honor, on the far left you see the issuing

22   banks, the Plaintiffs here.  Those are the financial

23   institutions that provide the customers access to payment

24   cards, credit or debit cards.  The issuing banks contract with

25   their customers, the consumers here.  The contract is called

1    the cardholder agreement again between the issuing banks and

2    the customers.

3            The issuing banks contract with MasterCard and Visa,

4    the card brands in our demonstrative aid.  The contract between

5    the issuing banks and the card brands is known as the issuing

6    bank agreement.  And what's significant, Your Honor, is that

7    the card brands' operating regulations are incorporated by

8    reference into that issuing bank agreement.

9            Next the card brands, again, MasterCard and Visa,

10   have contracts with acquiring banks.  These are the financial

11   institutions that provide the merchants access to the card

12   brand networks.  The contract between the card brands and the

13   acquiring banks is known as the acquiring bank agreement.

14           The next contract is between the acquiring bank and

15   merchants such as The Home Depot.  That's called the merchant

16   agreement.  And just like the issuing bank agreement and the

17   acquiring bank agreement, the merchant agreement also

18   incorporates by reference the card brand operating regulations.

19           Most significantly, Your Honor, these regulations

20   contemplate data breaches and outline specific dispute

21   resolution procedures for issuing banks to recover certain

22   operating expenses and fraud losses.  These are the exact same

23   operating expenses and fraud losses that are being sought in

24   the litigation that has been filed by the financial institution

25   Plaintiffs, and we would agree that the banks are not entitled

1   to double recovery for those losses.  But despite this

2   availability of the card brand recovery process, the banks have

3   filed this class action lawsuit.  But this lawsuit should be

4   dismissed, Your Honor, because the banks have failed to allege

5   facts sufficient to establish Article III injury in fact.

6           As Mr. Loveland stated, this Court must look at each

7   Plaintiff individually.  None of the 50 individual banks has

8   alleged a concrete, particularized injury specific to it which

9   is fairly traceable to The Home Depot.  Article III standing is

10  a threshold issue, Your Honor.  And in the Warth v. Seldin

11  case, the U.S. Supreme Court held that a Plaintiff must assert

12  its own legal rights and interests and cannot rest its claims

13  to relieve on the legal rights or interests of third parties.

14          The Supreme Court goes further in Warth to say that

15  Article III requires that a Plaintiff allege a distinct and

16  palpable injury to itself even if it is an injury shared by a

17  large class of other possible litigants.  The fact that this

18  lawsuit is brought as a class action does not affect each named

19  Plaintiff's burden of showing that they individually satisfy

20  the constitutional requirements of standing.

21          Next slide, please.

22          Here the named Plaintiffs fail to carry this burden.

23  And on this ground alone, the banks' complaint should be

24  dismissed.

25          Essentially, Your Honor, in the complaint, the

1  financial institution Plaintiffs list in paragraphs 12 through

2  79 the name and headquarters of each bank and location of their

3  branches.  And, Your Honor, that is not sufficient under Warth

4  v. Seldin.

5           Before this MDL was even formed, Your Honor, The Home

6  Depot received demand letters from individual credit unions and

7  community banks.  These letters identified the number of bank

8  customers and/or payment cards potentially compromised.  They

9  identified specific dollar figures and itemizations of the

10  costs associated with cancelling and reissuing cards and the

11  specific dollar figures for fraud reimbursement to bank

12  customers.

13          In those demand letters, the banks included facts to

14  support their claim for injuries allegedly suffered as a result

15  of The Home Depot data breach.  So as these demand letters

16  indicate, these banks are capable of providing factual content

17  sufficient to show a distinct and palpable injury to

18  themselves.  And, most importantly, the Supreme Court precedent

19  in Warth requires that they do so.  And in the master

20  consolidated complaint, the banks made no effort to plead any

21  fact sufficient to show a distinct and palpable injury because

22  though the banks have identified a specific loss under Warth,

23  Iqbal and Twombly the banks' complaint should be dismissed.

24          Now, the banks' only response to this argument is to

25  contend that they have suffered the same general categories of

1    injuries and that their collective allegation of injuries is
2    sufficient.  And they point to paragraphs 4, 11, 187, 214, 221
3    and 266.  One eighty-seven is the main paragraph that they
4    point to.
5              This paragraph, Your Honor, is conclusory and
6    insufficient.  And the only case that they cite in support of
7    this conclusory allegation is the United States v. Students
8    Challenging Regulatory Agency Procedure.  They use that to say
9    the allegation is sufficient.  But, Your Honor, that case was
10   decided over 30 years prior to Twombly and Iqbal.  And Twombly
11   and Iqbal make it very clear that facts must be alleged to
12   support any type of conclusion made, and conclusory statements
13   don't suffice.  There have to be sufficient facts alleged.
14             Next slide, please.
15             Now, the only other cases that the banks point to to
16   support their collective allegation is Adobe Systems Privacy
17   Litigation and Resnick v. AvMed.  But those two cases actually
18   highlight the deficiencies in the banks' complaints.  Both
19   cases are consumer cases, and in both cases consumer data was
20   stolen.
21             As you see from the highlighted language in Resnick
22   v. AvMed, first of all, Your Honor, in that case the
23   Plaintiffs' identities were actually stolen and accounts opened
24   up in their names.  And as the exemplar paragraphs highlight,
25   specific unreimbursed financial losses are detailed.

1          Similarly, in Adobe, again, that case personal data

2     including names, e-mail and mail addresses, telephone numbers

3     and passwords were stolen.  And, again, as the exemplar

4     paragraph indicates, specific unreimbursed financial losses are

5     identified.

6          Finally, Your Honor, we wanted to draw the Court's

7     attention to the Banknorth case.  That is a case that is just

8     like this case where the bank is suing the merchant as a result

9     of a data breach.  And as you see in that case, Your Honor,

10    just like in the demand letters that I describe Banknorth

11    specifies that fraudulent transactions resulted in a refund to

12    its customers of approximately $583,000.

13         None of these similar, specific facts are pled in the

14    financial institution Plaintiffs' master consolidated

15    complaint.  And under Warth v. Seldin, that justifies

16    dismissal.

17         Next slide, please.

18         Your Honor, it's telling that Magistrate Judge King's

19    Report and Recommendation in Willingham v. Global Payments

20    really highlights within this jurisdiction in a data breach

21    case the teeth of Warth, Iqbal and Twombly.  In that case,

22    Magistrate Judge King concluded that Willingham's allegations

23    were not sufficient under Rule 8, Warth, Iqbal and Twombly, and

24    dismissed the complaint for failure to allege facts sufficient

25    to demonstrate Article III injury in fact.

1           What I think is significant -- next slide, please --

2     is when you compare the exact paragraphs that Magistrate Judge

3     King found were insufficient to the conclusory paragraph in

4     paragraph 187 of the banks' master consolidated complaint they

5     are virtually identical, Your Honor.  And, again, in the Global

6     Payments case, the complaint was dismissed for failure to state

7     injuries under Article III.  And the same result should follow

8     here.

9           So, in short, when you compare the factual

10    allegations to the cases that the banks rely upon to what they

11    actually alleged in their complaint, it demonstrates how short

12    the banks fall in meeting the standards set forth by Warth v.

13    Seldin.

14          Next slide, please.

15          The banks' complaint should also be dismissed because

16    the overwhelming majority of the collective injuries alleged

17    are ordinary operating expenses.  These are the normal costs of

18    doing business as a bank in this day and age in which, yes,

19    there is fraud and steps need to be taken for fraud prevention

20    and investigation.  But, again, these expenses are part of the

21    normal course of business.

22          Mr. Loveland discussed at length the Clapper

23    decision, and so I'm not going to go through the legal

24    standards.  But just as in the consumer track, Clapper does set

25    forth the standard that this Court should apply in determining

1    whether or not these collective injuries, assuming that they

2    can satisfy Warth which they do not, but how they should be

3    viewed for purposes of whether Article III injury in fact has

4    been satisfied.

5            Your Honor, these are taken from paragraph 187 of the

6    Plaintiffs' complaint.  The cancelling and reissuing of payment

7    cards without fraudulent charges, changing or closing accounts,

8    notifying customers about the compromise, investigating claims

9    of fraudulent activity, increased fraud monitoring, these are

10   all operating expenses in the ordinary course of the banks'

11   business.  And, as Mr. Loveland explained, these type of

12   mitigation costs cannot confer Article III injury in fact

13   unless the threat of future harm is certainly impending.  And

14   here the banks have failed to plead any facts sufficient to

15   show that a future threat of injury is certainly impending.

16           And, Your Honor, to the extent the Plaintiffs argue

17   that another standard may apply, that the Plaintiffs must

18   demonstrate there is a substantial risk of harm, the banks

19   still fall short.  No facts have been pled to indicate that

20   even that standard, the standard that there is a substantial

21   risk of harm, has been pled in this complaint.

22           Clapper is clear.  The banks cannot manufacture

23   standing merely by inflicting harm on themselves based on their

24   fears of hypothetical harm that is not certainly impending.  In

25   addition, the banks' mitigation costs cannot confer standing if

1    they are not fairly traceable to any action by The Home Depot.

2          Again, the banks had a similar incentive to engage in

3    the very activities that they seek to recover here, all these

4    countermeasures, irrespective of the Home Depot's data breach.

5    And, again, these activities are part of the ordinary and

6    normal course of the bank's business.  The banks would have

7    incurred most, if not all, of these expenses in the ordinary

8    course of business.  The timing perhaps changed due to the

9    banks' own decisions.

10          You probably have been reading about chip and PIN,

11   Your Honor.  That's another reason completely outside of The

12   Home Depot data breach that is forcing issuing banks to have to

13   cancel and reissue cards.  So, again, these are the costs of

14   doing business in this day and age.  No facts have been pled

15   establishing a certainly impending threat of future harm.  And,

16   therefore, under Clapper these mitigation costs cannot confer

17   Article III injury in fact.

18          Next slide, please.

19          Your Honor, finally, the banks' claims for fraud

20   losses are not ripe for determination.  This final slide

21   provides the overview of the card brand recovery process.  This

22   is the process that's outlined in the risk allocation

23   agreements that I referenced earlier that reimburses the banks

24   for certain fraud losses and operating expenses.  The fact is,

25   Your Honor, that until the card brand recovery process is

1    complete no bank can plausibly allege that it has unreimbursed

2    expenses sufficient to confer standing.

3         Now, in discussing the ripeness doctrine, Judge

4    Totenberg in Southern Pilot Insurance Company stated, "The

5    Court will decline to address a claim that is not sufficiently

6    mature and where the issues are not sufficiently defined and

7    concrete to permit effective decision-making by the court."

8    The ripeness doctrine essentially seeks to avoid entangling the

9    court in the hazards of premature adjudication as recognized by

10   the Eleventh Circuit and Digital Properties, Inc. versus City

11   of Plantation.

12        Now, one of the key determinations, or considerations

13   rather, in determining whether a case should be dismissed for

14   ripeness is whether the Court's ability to resolve the issues

15   presented would be advanced by waiting until an uncompleted

16   event occurs.  Now, completion of the card brand recovery

17   process would advance this Court's ability to resolve issues

18   presented by this litigation.

