**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| _____ | ) | |
| In re: The Home Depot, Inc., Customer | ) | Case No.: 1:14-md-02583-TWT |
| Data Security Breach Litigation | ) | |
| | ) | |
| This document relates to: | ) | |
| | ) | |
| CONSUMER CASES | ) | |
| _____ | ) | |

**<u>MEMORANDUM OF LAW IN SUPPORT OF CONSUMER
PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS
SETTLEMENT AND FINAL CERTIFICATION OF SETTLEMENT CLASS</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................... i

TABLE OF AUTHORITIES ......................................................................... iii

I.     INTRODUCTION ............................................................................. 1

II.    RELEVANT BACKGROUND ........................................................ 3

       A.     The Data Breach ................................................................. 3

       B.     Consumer Plaintiffs' Claims and Home Depot's Motion to
              Dismiss ................................................................................ 4

       C.     Discovery ............................................................................. 6

       D.     Settlement Negotiations and Preliminary Approval .............. 7

III.   THE SETTLEMENT ........................................................................ 9

       A.     The Settlement Class ........................................................... 9

       B.     Settlement Benefits .............................................................. 9

              1.     Cash Settlement Fund ............................................... 9

              2.     Identity Guard Monitoring Services ......................... 10

              3.     Injunctive Relief ...................................................... 11

       C.     Class Notice and Claims Process ....................................... 13

       D.     Opt-Out and Objection Procedures ..................................... 14

       E.     Payment of Administrative and Notice Costs ...................... 14

       F.     Attorneys' Fees, Costs and Expenses; Service Awards ........ 14

       G.     Release ............................................................................... 15

IV.    THE  SETTLEMENT   MEETS  ALL  OF  THE  STANDARDS  FOR
       FINAL APPROVAL .................................................................... 15

       A.     The Proposed Settlement Warrants Final Approval ............. 15

       B.     The Settlement Is the Result of Good Faith, Arm's-Length
              Negotiations Conducted by Informed and Experienced Counsel
              with the Assistance of an Experienced Mediator .................. 17

C. The Settlement Is Fair, Adequate, and Reasonable Under the *Bennett* Factors ....................................................................... 19

    1. The Settlement Benefits Outweigh the Uncertainty of Success at Trial ......................................................................... 19

    2. The Settlement is Within the Range of Possible Recoveries and is Fair, Adequate, and Reasonable ................... 22

    3. Continued Litigation Would Be Complex, Expensive, and Lengthy................................................................................ 26

    4. The Substance and Degree of Opposition to the Settlement.................................................................................... 28

    5. The Stage of Proceedings Allowed Plaintiffs to Evaluate the Merits of the Case and the Settlement Relief ...................... 28

D. The Court Should Confirm Certification of the Settlement Class ........ 29

    1. The Criteria for Class Certification under Rule 23(a) are Satisfied................................................................................ 30

        a. Numerosity ........................................................................ 30

        b. Commonality .................................................................... 31

        c. Typicality.......................................................................... 33

        d. Adequacy of Representation............................................. 34

    2. The Settlement Class Satisfies the Requirements of Rule 23(b)(3) ............................................................................... 35

        a. Predominance .................................................................. 35

        b. Superiority ........................................................................ 37

E. Notice to the Settlement Class Complied With Due Process. .............. 38

V. CONCLUSION................................................................................. 40

# TABLE OF AUTHORITIES

**CASES**

*Agan v. Katzman & Korr, P.A.*,
    222 F.R.D. 692 (S.D. Fla. 2004) .......................................................................37

*Allapattah Servs., Inc. v. Exxon Corp.*,
    333 F.3d 1248 (11th Cir. 2003) ........................................................................36

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ...........................................................................30, 35, 37

*Anderson v. Garner*,
    22 F. Supp. 2d 1379 (N.D. Ga. 1997) ..............................................................30

*Appleyard v. Wallace*,
    754 F.2d 955 (11th Cir. 1985) ..........................................................................33

*Ault v. Walt Disney World Co.*,
    692 F.3d 1212 (11th Cir. 2012) ........................................................................33

*Behrens v. Wometco Enters., Inc.*,
    118 F.R.D. 534 (S.D. Fla. 1988) ................................................................22, 23

*Bennett v. Behring Corp.*,
    737 F.2d 982 (11th Cir. 1984) ...........................................16, 17, 18, 23

*Burrows v. Purchasing Power, LLC*,
    No. 1:12-CV-22800, 2013 WL 10167232 (S.D. Fla. Oct. 7, 2013)....................20

*Canupp v. Sheldon*,
    No. 204-CV-260-FTM-99DNF, 2009 WL 4042928 (M.D. Fla. Nov. 23,
    2009) ................................................................................................17, 18, 19

*Carnegie v. Household Int'l, Inc.*,
    376 F.3d 656 (7th Cir. 2004) ............................................................................37

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
    258 F.R.D. 545 (N.D. Ga. 2007). .................................................................30, 34

*Cooper v. Southern Co.*,
    390 F.3d 695 (11th Cir. 2004) ..........................................................................33

*Cox v. Am. Cast Iron Pipe Co.*,
    784 F.2d 1546 (11th Cir. 1986) ........................................................................31

*Wilson v. EverBank*,
  No. 14-CIV-22264, 2016 WL 457011 (S.D. Fla. Feb. 3, 2016) ........................24

*Figueroa v. Sharper Image Co.*,
  517 F. Supp. 2d 1292 (S.D. Fla. 2007).................................................................23

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ..............................................................................35

*Hines v. Widnall*,
  334 F.3d 1253 (11th Cir. 2003) ......................................................................33, 34

*In re Corrugated Container Antitrust Litig.*,
  643 F.2d 195 (5th Cir. 1981) ................................................................................23

*In re Countrywide Financial Corp. Customer Data Security Breach Litig.*,
  No. 3:08-MD-01998, 2009 WL 5184352 (W.D. Ky. Dec. 22, 2009) 19, 25, 32, 36

*In re Disposable Contact Lens Antitrust Litig.*,
  170 F.R.D. 524 (M.D. Fla. 1996) .........................................................................33

*In re Hannaford Bros. Co. Customer Data Security Breach Litig.*,
  293 F.R.D. 21 (D. Me. 2013) ................................................................................21

*In re Heartland Payment Sys., Inc. Customer Data Security Breach Litig.*,
  851 F. Supp. 2d 1040 (S.D. Tex. 2012)...............................................19, 25, 32, 36

*In re Motorsports Merchandise Antitrust Litig.*,
  112 F. Supp. 2d 1329 (N.D. Ga. 2000) ...................................................16, 17, 22

*In re Nissan Motor Corp. Antitrust Litig.*,
  552 F.2d 1088 (5th Cir. 1977) ..............................................................................39

*In re Target Corp. Customer Data Security Breach Litig.*,
  No. 14-2522 (PAM/JJK), 2015 WL 7253765 (D. Minn. Nov. 17, 2015)....passim

*In re U.S. Oil & Gas Litig.*,
  967 F.2d 489 (11th Cir. 1992) .......................................................................16, 20

*In re WorldCom, Inc. Sec. Litig.*,
  388 F. Supp. 2d 319 (S.D.N.Y. 2005) ...................................................................26

*Ingram v. The Coca-Cola Co.*,
  200 F.R.D. 685 (N.D. Ga. 2001) ..........................................................................18

*Juris v. Inamed Corp.*,
  685 F.3d 1294 (11th Cir. 2012) ............................................................................38