19        What are some of the benefits of dismissal on

20   ripeness grounds?

21        The card brand recovery process will inform issues

22   directly relevant to the litigation such as who is in and out

23   of the class; the number of class members and potentially

24   compromised accounts; the damages, if any, of putative class

25   members.  And, Your Honor, there would be no prejudice to the

1    banks by waiting.  The banks voluntarily entered into these

2    risk allocation agreements referenced on the first slide.  And,

3    again, the rules and regulations expressly state that there is

4    this process available to recover certain fraud losses and

5    certain operating expenses.

6          Now, Your Honor, just to make sure we are clear on

7    this slide of where we are in this process, at this point we

8    are essentially at the second-to-last rectangle.  The card

9    brands have notified The Home Depot of the fines and

10   assessments, the proposed fines and assessments.  Those

11   proposed fines and assessments are the moneys that will in turn

12   be issued to issuing banks that participate in the

13   reimbursement process.

14         Your Honor, we anticipate that this process could be

15   complete within the next three months.  And, therefore, a

16   dismissal on ripeness grounds, Your Honor, again makes sense to

17   allow this process to play out.  Because, again, until it plays

18   out and until the banks have received the moneys pursuant to

19   this process, they cannot plausibly allege under Warth, under

20   Iqbal, under Twombly, under Rule 8 that they have any

21   unreimbursed losses.

22         And, Your Honor, I'd like to turn over the rest of

23   the time to Ms. Brown unless the Court has any questions.

24         THE COURT:  All right, Ms. Dawson.

25         MS. BROWN:  Good afternoon, Your Honor.

1            As Ms. Dawson said, I'm here today to discuss the

2     reasons that the Plaintiffs' complaints should be dismissed

3     under Rule 12(b)(6).  And the banks' complaint here asserts a

4     number of different claims; but not a single one of them

5     constitutes a viable, legally cognizable cause of action.  And

6     they should all be dismissed.

7            I'm going to start by talking about the common law

8     negligence claims.  And then I will move on to the claim for

9     negligence per se, the claims for equitable relief and then

10    finally the claims under the state statutes.

11           And so to begin with the claim for negligence, the

12    negligence claim that the banks assert in the complaint should

13    be dismissed for two reasons:  First, it is barred by the

14    economic loss rule; and, second, there is no duty that flows

15    from The Home Depot to these banks.

16           So we will start with the economic loss rule.  And I

17    am cognizant, Your Honor, that by the time I stand up here to

18    discuss it there's already been a fair amount of discussion on

19    the doctrine this morning; so I'm going to try not to cover

20    points that we have already covered before.  But I want to

21    start out by saying that, you know, let's start out with what

22    is the economic loss rule.  Economic loss rule bars recovery in

23    tort for purely economic losses unless they result from

24    personal injury or property damage.  When we are talking about

25    the economic loss rule through the lens of these banks'

1    allegations, it's really important to start by looking at the

2    policies that underlie the economic loss rule because they are

3    particularly applicable here.

4           The economic loss rule exists because there's an

5    expectation that when economic losses arise out of a commercial

6    transaction that there's the ability to allocate risk, the

7    ability to allocate the risk of loss.  And I want to start for

8    a minute by putting up on the board a slide that you saw just a

9    minute ago from Ms. Dawson because here it's not that there's a

10   hypothetical possibility that these banks had the ability to

11   allocate the risk of loss.  They did so.  They entered into

12   contracts with the card brands that cover the risk of loss

13   here, And it's for that reason that the economic loss rule is

14   particularly applicable.

15          If I could point the Court's attention to a number of

16   cases we have cited in the brief, and I won't name them all.

17   But there are a lot of courts out there that have considered

18   the issue of how does the economic loss rule apply to

19   negligence claims arising out of a data breach.  And the courts

20   have overwhelmingly held that the economic loss rule bars those

21   claims.

22          So there's the Willingham case that we have talked a

23   lot about today, a Report and Recommendation from Magistrate

24   King.  There's a case from the First Circuit that's the TJX

25   case.  There's also the In Re Michaels PIN Pad Case, the

1    Banknorth case versus BJ's and the Sovereign Bank versus BJ's

2    case.  All of those cases the Court found that the economic

3    loss rule barred the negligence claims arising out of the data

4    breach, and the same result should follow here.

5          Now, the Plaintiffs have argued in their brief that

6    there is some sort of requirement of privity of contract that

7    exists for the economic loss rule to apply.  So I want to pause

8    here to consider that for a moment and respond to it because

9    the law is clear that privity of contract is not required in

10   many of the states that are implicated by the Plaintiffs'

11   claims.

12         And we could start with Georgia law for illustrative

13   purposes, and the case law is very clear out of the Georgia

14   Supreme Court.  That is the case of General Electric and

15   Lowe's.  In the General Electric/Lowe's case, the Plaintiff

16   Lowe's had entered into a contract with a third party to

17   purchase a piece of property; and that property was down the

18   road from a General Electric plant.  Well, when it turned out

19   that there were PCBs on the property, Lowe's brought a claim

20   against General Electric seeking to recover its economic losses

21   for not being able to use the piece of property.  And what the

22   court said was that those claims were barred by the economic

23   loss rule, and that was despite the fact there was no contract

24   between General Electric and Lowe's there.

25         And we don't just have to look to Georgia law.

1    There's an exhibit to our brief, Exhibit A, that includes a
2    discussion of all of the potentially applicable 50 states' laws
3    and showed that the economic loss rule applies in those states
4    with the same force.

5         There's also a case out of the United States Supreme
6    Court, the Robins Dry Dock case that is cited in our brief.
7    And in that case, the United States Supreme Court upheld the
8    application of the economic loss rule notwithstanding a lack of
9    contractual privity.  So there is no privity requirement, and
10   the economic loss rule applies.

11        Now, the Plaintiffs have also argued a couple of
12   exceptions to the economic loss rule; and we have talked a
13   little bit about them already this morning.  The first
14   exception that they have alleged is something called the
15   accident exception that I think Your Honor is familiar with
16   from other cases.  The accident exception as Ms. Sumner
17   addressed just isn't applicable here.  It applies in the
18   product defect context.  And, in fact, there's not a case that
19   applies -- certainly under Georgia law there's not a case that
20   applies that exception outside the product defect context.

21        And if you look to the case law that creates the
22   exception, if I could point Your Honor to the Vulcan Materials
23   case that's in our brief, that case law is captioned in terms
24   of a product defect claim.  It says when you have a sudden and
25   calamitous event that may only cause damage to the defective

1    product but also creates a risk of injury to person or property

2    that this exception applies.  This exception only applies in

3    the product defect case, and that's not what we have here.

4         The other exception that we have heard discussed by

5    the Plaintiff and raised in the brief is the independent duty

6    exception, and that exception is also inapplicable.  Again,

7    Ms. Sumner touched on this in her discussion earlier today.

8    But here the important point is that there simply is no duty

9    flowing from The Home Depot to these banks.  And so this

10   transitions to the second reason that the negligence claim

11   should be dismissed because there is no duty whatsoever,

12   independent or not, that flows from The Home Depot to the

13   banks.

14        And, again, if we were to look at the chart that we

15   have up on the board, the lack of a relationship between The

16   Home Depot and the banks is really what makes a duty here very

17   difficult.  Courts have consistently emphasized that when there

18   is a lack of a direct relationship between the parties that a

19   duty should not be found.  And here if you look at the chart,

20   you see the contract is not between the issuing banks and The

21   Home Depot.  The issuing banks contracted with the card brands.

22   The card brands contracted with the acquiring banks.  The

23   acquiring banks contracted with Home Depot.  There is no direct

24   relationship between The Home Depot and the banks, and that

25   weighs heavily against any finding of a duty.

1          So this is very much akin to, Your Honor, the

2     situation that was present in the Willingham case.  And in that

3     case, what the court found was that there was no direct

4     relationship between the customer there and the credit card

5     processor.  And, accordingly, because there was no direct

6     relationship, there was no duty.  The same result should follow

7     here.

8          And the lack of a direct relationship also renders

9     distinguishable a number of the cases that the Plaintiffs have

10    relied on in their brief like the Sony case, the AvMed case,

11    the Zappos case, the Hannaford case.  All of those cases had a

12    very different situation than the case that we see here.  None

13    of them involved a financial institution and a merchant.

14         So, Your Honor, it's also important here to address

15    this idea that there is some general duty to protect all

16    possible Plaintiffs in the world from foreseeable harm because

17    I think that that's ultimately, you know, given all the case

18    law that we have discussed, what the Plaintiffs' argument in

19    their brief boils down to is if a data breach is foreseeable

20    then Home Depot had the responsibility to protect everyone in

21    the world from the harm that would result from it.  But

22    foreseeability is not the end of the inquiry.

23         The Georgia Supreme Court took this issue head on in

24    the 2005 case of CSX Transportation versus Williams.  And there

25    what the court held is mere foreseeability alone does not

1    create a duty.  Instead, you have to then proceed to consider

2    the larger social consequences of the notion of duty.  And what

3    the court said was you need to tailor that notion so that the

4    illegal consequences of wrongs are limited to a controllable

5    degree.  The Supreme Court said that there should be care taken

6    not to expand traditional tort concepts beyond manageable

7    bounds and not to create an almost infinite universe of

8    potential Plaintiffs.

9         That's the situation that we are looking at here.

10   When you look at the very attenuative relationship between The

11   Home Depot and between these banks, applying a duty here would

12   stretch the tort law beyond manageable bounds.  And it's just

13   not necessary to take that step given the fact that the banks

14   have entered into risk allocation agreements that provide them

15   with a mechanism for recovering their economic losses.

16        In addition, you heard Ms. Sumner earlier today talk

17   about the difference between the level of proximate cause and

18   damages required for a tort claim to state a claim versus what

19   is required to establish standing.  And as Ms. Dawson has

20   already discussed, here even the standing threshold is not

21   satisfied.  But if we proceed and look at the separate inquiry

22   of whether the Plaintiffs have alleged concrete damages that

23   were proximately caused by the conduct alleged, they fail at

24   that bar as well; and that's an additional reason that the

25   negligence claims should be dismissed.

1        So where does that leave us with respect to the

2   negligence claims?

3        Well, here is a map that will look familiar to you by

4   this point in the day I'm sure.  But what we have done here,

5   the states in white are states where there is no bank

6   headquartered; and so those laws are not at issue here today.

7   And so if we go through and we take off the states where under

8   our analysis of the law which is set forth in the Exhibit A to

9   the motion the claims should be barred by the economic loss

10  rule, you are left with a much smaller number of states.

11        And then when we proceed to consider the next

12  required issue which is is there a duty at all between The Home

13  Depot and the banks, those states go away as well.  And where

14  we are left at the end of the day is that the banks have failed

15  to assert a viable negligence claim, and those claims should be

16  dismissed.