*Leszczynski v. Allianz Insurance*,
   176 F.R.D. 659 (S.D. Fla. 1997) ........................................................................30

*Lipuma v. American Express Co.*,
   406 F. Supp. 2d 1298 (S.D. Fla. 2005).............................................20, 23, 26, 28

*Meyer v. Citizens and Southern Nat'l Bank*,
   677 F. Supp. 1196 (M.D. Ga. 1988)..................................................................16

*Perez v. Asurion Corp.*,
   501 F. Supp. 2d 1360 (S.D. Fla. 2007)..............................................................26

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ........................................................................................38

*Prado-Steinman v. Bush*,
   221 F.3d 1266 (11th Cir. 2000) .......................................................................33

*Ressler v. Jacobson*,
   822 F. Supp. 1551 (M.D. Fla. 1992) .....................................................20, 26, 28

*Saccoccio v. JP Morgan Chase Bank, N.A.*,
   297 F.R.D. 683 (S.D. Fla. 2014) ...............................................................20, 38

*Shane v. Humana, Inc.*,
   No. 00-MD1334-MORENO, 2009 WL 7848518 (S.D. Fla. Nov. 5, 2009) .......20

*Sharf v. Fin. Asset Resolution, L.L.C.*,
   295 F.R.D. 664 (S.D. Fla. 2014) ......................................................................31

*Stewart v. Winter*,
   669 F.2d 328 (5th Cir. 1982) ...........................................................................31

*Terrill v. Electrolux Home Products, Inc.*,
   295 F.R.D. 671 (S.D. Ga. 2013)......................................................32, 33, 35, 37

*Vega v. T-Mobile USA, Inc.*,
   564 F.3d 1256 (11th Cir. 2009) .......................................................................31

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ....................................................................................31

*Warren v. City of Tampa*,
   693 F. Supp. 1051 (M.D. Fla. 1988) ................................................................16

*Williams v. Mohawk Indus.*,
   568 F.3d 1350 (11th Cir. 2009).......................................................................31

## RULES

Fed. R. Civ. P. 23(a)..............................................................30, 31, 33, 34

Fed. R. Civ. P. 23(b) ................................................................. 30, 35, 40

Fed. R. Civ. P. 23(c)(2)......................................................................13

Fed. R. Civ. P. 23(e), (e)(2) ...................................................1, 16, 38, 40

## EXHIBITS

Exhibit 1 - Declaration of Norman E. Siegel

Exhibit 2 - Declaration of Kenneth Jue

## I.   <u>INTRODUCTION</u>

The Court previously granted preliminary approval of the proposed Settlement Agreement (hereinafter, "Settlement") reached by and between Consumer Plaintiffs ("Plaintiffs") and Defendants Home Depot U.S.A., Inc. and The Home Depot, Inc. ("Home Depot") (collectively, the "Parties") in this case. *See* ECF No. 185 (Preliminary Approval Order). Notice of the Settlement has now been disseminated to Class Members pursuant to the Notice Program set forth in the Settlement Agreement. By this motion, Plaintiffs respectfully ask the Court to grant final approval to the Settlement, reached after seven months of arms-length negotiations under the supervision of a highly-qualified mediator. The Settlement is fair, reasonable and adequate and it meets and exceeds the established legal standards governing final approval. Fed. R. Civ. P. 23(e)(2).[1] The Settlement provides significant benefits to the Settlement Class Members that are well-tailored to the nature of the harm alleged.

In support of this memorandum, Consumer Plaintiffs submit herewith the Declaration of Norman E. Siegel as Exhibit 1 and the Declaration of Kenneth Jue on Behalf of Settlement Administrator Regarding Notice as Exhibit 2.

---

[1] Class Counsel has submitted a separate motion and supporting papers seeking approval of service awards for Class Representatives and for reimbursement of attorneys' fees, costs and expenses.

*First*, Home Depot will establish a cash fund of $13 million to compensate Class Members for documented out-of-pocket losses, unreimbursed charges, and time spent remedying issues relating to the Home Depot data breach, up to $10,000, including up to five hours of documented time at $15 per hour. Class Members who submit claims for documented losses may also self-certify time spent remedying issues relating to the data breach at $15 per hour for up to two hours.

*Second*, Home Depot will separately fund 18 months of "identity protection" services available to all Class Members who had their payment card data compromised through Identity Guard's "Essentials" package, which provides Social Security number monitoring, online black market monitoring, identity theft victim assistance, and identity theft insurance of $1 million, among other benefits. This service has a retail value of approximately $180 per enrollee and helps mitigate possible future harm caused by the breach.

*Third*, in order to protect the important privacy interests of Class Members, Home Depot will significantly upgrade its data security practices, maintain the position of Chief Information Security Officer, conduct routine product and data risk assessments, design and implement reasonable safeguards to manage any risks identified through its risk assessments, select and retain service providers capable of maintaining reasonable security practices, implement a dynamic security

2

program that addresses changing security concerns, maintain clear written disclosures about the storage of customer information, and implement enhanced employee training procedures and point-of-sale security measures.

Home Depot is bearing the costs of the Notice Program and the other costs of the Settlement Administrator, as well as any court-awarded attorneys' fees, costs and expenses for Class Counsel, all of which will be paid separately from the benefits provided for the Settlement Class. While the objection and opt-out deadline is still 3 weeks away, the reaction from the Settlement Class thus far has been positive. As of June 23, 2016, with over four months until the claims deadline, over 54,800 claims have been submitted and 29 class members have opted out of the Settlement. *See* Exhibit 2, Declaration of Kenneth Jue ("Jue Decl."), ¶ 8. To date, only one objection has been submitted. *See* Exhibit 1, Declaration of Norman Siegel ("Siegel Decl."), ¶ 20.

## II.   **RELEVANT BACKGROUND**

### A. The Data Breach

In September 2014, Home Depot announced that its payment systems had been breached. Home Depot's investigation revealed that, between approximately April 10, 2014 and September 13, 2014, hackers used a third-party vendor's credentials to gain control of Home Depot's data systems. The hackers installed malware on Home Depot's self-checkout terminals to steal customers' personal

and financial information, including names, debit and credit card numbers, expiration dates, and three-digit security codes. The same hackers also stole a separate file containing e-mail addresses only. Plaintiffs allege that following the data breach, the hackers sold the stolen data over the Internet, which allowed criminals to make fraudulent purchases and commit other forms of fraud.

### B. Consumer Plaintiffs' Claims and Home Depot's Motion to Dismiss

To prepare the consolidated complaint, Plaintiffs' Counsel conducted in-depth factual research into the events leading to the Home Depot data breach. This factual investigation drew from public and non-public sources and included reviewing announcements by Home Depot concerning the data breach, reviewing news articles, including investigative reports, examining the causes of the data breach, conducting factual research into Home Depot's data security practices, including reviewing information about past breaches of Home Depot's and other retailers' systems and interviewing former employees knowledgeable about Home Depot's internal data security practices, researching warnings and alerts issued by credit card issuers, studying industry standards governing data security, evaluating studies examining data security practices, breaches, risks and the impact of breaches, reviewing Home Depot's annual reports to shareholders, Securities and Exchange Commission (SEC) filings, and privacy policies, and retaining and communicating with knowledgeable consultants and experts on data security. (*See*

Siegel Decl., ¶ 4.) Plaintiffs' Counsel also engaged in comprehensive legal research into potential claims that could be brought on behalf of Consumer Plaintiffs. This included in-depth research into the viability of Article III standing, reviewing claims asserted in previous data breach and consumer privacy litigation, and considering potential claims based on the statutory and common law of all 50 states and the District of Columbia. Plaintiffs' Counsel identified the elements of the claims and governing case law, assessed the viability of the claims through class certification and trial, identified the common evidence available to support each claim, and analyzed Home Depot's likely defenses based on defense theories advanced in other data breach cases. (Siegel Decl., ¶ 5.)