17        That brings us to a negligence claim of a slightly

18  different flavor which is the Plaintiffs' claim for negligence

19  per se.  That claim should also be dismissed because the

20  Plaintiffs have not identified a legal prohibition that gives

21  rise to a claim for negligence per se.  And on this claim, the

22  Plaintiffs hang their hat on the unfairness prong of Section 5

23  of the FTC act.  That is the law that they point to to say that

24  there is a duty imposed by the statute that gives rise to

25  negligence per se.  But it does not, and that is because for a

1    statute to give rise to a Plaintiff for negligence per se there

2    has to be a concrete wrong that is prohibited by the statute.

3    There has to be ascertainable certainty as to what conduct is

4    being prohibited.  We know that from a number of cases cited in

5    the briefs.  The Jenkins case is one example of a court

6    reaching that position.

7         So let's talk about the unfair practices prong of

8    Section 5 of the FTC act.  That is a provision that is

9    amorphous by Congress's design.  Congress made a decision when

10   enacting the FTC act that instead of spelling out every

11   violative practice that the FTC could pursue under the statute

12   instead it would give the FTC discretion to determine what

13   constitutes an unfair practice and what does not.

14        There are no cases where a court has held that there

15   is negligence per se for a violation of the unfair practices

16   prong of Section 5 of the FTC act.  There are a couple of cases

17   that the Plaintiffs cite in their briefs to attempt to say that

18   there are cases that would fall in that category, but those are

19   not based on violations of the unfair practices prong of

20   Section 5.  They are based on FTC regulations that are specific

21   with respect to franchisee disclosure requirements.  And that's

22   a very different situation than we have here where the banks

23   are simply traveling on the unfairness prong.

24        So as we are talking about Section 5, it's really

25   impossible today to talk about that statute without at least

1    referencing the Wyndham decision because that's a decision that

2    there's been a lot of attention and discussion around that has

3    to do with Section 5 of the FTC act as it relates to cyber

4    security practices.  It's important to put that case in its

5    proper context because what was at issue in Wyndham was the

6    issue of whether the FTC has the authority to regulate cyber

7    security practices under the unfair practices prong of Section

8    5.  That was the issue in the case.

9           The second issue in the case was whether Wyndham had

10   constitutional, due process fair notice that its conduct could

11   be regulated under that statute such that it was fair to apply

12   the statute to Wyndham under the circumstances.  The case did

13   not involve in any way whether the FTC act gives rise to a

14   claim for negligence per se, and it also did not address the

15   issue of whether there is a duty under the FTC act to use

16   particular security measures or to use reasonable security

17   measures.  The focus was on the FTC's authority and on this

18   concept of fair notice.

19          In analyzing that issue, the Third Circuit said loud

20   and clear that in considering the constitutional fair notice

21   claim Wyndham was not entitled to know with reasonable

22   certainty or ascertainability what practices the FTC thought

23   would violate that prong.  Wyndham was not entitled to know

24   with ascertainable certainty.  And that is what renders the

25   Wyndham decision completely inapposite here because the

1    standard for negligence per se is there has to be a reasonable

2    ascertainable standard that exists under the statute -- a

3    reasonably ascertainable standard that exists under the

4    statute.  And that is just not required -- not applicable under

5    Wyndham.

6              And, in fact, to the extent that Wyndham went on to

7    look at whether there was, in fact, some kind of ascertainable

8    standard with respect to cyber security practices, in that case

9    there are two footnotes, Footnotes 21 and 22, where the Third

10   Circuit actually looked at the FTC's consent orders and the

11   FTC's cyber security guidelines, the two things that the

12   Plaintiffs allude to in their briefs.  And what the court found

13   is that they did not provide reasonable and ascertainable

14   certainty as to what the FTC considered a violation of

15   Section 5 of the cyber security level.

16             So Section 5 does not provide the ascertainable

17   certainty that is necessary to state a claim for negligence per

18   se, but there is another problem here too.  To assert a

19   negligence per se claim, the banks have to fall within the zone

20   of people that are protected by the statute.  And for the

21   unfair practices prong of Section 5, that is only one category

22   of people -- consumers.  And the banks are not acting as

23   consumers when they are operating the payment-card-issuing side

24   of their business, and so also they cannot take advantage of

25   the FTC act on a negligence per se claim.

1           The banks have also tried to argue that there's some

2    PCI DSS standards -- these are some of the operating

3    regulations that Ms. Dawson referred to earlier -- also that

4    Home Depot's internal standards might in some way give rise to

5    a standard that is negligence per se.  But that's not correct.

6    Under the case law, you have to have a legal standard.  And

7    these PCI DSS regulations are not a law, nor are Home Depot's

8    internal policies.

9           And there's an important policy point here as well

10   that if the Court were to hold that when a company adopts

11   internal policies it sets a duty of care for third parties that

12   creates an incentive for companies to set a pretty low bar on

13   their policies to ensure that they are not taking on additional

14   liability.  So that is not a policy that we believe the Court

15   should further hear.

16          The next claims that we come to are the claims for

17   equitable relief.  And here we have a claim for declaratory

18   judgment and for an injunction.  These claims focus not on the

19   state of security measures at Home Depot at the time of the

20   breach but rather on the state of those security measures as of

21   today.  And the Plaintiffs ask for a declaration that those

22   measures are unreasonable and inadequate.  They ask the Court

23   to go on and impose some specific requirements that the

24   Plaintiffs have suggested as to how the security should be

25   improved.

1              But these claims fail for two reasons.  First, they

2       haven't established a substantial likelihood of future injury.

3       And Ms. Sumner has already talked about this point earlier

4       today.  But, basically, the complaint asks the Court to

5       conclude that simply because The Home Depot was subject to one

6       data breach it will be subject to another one; and it ignores

7       any measures that have been taken in the interim to further

8       strengthen and improve security practices.  So there are no

9       factual allegations in the complaint that could suggest a

10      substantial likelihood of future injury.

11             Also, these equitable relief claims fail because

12      money damages would be sufficient to remedy any future injury

13      that occurred.  To the extent that there was a second data

14      breach at Home Depot and the Plaintiffs had additional claims

15      to assert, then those claims could be redressed through

16      monetary damages, and that precludes their claim for equitable

17      relief.

18             There's one other point that we need to cover with

19      respect to the equitable relief claims, and that has to do with

20      the association Plaintiffs.  And this is the first time we have

21      talked about the association Plaintiffs because the only claims

22      that they assert in the claim -- in the complaint are these

23      claims for equitable relief.  The association Plaintiffs,

24      however, lack standing here; and that is because the analysis

25      with respect to association Plaintiffs focuses on whether the

1    participation of association members would be required in the

2    litigation.   To the extent that participation of individual

3    members would be required, then the courts, including the

4    United States Supreme Court in Hunt versus Washington State,

5    have said that associational standing simply does not exist.

6            And so here where one of the declarations that the

7    Plaintiffs seek is a declaration that their members were forced

8    to pay for fraud transactions -- that's in the complaint at

9    paragraph 280 -- that's an issue that can't just be resolved

10   across the board.   These associations will have members who

11   never even had a cardholder who shopped at Home Depot, much

12   less had a card implicated, much less incurred fraud

13   transactions.   So in order to determine who has a claim at all,

14   you would have to have the participation of the individual

15   members; and that forecloses any finding of associational

16   standing.   So the equitable relief claims fail as well.

17           That brings us finally to the Plaintiffs' state

18   statutory claims.   The Plaintiffs are asserting claims under

19   eight different state statutes.   Those are the statutes of

20   Alaska, California, Connecticut, Florida, Illinois,

21   Massachusetts, Minnesota and Washington.   So we have got those

22   depicted on the screen here.

23           And as a starting point, before I even talk about the

24   states' specific defects of those statutory claims, it's

25   important to remember that each of the statutes requires the

1    bank to plead an injury that was caused by the alleged conduct;

2    and that is not something that the Plaintiffs have done here.

3    They haven't satisfied the requirement of injury to property,

4    proximate cause.  And for those reasons, these claims fail.

5            But there are additional reasons as well, and I'm

6    going to run through these fairly quickly because they are

7    briefed at length in our papers and you probably don't need to

8    take the time for me to go through all those arguments again.

9    But I do want to start with some of the broad problems with

10   respect to the claims.

11           There are a number of the claims that require a

12   showing of conduct that's either unfair or that is immoral,

13   unethical, oppressive or unscrupulous.  And under the cases

14   that we have cited in the brief, the failure that Plaintiffs

15   allege to maintain reasonable or appropriate security measures,

16   those just don't rise to the level of unscrupulous or immoral

17   conduct.  So the claims that have those requirements do not

18   exist.

19           You will see that in a number of these other boxes

20   they also have that same requirement.  And for that reason

21   alone, those claims fail too.  So you would have like the

22   Connecticut statute, the Washington statute and the Alaska

23   statute, the California statute.  The same argument I just made

24   would also require the dismissal of the claims under those

25   states.  But I have left them highlighted here just to show you

1    that there are additional reasons that the claims in those

2    states fail.

3             So, for example, if we started with Alaska, Alaska's

4    statute actually enumerates 57 specific practices that violate

5    the statutory provision.  Failure to prevent a data breach or

6    to maintain reasonable security measures, that's not one of the

7    listed offenses.  It is true that the list of offenses is not

8    exclusive, but what's important is that on that list of 57

9    things there is a provision that relates to what happens in the

10   event of a data breach.  And so there is a provision that says

11   it's an unfair practice to fail to properly notify following a

12   breach.

13            That's not at issue here.  But the fact that the

14   legislature considers data breach liability and adopted that

15   one provision and not a broader duty to prevent the breach is

16   indicative, and it requires the dismissal of the Alaska claim

17   as well.

18            With respect to the Washington's statute at issue,

19   that statute does not even apply when a company has been

20   certified PCI DSS compliant in the year leading up to the

21   breach.  And that is the case with respect to Home Depot.  The

22   Plaintiffs have not alleged that there was a failure to obtain

23   PCI DSS certification prior to the breach, and so that statute

24   is just not applicable here.

25            In Minnesota, this is a very specific statutory

1    provision that exists that holds that with respect to

2    specifically enumerated categories of information a company can

3    be liable for holding them for more than 48 hours after a

4    transaction is processed.  The Plaintiffs' complaint when you

5    parse it by paragraph does not allege that the precise type of

6    information at issue was retained or that it was retained past

7    the 48-hour statutory period, so that claim also fails.

8         In Connecticut, the statute applies different

9    standards depending on whether you are talking about passive

10   conduct or active conduct.  Something like a failure to

11   maintain security measures is passive conduct, and so under the

12   case law there is no violation unless there's an independent

13   duty to act in the manner alleged.  There is no independent

14   duty here as we have already discussed, and so the Connecticut

15   claim fails.

16        In Florida, under the Florida Deceptive and Unfair

17   Trade Practices Act, as a preliminary matter there's this whole

18   issue of a failure to allege conduct that is immoral,

19   unethical, oppressive or unscrupulous.  But there's an

20   additional issue to be considered, and that is under FDUTPA

21   there's a strong argument that these businesses can only assert

22   claims under the statute if they are acting as consumers.