Plaintiffs' Counsel also carefully identified and vetted potential class representatives, gathered and examined documents to confirm their purchases during the relevant period and collected documentary evidence of consumer harm suffered as a result of the breach. The extensive plaintiff vetting process resulted in presenting to the Court a narrowed group of 88 named plaintiffs from across the United States that had suffered both actual and imminent harm resulting from the Home Depot breach and therefore had standing to assert viable claims on behalf of the Class. (Siegel Decl., ¶ 6.)

After an extensive investigation, Plaintiffs filed a comprehensive 185-page Consolidated Class Action Complaint on May 1, 2015 ("Complaint"). (ECF No.

93.) The 88 named plaintiffs ("Named Plaintiffs") asserted claims on behalf of themselves and all Home Depot customers in the United States whose financial and personal information was compromised in the data breach. The Complaint made detailed factual allegations concerning Home Depot's technology and data security practices, the breach, Home Depot's post-breach conduct, and the experiences of each of the Named Plaintiffs. The Complaint asserted causes of action for violations of consumer laws in 51 U.S. jurisdictions, violations of data breach notification statutes in 28 jurisdictions, and common law claims including negligence, breach of implied contract, unjust enrichment, and declaratory judgment. (*See* Siegel Decl., ¶ 7.)

Home Depot moved to dismiss the claims on June 1, 2015, arguing lack of Article III standing and failure to state any claim for relief. (ECF No. 105.) Consumer Plaintiffs opposed the motion with principal and supplemental briefing. (ECF Nos. 117 & 124.) Home Depot also filed a reply. (ECF No. 129.) The Court heard oral argument on October 22, 2015. The parties later notified the Court of their intention to settle the case prior to a ruling on the motion to dismiss.

### C. Discovery

To prepare for discovery, Consumer Plaintiffs' Counsel met and conferred with counsel for the Financial Institution Plaintiffs and Home Depot's counsel on over a dozen occasions. The parties negotiated a scheduling order (Case

Management Order No. 4, ECF No. 107), a discovery protocol (Case Management Order No. 5, ECF No. 110), an expert discovery protocol (ECF No. 111), a confidentiality protective order (ECF No. 132), and a joint motion governing the authentication of documents. (*See* Case Management Order No. 6, ECF No. 155.) At the time of Settlement, the parties were in the final stages of negotiating an ESI protocol. (*See* Siegel Decl., ¶ 8.) Further, with the Court's approval, Consumer Plaintiffs on behalf of themselves and jointly with the Financial Institutions propounded 126 document requests on Home Depot. (*Id*.) The parties then held multiple conferences to negotiate the scope of the requests, search terms, and Home Depot's document custodians. (*Id*.)

### D. Settlement Negotiations and Preliminary Approval

In August 2015, the parties agreed to mediate and engaged experienced mediator Jonathan B. Marks of MarksADR, LLC. The parties participated in two full-day mediation sessions with Mr. Marks on September 1 and 18, 2015. While the parties made significant progress at those sessions, they did not reach agreement. *See* Siegel Decl., ¶ 10. Using the information gained from these sessions however, the parties researched their positions to prepare for further negotiations. For instance, Plaintiffs' Counsel investigated the possibility of providing identity theft monitoring services as a potential settlement benefit that would include an insurance policy to protect customers from future harm. (*See*

Siegel Decl., ¶ 11.) After completing a competitive bidding process among four highly-rated companies in that field, Plaintiffs' Counsel strengthened the Plaintiffs' negotiating position by introducing the monitoring services as an additional form of possible relief. (*Id*.)

In the following months, the parties continued extensive negotiations with the assistance of Mr. Marks. As a result of these efforts, on January 26, 2016, the parties were able to reach an agreement in principle, subject to preparation and execution of a written settlement agreement, on the substantive elements of the settlement. (*See* Siegel Decl., ¶ 12.) The parties did not discuss attorneys' fees, costs, or expenses until they had reached an agreement in principle on the substantive elements of the settlement. (*Id*.) After reaching an agreement in principle, and so notifying the Court, the parties worked diligently to craft the settlement papers, including a notice program and claims processes, working closely with the Settlement Administrator. (*See* Siegel Decl., ¶ 19.) On March 7, 2016, Plaintiffs filed a Motion for Preliminary Approval, together with an executed Settlement Agreement and exhibits. On March 8, 2016, the Court held a hearing on the Motion for Preliminary Approval and issued an order certifying the settlement class, preliminarily approving the Settlement, and directing notice to the Settlement Class.

## III.   THE SETTLEMENT

### A. The Settlement Class

On March 7, 2016, Plaintiffs, on behalf of the Settlement Class, and Home Depot entered into a Settlement Agreement and Release resolving all claims asserted in the Consumer Cases. The Settlement Class is:

> All residents of the United States whose Personal Information was compromised as a result of the Data Breach first disclosed by Home Depot in September 2014.
>
> "Personal Information" means payment card data including payment card account numbers, expiration dates, card verification values, and cardholder names from payment cards used at self-checkout lanes at U.S. Home Depot stores between April 10, 2014 and September 13, 2014, and/or e-mail addresses compromised as a result of the Data Breach.

(Settlement Agreement, ¶¶ 25, 16 (ECF No. 182-2, Ex. A)).

### B. Settlement Benefits

#### 1. Cash Settlement Fund

The Settlement Agreement provides that Home Depot will establish a $13 million Settlement Fund to compensate Settlement Class Members for out-of-pocket losses or unreimbursed expenses fairly traceable to the data breach, such as costs to purchase credit monitoring or to place a freeze or alert on credit reports. (Settlement Agreement, ¶¶ 28, 32). The Fund will also provide reimbursement for any consequential expenses related to fraud or identity theft, such as late fees, declined payment fees, and overdraft fees. Those Settlement Class Members with

supporting documentation may also submit a claim for time spent remedying issues fairly traceable to the data breach to be compensated at $15 per hour for up to five hours. Settlement Class Members with documented out-of-pocket losses or unreimbursed charges who cannot separately document their time, may self-certify the amount of time they spent remedying issues fairly traceable to the data breach and file a claim for up to two hours at $15 per hour. Settlement Class Members who submit valid claim forms and documentation will be eligible for reimbursement up to a maximum of $10,000.

### 2. Identity Guard Monitoring Services

Home Depot will fund 18 months of identity protection services through Identity Guard's "Essentials" package available to all Class Members who had their payment card data compromised as a result of the data breach. (Settlement Agreement, § VI). The Essentials package has a retail value of $9.99 per month that confers a benefit of nearly $180 per enrollee. Identity Guard's services include Social Security number monitoring, online black market monitoring, identity verification alerts, account takeover alerts, identity theft victim assistance, lost wallet protection, password protection, and identity theft insurance up to $1 million. Home Depot will pay $6.5 million to cover all eligible settlement class members who elect to claim this benefit. (Settlement Agreement, ¶¶ 28, 37-39; *see also* ECF No. 181-4; Declaration of Gerald W. Thompson, ¶ 4).