23        Your Honor, there's a little bit of a split of

24   authority on that issue.  There are cases that go both ways,

25   and these cases arise out of an amendment that was fairly

1    recent to the statute that allowed businesses to bring claims

2    just like individuals.  The cases holding that a bank must --

3    or that a business must be acting as a consumer are the better

4    recent cases because they look at the legislative history

5    behind that change; and what they conclude is that the change

6    was made simply to give businesses the same rights that

7    consumers had before, individual consumers had before.  And

8    that requires a finding that a business would be a consumer.

9            And under the California statute, with respect to the

10   unfairness claim, as we have discussed there's no oppressive,

11   unscrupulous, immoral conduct.  And with respect to the

12   unlawful claim, here they rely on a statute called the Customer

13   Records Act.  But that is a statute that only protects

14   information provided by customers in the course of their

15   transactions, and it has no applicability to a claim brought by

16   here somebody other than the customer.  And, in fact, we

17   haven't been able to locate any cases brought either under the

18   statute where the private right of action only flows to

19   customers or even under the UCL asserting a claim for violation

20   of this statute by somebody other than a customer.  So at the

21   end of the day, the banks' statutory claims should be dismissed

22   as well.

23           And if you have no questions, Your Honor, that

24   concludes my argument.

25           THE COURT:  All right, Ms. Brown.

1          Mr. Canfield?

2          MR. CANFIELD:   Your Honor, Mr. Guglielmo will be

3    addressing the state statutory claims and the declaratory

4    relief claims.   I will be addressing all of the other issues.

5          The story of The Home Depot data breach from the

6    standpoint of the banks and credit unions in this country

7    begins in early September of 2014.   The things that Governor

8    Barnes was talking about that led up to the breach were unknown

9    to the banks.   They didn't know that Home Depot's IT staff was

10   predicting that there could be a massive data breach of the

11   type that occurred and recommending to senior management that

12   they make changes to prevent it but that senior management was

13   ignoring those recommendations.

14         The banks didn't know as Home Depot's CEO admitted

15   after the breach that their data security systems were

16   "desperately out of date."   The banks didn't know that some of

17   Home Depot's own IT staffers were telling their friends, If you

18   shop at Home Depot, don't use a credit card; pay in cash; it's

19   too risky.   Banks didn't know any of that, and they couldn't

20   have known because Home Depot was telling the world on its

21   website that they were using security measures for their data

22   that was adequate for the kind of data that they maintained.

23         So what happened in the beginning of September 2014?

24         That began the process that caused the banks to find

25   out about this.   There was a black market website that some

1    people refer to as the amazon.com of the black market that

2    announced on September 1 that for the criminals that are its

3    customers it said, "Load your accounts and prepare for an

4    avalanche of cash."  And the next day they put millions of

5    credit cards on their website that came from Home Depot.

6            That set off a feeding frenzy among criminals,

7    particularly in the United States and Canada.  The amazon.com

8    black market website crashed because the criminals were going

9    on there and trying to buy so many cards that the site couldn't

10   handle it.  It caused a tremendous spike over the next few days

11   in fraudulent credit card transactions in this country.  One

12   bank recorded that it had over $300,000 of fraud loss in two

13   hours.  And it just got worse and worse until Home Depot

14   finally about five, six, seven, eight days later copped to the

15   fact that there was a data breach, a massive data breach at its

16   stores, told the banks, and the banks started to cancel all

17   those credit cards that had been compromised in the breach.

18           So in addition to cancelling and reissuing these

19   cards for which they incur substantial costs because not only

20   did they have to produce a new piece of plastic -- they've got

21   to communicate with their customers; they've got to FedEx or

22   mail it; there's substantial costs involved -- they were also

23   forced to pay the fraudulent charges that had been made before

24   -- on these cards before the cards were cancelled.  By law the

25   banks are largely responsible for those fraud losses, and the

1    banks incur costs in connection with investigating those fraud

2    losses.

3         A bank can learn about a fraud loss from a variety of

4    different ways.  One way is a customer calls up and says, I

5    didn't make that transaction.  Well, the bank has got to do an

6    investigation; and they have a person that does that.  And

7    Ms. Dawson is right that banks have procedures in place to do

8    this, but it happens just at a dribble.  After The Home Depot

9    data breach, this process overwhelmed particularly small banks

10   with having to deal with what was a massive situation.

11        The banks lost interest and transaction fees because

12   their cards weren't being used as customers stopped using them

13   and during the period that they were being cancelled and

14   reissued.  But notwithstanding these hard, out-of-pocket

15   losses, Home Depot asserts that a couple of reasons why banks

16   shouldn't even be here in court to try to take advantage of the

17   legal rights that they possess in this country.

18        Their first argument they refer to as standing.  I

19   have been thinking about it as immunity.  What essentially they

20   are saying is, Yeah, we may have been responsible for hundreds

21   and millions and billions of dollars of losses, but there's

22   nobody out there that can do anything about it.  They say that

23   the consumers don't have standing because the banks reimbursed

24   their fraud losses.  They say the banks don't have standing for

25   reasons I don't quite understand even though they are the ones

1    that actually bore the fraud losses.

2              So who gets to sue when there's been a fraud loss?

3              There isn't anybody.  What they are asking for is

4    immunity.

5              We're not seeking as banks damages for something

6    that's going to happen in the future.  We've got hard-dollar,

7    out-of-pocket losses that the banks can point to as Ms. Dawson

8    showed -- suggested.  And, in fact, there has never been to my

9    knowledge, and Home Depot has never cited, a single data breach

10   case brought by a financial institution that has been dismissed

11   for lack of standing.  It doesn't make any sense in these

12   contexts.

13             Let me deal briefly with what I think in all due

14   respect is somewhat of a silly argument.  And maybe I'm

15   old-fashioned and I think that notice pleading is still a rule

16   in this court, but there's no question that we have alleged

17   every one of our named Plaintiffs suffered the cost of

18   reissuing cards and that they were fraud -- the charges for

19   fraudulent use of the cards that they had issued, every single

20   one of them have alleged that.  They apparently say that we

21   should have alleged the same language with regard to each one

22   of those 50 people.

23             If we should have done that, it's my fault.  It was

24   in the original draft.  Our draft complaint was over a hundred

25   pages.  I said, Judge Thrash doesn't need to read all this,

1    same thing.  So we had an introductory paragraph that says each

2    of the following banks suffered these injuries.

3           I'm not aware of any case of this Court or any other

4    court that says you can't allege for standing purposes injuries

5    in a general way.  That's the Lujan case out of the U.S.

6    Supreme Court.  But, you know, if it's necessary that we allege

7    for each one of these banks exactly how many cards they were

8    issued, exactly how much fraud loss they have incurred, the

9    name of their customers who were affected, the names of the

10   employees who were involved in the process, whatever level of

11   detail is necessary, we will do it.  Give us a chance to do it.

12   But we don't think it's necessary.  It's not going to improve

13   Home Depot's ability to defend this case, and it's not

14   necessary to show that the banks have been injured.

15          Clapper that we have talked so much about helps us.

16   We are not talking about mitigation costs that might occur down

17   the road.  What Clapper says is standing can be "based on a

18   substantial risk that harm will occur which may prompt

19   Plaintiffs to reasonably incur costs to mitigate or avoid that

20   harm."  That's exactly what the banks did here.  In fact, the

21   banks have a legal duty to mitigate their damages.  And if they

22   hadn't reissued these cards and let the thieves continue their

23   feeding frenzy and billions of dollars in fraud losses have

24   been run up and we file a lawsuit, you can bet Home Depot would

25   be in here saying, Wait a minute, you should have cancelled and

1    reissued those cards because it would have saved us a billion

2    dollars or more.

3            And it's not just me saying this.  There have been

4    lots of courts that have said it.  Judge Magnuson in Target

5    rejected this argument, said this is not a future harm.  It's a

6    cost warning at the time of the breach.  The First Circuit in

7    the Anderson versus Hannaford Brothers said that the decision

8    to reissue cards is "commercially reasonable judgment in order

9    to mitigate damages."

10           So we don't think that there's a standing issue at

11   all in connection with the claims that we have asserted.

12           THE COURT:  So there's a financial institutions

13   decision in Target?

14           I have only --

15           MR. CANFIELD:  Yes, there is.

16           THE COURT:  -- had the consumer.

17           There's a financial institution?

18           MR. CANFIELD:  There is.  We cited it.  It's in the

19   brief.  And Judge Magnuson rejected the motion to dismiss the

20   negligence counts and dealt specifically with a lot of the

21   issues that are raised in this case.  In fact, he has certified

22   a class.  And we have -- he has gotten that far in the case.

23   And we believe that there are things he said in the

24   certification decision that also bear on this issue.

25           Now, let me talk about this ripeness claim.  And I

1    thought we were here on a motion to dismiss rather than the

2    motion for summary judgment, but let me look at -- let me talk

3    about the ripeness bar.  And under the law, a claim is ripe if

4    it prevents a controversy that is definite and concrete.

5    That's what we got here.  It's not used -- the ripeness

6    doctrine is not used to dismiss a case that's brought to

7    recover damages for harm that's already occurred, generally

8    used in constitutional challenges to a statute or government

9    action.

10          As the Ninth Circuit stated in a case that we cited

11   in our brief, "It's hard to see how a claim for damages could

12   be unripe.  Either a cause of action has accrued so it's ripe,

13   or it has not yet accrued so the complaint fails to state a

14   claim upon which relief can be granted."

15          Home Depot has not cited a single case that involved

16   a claim for damages that was dismissed on ripeness grounds.  It

17   hasn't cited a single data breach case that has been dismissed

18   on ripeness grounds.

19          We heard a lot about this card recovery process and

20   the various contracts that are here.  None of that is before

21   the Court.  We didn't allege that stuff in our complaint, and

22   it would be inappropriate to consider it on a motion to

23   dismiss.  So all of the arguments that are based on that ought

24   to be dismissed out of hand and rejected.  But since Home

25   Depot's brought it up and made allegations about this process,

1    I feel I need to respond.

2            Here's what they didn't tell you.  These card brand

3    recovery processes by definition are not designed to provide

4    full compensation for issuing banks for all their losses.  They

5    specifically state that they provide only partial compensation.

6    And Home Depot essentially admits, says in its brief that the

7    programs might provide reimbursement of a portion of the banks'

8    losses.

9            Second thing, these programs are voluntary.  Banks

10   don't have to participate in them.  Even if they do

11   participate, they don't have to release any claims they have in

12   court.  And the programs specifically say that the participants

13   maintain the right to file claims for negligence and fraud

14   arising out of the things that are covered by these processes.

15   Home Depot doesn't contend otherwise.

16           Next factor, there is no guarantee that any bank will

17   ever get any money from the program even for the limited

18   amounts that are available.  Home Depot doesn't contend

19   otherwise.  It says in its brief that the banks' losses are

20   "potentially recoverable."  It doesn't explain why that's so.