### 3.  Injunctive Relief

Home Depot has agreed to adopt and implement, at a minimum, the following data security measures in its U.S. stores for two years from the effective date of the Settlement Agreement:

a. **Chief Information Security Officer**. Home Depot will maintain an executive position with responsibility to coordinate and be responsible for the company's programs to protect the security of customers' Personal Information.

b. **Product and Data Risk Assessments**. Home Depot will routinely perform risk assessments that identify material internal and external risks to the security of customer Personal Information stored on its systems, which at a minimum will consider risks associated with (1) employee training and management; (2) software design and testing; and (3) vendor data management and security practices.

c. **Safeguard Design Resulting from Risk Assessments**. Home Depot will design and implement reasonable safeguards to manage any risks that are identified through its risk assessments.

d. **Vendor Program**. Home Depot will develop and use reasonable steps to select and retain service providers capable of maintaining security

practices consistent with the requirements set forth in the Settlement Agreement.

e. **Dynamic Security Program**. Home Depot will evaluate and adjust as reasonably necessary its systems on which and by which customers' Personal Information is stored in light of (1) the results of the testing and monitoring required by the Settlement, (2) any material changes to its operations or business arrangements, or (3) any other circumstances that it knows or has reason to know may have a material impact on the effectiveness of its security program.

f. **Notice**. Home Depot will maintain and make available to its customers clear written disclosures explaining that it stores certain customer information and describing how it uses that information.

g. **Employee Education**. Home Depot will maintain a program to educate and train its workforce on the importance of the privacy and security of its customers' Personal Information.

h. **Enhanced Security Measures**. With respect to all consumer credit and debit transactions made in Home Depot's U.S. stores, Home Depot will (1) encrypt all payment card data at the time that such data is input at the point of sale; (2) not retain the card security code data, the PIN verification code number, or the full contents of any track of

magnetic stripe data, after the authorization of the transaction or in the
case of a PIN debit transaction for more than 48 hours after
authorization of the transaction; and (3) implement and utilize EMV
chip card technology.

### C. Class Notice and Claims Process

With Court approval, Counsel implemented multiple types of notice to
ensure the broadest possible reach, including individual notice to all members who
could be identified through reasonable effort. Fed. R. Civ. P. 23(c)(2). On April 21,
2016, the Settlement Administrator posted the Notice to the Settlement Website
located at www.HomeDepotBreachSettlement.com. (Jue Decl., ¶ 3.) On the same
day, the Settlement Administrator commenced the transmittal of the E-Mail Notice
to 61,037,158 Settlement Class Members' email addresses. (Jue Decl., ¶ 4.) The
initial E-Mail Notices were sent on a rolling basis and E-Mail Notice to these email
addresses was completed on May 2, 2016. (*Id*.) On April 22, 2016, KCC began an
Internet notice campaign targeted to adults aged 18 and older who are also credit
card holders. (Jue Decl., ¶ 5.) The targeted Internet notice campaign ran through
May 20, 2016. In total, there were 10,051,628 Internet impressions. (*Id*.) Lastly,
KCC caused the Publication Notice to be published in the May 9, 2016, issue of
*People* magazine, which went on sale on April 29, 2016. (Jue Decl., ¶ 6.)

Combining the direct E-Mail Notice and the targeted Internet notice campaign, the Notice reached approximately 75.4% of the Class. (Jue Decl., ¶ 7.)

The Settlement provides for a consumer-friendly process for Class Members to submit claims online through the dedicated website, www.HomeDepotBreachSettlement.com, which was activated on April 21, 2016 (with an option for submission of claims by U.S. mail). (Jue Decl., ¶ 3.)

### D. Opt-Out and Objection Procedures

Any person within the Settlement Class definition may exclude himself or herself from the Settlement Class by mailing a written request for exclusion to the Settlement Administrator, at the mailing address indicated in the notice. (Settlement Agreement, ¶ 45). Any Settlement Class Member who does not timely and validly seek exclusion may object to or comment upon the Settlement; Class Counsel's fee, cost, and expense application; and/or the requests for service awards.

### E. Payment of Administrative and Notice Costs

Home Depot will pay the costs of providing Class notice and administering the Settlement benefits. Home Depot will pay these costs separately from the other Settlement Class benefits. (Settlement Agreement, ¶¶ 44, 53).

### F. Attorneys' Fees, Costs and Expenses; Service Awards

Consumer Plaintiffs' Counsel are filing concurrently an application for an award of attorneys' fees in the amount of $8.475 million and costs and expenses in the amount of $163,581.93. The attorneys' fees, costs, and expenses awarded by the Court will be paid separately by Home Depot, in addition to the relief for the Settlement Class. (Settlement Agreement, ¶ 49). Consumer Plaintiffs' Counsel is also seeking a service award of up to $1,000 for each Settlement Class Representative,[2] which is intended to compensate such individuals for their efforts in the litigation and commitment on behalf of the Settlement Class. Any Court-approved service awards will be paid from the Settlement Fund. (Settlement Agreement, ¶ 60).

### G. Release

In exchange for the Settlement benefits, Consumer Plaintiffs and the Settlement Class Members will release Home Depot from any claims relating to the issues in this case. Home Depot will similarly release all claims against the Settlement Class and Class Counsel. (Settlement Agreement, § X).

## IV.   THE SETTLEMENT   MEETS ALL OF THE STANDARDS FOR FINAL APPROVAL

### A. The Proposed Settlement Warrants Final Approval

---

[2] Settlement Class Representatives are defined in Paragraph of 27 of the Settlement Agreement.

There is a "strong judicial policy favoring settlement," and an "overriding public interest in favor of settlements." *Meyer v. Citizens and Southern Nat'l Bank*, 677 F. Supp. 1196, 1200 (M.D. Ga. 1988) (citation and internal quotations omitted); *see also In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits."). This is because "[s]ettlements conserve judicial resources by avoiding the expense of a complicated and protracted litigation process and are highly favored by the law." *In re Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333 (N.D. Ga. 2000). The Court has broad discretion in approving a settlement. *Id.*

In approving a settlement under Federal Rule of Civil Procedure 23(e), the district court must find that it "is fair, adequate and reasonable and is not the product of collusion between the parties." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (internal quotations omitted). "The Court [must] make a two part determination that: 1) there is no fraud or collusion in reaching the settlement, and 2) the settlement is fair, adequate and reasonable." *Warren v. City of Tampa*, 693 F. Supp. 1051, 1054 (M.D. Fla. 1988), *aff'd*, 893 F.2d 347 (11th Cir. 1989). Approval of a class action settlement, including application of the foregoing factors, "is committed to the sound discretion of the district court." *U.S. Oil & Gas Litig.*, 967 F.2d at 493; *Bennett*, 737 F.2d at 987.

16

The Eleventh Circuit has held that in determining whether a proposed settlement is "fair, adequate and reasonable," a court should look to the following factors: (1) the plaintiffs' likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate, and reasonable; (4) the complexity, expense, and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved. *See Bennett*, 737 F.2d at 986; *In re Motorsports*, 112 F. Supp. 2d at 1333. As set forth below, the *Bennett* factors strongly support a finding that the Settlement is fair, reasonable and adequate and warrants final approval by the Court.