21           Well, let me tell you why.  Whether there's a payment

22   under this process depends upon whether Home Depot is willing

23   to fund it.  The money comes from Home Depot.  So there's some

24   kind of a negotiation that -- secret negotiation that takes

25   place between Home Depot and the various card brands.  And the

1   card brands somehow decide how much money is appropriate if

2   Home Depot is willing to pay it.

3           And we know that in the Target case MasterCard and

4   Target went through that process, and my understanding is that

5   Target said they weren't required to pay anything under this

6   card brand process.  They didn't think it was appropriate

7   legally.  And they used that leverage to get Visa to -- or to

8   get MasterCard to accept less than even what would have been

9   otherwise provided under the process.

10          And this went out to the banks, went out to all the

11  banks.  They put in a release language into the process that

12  wasn't required by the card brand recovery regulations.  And

13  Judge Magnuson in Target looked at it.  He said it wasn't fair

14  and adequate and the proposed settlement didn't pass the smell

15  test.  This is what they want this Court to await the results

16  of before moving on with this case.

17          So look at the practical impact of what they're

18  doing.  They want a delay for some period of time that's

19  largely within Home Depot's control.  Meanwhile, the Plaintiffs

20  are sitting out there with losses.  Apparently, our claims are

21  supposed to be dismissed and we are supposed to wait for the

22  possibility that we might get some few dollars back for the

23  losses that we've sustained.

24          And what happens in the interim?  Does the MDL

25  disband, Plaintiffs' lawyers go home?  Do we wait until the

1    statute expires?

2           There's no guarantee of any of that.  This is really

3    no different than a personal injury case where Plaintiff's got

4    collateral sources like the Defendant in a car crash case

5    coming in and saying you got to dismiss this case on ripeness

6    grounds because the Plaintiff might get some of his medical

7    expenses paid or he's got a disability insurance policy that's

8    out there and maybe that entitles us to some set-off, so it

9    needs to just go away.

10           And then I really find it interesting that Home Depot

11   says that what happens in that card brand recovery process will

12   help the Court.  I think in their brief they said it would

13   enhance the Court's ability to assess liability here.

14           Well, as I said, this is a secret process; but we can

15   deal with the problems of the delay very simply.  There was an

16   investigator's report in this process.  I presume Home Depot

17   has made a report to Visa and MasterCard about what happened.

18   We have asked them to produce that stuff to us.  They won't.

19   Just produce it now and we will know exactly what's going on.

20   You don't have to wait until the end of the process to get the

21   benefit of that.

22           So it would be unprecedented and entirely

23   fundamentally unfair to dismiss this case because Home Depot

24   may reach some sort of an agreement with people with whom it's

25   in business, attended some conferences together and is all

1    interrelated.  With all due respect, we would trust the ability

2    of this Court and a jury of ordinary folks to assess what Home

3    Depot did, whether that was legally appropriate and the damages

4    that were suffered by the bank than would the secret process.

5            Now, let me turn to the substantive claims; and I

6    will talk first about negligence.  And, as Home Depot says,

7    they only challenge our negligence count on two grounds.  One

8    is duty, and the other is the economic loss rule.  They didn't

9    mention the Target case, but in the financial institutions

10   track the judge dismissed this claim which is almost identical

11   to the claim we have.  He said that Minnesota law imposes a

12   duty to act with reasonable care for the protection of others

13   in two situations:  The first, just like the laws in Georgia,

14   general negligence law imposes a general duty of reasonable

15   care when the Defendant's own conduct creates a foreseeable

16   risk of injury to a foreseeable Plaintiff.

17           Then he went on to say that Plaintiffs have plausibly

18   alleged that Target's actions/inactions, disabling certain

19   security features and failing to heed the warnings that as the

20   hackers' attack began caused foreseeable harm to Plaintiffs.

21   And the Plaintiffs have also foreseeably alleged that Target's

22   conduct both caused and exacerbated the harm that they

23   suffered.  And for that reason, he dismissed the challenge to

24   the negligence case.

25           Well, let me look first at the economic loss rule.

1    We allege that the economic loss rule does not apply for three

2    reasons.  First is there's no contract between Home Depot and

3    any of the named Plaintiffs.  Second, we allege that there's an

4    independent duty exception to the economic loss rule that

5    applies here because under Georgia law and under federal law

6    Home Depot had a legal duty to protect the customer information

7    that was in its care.  And then, third, there is the accident

8    exception to the economic loss rule.

9         Home Depot had seriously overstated the extent of the

10   economic loss rule in Georgia.  They rely on the Supreme Court

11   case in General Electric versus Lowe's.  And let me read what

12   the Court in that case said.  It said the economic loss rule

13   generally provides a contracting party who suffers purely

14   economic losses must seek his remedy in contract and not in

15   tort.  And then it goes on to say that under that economic loss

16   rule a Plaintiff can recover in tort only those economic losses

17   resulting from his person or damage to his property.

18        So it's the situation where there's a contract.  The

19   Plaintiff if it's just economic loss for breach of contract can

20   only pursue a claim under the contract.  If he has got personal

21   damage or property damage claims, he can pursue a tort action

22   from based on that contractual relationship.

23        The General Electric versus Lowe's court did not say

24   that anytime a Plaintiff seeks economic losses that aren't

25   caused by property damage or personal injury they can't bring a

1    suit in tort.  That's not what they say.  The issue in the

2    Lowe's case was that Lowe's sought to recover for two pieces of

3    property, one that it owned and one that it didn't own.  And

4    the Supreme Court said -- and it was the issue that was

5    certified to it by the Eleventh Circuit.  With regard to the

6    property that the Plaintiff didn't own, he had no right to

7    claim economic losses.  That's the issue in the case.  It's not

8    a broad expansion of where the economic loss rule is in

9    Georgia.

10          Judge Evans' decision last year in Hanover Insurance

11   Company said the same thing:  The economic loss rule provides

12   that a Plaintiff may not recover in tort for purely economic

13   damages arising from a breach of contract.

14          Judge Duffey said the same thing:  When a party's

15   claim arises from a duty owed in contract and the party only

16   alleges economic damages, the economic loss rule applies.

17          We don't allege a contract between the Plaintiffs and

18   Home Depot.  Home Depot doesn't say there's a contract between

19   the Plaintiffs.  What they say is that there's this chain of

20   contracts out there, none of which are before the Court, can't

21   be construed by the Court but somehow substitute for a direct

22   contract.

23          That's just not an issue the Court can address on a

24   motion to dismiss.  And the District of Maine in the Banknorth

25   case said exactly that because the argument was made, and the

1    court said that the meaning of these various contracts couldn't

2    be determined on a motion to dismiss for purposes of the

3    economic loss rule.

4         Second reason it doesn't apply is the independent

5    duty exception, and this Court's recognized that exception.  If

6    there is a duty, Home Depot had a duty outside of some contract

7    that it may have had with Visa and MasterCard or any others to

8    protect customer data by using adequate security measures, then

9    it can be held liable in a tort action regardless of whether

10   there's a contract or not.

11        And we allege that that duty comes from a number of

12   sources.  It comes from the duty that was recognized in the

13   Target case that applies to everyone in the world that you have

14   to conduct your own -- yourself in a way that prevents a risk

15   of harm for foreseeable people.  And we allege a duty that

16   arises under Section 5 of the FTC act which makes -- the FTC

17   has interpreted the act and makes the failure to have

18   reasonable data security measures an unfair trade practice.

19        We allege other sources of duty which I will get to

20   in a minute, but let me talk then about the accident exception.

21   As other lawyers have said, the economic loss rule does not

22   apply to a sudden or calamitous event which poses an

23   unreasonable risk of injury to other persons or parties.  We

24   say that's exactly what the case was here.  There was a sudden

25   calamitous event which imposed this humongous harm.  And the

1  only court that's ever considered that issue in the data breach

2  case in the District of Arizona held that the accident

3  exception applied and barring prevention the economic loss rule

4  in the data context.

5         What Home Depot wants to do is to limit that.  They

6  say it's limited only in the product liability context but --

7  that's true.  Historically, the economic loss rule in Georgia

8  was limited to products cases.  But in the last few years, last

9  decade or so, it's been applied a little bit more broadly than

10  that.  Home Depot wants to apply it broadly, but they want to

11  apply the exceptions narrowly and limit them to an area that

12  the Supreme Court has expanded a little bit based on a case

13  that was decided 30 years ago.  And there is no Georgia case

14  that says it only applies in a products liability case, and we

15  would say that the same policy reasons that support the

16  accident exception in a product liability case can be used in a

17  data breach case to apply the exception itself.

18         As to duty, the independent duty that we allege that

19  was breached, as I say, the first duty is the general duty to

20  conduct yourself so as not to subject others to a foreseeable

21  and unreasonable risk of harm.  It's recognized in the

22  restatement.  It's recognized by the Georgia Supreme Court.

23  It's recognized by numerous state and federal decisions

24  applying Georgia law.

25         Home Depot in its brief ignores all the cases with

1    the exception of the Bradley Center case.  And they say, well,

2    the rule is really limited to where there's a special

3    relationship.  And it's true that in the Bradley Center case

4    there was a special relationship.

5           A person who was injured by a patient sued the

6    psychiatrist who had been treating the patient and alleged

7    negligence, and the court held that there could be liability

8    there based on the general duty to prevent foreseeable harm.

9    The special relationship came up in the context of the

10   relationship between the doctor and the patient; and the court

11   said the doctor's got a duty to prevent the world as a whole

12   from unreasonable risk of harm from his own conduct, but he

13   only has a duty to prevent third parties from causing that kind

14   of harm if there's a special relationship.  That's where it

15   comes up.  It's not some sort of general exception to all of

16   this.

17          Many courts have recognized this general duty, and

18   they have breach cases both in consumer and financial

19   institution tracks.  Judge Murphy in the Bishop case didn't

20   discuss the duty, but he implicitly recognized it in refusing

21   to dismiss a negligence case involving a data security issue at

22   Shorter University.

23          Home Depot relies extensively on the Willingham

24   decision which was a Report and Recommendation.  Willingham did

25   hold that there wasn't a duty.  It did not consider whether the

1    -- there's not even a mention of the general duty to prevent

2    foreseeable harm to others.  It didn't consider the FTC act,

3    didn't consider anything but a couple of decisions from out of

4    state; and it's just not a persuasive decision.

5         The second source of duty as I mentioned is Section 5

6    of the FTC act.  The Home Depot says you can only consider that

7    in the context of the negligence per se claim.  I don't know

8    why that would be so.  If the federal law, Section 5, imposes a

9    duty on Home Depot to use adequate data security but for some

10   reason it can't be enforced through a negligence per se claim

11   by a particular Plaintiff, there's still a duty.

12        The FTC here we don't know what they are doing.  Home

13   Depot may.  But there could be investigation going on now.  FTC

14   could come in just as they did in Wyndham Hotels' data breach

15   and sue Home Depot, say you violated Section 5 of the FTC act.

16   And it's hard to understand how the FTC could pursue a lawsuit

17   against Home Depot for breaching its duty to maintain

18   reasonable data security but Home Depot has no duty outside of

19   its contract with regard to everybody else in the world.  That

20   just makes no sense.

21        And this issue was considered in a case we cited in

22   our brief but not for this purpose.  It's the TJX MDL decision.