### B. The Settlement Is the Result of Good Faith, Arm's-Length Negotiations Conducted by Informed and Experienced Counsel with the Assistance of an Experienced Mediator

A threshold consideration in evaluating a proposed settlement is whether it is the product of fraud or collusion between the parties. *See In re Motorsports*, 112 F. Supp. 2d at 1333. "In determining whether there was fraud or collusion, the court examines whether the settlement was achieved in good faith through arms-length negotiations, whether it was the product of collusion between the parties and/or their attorneys, and whether there was any evidence of unethical behavior or want of skill or lack of zeal on the part of class counsel." *Canupp v. Sheldon*, No. 204-CV-260-FTM-99DNF, 2009 WL 4042928, at *9 (M.D. Fla. Nov. 23, 2009) (citing

*Bennett*, 737 F.2d at 987 n.9), *aff'd sub nom. Canupp v. Liberty Behavioral Healthcare Corp.*, 447 F. App'x 976 (11th Cir. 2011).

Here, there was no fraud or collusion. The parties engaged in good faith negotiations over a period of seven months that included two in-person meetings in Atlanta, Georgia with the assistance of a mediator experienced in complex litigation. *See Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("The fact that the entire mediation was conducted under the auspices of . . . a highly experienced mediator, lends further support to the absence of collusion."). As part of their negotiations, the parties exchanged information about the size and scope of the class, possible injunctive relief, the merits of Plaintiffs' claims, and potential mechanisms to mitigate future harm, including evaluating and undertaking a competitive bidding process for identity theft monitoring services. This exchange of information ensured sophisticated and meaningful settlement negotiations.

In evaluating settlement, the Court is "entitled to rely upon the judgment of experienced counsel for the parties." *Canupp*, 2009 WL 4042928, at *5. Through arm's-length negotiations between sophisticated counsel experienced in litigating complex cases, the parties were able to reach an agreement that compares very favorably to settlements in data breach class actions that have been approved by other courts. *See, e.g., In re Target Corp. Customer Data Security Breach Litig.*,

No. 14-2522 (PAM/JJK), 2015 WL 7253765, at *1 (D. Minn. Nov. 17, 2015) (approving settlement that provided $10 million settlement to pay for losses and time spent as a result of Target data breach, and injunctive relief, but no relief specifically addressing future harm); *In re Heartland Payment Sys., Inc. Customer Data Security Breach Litig.*, 851 F. Supp. 2d 1040, 1048-1069 (S.D. Tex. 2012) (approving settlement that provided up to $2.4 million to pay for out-of-pocket losses but no monitoring services); *In re Countrywide Financial Corp. Customer Data Security Breach Litig.*, No. 3:08-MD-01998, 2009 WL 5184352, at *1-4 (W.D. Ky. Dec. 22, 2009) (approving settlement that provided up to $1.5 million to pay out-of-pocket costs, up to $5 million to pay identity theft losses, and 2 years of free credit monitoring services).

The Court is "entitled to rely upon the judgment of experienced counsel for the parties." *Canupp*, 2009 WL 4042928, at *5. Given that there is no evidence of fraud or collusion (and no objectors claim as much), this factor weighs in favor of final approval.

### C. The Settlement Is Fair, Adequate, and Reasonable Under the *Bennett* Factors

#### 1. The Settlement Benefits Outweigh the Uncertainty of Success at Trial

The trial court weighs the first *Bennett* factor, the likelihood of success at trial, "against the amount and form of relief contained in the settlement."

*Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 692 (S.D. Fla. 2014) (quoting *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1319 (S.D. Fla. 2005)). "As settlements are construed upon compromise, the merits of the parties' claims and defenses are deliberately left undecided. Judicial evaluation of a proposed settlement of a class action thus involves a limited inquiry into whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement." *Ressler v. Jacobson*, 822 F. Supp. 1551, 1552-53 (M.D. Fla. 1992). "Furthermore, public policy strongly favors the pretrial settlement of class action lawsuits." *Shane v. Humana, Inc*., No. 00-MD1334-MORENO, 2009 WL 7848518, at *9 (S.D. Fla. Nov. 5, 2009), *report and recommendation adopted sub nom*. *In re Managed Care Litig*., No. 00-1334-CV-MORENO, 2009 WL 7848638 (S.D. Fla. Dec. 1, 2009). This is especially true in "MDL complex class action litigation," where consolidated cases "can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive." *Id*. (quoting *U.S. Oil & Gas Litig*., 967 F.2d at 493).

    Although Plaintiffs are confident in the merits of their claims, success at trial is far from certain. *See Burrows v. Purchasing Power, LLC*, No. 1:12-CV-22800, 2013 WL 10167232, at *6 (S.D. Fla. Oct. 7, 2013) (first *Bennett* factor weighs in favor of approval where "success at trial is not certain for Plaintiff."). Indeed,

despite their firm belief that the record evidence would establish Home Depot's liability and prove damages on a class-wide basis, Plaintiffs faced multiple, ongoing and potentially case-ending risks. (*See* Siegel Decl., ¶¶ 15, 16). These include the significant risks of Home Depot prevailing on its motion to dismiss and the Court finding that some or all Consumer Plaintiffs' did not maintain Article III standing to sue. If some or all claims survived Home Depot's motion to dismiss, Plaintiffs would face the challenges of obtaining and maintaining class certification through trial on state statutory and common law cutting across multiple jurisdictions. (*See id.*) Another risk included establishing causation, which has been a barrier to consumer plaintiffs' success in retailer data breach litigation. *See, e.g.*, *In re Hannaford Bros. Co. Customer Data Security Breach Litig.*, 293 F.R.D. 21, 33 (D. Me. 2013); *Target*, 2015 WL 7253765, at *2 ("proving causation for any established losses will be difficult, given the other large-scale retailer data breaches that occurred at approximately the same time as the Target breach.").

Additional potential risks ameliorated by the settlement include proving damages for class members, both those who suffered unauthorized charges, loss of access to their accounts and costs such as late fees, card replacement fees and credit monitoring services, as well as claims that all class members suffered imminent, certainly impending harm from potential fraud and identity theft. *See Target*, 2015 WL 7253765, at *2 ("the vast majority of the class suffered very

small losses, if any, because out-of-pocket losses for those consumers whose identities were stolen were limited by the card company's reimbursement policies and the identity-theft protection Target offered to all consumers in the wake of the breach. These issues are just a few of the many legal and factual issues that make ultimate success in the consumer track tenuous. This factor weighs in favor of the settlement.").

Even if one or more classes were certified and were successful in establishing liability at trial, the jury could award damages in an amount lower than that sought by the Class or the amount offered in the Settlement. *See In re Motorsports*, 112 F. Supp. 2d at 1334 ("[T]he trial process is always fraught with uncertainty."). Both sides also faced the uncertainties, risks, expense and significant delays associated with appeals that would inevitably be pursued following trial. The proposed Settlement avoids these uncertainties and provides the Settlement Class with meaningful and certain relief.

## 2.  The Settlement is Within the Range of Possible Recoveries and is Fair, Adequate, and Reasonable

The second and third *Bennett* factors—whether the settlement falls within the range of possible recoveries and is fair, adequate and reasonable—can be considered together. *See Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 541 (S.D. Fla. 1988), *aff'd sub nom. Behrens v. Wometco Enters.*, 899 F.2d 21 (11th Cir. 1990) ("The second and third considerations of the *Bennett* test are easily

combined."). As in most litigation, "[t]he range of potential recovery 'spans from a finding of non-liability through varying levels of injunctive relief,' in addition to any monetary benefits to class members." *Figueroa v. Sharper Image Co.*, 517 F. Supp. 2d 1292, 1326 (S.D. Fla. 2007) (quoting *Lipuma*, 406 F. Supp. 2d at 1322). When considering the question of a possible recovery, the focus is on the possible recovery at trial. *See In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981). However, "[a] settlement can be satisfying even if it amounts to a hundredth or even a thousandth of single percent of the potential recovery." *Behrens*, 118 F.R.D. at 542; *see also Bennett*, 737 F.2d at 986 (where range of possible recovery is zero to $12,000,000, a settlement fund of $675,000.00 (or 5.6%) is a fair and adequate sum in view of the risks of further litigation and the fact that damages are not the primary goal of this lawsuit). "[T]he Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality." *Figueroa*, 517 F. Supp. 2d at 1326. "Moreover, the existence of strong defenses to the claims presented makes the possibility of a low recovery quite reasonable." *Lipuma*, 406 F. Supp. 2d at 1323 (citing *Bennett*, 737 F.2d at 986)).