23   It was a data breach brought by financial institutions, and the

24   Plaintiffs allege that the Defendants' lack of security

25   measures was unfair under Section 5 of the FTC act.  They

1    argued that it could be enforced through the Massachusetts

2    unfair trade practices claim, and the court allowed the motion

3    -- or allowed the claim to survive a motion to dismiss.

4           And one of the things that was argued in the case is

5    reminiscent of what Home Depot is doing here.  The TJX argued

6    that all we have got here are consent decrees from the FTC.

7    This is back in 2007 before the FTC got really active in the

8    area.  And the First Circuit disagreed with that argument and

9    said:  Where, as here, a substantial body of FTC complaints and

10   consent decrees focus on a class of conduct, it is hard to see

11   why a court would choose to flatly ignore it.

12          Now, there are other sources of duty.  There are

13   industry standards.  There are some Georgia cases that imply a

14   duty to follow industry standards that are enforceable in court

15   cited in our brief.  And then there are other factors that are

16   useful in the duty analysis.  There's the commitment, public

17   commitment that Home Depot made that it was following industry

18   standards, its own internal rules and guidelines.  And those in

19   and of themselves may not establish the duty, but the duty is a

20   policy issue.  And as the Target case did, it looks to those

21   and says recognizing a duty under these circumstances is not

22   some great leap of faith.  All we're doing is imposing upon

23   Home Depot a duty to do what it's already doing or already

24   should be doing.

25          Now, let me talk about negligence per se.  It's based

1  entirely on Section 5 of the FTC act.  And Georgia law allows a

2  negligence per se claim for breach of a statute or a regulation

3  or a directive that establishes a standard of conduct.  We

4  allege that Section 5 as interpreted by the FTC requires Home

5  Depot to have adopted reasonable data security practices, that

6  Home Depot violated the statute and that its violation supports

7  a negligence per se claim.

8       Home Depot says three reasons why that doesn't

9  follow.  The first is that Section 5 does not impose a clear

10  standard of conduct.  It says the FTC guidelines don't have the

11  force of law.  And it says Plaintiffs are not within the class

12  that's protected by Section 5.  None of those arguments have

13  merit.

14       The FTC on its website sums up what it's doing in all

15  these consent decree cases, enforcement actions, and says:  A

16  company's data security measures must be reasonable in light of

17  the sensitivity and volume of consumer information it holds,

18  the size and complexity of its data operations and the cost of

19  available tools to improve security and reduce vulnerability.

20       Our contention is that Home Depot violated that

21  standard which is what the FTC applies under Section 5.  The

22  FTC also issues guidelines which in the Wyndham case the Third

23  Circuit called it a checklist of what should be included in a

24  sound security program.  Those are useful.  They tell Home

25  Depot what should be included.

1              Well, what the FTC does is leave the decision about

2      what's reasonable under the circumstances to each business.

3      They don't try to mandate particular security measures because

4      each business is different.  But the negligence per se rule in

5      Georgia does not require that the FTC be any more specific than

6      what it is.  The only requirement under Georgia law is that

7      there be an identifiable standard of conduct from the statute,

8      regulation or directive.  And the standard here according to

9      the FTC is reasonableness.

10             The Georgia Supreme Court addressed the issue in

11     Teague versus Keith, and they rejected the argument that Home

12     Depot is making.  What the Georgia Supreme Court said in that

13     case is, "Where a statute provides a general rule of conduct,

14     although only amounting to a requirement to exercise ordinary

15     care, the violation thereof is negligence as a matter of law or

16     negligence per se, whereas in the absence of such a statute the

17     jury is left to determine whether such conduct constitutes

18     negligence."

19             That principle is applied in other cases.  That's the

20     principle that we are relying on here.

21             Wyndham Hotel is directly on point.  Wyndham said

22     that -- they argued to the Third Circuit, We don't have

23     knowledge of any standard; all that's out there is the FTC

24     Section 5 says it's an unfair practice; we don't know that it's

25     unfair.

1            And what the Third Circuit did is it said it's that

2    reasonableness standard.  And Wyndham said, well, these

3    guidelines don't impose any specific requirements.  And what

4    the Third Circuit said is they are not imposing specific

5    requirements; they are imposing -- the FTC is imposing a

6    standard of care.  And Wyndham had notice of that; and the FTC

7    was entitled to pursue enforcement action to ensure that its

8    duty was complied with, exact same thing as here.

9            The Georgia Supreme Court's decision in the Wells

10   Fargo Bank versus Jenkins case upon which they rely is not to

11   the contrary.  That was a case in which Congress just set a

12   statute that said it's a policy that banks protect their

13   customers' information.  Supreme Court said that's an

14   aspirational standard -- or aspirational statement.  There's no

15   standard.  The standard was left for regulation, and the

16   regulations have never been adopted.  So Jenkins didn't

17   overrule the Teague line of cases that I have talked about.

18   And the federal statute at issue in the Jenkins case is totally

19   different than the one involved in Section 5 because, as I say,

20   Section 5 has a definite standard of conduct -- reasonableness.

21           Home Depot argues again, as I said, their second

22   argument, the guidelines and borders lack the force of law.

23   Whether they have the force of law or not doesn't matter.  What

24   matters is the reasonableness standard has the force of law,

25   and that's what we seek to impose just as the FTC might do if

1    it comes in and brings an action against Home Depot.

2            The last argument is that Plaintiffs are not consumed

3    so as a result are not within the class of persons Congress

4    intended to protect.  That's just not true.  We have cited two

5    cases that were brought to enforce regulations that were

6    adopted under Section 5 by businesses.  And the argument in one

7    of those cases was made by the Defendant, You can't bring that

8    cases because you're a business, not a consumer.  The Court

9    rejected it.  And if you had to be a consumer, neither one of

10   these cases could have gone forward.

11           The fact that businesses can -- are protected by

12   Section 5 is consistent with the FTC's longstanding view of

13   Section 5.  We have cited numerous examples of enforcement

14   actions in which the FTC has taken action on behalf of

15   businesses.  The FTC has pursued enforcement actions in a data

16   breach case in the Wyndham case in which they specifically

17   allege that one of the problems in that case in their complaint

18   was the damage that was being caused to businesses as a result

19   of the breach.

20           And the courts have recognized.  The TJX data breach

21   case out of the First Circuit, we didn't cite it for this

22   purpose, but it's instructive.  It's helpful.  The state courts

23   have weighed in on the issue.  They frequently analyze

24   Section 5 in conjunction with lawsuits brought under the state

25   Unfair and Deceptive Trade Practices Act.

1    And there are two cases we didn't cite in our brief I

2    will quote.  One is Western Star Trucks versus Big Iron

3    Equipment.  And I don't have the cite, but I can get it for the

4    Court.  "It is clear that 15 U.S.C., Section 45(a)(1)" --

5    that's Section 5 -- "is not limited to consumer transactions."

6    And Larsen Chelsey Realty Company versus Larsen, 656 A.2d 1009

7    Connecticut says, "The federal courts have repeatedly and

8    historically applied the provisions of Section 5 to situations

9    not involving consumers."

10    So we think all of the requirements of a negligence

11    per se claim have been properly pled, and as a result it would

12    be improper to dismiss that claim.

13    Thank you, Judge, for your attention.  And I will

14    turn to Mr. Guglielmo.

15    THE COURT:  Well, let's take a 15-minute break and

16    then I will hear the remainder of the arguments.

17    MR. GUGLIELMO:  Thank you, Your Honor.

18    THE COURT:  Court's in recess for 15 minutes.

19    (A short recess was taken.)

20    MR. GUGLIELMO:  Good afternoon, Your Honor.

21    THE COURT:  Good afternoon.

22    MR. GUGLIELMO:  My name's Joseph Guglielmo.  I'm

23    going to be handling, Your Honor, as Mr. Canfield said, the

24    equitable claim as well as the state statutory claims.  And I

25    know I have about 15 minutes, but I will try to do it in less

1    time because I know Your Honor has been on the bench for a very

2    long time today, and we appreciate your time.

3          Your Honor, Home Depot intends to recast the

4    equitable claims that the Plaintiffs have alleged claiming that

5    these equitable claims focus on past conduct.  In reality, they

6    focus on ongoing and current future conduct, Your Honor.  A

7    review of the complaint itself establishes that we have not

8    simply alleged past conduct.  In fact, we allege that Home

9    Depot's data security measures remain inadequate and that they

10   remain at risk of a future data breach until such practices

11   change.  Those paragraphs, Your Honor, include paragraphs 214,

12   221, 228, 238, 279, 282.

13         Your Honor, Home Depot also disputes the factual

14   allegations of our complaint.  They say we fixed all the

15   problems that caused the data breach.  That's what they say in

16   response to the motions.  So, therefore, we don't need

17   declaratory relief.

18         Your Honor, as an initial matter, that argument is

19   inappropriate on a motion to dismiss.  There's no evidence in

20   the record that they have actually substantively cured these

21   problems that we believe are systemic in nature and are long

22   ongoing in our complaint.  We detail a number of facts, Your

23   Honor, that show that they basically didn't prioritize.  In

24   fact, data security was at the bottom of the priority list.

25         Your Honor, not only they argue that -- they change

1    the factual allegations or dispute them; they also argue that

2    our claims aren't plausible.  Well, you only have to look at

3    what happened in the facts that we have alleged in detail to

4    show that it is plausible that another data breach could occur

5    because this was something that was ingrained in the corporate

6    structure.

7              And, Your Honor, we cited a number of cases that

8    support our argument that similar allegations were sufficient

9    at the motion to dismiss stage.  In fact, we cited the In Re

10   Adobe case out of the Northern District of California which was

11   denied at motion to dismiss declaratory injunctive claims.  We

12   cite the In Re Sony Gaming case out of the Southern District of

13   California.  And, importantly, we cite the Target consumer

14   case.  The consumers in Target alleged -- asserted a claim

15   under declaratory relief and injunctive relief.

16             And, Your Honor, it's not just a theoretical argument

17   here.  If you look at the settlement agreement between Target

18   and the consumers, in Section 5.2 of their settlement

19   agreement -- and this is filed in the court before

20   Judge Magnuson -- there is substantial declaratory and

21   injunctive relief that Home Depot -- I'm sorry -- Target must

22   abide by for a period of five years.  This is not something

23   that's just theoretical.  These are actual claims.  And so we

24   believe that the declaration that we seek is appropriate.

25             We seek a declaration from this Court that Home Depot

1    continues to owe a legal duty to secure its customers' personal

2    and financial data and that Home Depot continues to breach this

3    duty by failing to employ reasonable data security measures.

4    And I know counsel stated that our allegations may not be as

5    clear with respect to our declarations, somehow we may be

6    declaring that we are seeking damages, Your Honor.  And that's

7    not what we are seeking.

8         Our declaration is not seeking to remedy past

9    conduct, and nor is our declaration seeking damages.  And to

10   the extent that there's any confusion, Your Honor, that can be

11   adjusted with respect to the Court at its discretion in

12   applying the declaration modifying some of the language that we

13   have.  It's not our intent.  In fact, we disclaim damages with

14   respect to the declaratory and injunctive claims, Your Honor.