The proposed Settlement here is fair, reasonable, and adequate because it squarely addresses and resolves the issues raised by Plaintiffs in this litigation by providing monetary compensation (up to $10,000 per Class Member) to address

Class Members with past monetary harm, identity and credit monitoring services to address exposure to future harm, and injunctive relief to protect the important privacy interests of Class Members that benefits all Class Members. *See Wilson v. EverBank*, No. 14-CIV-22264, 2016 WL 457011, at *11 (S.D. Fla. Feb. 3, 2016) ("courts rightly consider the value of injunctive and monetary relief together in assessing whether a class action settlement provides sufficient relief to the class.").

This relief is tailored to address the realistic harms caused by a retailer data breach, taking significant measures to ensure a similar breach does not happen again. With respect to the injunctive relief portion of the Settlement, two industry experts have opined that the modifications to Home Depot's data management provide significant relief to the Class:

> [T]he equitable relief provided by this Settlement is of substantial value to the millions of consumers who are victims of the Home Depot data breach incident and to consumers whose credit or debit card data and/or personal information is maintained or in the future will be maintained by Home Depot, in the following ways:
>
> - Increases accountability and centralized responsibility for data breach incident management.
>
> - Improves the company's ability to quickly detect and contain security threats through aggressive monitoring and agile response.
>
> - Raises the level of awareness and understanding about data security and privacy issues among the company's employees (who serve as the first line of defense).

- Reduces the risk of future data breaches for customers, consumers, employees and other stakeholders.

*See* Declaration of Larry Ponemon in Support of Consumer Plaintiffs' Motion for Service Awards, Attorneys' Fees and Litigation Expense Reimbursement ("Attorneys' Fees") (Exhibit 4 to Memorandum in Support ("Ponemon Decl.") ¶ 17); *see also generally* Declaration of John E. Jorgenson ("Jorgensen Decl.") (Exhibit 3 to Memorandum in Support of Attorneys' Fees).

Although the claims process extends to October 29, 2016, the settlement claims indicate that the $13 million fund will be more than sufficient to reimburse consumers with out-of-pocket losses. Moreover, millions of class members are eligible to enroll in Identity Guard monitoring services and *all class members* will benefit from the injunctive component of the Settlement. As discussed above, these benefits compare favorably to settlements in other data breach cases that received court approval. *See, e.g., Target,* 2015 WL 7253765, at *1; *In re Heartland*, 851 F. Supp. 2d at 1048-1069; *Countrywide*, 2009 WL 5184352, at *1-4.

This Settlement establishes a means for prompt resolution of the claims against Home Depot, while avoiding protracted and expensive litigation that could lead to little or no recovery at all. Given the multi-faceted forms of relief available under the Settlement, and the avoidance of the risk and expense of further litigation, this factor likewise weighs in favor of final approval.

### 3.  Continued Litigation Would Be Complex, Expensive, and Lengthy

The complexity, expense, and duration of the litigation all weigh in favor of final approval. In considering this factor, courts "should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Lipuma*, 406 F. Supp. 2d at 1323 (citation omitted). "The law favors compromises in large part because they are often a speedy and efficient resolution of long, complex, and expensive litigation." *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1380 (S.D. Fla. 2007) (quotations omitted).

As noted above, further litigation against Home Depot would necessarily involve significant additional time and money for the class certification evidentiary hearing, merits depositions, *Daubert* motions, summary judgment proceedings, trial, and possible appeals. In light of the costs and delays inherent in litigating this case to trial, the "unpredictability of a lengthy and complex . . . trial," as well as the likelihood of further appellate activity if Lead Plaintiffs were to prevail at trial, "the benefits to the class of the present settlement become all the more apparent." *Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992); *see also In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 337 (S.D.N.Y. 2005) (noting that although litigation prior to settlement "was a costly undertaking for all parties . . . [n]evertheless, further litigation would have resulted in considerable additional

26

expense"). Moreover, the "legal issues" involved in consumer data breach litigation "are cutting-edge and unsettled, so that many resources would necessarily be spent litigating substantive law as well as other issues." *Target*, 2015 WL 7253765, at *2.

A speedy settlement is especially warranted in the data breach context because consumers benefit *immediately* from protections like identity theft monitoring services and injunctive relief. Indeed, the Settlement helps mitigate future harm by permitting Class Members to enroll in Identity Guard's "Essentials" package,[3] which provides Social Security number monitoring, online black market monitoring, identity theft victim assistance, and identity theft insurance of $1 million, among other benefits. The longer this litigation drags on, the more likely consumers are to suffer identity theft or fraud without having this additional protection in place. Moreover, consumers' personal information maintained by Home Depot will be significantly more secure once the injunctive relief goes into effect and Home Depot is contractually obligated to implement the data security measures discussed above. Thus, the Settlement's guaranteed and immediate recovery and protection weigh strongly in favor of final approval. *See, e.g.*, *Target*, 2015 WL 7253765, at *2 ("early settlement of this case benefits the Plaintiff class immensely, and this factor weighs heavily in favor of the settlement.").

---

[3] Identity Guard offers identity theft protection and credit monitoring services to consumers.

### 4.   The Substance and Degree of Opposition to the Settlement

The deadline for Settlement Class Members to opt-out or object is July 18, 2016. While that deadline is still three weeks away, the reaction to the Settlement thus far has been positive. As of June 23, 2016, 29 Settlement Class Members have opted out of the Settlement Class (Jue Decl., ¶ 8), and only one objection has been submitted. (Siegel Decl., ¶ 20.) The positive reaction thus far further supports the reasonableness of the Settlement. *See, e.g.*, *Ressler v. Jacobson*, 822 F. Supp. 1551, 1556 (M.D. Fla. 1992) ("small amount of opposition strongly supports approving the Settlement"); *Lipuma*, 406 F. Supp. 2d at 1324 ("a low percentage of objections points to the reasonableness of a proposed settlement and supports its approval.").

### 5.   The Stage of Proceedings Allowed Plaintiffs to Evaluate the Merits of the Case and the Settlement Relief

The stage of proceedings at which the settlement was achieved also supports final approval. The purpose of this factor is "to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Lipuma*, 406 F. Supp. 2d at 1324. As explained above, before filing the Complaint, Plaintiffs' Counsel devoted significant time to investigating the facts related to the data breach and Home Depot's subsequent response, including interviewing dozens of witnesses with knowledge about Home Depot's data security practices. These efforts are reflected

in Plaintiffs' comprehensive 185-page Complaint. Counsel also extensively researched potential claims under the laws of the various U.S. states and territories.