15        Next Home Depot argues that our claims fail because

16   damages will be an adequate remedy.  And they cite Your Honor's

17   Atlas Roofing case.  Well, there, Your Honor, as you know, in

18   Atlas Roofing you dismissed that claim basically saying the

19   Plaintiffs didn't allege that the legal remedy would be

20   inadequate.  There was no allegation.  Here we have allegations

21   in the complaint.  I should note, Your Honor, you know, no one

22   mentioned this; but you -- Your Honor denied the motion to

23   dismiss the declaratory relief claims in Atlas Roofing, so it

24   was with respect to the injunctive claims that were dismissed

25   there.

1          And we pointed to the In Re Managed Care case out of

2     the Southern District of Florida.  There Judge Moreno indicated

3     that to determine whether money damage would be an adequate

4     remedy was something that couldn't be decided on a motion to

5     dismiss, and we believe that case is dispositive here as well.

6          And, Your Honor, in our complaint we specifically set

7     forth the allegations of why money damages would not be an

8     adequate legal remedy, and that's at paragraph 282.

9          With respect to the other arguments they raise on the

10    declaratory -- I'm sorry.  With the other arguments they raise

11    on the associational standing claims, Your Honor, we have our

12    associations, there are 17 of them in the complaint.  They

13    range from associations such as the Georgia Union Credit League

14    which is a local association to the National Association of

15    Credit Unions or CUNA.  Your Honor, those 17 associations stood

16    up to be part of this case because they have a legitimate

17    interest in making sure that their members are protected from

18    inadequate data security.

19         The associations are necessary to this case because

20    the financial institutions, certain of them don't want to stand

21    up on their own.  They are afraid of either retribution or they

22    just don't want to spend the time and the effort; they don't

23    have the time or resources to do it.  So it's appropriate for

24    the associations to be here.

25         And the other thing, Your Honor, is the associations

1   provide invaluable resources to counsel on these issues.  They

2   are working with their client.  They are at the forefront.

3          With respect to the three-part test, Your Honor, we

4   believe that we satisfied all three prongs, the first prong

5   being that the members would otherwise have standing.  We

6   believe we satisfied that.

7          The second prong was that the interests of the

8   associations are germane to their purpose.  We believe that

9   obviously protecting their financial institution members from

10  inadequate data security is clearly a germane interest.

11         And the third prong which is the only prong that Home

12  Depot challenges is they challenge the prong saying that

13  individual participation is necessary.  And in the opposition

14  -- or in the motion to dismiss they say the reason why is

15  because we are seeking damages.  And the associations are not.

16  They specifically disclaimed three times paragraphs 6, 62 and

17  285 that the associations are here seeking declaratory and

18  injunctive relief.

19         So the cases that we cite, including the Eleventh

20  Circuit case, Borrero versus United Health, which is

21  610 F.3d 1296, 1306, and the In Re Managed Care case, Your

22  Honor, both of those cases deny motions to dismiss associations

23  based on similar claims where they are seeking declaratory and

24  injunctive relief.  They are not seeking damages.  So with that

25  argument, Your Honor, we believe we satisfied the associational

1    standing under the Hunt test.

2         Your Honor, we have additional standing allegations

3    that were not challenged in the motion to dismiss or in the

4    reply which is that the associations have standing in their own

5    right.  We have alleged that they have diverted resources

6    necessary to actually participate and to challenge Home Depot's

7    inadequate data security measures.  And we cite the Arcia case

8    out of the Eleventh Circuit, 772 F.3d 1335 at 1341 and '42,

9    diversion of resources was sufficient to confer standing for an

10   association.  That's unrebutted.

11        Your Honor, I will briefly turn to the state

12   statutory claims.  I'm not going to repeat what's in our

13   papers.  I believe with respect to Article III standing

14   Mr. Canfield has done a very good job of explaining why the

15   financial institutions have Article III standing not only for

16   the negligence, negligence per se claims, but also why they

17   have Article III standing for the state statutory claims.

18        Your Honor, it's interesting to note when talking

19   about the state statutory claims what Home Depot fails to

20   acknowledge is just five cases on point with respect to the

21   eight states that we bring.  We brought claims for eight

22   states, Your Honor.  And the In Re Target case, there the

23   appellate claims by financial institutions under the Minnesota

24   Card Act, that's the same claim that we are bringing here.  The

25   In Re TJ Maxx case, a First Circuit decision Mr. Canfield

1   cited, that case reversed dismissal of Chapter 93(a) which is

2   the same thing we're bringing brought by financial

3   institutions.  And those were based on the unfairness prong of

4   Section 5, again, same type of claim we're bringing here.

5            In Re Heartland, that's out of the Southern District

6   of Texas; but that case denied motion to dismiss the FUDTPA

7   claims, the Florida Unfair Deceptive Trade Practice claims.

8   And those were brought by financial institutions.  And it's

9   worthy to note, Your Honor, in that case the Court held that

10  the financial institutions had standing to bring that case.

11  They did not -- it wasn't limited to consumers.  So it's a case

12  directly on point.

13           The last two cases I'll cite are not financial

14  institution cases, but they are yet cases dealing with data

15  breaches.  It's the Adobe case.  There the claims were upheld.

16  The consumers have Article III standing.  Claims for unfair

17  competition, unfair prong which is what we bring were upheld,

18  as well as declaratory relief in violation of the Consumer

19  Records Act.

20           And then the last case out of Illinois is the In Re

21  Michaels Stores case.  There the claims were upheld on a motion

22  to dismiss Illinois Consumer Fraud Act.  And, Your Honor, it's

23  also worthy to note that Home Depot in its reply really doesn't

24  -- they don't even respond to the arguments we make with

25  respect to Illinois or Massachusetts.

1           I will just turn briefly to the three states that

2    don't have case law on point or directly on point with respect

3    to data breach.  It's Alaska, it's Connecticut and it's

4    Washington.  We believe as an initial matter, Your Honor, all

5    those states' statutory claims follow Section 5 of the FTC.  So

6    to the extent our claims are predicated on fairness claims

7    which they are, the Section 5 FTC claims of inadequate data

8    security measures would constitute a basis for our claim.

9           As you turn to Alaska, some of the arguments -- very

10   quickly just responding to what the Defendants argued earlier,

11   they say that we need to specify a particular provision that's

12   been breached.  Well, they acknowledge that the statute itself

13   says it's not an exclusive list.

14          And so what do they say?

15          They say, well, there's a requirement of a

16   notification of a data breach.  And so, you know, that's a

17   notification statute.  Somehow they must have contemplated that

18   a breach isn't a violation but a failure to notify is.

19          It just doesn't make any sense, Your Honor; and it's

20   contrary to what the statute says.  The statute basically says

21   this list is not exclusive.

22          THE COURT:  Five minutes, Mr. Guglielmo.

23          MR. GUGLIELMO:  Okay.  I'm on the home stretch, Your

24   Honor.

25          With respect to the Connecticut claim, they say we

1   engaged in simply passive conduct.  I find that hard to

2   understand because all you need to do is read some of the

3   allegations in the complaint, and they specifically allege

4   active conduct.

5           Deliberately turning off the NTP firewall despite the

6   warnings they have received, that's paragraph 129.

7   Specifically using old versions of software despite the fact

8   there are semantics telling them to use new versions of

9   software, 143.  Your Honor, we have a number of paragraphs in

10  the complaint that talk about the active conduct.  So to the

11  extent they claim it's simply passive, it's not.

12          And with respect to the issue that it's passive

13  conduct, there is passive conduct in here.  But we do state a

14  duty.  As Mr. Canfield indicated, there's privacy policies and

15  industry standards.  So in either way, we meet the

16  requirements.

17          The Washington public -- Washington Consumer

18  Protection Act claim, Your Honor, they basically argue, well,

19  we were PCI compliant so that gives us an act.  Well, there's

20  nothing in the record, Your Honor, that supports that they were

21  PCI compliant.  In fact, what we cite is their own 2015 Form

22  10K filed with the SEC which they state:  A forensic

23  investigation working on behalf of the payment card networks

24  alleged that we were not in compliance with certain of the PCI

25  DSS standards at the time of the 2014 data breach.

1          So for the Defendants to argue that they were

2     compliant, they point to nothing.  That's really not a basis to

3     dismiss.

4          With respect to the unfair prong and the unlawful

5     prong in California, the unfair prong, Your Honor, does not

6     require that the predicate act be one that we have standing

7     for.  And the case we cite which is -- there's numerous cases,

8     but it's called Chabner versus United Omaha Life.  And that

9     says it does not matter whether the underlying statute also

10    provides for a private right of action.  17-200 can form the

11    basis for a private cause of action even if the predicate

12    statute does not.  We have a few other cases that say that.

13         So for The Home Depot Defendants to argue that we

14    can't use the Consumer Records Act as a violation of the unfair

15    prong is just incorrect.  They also throw in that we're not

16    consumers.  The statute itself 17-201 says any injured

17    individual can bring a claim.

18         Your Honor, if you have any questions for me.  If

19    not, I'm done.

20         THE COURT:  All right.  Thank you very much.

21         Ms. Dawson, you've got 13 minutes of your time left.

22         MR. GUGLIELMO:  Your Honor, can I raise one point

23    with my last remaining minute?

24         Mr. Canfield had reminded me before the break that we

25    had forgotten to mention something with respect to the Target

1    case.  Your Honor, in the Target case on the motion to dismiss

2    the consumers' claim, there the Court analyzed the economic

3    loss rule of five states.  With respect to Georgia, it did not

4    find Willingham persuasive.  And it basically said because of

5    the independent duty exclusion it did not find that the

6    economic loss rule would apply.

7          And I just wanted to mention that to you.  So if you

8    look at the In Re Target Data Breach action, the consumer

9    motion to dismiss there, the Court did not apply the economic

10   loss rule of Georgia.

11         THE COURT:  All right.

12         Ms. Dawson?

13         MS. DAWSON:  Thank you, Your Honor.  Ms. Brown and I

14   will split our 13 minutes.

15         Point number one, Your Honor.  And if I could have

16   slide six up, please.

17         The requirements of notice pleading are set forth in

18   Warth v. Seldin, Iqbal and Twombly.  Quite simply, the

19   conclusory statements made by the financial institutions,

20   essentially everybody was injured, everybody was injured the

21   same way, here are a list of some injuries, with nothing more

22   simply does not meet the pleading standard set forth in Supreme

23   Court precedent that applies here that was correctly applied by

24   Magistrate Judge King in dismissing the Global Payments case.

25         Point number two, Your Honor.  A question was raised,

1    who can sue.  Clapper answers that question, Your Honor, as to

2    who can sue.  Mr. Loveland read the entire footnote from

3    Clapper which again was omitted in the argument presented by

4    opposing counsel.  Plaintiffs' counsel read only a portion of

5    Clapper to the Court:  Standing does not exist where the

6    occurrence of harm will depend upon the decisions of

7    independent third parties and a speculative chain of future

8    events.