After filing the Complaint, Counsel fully briefed and argued the motion to dismiss and engaged in protracted negotiations with Home Depot's counsel over the scope of discovery and settlement terms. Although the exchange of documents had not yet taken place, Counsel had a sufficient understanding of the facts and legal merits of the case, including its strengths and weaknesses, when negotiating the Settlement. As highlighted above, early settlements are particularly beneficial in the data breach context because Class Members can take advantage of settlement benefits that immediately help prevent and address possible future harm. *See Target*, 2015 WL 7253765, at *2 ("early settlement of this case benefits the Plaintiff class immensely"). The parties settled while Home Depot's motion to dismiss was still under advisement. Thus, the parties were incentivized to reach a fair deal while substantial risk remained on both sides. Like the other *Bennett* factors, this factor weighs in favor of final approval as Class Members benefited significantly from early resolution of the case.

### D. The Court Should Confirm Certification of the Settlement Class

For settlement purposes only, Plaintiffs request that the Court confirm the certification of the Settlement Class pursuant to Rule 23 of the Federal Rules of Civil Procedure. When "[c]onfronted with a request for settlement-only class

certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is there be no trial," but must ensure satisfaction with other Rule 23 requirements. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). The Settlement Class satisfies each of the requirements of Rule 23(a) (numerosity, commonality, typicality and adequacy of representation) and of Rule 23(b)(3) (predominance and superiority).

### 1. The Criteria for Class Certification under Rule 23(a) are Satisfied

#### a. *Numerosity*

Rule 23(a)(1) requires that a proposed settlement class be "so numerous that joinder of all class members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs "need only show that it would be extremely difficult or inconvenient to join all members of the class," not "that joinder is impossible." *Columbus Drywall & Insulation, Inc. v. Masco Corp*., 258 F.R.D. 545, 554 (N.D. Ga. 2007) (quoting *Anderson v. Garner*, 22 F. Supp. 2d 1379, 1384 (N.D. Ga. 1997)). "Practicability of joinder depends on factors such as the size of the class, ease of identifying its members and determining their addresses, ease of making service on them if joined, and their geographic dispersion." *Id.* Courts require only that plaintiffs provide "some evidence of the number of members in the purported class, or at least a reasonable estimate of that number." *Leszczynski v. Allianz Insurance*, 176 F.R.D. 659, 669 (S.D. Fla. 1997).

The Eleventh Circuit has held that generally more than forty class members is adequate to satisfy this requirement. *See Sharf v. Fin. Asset Resolution, L.L.C.*, 295 F.R.D. 664, 668-69 (S.D. Fla. 2014) (citing *Cox v. Am. Cast Iron Pipe Co*., 784 F.2d 1546, 1553 (11th Cir. 1986)). Plaintiffs have learned through confirmatory discovery that the Settlement Class consists of approximately 40 million U.S. Home Depot customers who had their payment card data stolen, and 52-53 million individuals who had their email address stolen, with some overlap between the groups. (Siegel Decl., ¶ 18.) Numerosity is easily satisfied.

### b.    *Commonality*

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." *Id*. "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" such that "all their claims can productively be litigated at once." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). The common questions must "generate common *answers* apt to drive the resolution of the litigation." *Id.* (internal quotations omitted). This is a "relatively light burden" that requires "there be at least one issue whose resolution will affect all or a significant number of the putative class members." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1268 (11th Cir. 2009); *Williams v. Mohawk Indus.*, 568 F.3d 1350, 1355 (11th Cir. 2009) (quoting *Stewart v. Winter*, 669 F.2d 328, 335 (5th Cir. 1982)). Indeed, "[t]he commonality element is generally

satisfied when a plaintiff alleges that defendants have engaged in a standardized course of conduct that affects all class members." *Terrill v. Electrolux Home Products, Inc.*, 295 F.R.D. 671, 685 (S.D. Ga. 2013) (internal quotations omitted).

In this case, the Class Members are joined by the common questions of law and fact that arise from the same event—the data breach. These issues include: (1) whether Home Depot failed to adequately protect Settlement Class Members' personal and financial information; (2) whether Home Depot's conduct constituted unfair methods of competition and unfair, deceptive, or unlawful acts actionable under applicable consumer protection laws; (3) whether Home Depot had a legal duty to adequately protect Settlement Class Members' personal and financial information; (4) whether Home Depot breached that legal duty; and (5) whether Home Depot knew or should have known that customers' personal and financial information was vulnerable to attack. These common issues all center on Home Depot's conduct, satisfying the commonality requirement. *See, e.g.*, *Countrywide*, 2009 WL 5184352, at *3 ("All class members had their private information stored in Countrywide's databases at the time of the data breach."); *Heartland*, 851 F. Supp. 2d at 1059 ("Answering the factual and legal questions about Heartland's conduct will assist in reaching classwide resolution.").

c.   *Typicality*

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." *Id*. This requirement "measure[s] whether a sufficient nexus exists between the claims of the named representative and those of the class at large." *Hines v. Widnall*, 334 F.3d 1253, 1256 (11th Cir. 2003) (quoting *Prado-Steinman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)). "[F]actual differences among the claims of the putative class members do not defeat certification." *Cooper v. Southern Co.*, 390 F.3d 695, 714 (11th Cir. 2004) (internal quotations omitted). Typicality is satisfied where claims "arise from the same event or pattern or practice and are based on the same legal theory." *Terrill*, 295 F.R.D. at 686 (quoting *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012)). Like commonality, the typicality requirement is not demanding. *See In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 532 (M.D. Fla. 1996). Therefore, "a strong similarity of legal theories will satisfy the typicality requirement despite substantial factual differences." *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985).

The Consumer Plaintiffs' claims are typical of those of the Settlement Class because they arise from the same data breach and Home Depot's conduct in connection with the data breach. They are also based on the same legal theory that Home Depot failed to protect their personal and financial information. Because

there is a "sufficient nexus" between the Consumer Plaintiffs' claims and the claims of Settlement Class Members, the typicality requirement is satisfied. *Hines*, 334 F.3d at 1256.

### d.    *Adequacy of Representation*

The adequacy requirement is satisfied when "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To make this determination, courts employ "a two-part test: (1) whether plaintiffs have interests antagonistic to the interests of other the class members; and (2) whether the proposed class' counsel has the necessary qualifications and experience to lead the litigation." *Columbus Drywall*, 258 F.R.D. at 555. "The fact that the named plaintiffs may have suffered greater damages does not indicate that named plaintiffs possess interests antagonistic to other plaintiffs." *Id.*

The Consumer Plaintiffs have fulfilled their responsibilities by working with their counsel to prepare and file complaints against Home Depot, providing documents related to the breach to Plaintiffs' counsel, and otherwise assisting in the prosecution of the litigation. They do not have any interests adverse to the interests of the other Settlement Class Members as their claims arise out of the same Data Breach. In addition, this Court previously appointed Plaintiffs' Counsel based on their qualifications and experience. (ECF No. 60.) Because Plaintiffs and

Counsel have devoted considerable time and resources to the case, the adequacy requirement is satisfied.

### 2. The Settlement Class Satisfies the Requirements of Rule 23(b)(3)

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that class treatment is "superior to other available methods for fairly and efficiently adjudicating the controversy." *Id*. Where, as here, a court is "[c]onfronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems." *Amchem*, 521 U.S. at 620.

### a. *Predominance*

The predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623. "Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." *Terrill*, 295 F.R.D. at 688. Predominance does not require that all questions of law or fact be common, but rather that "a significant aspect of the case . . . can be resolved for all members of the class in a single adjudication." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (internal quotations omitted).