9             Next slide, please.

10            For all the mitigation costs, in addition to being

11   costs that are part of the ordinary course of business, first

12   of all, going back to Warth v. Seldin, Iqbal and Twombly, none

13   of those operating expenses are specifically alleged.  On the

14   standard of substantial risk of harm, again, this goes back to

15   the conclusory nature of the allegations in this complaint,

16   Your Honor.  There is no factual content, no facts alleged to

17   support a claim of a substantial risk of harm and certainly no

18   facts alleged to support a claim that a threat is certainly

19   impending.

20            This speculative chain of future events that third

21   parties intervene, that, Your Honor, is not enough to confer

22   standing under Article III.  Those individuals, those banks who

23   could actually meet the Clapper standard, that's who has

24   standing to sue, Your Honor.  But if you don't raise your

25   factual allegations to establish that those requirements are

1  met under the Clapper decision, then, no, you do not have
2  standing to sue.
3        Point three, Your Honor, is the Plaintiffs say in
4  Target that opinion on the banks' -- excuse me -- on Target's
5  motion to dismiss the banks' claims that somehow that should be
6  persuasive to the Court.  First of all, Your Honor, Target did
7  not challenge the bank's standing.  It was never analyzed by
8  the Court.  And, therefore, that order is irrelevant vis-a-vis
9  our standing arguments.  As Mr. Loveland stated, the analysis
10  by the Court in Target on the consumer order on the motion to
11  dismiss, similar to the order in Target on the financial
12  institution motion to dismiss, the detailed analysis of
13  individual Plaintiff claims and, again, standing was not
14  addressed at all.  And, therefore, that's not relevant to the
15  arguments on standing.
16        Finally, Your Honor, the bulk of the time is spent
17  talking about The Home Depot and this whole concept of being
18  immune from liability.  Nothing could be further from the
19  truth, Your Honor.  The Home Depot is taking responsibility for
20  what occurred.  The Home Depot is holding itself accountable.
21  Immediately after the breach it took responsibility notifying
22  consumers, offering to provide free credit monitoring
23  protection.
24        And, Your Honor -- next slide, please -- through the
25  card brand recovery process The Home Depot will be paying

1    millions and millions of dollars that the issuing banks,

2    Plaintiffs here, will be able to recover for fraud and for

3    certain operating expenses.  And it is very important, Your

4    Honor, to note that these operating expenses -- those are the

5    mitigation costs that were on the prior slide -- those, not

6    recoverable under Clapper, not recoverable under litigation,

7    yet and still to the card brand recovery process they are

8    actually going to be able to recover losses they can't recover

9    in court in addition to the fraud losses.

10            Now, let me take one step back.  And I apologize,

11   Your Honor, because there seems to be an issue as to whether or

12   not any of this is even properly before the Court.

13            As I noted before, paragraph 86 of the Plaintiffs'

14   complaint they actually talk about and name, you know, who's

15   the merchant, who's the acquiring bank, who's the issuing bank,

16   who's the card brand.  They bring it up in their complaint,

17   Your Honor.  They talk about the process of a payment card

18   transaction.

19            In paragraph 93, they talk about Home Depot's duty;

20   and they point to specifically rules governing payment card

21   transactions, the industry standards.

22            In paragraph 169, payment card processors and

23   networks, including Visa and MasterCard, issue card operating

24   regulations that are binding on Home Depot.  Such regulations

25   were in place long before the 2014 data breach.

1          Paragraph 170, the card operating regulations require

2     Home Depot to protect cardholder data and prevent its

3     unauthorized disclosure.

4          Paragraph 171, Home Depot violated the card brand

5     operating regulations.

6          So, Your Honor, this is properly before the Court.

7     And in addition to the card brand recovery process we will

8     admit has not been the subject of a decision in a data breach

9     case, it is true the ripeness cases that are cited in our

10    briefing are not about data breaches.  But it's the principle,

11    Your Honor, and the logic and the rationale behind the ripeness

12    doctrine that makes sense here.

13         Essentially, litigation as we all know, lot of time,

14    lot of money, lot of resources, lot of expense, and there's

15    uncertainty associated with it.  The banks could be here and on

16    appeal to the Eleventh Circuit and ultimately at the end of the

17    day perhaps recover, perhaps not recover.  The card brand

18    recovery process -- and this is why so many banks participate

19    in it -- is a process, a streamlined process, by which in the

20    event of a data breach which, again, is anticipated through

21    that card brand network of contracts the banks have the

22    opportunity to recover funds in a streamlined process and not

23    wait for all this litigation to take place.

24         And, Your Honor, in terms of just to give you a

25    context of why dismissing and/or staying, Your Honor, there's

1    some worry about statute of limitations running and things like

2    that, but staying and waiting for this process to play out, the

3    top ten banks account for approximately 60 to 70 percent of the

4    potentially compromised payment cards.  And they normally do --

5    again, this is a process that is part of the ordinary course of

6    business.  This goes on whether or not there is litigation or

7    there isn't litigation.

8            They do agree to releases, Your Honor.  And one of

9    the reasons why they agree to release is because they can get

10   the money now, the issue is behind them.  And, Your Honor, The

11   Home Depot also is required to sign a release.  The Home Depot

12   -- and Mr. Canfield did allude to this -- could, in fact,

13   choose to contest some of the fines or assessments by the card

14   brands.  But in exchange for paying millions and millions and

15   millions of dollars that will go to the issuing banks as part

16   of this process, they too are waiving certain rights.

17           And so, Your Honor, at the end of the day, by either

18   dismissing or staying really this makes sense because at this

19   point these particular banks cannot plausibly allege they have

20   an unreimbursed expense.  And, Your Honor, the confusion and

21   potential risk to Home Depot of double recovery is real.

22           Now, we have the card brand process going over here

23   and the litigation going over here.  How are we in a systematic

24   way able to track and ensure that banks that take advantage of

25   the process sign a release or even not sign a release that are

1  not going to come back into this court and try to get

2  additional moneys?

3        Again, there's no prejudice to the banks by delaying

4  and waiting and dismissing or either staying this.  But the

5  card brand process should be allowed to run its course.  And,

6  again, Home Depot is taking responsibility and being

7  accountable.  And this idea of being immune, no, Your Honor.

8  Through that recovery process, millions of dollars will be paid

9  by The Home Depot as a result of the data breach.

10        THE COURT:  Ms. Brown, you have got four minutes.

11        MS. BROWN:  I was afraid you were going to say that.

12        Okay.  I want to start quickly with the Plaintiffs'

13  argument with respect to negligence per se.  And there we heard

14  an argument that the FTC guidelines and the consent orders, in

15  fact, do provide some type of an ascertainable standard of

16  conduct that is sufficient to give rise to a negligence per se

17  claim.  But they do not.

18        And so if you look at the Wyndham opinion, if you

19  look at those Footnotes 21 and 22, Footnote 21 the Third

20  Circuit says:  We agree with Wyndham the guidebook could not on

21  its own provide ascertainable certainty of the FTC's

22  interpretation of what specific cyber security practices

23  violate Section 5.

24        The same in Number 22:  We agree with Wyndham the

25  consent orders which admit no liability and which focus on

1    perspective requirements on the Defendant were of little use to

2    it in trying to understand the specific requirements imposed by

3    Section 5.

4           There's no ascertainable standard of conduct, and

5    that is why the Plaintiffs haven't cited a single case where a

6    court has found negligence per se based on a violation of the

7    unfairness prong of Section 5.

8           Second, Your Honor, on the economic loss rule, we

9    heard some debate over whether privity is required.  And the

10    Plaintiffs disagree with Home Depot's interpretation of the

11    Lowe's versus General Electric case.  At the end of the day,

12    Lowe's versus General Electric the Georgia Supreme Court upheld

13    the application of the economic loss rule when there was no

14    contract between the Plaintiff and the Defendant.

15           But if the Plaintiffs don't like that decision, we

16    can point you to many others where courts have held there is no

17    privity requirement with respect to the application of the

18    economic loss rule.  You can look at the Re/Max case, you can

19    look at the Benator case, you can look at the Adventure

20    Outdoors case, all cited in our brief.  All hold no privity.

21    And as we have discussed, there are a number of cases

22    dismissing data breach claims under the economic loss rule.

23           To the extent that the Court were to think that there

24    is a privity requirement -- and there is not -- if you look at

25    the Annett case which is cited in our briefs, and it's under

1    Iowa law, it says when the parties enter into a chain of

2    contracts even if the two parties at issue have not actually

3    entered into an agreement with each other courts have applied

4    the contractual economic loss rule to bar tort claims for

5    economic loss on the theory that tort law should not supplant a

6    consensual network of contracts.  That is the consensual

7    network of contracts we have here between these sophisticated

8    financial institutions who are involved in the issuing of

9    payment cards as a valuable, profitable line of their business

10   and who have covered that risk through their contracts with the

11   card brands.

12        And the last thing that I'll say is on the Target

13   decision.  There has been some discussion of the Target

14   decision and the fact that the court there found a duty that

15   existed from Target to the financial institutions.  That case

16   was wrongly decided, but it's also distinguishable.

17        In that case, the parties all agree that for purposes

18   of the motion to dismiss there was one law and one law only

19   that governed.  It was Minnesota law.  And in reaching the

20   decision, there was a duty of care.  The court relied heavily

21   on a duty that it found existed under the Minnesota Plastics

22   Act.

23        When we were talking about the state statutory

24   claims, we established that the Minnesota Plastics Act does not

25   apply based on the allegations of this complaint.  But, also,

1    in the Target decision there was not one word of discussion

2    about the lack of a relationship between Target and the banks

3    and --

4              THE COURT:  Time's up, Ms. Brown.

5              MS. BROWN:  Okay.  Thank you, Your Honor.

6              THE COURT:  Well, these cases obviously involve

7    difficult questions of law and policy; and I wouldn't even

8    begin to think about ruling from the bench on something like

9    this.  So the arguments have been very helpful, and I'll get

10   out a written order as soon as I can.

11             MR. CANFIELD:  Your Honor, the parties have a joint

12   request of the Court.  We believe that it makes sense for the

13   Court to have a status conference to consider some issues, one

14   of which has some time sensitivity.  And I don't know what the

15   Court's calendar is like before Thanksgiving.

16             The parties have conferred.  And if by any chance the

17   Court is available the morning of November 16th, that works for

18   us.  If the Court has other dates that are available, we will

19   do our best to make sure that we can be.

20             THE COURT:  Well, I've got a criminal trial that I'm

21   starting week after next; and I'm just not sure how long that

22   criminal case is going to last.  You can get in touch with my

23   office week after next and see how that's going, and I will be

24   glad to schedule a status conference sometime between the end

25   of that trial and Thanksgiving.

1          MR. CANFIELD:  Thank you very much, Judge.

2          THE COURT:  All right.  Thank you very much, counsel.

3          Court's in recess until further order.

4          (Proceedings adjourned at 3:14 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT:

4    NORTHERN DISTRICT OF GEORGIA:

5

6              I hereby certify that the foregoing pages, 1 through

7    144, are a true and correct copy of the proceedings in the case

8    aforesaid.

9              This the 13th day of November, 2015.

10

11

12

13              _____

14              Susan C. Baker, RMR, CRR
                Official Court Reporter
15              United States District Court

16

17

18

19

20

21

22

23

24

25