The many common questions of fact and law that arise from Home Depot's conduct predominate over any individualized issues. These common questions include whether Home Depot failed to reasonably protect Class Members' personal and financial information, whether it had a legal duty to do so, and whether Home Depot failed to timely notify Class Members of the data breach. Other courts have recognized that these types of common issues arising from a data breach predominate over individualized issues. *See, e.g.*, *Countrywide*, 2009 WL 5184352, at *6-7 (finding predominance where proof would focus on data breach defendant's conduct both before and during the theft of class members' personal information); *Heartland*, 851 F. Supp. 2d at 1059 (finding predominance where "several common questions of law and fact ar[ose] from a central issue: Heartland's conduct before, during, and following the data breach, and the resulting injury to each class member from that conduct").

With regard to potential differences in damages for members of the class, "numerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate." *Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003), *aff'd sub nom. Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005). The predominance requirement is satisfied.

**b.** *Superiority*

Because of the many common issues that predominate in this case, a class settlement is superior to other methods for fairly and efficiently adjudicating these claims. "The inquiry into whether the class action is the superior method for a particular case focuses on increased efficiency." *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692 (S.D. Fla. 2004) (internal quotations omitted). Judicial economy is best served by resolving Plaintiffs' claims as a class. *See Terrill*, 295 F.R.D. at 697 ("A single, coordinated proceeding is superior to hundreds of discrete and disjointed suits addressing the same facts and legal issues.").

Here, a class action is the superior method of adjudicating this controversy. There are millions of Class Members whose claims all raise the same issues of law and fact. Courts have recognized that in retail data breach cases "the vast majority of the class suffered very small losses" meaning that many individual claims are unlikely to be pursued and the class action mechanism provides the only available means of pursuing their claims. *Target*, 2015 WL 7253765, at *2; *see also Amchem*, 521 U.S. at 617 (class action is a superior form of litigation to address "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all"); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a

fanatic sues for $30.00."). Those who do pursue individual remedies risk inconsistent adjudications across varying jurisdictions.

Thus, the Settlement avoids duplicative litigation, saving all parties and the Court significant time and resources. The Settlement provides substantial benefits to all members of a large Class. Under the compelling circumstances of this case, a class action is superior to other available methods for fairly and efficiently adjudicating the litigation.

### E. Notice to the Settlement Class Complied With Due Process.

Rule 23(e) provides that "'notice of the proposed dismissal or compromise [of a class action] shall be given to all members of the class in such manner as the court directs.'" *See Juris v. Inamed Corp.*, 685 F.3d 1294, 1307 n.10 (11th Cir. 2012). "The notice should be 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Saccoccio*, 297 F.R.D. at 691 (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985)). The Notice program utilized here, as set by the Court's May 8, 2016, Order (ECF No. 185), easily meets this standard.

The Notice program was carried out by the Court-appointed Claims Administrator, KCC, a nationally-recognized notice and claims administration firm, under the supervision of Lead Counsel. (*See* Jue Decl., ¶ 1.) On April 21,

2016, KCC posted the Notice to the Settlement Website located at www.HomeDepotBreachSettlement.com. (Jue Decl., ¶ 3.) Also beginning April 21, 2016, KCC provided individual, direct notice to each member of the Settlement Class whose email address was reasonably ascertainable. (Jue Decl., ¶ 4.) In addition, KCC caused the Short-Form Notice to be published in the May 9, 2016, issue of *People Magazine* that went on sale April 29, 2016, and ran an Internet campaign of "banner ads" from April 22, 2016 through May 2, 2016. (Jue Decl., ¶ 5.)

The Notice describes in plain language the Settlement terms, the claims at issue, the releases, the process for objecting to the Settlement and requesting exclusion from the Settlement Class, how to make a claim, all pertinent deadlines, and the time, date and place of the Final Approval Hearing. Moreover, the Settlement Administrator established a dedicated telephone call center and a website to assist potential Settlement Class Members with the Settlement or the claims process. (Jue Decl., ¶ 8.) These efforts to inform Settlement Class Members of the Settlement, and their rights and obligations associated therewith, satisfy due process. *See In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104 (5th Cir. 1977) (holding that notice must contain "an adequate description of the proceedings written in objective, neutral terms, that . . . may be understood by the average absentee class member").

39

This Court approved Lead Plaintiffs' proposed notice plan in its Preliminary Approval Order. (ECF No. 185.) To date, Lead Plaintiffs have satisfied all of the elements of the notice plan approved by the Court. (*See generally* Jue Decl.; Siegel Decl., ¶ 19.) Accordingly, the notice program implemented in this action constitutes the best notice practicable under the circumstances and satisfies the requirements of due process and Federal Rule of Civil Procedure 23.

## V.  <u>CONCLUSION</u>

For the reasons stated herein and in the Lead Counsel Declaration, Lead Plaintiffs respectfully request that the Court: (1) grant final approval of the proposed class action settlement with Defendants The Home Depot, Inc. and Home Depot U.S.A., Inc.; (2) finally certify the Settlement Class pursuant to Federal Rules of Civil Procedure 23(b)(3) and (e); and (3) enter an order and final judgment in this action.

Dated: June 27, 2016                     Respectfully Submitted,

    */s John R. Bevis*

David J. Worley                          Roy E. Barnes
James M. Evangelista                     John R. Bevis
**HARRIS PENN LOWRY, LLP**               **THE BARNES LAW GROUP, LLC**
400 Colony Square                        31 Atlanta Street
1201 Peachtree Street, NE, Suite 900     Marietta, GA 30060
Atlanta, GA 30361                        Telephone: 770-227-6375
Telephone: 404-961-7650                  Fax: 770.227.6373
Fax: 404-961-7651                        roy@barneslawgroup.com
david@hpllegal.com                       bevis@barneslawgroup.com
jim@hpllegal.com

*Consumer Co-Lead Counsel*
*and Steering Committee Members*

John A. Yanchunis, Sr.
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N Franklin Street
Tampa, FL 33602
Telephone: 813-223-5505
Fax: 813-223-5402
jyanchunis@forthepeople.com

*Consumer Co-Lead Counsel*
*and Steering Committee Member*

Tina Wolfson
**AHDOOT AND WOLFSON, P.C.**
1016 Palm Avenue
West Hollywood, CA 90069
Telephone: 310-474-9111
Fax: 310-474-8585
twolfson@ahdootwolfson.com

*Consumer Plaintiffs'*
*Steering Committee Member*

William B. Federman
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma, OK 73120
Telephone: 405-235-1560
Fax: 405-239-2112
wbf@federmanlaw.com

*Consumer Plaintiffs'*
*Steering Committee Member*

*Consumer Liaison Counsel*
*and Steering Committee Members*

Norman E. Siegel
Barrett J. Vahle
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone: 816-714-7100
Fax: 816-714-7101
siegel@stuevesiegel.com
vahle@stuevesiegel.com

*Consumer Co-Lead Counsel*
*and Steering Committee Members*

Daniel C. Girard
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: 415-981-4800
Fax: 415-981-4846
dcg@girardgibbs.com

*Consumer Plaintiffs'*
*Steering Committee Member*

Gary S. Graifman
**KANTROWITZ, GOLDHAMER**
**& GRAIFMAN, P.C.**
210 Summit Avenue
Montvale, NJ 07645
Telephone: 201-391-7600
Fax: 201-307-1086
ggraifman@kgglaw.com

*Consumer Plaintiffs'*
*Steering Committee Member*

41

Howard T. Longman
**STULL STULL & BRODY**
6 East 45th Street
New York, NY 10017
Telephone: 212-687-7230
Fax: 212-490-2022
hlongman@ssbny.com

*Consumer Plaintiffs'*
*Steering Committee Member*