FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUL 20 2016

JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| In re: The Home Depot, Inc., Consumer ) | Case No.: 1:14-md-02583-TWT |
| Data Security Breach Litigation ) | |
| ) | |
| This Document Relates to: ) | |
| ) | |
| CONSUMER CASES ) | |
| ) | |

## OBJECTION TO CLASS ACTION SETTLEMENT, SERVICE AWARDS, AND FEE REQUEST OF *PRO SE* OBJECTOR SAM A. MIORELLI, E.I., ESQ.

i

# TABLE OF CONTENTS

I.  Mr. Miorelli is a class member, has timely filed his claim and this objection, and does not intend to appear at the fairness hearing unless it is rescheduled. ...................................................................... 2

    A.  This Objection is timely filed. ................................................. 5

II.  The Court has a fiduciary duty to the unnamed members of the class and Class Counsel bears the burden of proving the settlement is fair, reasonable, and adequate. ................................................................ 5

III.  The existence of the Side Deal violates Rule 23(e)(3) and Class Counsel's eagerness to hide material facts from the docket demonstrates his conflict of interest requiring his removal. .......................... 9

    A.  The Side Deal violates Rule 23(e)(3). ...................................... 9

    B.  The Side Deal renders the Class Notice inadequate. ......................... 10

    C.  Class Counsel's engagement in the Side Deal demonstrates his conflict of interest with his supposed clients: the absent Settlement Class Members. ................................................... 12

    D.  Consumer Plaintiffs' agreement to the Side Deal demonstrates either their breach of their duty to police the actions of Class Counsel or their inadequacy to represent the absent class members. ........................................................................ 15

IV.  The primary "benefit" to absent Settlement Class Members is something absent Settlement Class Members already have and which is not useful in duplicate. ........................................................ 17

    A.  The Identity Guard service is entirely duplicative of the previously-provided AllClear ID service Home Depot offered its customers and the two $1 million insurance policies cannot be used in combination. ............................................................ 17

    B.  Identity theft monitoring services such as Identity Guard are of little or no value to consumers. ............................................. 22

ii

C.    Even if Identity Guard has non-zero value to an individual consumer, it is unlikely that the 18-month service offered by this settlement is a consumer's only avenue to such service for free, meaning it has zero marginal value to absent Settlement Class Members. ................................................................................. 25

V.    The injunctive relief is illusory. ....................................................................... 31

A.    The "Injunctive Relief" was either already implemented by Home Depot in 2014 or 2015 or much more specific versions of its requirements are already required by the credit card industry's binding standards. ................................................................. 31

B.    Since the various measures in the "Injunctive Relief" section of the Settlement Agreement were already implemented by Home Depot prior to and independent from the Settlement Agreement, they have no value to the Settlement Class Members. ...................................................................................... 36

VI.   The class cannot be certified because Rule 23(a)(4) and (g)(4) require separate representation for subclasses with competing interests. .............. 38

A.    The settling parties bear the burden of proof that the class is properly certified. ............................................................................. 38

B.    The Settlement Agreement creates two different subclasses which are improperly both represented by Class Counsel. ............... 39

C.    Class Counsel's statements show that these subclasses' interests became adverse to each other when Identity Guard was introduced. ..................................................................................... 40

D.    The Consumer Plaintiffs are not members of the second subclass so cannot represent them. ........................................................ 42

VII. The Settlement is a tiny percentage of the value of the Class' damages, demonstrating that Class Counsel and the Consumer Plaintiffs sold out the absent Settlement Class Members and proving the Settlement Agreement does not satisfy the *Bennett* factors. ................. 43

    A. The total recovery is a fraction of the class' injury. ............................ 43

    B. This miniscule settlement is either a sellout by Class Counsel and the Consumer Plaintiffs or a nuisance settlement whose only purpose is the generation of legal fees and incentive awards. ................................................................................................ 45

    C. Class Counsel's analysis of the fourth *Bennett* factor lends further evidence that the Settlement Agreement is aimed more at Class Counsel's pocketbook than the Settlement Class Members'. ................................................................................. 48

    D. Class Counsel's analysis of the final *Bennett* factor also shows that the real purpose of settling at this point is avoidance of risk to the lawyers, not to the Settlement Class Members. ................ 49

VIII. The extensive and unreasonable burdens on objecting violate Rule 23 and make Class Counsel's claims regarding the substance and degree of opposition to the Settlement Agreement spurious. ..................... 51

    A. The objection process unnecessarily requires four signed copies to be mailed to the settling parties and the Court. ................. 51

    B. Objectors who appear through counsel have unnecessary additional hurdles. ............................................................................. 54

    C. The requirements of burdensome disclosure of prior objections demands irrelevant materials whose only purpose is to fuel an *ad hominem* attack on an objector. ..................................... 57

    D. The requirement that an objector personally sign the objection, even if he is represented by counsel, violates Federal Rule of Civil Procedure 11. ................................................................... 58

IX.    The Settlement Agreement violates Rule 23(h). ................................. 59

X.    Mr. Miorelli should be allowed to depose the Consumer Plaintiffs to test their adequacy of representation. ............................... 63

XI.    Even if the class can be certified, the Settlement Agreement is objectively unfair and a class action settlement should not be approved when the primary beneficiaries are the Consumer Plaintiffs and Class Counsel. .............................................. 64

    A.    The "clear sailing" provision of the Settlement Agreement shows self-dealing by Class Counsel. ................................... 64

    B.    The segregated fees fund of the Settlement Agreement demonstrates self-dealing by Class Counsel. .......................... 66

    C.    A large disparity between the recovery of the Consumer Plaintiffs and the absent Settlement Class Members is not permitted under Eleventh Circuit precedent. ........................ 68

XII.    Class Counsel should not get more than the 25% benchmark attorneys' fee calculated on the basis of the benefit to the class, not the gross recovery, much of which is actually a benefit to the Defendant instead of the class. ................................... 72

    A.    The basis for a contingent fee should exclude costs of class notice, Class Counsel's costs, and any incentive payments. .............. 72

    B.    Class Counsel has not provided the required support for his attorneys' fee lodestar calculation, and as such, his fee should not be awarded on the basis of a lodestar analysis. ........................... 75

    C.    The value of any reversion of the Settlement Fund to Home Depot or any *cy pres* award should not be included in the calculation of an attorneys' fee. ............................... 80

XIII.    CONCLUSION ........................................................................ 81

# TABLE OF AUTHORITIES

**Cases**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ..................................... 6, 7, 38, 39

*Ameritrust Co., N.A. v. White*, 73 F.3d 1553 (11th Cir. 1996) ...................................... 10

*Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534 (S.D.Fla 1988) ......................... 47

*Bennet v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984) ................................................ 48

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) ........................................... 11

*Boring v. Bed Bath & Beyond*, 2013 WL 6145706, No. 12-cv-05259-JST (N.D.
    Cal. Nov. 21, 2013) ..................................................................................................... 53

*Chanel, Inc. v. Doan*, 2007 WL 781976 (N.D. Cal. 2007) ............................................... 79

*Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) ........................................................ 8

*Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401 (9th Cir. 1989) ...................... 7

*Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143 (3d Cir. 2005) .......................................... 61

*Evans v. Jeff D.*, 475 U.S. 717 (1986) ....................................................................... 41, 45

*F.T.C. v. Cambridge Exchange, Ltd., Inc.*, 845 F.Supp 872 (S.D. Fla. 1993) ................. 77

*Faught v. American Home Shield Corp.*, 668 F.3d 1233 (11th Cir. 2011) ................. 7, 57

*Galloway v. Kan. City Landsmen*, No. 4:11-1020-CV-W-DGK, 2012 WL
    4862833 (W.D. Mo. Oct. 12, 2012) ........................................................................... 52

*Georgine v. Amchem Prods.*, 83 F.3d 610 (3d Cir. 1996) .............................................. 38

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ............................................... 8

*Hecht v. United Collection Bureau*, 691 F.3d 218 (2d Cir. 2012) .................................. 73

*Holmes v. Continental Can Co.*, 706 F.2d 1144 (11th Cir. 1983) .............................. 70, 71

*In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748 (7th Cir. 2011) ................................... 71

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) .............passim

*In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) ................................................ 81

*In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277 (3d Cir. 2005) ...................................................... 39

*In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013) ......................................... 38

*In re General Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d. Cir. 1995) .................................................................................... 6, 39, 40

*In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220 (5th Cir. 2008) ............................................................................................................ 60

*In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013) ........................................ 81

*In re Mercury Interactive Corp. Securities Litig.*, 618 F.3d 988 (9th Cir. 2010) ........... 64

*In re Motor Fuel Temperature Sales Practices Litig.* , No. 07-md-01840-KHV-JPO, Order (Dkt. No. 3019) (D. Kan. Nov. 10, 2011) ....................................... 53, 54

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088 (5th Cir. 1977) .................... 11

*In re Prudential Ins. Co. America Sales Practices Litig.*, 148 F.3d 283 (3d Cir. 1988) ............................................................................................................ 81

*In re Relafen Antitrust Litigation*, 360 F.Supp.2d 166 (D. Mass. 2005) ......................... 6

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004) ............................. 5

*In Re Washington Public Power Supply Syst. Lit.*, 19 F.3d 1291 (9th Cir. 1994) ........... 8

*Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223 (2000) ......................................... 66

*Irvindale Farms v. W.O. Pierce Dairy*, 78 Ga. App. 670, 51 S.E.2d 712 (1949) ........... 10

*Juris v. Inamed Corp.*, 685 F.3d 1294 (11th Cir. 2012) .................................................. 43

*Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354 (D.D.C. 1983) ............................... 79

*Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581 (3d Cir. 1991) ....................................... 13, 14

*Lipuma v. American Express Co.*, 406 F.Supp.2d 1298 (S.D. Fla. 2005) ....................... 49

*Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142 (9th Cir. 2000) ..................... 67

*Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072 (2nd Cir. 1995) ................. 15

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) .......................... 81

*Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781 (7th Cir. 2004) ..................... 7

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ..........................................7, 43

*Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006) ...............46, 81

*Newman v. Americredit Financial Services*, 2014 U.S. Dist. LEXIS 15728 (S.D.

   Cal. Feb. 3, 2014) ...................................................................................51

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ................................................40

*P & B Marina, Ltd. Partnership v. Logrande*, 136 F.R.D. 50 (E.D.N.Y. 1991) .............77

*Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982) ..........................70, 71

*Plummer v. Chemical Bank*, 91 F.R.D. 434 (S.D.N.Y. 1981) ...........................70

*Prandini v. National Tea Co.*, 557 F.2d 1015 (3d Cir. 1977) ............................40

*Ratcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013) .........43

*Real v. Continental Group, Inc.*, 116 F.R.D. 211 (N.D. Cal. 1986) ...................77

*Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014) .....................72, 73

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) .......................6

*Rodriguez v. Nat'l City Bank*, 726 F.3d 372 (3d Cir. 2013) .............................38

*Sanders v. John Nuveen & Co., Inc.*, 463 F.2d 1075 (7th Cir. 1972) .............12

*Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, ___ F.3d ____, 2016

   WL 3163073 (6th Cir. June 7, 2016) ....................................................77, 78

*Silber v. Mabon*, 957 F.2d 697 (9th Cir. 1992) ..................................................7

*Staton v. Boeing*, 327 F.3d 938 (9th Cir. 2003) ..........................................8, 40

*Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir.

   2006) ......................................................................................................37

*Thomas v. F.F. Financial, Inc.*, 128 F.R.D. 192 (S.D.N.Y. 1989) .....................77

*Trabakoolas v. Watts Water Tech., Inc.,* No. 3:12-cv-01172-WHO (EDL) (Dkt. 276) (N.D. Cal. Feb. 14, 2013) ................................................................ 55

*Twigg v. Sears, Roebuck & Co.,* 153F.3d 1222 (11th Cir. 1998) .................................... 73

*U.S. v. Leventhal,* 961 F.2d 936 (11th Cir. 1992) ........................................................ 76

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.,* 350 F.3d 1181 (11th Cir. 2003) ................................................................................................ 38

*Vassalle v. Midland Funding, LLC,* 708 F.3d 747 (6th Cir. 2013) ........................... 69, 71

*Vizcaino v. Microsoft Corp.,* 290 F.3d 1043 (9th Cir. 2002)............................................. 8

*Vought v. Bank of America, N.A.,* 901 F. Supp.2d 1071 (C.D. Il. 2012) ...................... 66

*Weinberger v. Great Northern Nekoosa Corp.,* 925 F.2d 518 (1st Cir. 1991)................. 65

**Rules**

Federal Rule of Civil Procedure 11 .......................................................................... 58

Federal Rule of Civil Procedure 23 ....................................................................passim

U.S. Court of Appeals for the 11th Circuit Rule 36-2 ................................................ 47

**Other Authorities**

. LifeLock Standard | LifeLock, LifeLock, Inc. (last visited July 16, 2016), https://www.lifelock.com/products/lifelock-standard/ ................................... 21

*2015 ITRC Breach Report,* Identity Theft Resource Ctr. (Dec. 29, 2015), http://www.idtheftcenter.org/images/breach/DataBreachReports_2015.pdf. ......................................................................................................... 25

A C. Wright, A. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1769.1 (1986)................................................................................................ 15

Adam Greenberg, *PNI Digital Media investigates potential credit card 'issue' as more photo center websites go down,* SC Magazine (July 20, 2015), http://www.scmagazine.com/pni-digital-media-investigates-potential-

credit-card-issue-as-more-photo-center-websites-go-
down/article/427406/ ................................................................. 27

American Bar Association, *Model Rules of Professional Conduct* (2016).................. 13

American Law Institute, *Principles of the Law of Aggregate Litig.*, § 3.05(c)
(2010) .......................................................................................... 7

Andrew Blake, *Excellus BlueCross BlueShield hacked; 10.5M patients affected*,
The Washington Times (Sept. 10, 2015),
http://www.washingtontimes.com/news/2015/sep/10/excellus-
bluecross-blueshield-hacked-105m-patients/ ......................................... 28

Anna Wilde Mathews & Danny Yadron, *Health Insurer Anthem Hit by
Hackers*, Wall St. J. (Feb. 4, 2015, 9:39 PM),
http://www.wsj.com/articles/health-insurer-anthem-hit-by-hackers-
1423103720 ................................................................................... 26

Benefits of Identity Theft Coverage, Identity Guard (last visited July 18,
2016), http://www.identityguard.com/how-identity-guard-works/id-
insurance/summary1/ ..................................................................... 18

Benefits of Identity Theft Coverage, Identity Guard (last visited June 16,
2016), https://www.identityguard.com/how-identity-guard-works/id-
insurance/summary1/ ..................................................................... 19

Brian Krebs, *Are Credit Monitoring Services Worth It?*, Krebs on Security
(Mar. 19, 2014), http://krebsonsecurity.com/2014/03/are-credit-
monitoring-services-worth-it/ ...................................................... 22, 23

Brian Krebs, *Sources: Trump Hotels Breached Again*, Krebs on Security (April
4, 2016), http://krebsonsecurity.com/2016/04/sources-trump-hotels-
breached-again/ ............................................................................. 27

California Attorney General Data Breach List, Costco (Sept. 21, 2015), https://oag.ca.gov/system/files/Costco%20General%20Notice%20Sample_0.pdf...........................................................................................27

California Attorney General Data Breach List, Rite Aid Corp. (last visited June 16, 2016), https://oag.ca.gov/system/files/Rite%20Aid%20Notification%20Letter_0.pdf .............................................................................................27

Chad Terhune, *UCLA Health System data breach affects 4.5 million patients*, L.A. Times (July 17, 2015), http://www.latimes.com/business/la-fi-ucla-medical-data-20150717-story.html...................................................29

Charles Silver, *Due Process and the Lodestar Method*, 74 Tul. L. Rev. 1809 (2000)..........................................................................................................67

Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L. Rev. 71 (Jan. 2007)....................53

Conte, 1 Attorney Fee Awards § 2.05 .......................................................81

Cyber Security Update, Scottrade, Inc. (Oct. 1, 2015), https://about.scottrade.com/updates/cybersecurity.html ...............................28

Evidence of Coverage: All Members Except NY and WA State Residents Stolen Identity Event Insurance, LifeLock, Inc. (last visited July 16, 2016), https://www.lifelock.com/legal/united-specialty-insurance-company/ .......21

*Fact Sheet 33: Identity Theft Monitoring Services,* Privacy Rights Clearinghouse (June 2016), https://www.privacyrights.org/identity-theft-monitoring-services...........................................................................18

Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (2010) (the "FJC Judge's Class

Notice Guide") (last visited July 17, 2016),
http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotC
heck.pdf ............................................................................................... 55, 56

*Fraley v. Facebook, Inc.*, No. 11-cv-01726 RS (N.D. Cal. Jun. 7, 2013),
Declaration of Jennifer M. Keough Regarding Settlement Administration
(Dkt. 341) ................................................................................................. 54

FraudScout Identity Monitoring and Protection | IDT911, IDT911, LLC.
(last visited July 16, 2016), http://idt911.com/products/fraudscout ................ 21

Herbert Newberg & Alba Conte, Newberg on Class Actions (4th ed. 2002) ........... 6

How Identity Guard Works, Identity Guard (last visited July 18, 2016),
http://www.identityguard.com/how-identity-guard-works/ ......................... 18

ID Experts, *MyIDCare Credit Edition Terms of Service (TOS)*, (last visited
June 16, 2016)
https://www.idexpertscorp.com/TOSPF.aspx?ParticipantID=808413 ............ 19

Identity Theft Protection Plan | Protection Against Company, Computer,
Internet & Insurance Identity Theft & Credit Card Fraud – Identity
Fraud, Identity Fraud, Inc. (last visited July 16, 2016),
https://my.identityfraud.com/protection.html ..................................................... 21

Identity Theft Protection Service | Protect My ID, (last visited June 16,
2016), http://www.protectmyid.com/our-product-benefits .............................. 20

Information Announcement Excellus BlueCross BlueShield Cyberattack
Identity Theft Protection Services & Credit Monitoring, N.Y. Office of
General Services (Sept. 21, 2015),
https://bsc.ogs.ny.gov/sites/default/files/Excellus_Cyberattack.pdf ............ 28

IRS Statement on "Get Transcript," (Feb. 26, 2016),
   https://www.irs.gov/uac/newsroom/irs-statement-on-get-transcript..........27

Lester Brickman, *Lawyer Barons* (2011) ........................................................67

Letter to Consumers, T-Mobile CEO on Experian's Data Breach, John
   Legere, CEO, T-Mobile USA, Inc. (Oct. 1, 2015), http://www.t-
   mobile.com/landing/experian-data-breach.html ................................................28

Letter to Customers, Mark Emery, Director of Integrated Services, Project
   Management Institute, (filed with the California Attorney General on
   July 14, 2016),
   https://oag.ca.gov/system/files/Standard%20Notice%20%284%29_1.p
   df......................................................................................................................20

Letter to Employees and Former Employees, Mitchell R. Creem, CEO,
   Verity Health System (filed with the California Attorney General on May
   31, 2016),
   https://oag.ca.gov/system/files/Verity%20Health%20System%20-
   %20Sample%20Notice_0.pdf..............................................................................20

Letter to New Hampshire Attorney General, CVS Pharmacy, Inc., Notice
   Pursuant to N.H. Rev. Stat. Ann. § 359-C:20 (Sept. 10, 2015),
   http://doj.nh.gov/consumer/security-breaches/documents/cvs-
   20150910.pdf ....................................................................................................27

Marilyn Malara, *IRS data breach worse than first reported, 720k accounts*
   *hacked*, UPI (Feb. 27, 2016),
   http://www.upi.com/Top_News/US/2016/02/27/IRS-data-breach-
   worse-than-first-reported-720K-accounts-hacked/9351456585762/ ..................27

Monitoring Services: Stay Informed of Important Activity, AllClear ID (last
  visited July 18, 2016),
    https://www.allclearid.com/personal/services/monitoring-services/ .......... 18
OPM, *Cybersecurity Resource Center CYBERSECURITY INCIDENTS What
  Happened, (*last visited June 16, 2016)
    https://www.opm.gov/cybersecurity/cybersecurity-incidents/ .................... 26
OPM, *Cybersecurity Resource Center SIGN UP FOR SERVICES*, (last visited
  June 16, 2016) https://www.opm.gov/cybersecurity/ ....................................... 26
Press Release, Anthem, Inc. (June 10, 2015),
    https://www.anthemfacts.com/pdf/Revised+Subsitute+Notice+(6-10-
    15).pdf ........................................................................................................... 26
Press Release, The Home Depot Completes Malware Elimination and
  Enhanced Encryption of Payment Data in All U.S. Stores, The Home
  Depot (Sept. 18, 2014),
    http://ir.homedepot.com/tools/viewpdf.aspx?page={1005034F-3E31-
    41AF-81A9-14FC3BAD1CBF} ................................................................... 35
Press Release, UCLA Health Victim of a Criminal Cyber Attack, UCLA
  Health (July 17, 2015),
    https://www.uclahealth.org/pages/data2015.html. ........................................ 29
PrivacyArmor, Identity Theft Restoration Services | MyPrivacyArmor,
  InfoArmor, Inc. (last visited July 16, 2016),
    https://www.myprivacyarmor.com/ .................................................................. 21
Reem Nasr, *Experian data breach hits more than 15M T-Mobile customers,*
  *applicants,* CNBC (Oct. 1, 2015 4:35 PM),

http://www.cnbc.com/2015/10/01/experian-reports-data-breach-involving-info-for-more-than-15m-t-mobile-customers.html ............................ 28

Requirements and Security Assessment Procedures Version 3.2, Payment Card Industry (PCI) Data Security Standard (April 2016), https://www.pcisecuritystandards.org/documents/PCI_DSS_v3-2.pd32, 33, 34, 35

Robert H. Klonoff, *Making Class Actions Work: The Untapped Potential of the Internet*, 69 U. PITT. L. REV. 727 (2008) ................................................................ 53

Robert Hackett, *Scottrade data breach affects millions of customers*, Fortune (Oct.2, 2015), http://fortune.com/2015/10/02/scottrade-data-breach/ .......... 28

Steven Norton, *Home Depot Names Jamil Farshchi Chief Information Security Officer*, Wall St. J. (Mar. 30, 2015 2:44 PM), http://blogs.wsj.com/cio/2015/03/30/home-depot-names-jamil-farshchi-chief-information-security-officer/ ........................................................ 32

Submitted Breach Notification Sample | State of California – Department of Justice – Kamala D. Harris Attorney General, Rite Aid Corp. (last visited June 16, 2016), https://oag.ca.gov/system/files/Rite%20Aid%20Notification%20Letter _0.pdf ................................................................................................................ 20

Summary Description of Benefits for Personal Internet & Identity Coverage Master Policy, AllClear ID (last visited June 16, 2016), https://www.allclearid.com/insurance/ .......................................................... 19

Summary Description of Benefits for the Experian Identity Theft Coverage (last visited June 16, 2016), http://www.protectmyid.com/summary-of-benefits........................................................................................................... 20

Summary Description of Benefits for the Personal Internet & Identity
   Coverage Master Policy, AllClear ID (last visited July 18, 2016),
   https://www.allclearid.com/insurance/ ............................................................. 17

Summary Description of Benefits for the Personal Internet & Identity
   Coverage Master Policy, Identity Fraud Insurance Services (last visited
   July 16, 2016),
   https://my.identityfraud.com/pub/IFI1MMSummaryOfBenefits.pdf. ........... 21

Table 1300, Age of reference person: Annual expenditure means, shares, standard
   errors, and coefficients of variation, Consumer Expenditure Survey, 2014, U.S.
   Bureau of Labor Statistics (2014),
   http://www.bls.gov/cex/2014/combined/age.pdf ............................................ 26

Teresa Dixon Burray, Should you sign up for Home Depot's identity theft
   protection with AllClear ID?, The Plain Dealer (Sept. 10, 2014 12:35 PM),
   http://www.cleveland.com/business/index.ssf/2014/09/should_you_
   sign_up_for_home_de.html .................................................................... 17

Terms & Conditions, 3 Terms and conditions applicable to all Infoarmor
   products, InfoArmor, Inc. (last visited July 16, 2016),
   https://www.myprivacyarmor.com/terms-conditions/ ................................... 21

The Aftermath of a Mega Data Breach: Consumer Sentiment, Ponemon Inst.
   (April 2014), http://www.experian.com/assets/p/data-
   breach/experian-consumer-study-on-aftermath-of-a-data-breach.pdf ....... 24, 25

Trump Hotel Collection – Incident FAQS, Trump Hotel Collection (last
   visited July 16, 2016), https://www.trumphotelcollection.com/cc-
   security-faq .............................................................................................. 28

William D. Henderson, *Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements*, 77 Tul. L. Rev. 813 (2003) ...........................................66

## INTRODUCTION

2014 was a bad year for consumers' data at major American retailers. Whether it was Target, eBay, or one of the several bank breaches, Home Depot was part of an unfortunate trend of companies using lax security with their customer data and their customers suffering as a result.

In the wake of those breaches, the predictable flurry of class action litigation followed. So far, none has provided anything of much/any value to the majority of class members who will have years of future risks of identity theft, headaches, and worry. Based on the Settlement Agreement at issue in this case, this case is headed in that same regrettable direction.

The real novelty of this case is its shocking number of defects. They include facial violations of the Federal Rules of Civil Procedure, aggressive attempts of Class Counsel to hide relevant materials from his absent Settlement Class Member supposed-clients, and a litany of indicia of self-dealing from Class Counsel. The Settlement Agreement pairs those structural defects with a *de facto* subclass that has only illusory benefits in exchange for their release of damages worth at least $50-100 each.

As a predictable added bonus, these outrages are punctuated with a Class Counsel motion for a bonanza of legal fees. Legal fees that they, of course, insist

the Court should leave to their sole discretion to distribute. All of this in a Settlement Agreement arriving before the Court prior to a ruling on the motion to dismiss and prior to any discovery of the defendant whatsoever. The Court should put a halt to this mess and seriously consider whether the Consumer Plaintiffs and Class Counsel are even the proper people to continue the litigation going forward in light of this farcical settlement attempt.

I. **Mr. Miorelli is a class member, has timely filed his claim and this objection, and does not intend to appear at the fairness hearing unless it is rescheduled.**

Mr. Miorelli, who resides at 764 Ellwood Avenue, Orlando, FL 32804, is a Settlement Class Member (capitalized terms used in this Objection have the same meaning as used in the Settlement Agreement and Release, the "Settlement Agreement," unless otherwise defined). (Declaration of Sam A. Miorelli, E.I., Esq. in Support of Objection to Class Action Settlement, Service Awards, and Fee Request of *Pro Se* Objector Sam A. Miorelli, E.I., Esq. (the "Miorelli Declaration") at ¶¶ 1-2). Mr. Miorelli made multiple purchases at Home Depot stores during the time period of April 10, 2014 to September 13, 2014 across multiple credit cards. *Id.* at ¶ 2. Mr. Miorelli frequently uses the self-checkout line at Home Depot and at least one of these credit card charges was the result of such use. *Id.*

2

Mr. Miorelli filed a claim using the settlement website, with claim number HDD-400058642-4. *Id.* at ¶ 3. Unfortunately, the settlement website does not allow a Settlement Class Member to file a claim listing multiple credit cards, so Mr. Miorelli only filed a claim pursuant to his American Express card. *Id.* Mr. Miorelli intends this objection to alert the Court that he also claims his membership in the Settlement Class based on his Chase credit card. This explanation of Mr. Miorelli's basis for class membership is presented in compliance with Section 12(c) of the Preliminary Approval Order. (Dkt 185 at ¶ 12).

The caption above complies with Section 12(a) of the Preliminary Approval Order and Mr. Miorelli's signature block below complies with Sections 12(b) and (m). In compliance with Section 12(l), Mr. Miorelli hereby provides Notice of his Unavailability to Appear at the Fairness Hearing at 10:00 a.m. at the United States District Court for the Northern District of Georgia, Atlanta Division, Richard B. Russell Federal Building and United States Courthouse, 75 Ted Turner Drive, SW, Courtroom 2108, Atlanta, GA 30303-3309 due to a previously-scheduled commitment in Denver, CO that same day.

Mr. Miorelli hereby requests leave to appear at the Fairness Hearing via telephone. In the event the Fairness Hearing is rescheduled for any reason, Mr.

Miorelli will likely attend such rescheduled hearing in person as that is his usual practice. (Miorelli Declaration at ¶ 6).

Mr. Miorelli complies with Section 12(d) below and as a *pro se* objector, Sections 12(e), (f), (h), and (i) are inapplicable. Mr. Miorelli's evidence and information in support of this objection are attached to this filing as Exhibits or included in the Miorelli Declaration or its Exhibits. In compliance with Section 12(k), Mr. Miorelli states he does not presently intend to present any evidence or information beyond that included in such filings. However, Mr. Miorelli reserves the right to present additional information or evidence if any party argues that Mr. Miorelli is not a Settlement Class Member.

Mr. Miorelli objects to the requirement of Section 12(g) as it is irrelevant and is only intended to dissuade potential objectors, which is improper and illegal as explained below. Mr. Miorelli nevertheless has provided the demanded responsive information in the Miorelli Declaration. (Miorelli Declaration at ¶ 10).

To the extent that other Settlement Class Members file objections which are not inconsistent with the objections raised herein, Mr. Miorelli reserves the right to adopt those objections and address them at the Fairness Hearing as well. To the extent that any objector participates in discovery relating to the Settlement Agreement, Mr. Miorelli joins their motion to do so and requests equal access to

such proceedings. Mr. Miorelli also hereby requests the opportunity to depose and cross-examine any witness presenting evidence in support of the Settlement Agreement. Mr. Miorelli states herein, in compliance with Section 12(j) of the Preliminary Approval Order, that he does not intend to personally call any witnesses at the Final Approval Hearing.

A. This Objection is timely filed.

This Objection, with its Exhibits, is mailed, U.S. First Class Certified Mail Return Receipt Requested, to the Clerk of the Court, Class Counsel, and Home Depot's Counsel, with a postmark of July 18, 2016, in compliance with Section 12 and 18 of the Preliminary Approval Order. Consequently, this Objection is timely filed.

II. **The Court has a fiduciary duty to the unnamed members of the class and Class Counsel bears the burden of proving the settlement is fair, reasonable, and adequate.**

A district court must act as a "fiduciary for the class who must serve as a guardian of the rights of absent class members." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 534 (3d Cir. 2004). "Both the United States Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust*

*Litigation*, 360 F.Supp.2d 166, 192-94 (D. Mass. 2005) (*citing, inter alia, Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617, 623 (1997) ("Rule 23(e) protects unnamed class members from 'unjust or unfair settlements' agreed to by 'fainthearted' or self-interested class 'representatives.'")); *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279-80 (7th Cir. 2002) ("district judges [are] to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions").

　　"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members . . . [T]he court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re General Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 785 (3d. Cir. 1995) ("*GM Pickup Truck*") (internal quotations and citations omitted). "A trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class." Herbert Newberg & Alba Conte, Newberg on Class Actions § 13:20 (4th ed. 2002). "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356

F.3d 781, 785 (7th Cir. 2004). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F.2d 697, 701 (9th Cir. 1992). *Accord Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989) ("The district court must ensure that the representative plaintiff fulfills his fiduciary duty toward the absent class members").

"The proponents of class action settlements bear the burden of developing a record demonstrating that the settlement distribution is fair, reasonable, and adequate." *Faught v. American Home Shield Corp.*, 668 F.3d 1233, 1239 (11th Cir. 2011) (internal quotations omitted). *See also* American Law Institute, *Principles of the Law of Aggregate Litig.*, § 3.05(c) (2010).

"Where the court is '[c]onfronted with a request for settlement-only class certification,' the court must look to the factors 'designed to protect absentees.'" *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003) (*quoting Amchem*, 521 U.S. at 620). "[S]ettlements that take place prior to formal class certification require a higher standard of fairness." *Molski*, 318 F.3d at 953. "[P]re-certification settlement agreements require that we carefully review the entire settlement, paying special attention to 'terms of the agreement contain[ing] convincing indications that the incentives favoring pursuit of self-interest rather than the class's interest in fact influenced the outcome of the negotiations.'" *Dennis v. Kellogg Co.*, 697 F.3d 858,

867 (9th Cir. 2012) (*quoting Staton v. Boeing*, 327 F.3d 938, 960 (9th Cir. 2003)). "These concerns warrant special attention where the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998); *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).

It is insufficient that the settlement happened to be at "arm's length" without express collusion between the settling parties. *Bluetooth*, 654 F.3d at 948 (*quoting Staton*, 327 F.3d at 960). Because of the danger of conflicts of interest, third parties must monitor the reasonableness of the settlement as well. *Id.* "Because in common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage, courts have stressed that when awarding attorneys' fees from a common fund, the district court must assume the role of fiduciary for the class plaintiffs." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002) (*quoting In Re Washington Public Power Supply Syst. Lit.*, 19 F.3d 1291 (9th Cir. 1994)). "Accordingly, fee applications must be closely scrutinized." *Id.*

**III.   The existence of the Side Deal violates Rule 23(e)(3) and Class Counsel's eagerness to hide material facts from the docket demonstrates his conflict of interest requiring his removal.**

The behavior of Class Counsel proves his interests intractably conflict with that of the absent Settlement Class Members and he, along with the entire membership of the Steering Committee must be removed from the representation.

Class Counsel and Defendants have admitted that they have a side deal which also affects the Settlement Agreement. (Dkt 181-2 at ¶65). Mr. Miorelli shall refer to this as the "Side Deal." The Side Deal apparently grants additional rights to Defendants on terms and conditions which Class Counsel, the Consumer Plaintiffs, and Defendants expressly agree to keep secret, including secret from the absent Settlement Class Members themselves. *Id.* Among the rights granted in the Side Deal is at least the right of Defendants to terminate the Settlement Agreement if a secret number of absent Settlement Class Members opt out of the Settlement Agreement. *Id.* There is no reason to believe from the record that this is the *only* additional right Defendants maintain in the Side Deal.

A.   The Side Deal violates Rule 23(e)(3).

Federal Rule of Civil Procedure 23 requires that "[t]he parties seeking approval must file a statement identifying any agreement made in connection

9

with the proposal." Fed. R. Civ. P. 23(e)(3). It is not sufficient that the Settlement Agreement blandly mentions in passing that such an agreement exists. The Side Deal must be available to the absent Settlement Class Members to review just like the Settlement Agreement or any of its exhibits.

B. <u>The Side Deal renders the Class Notice inadequate.</u>

Without access to the actual contents of the Side Deal, absent Settlement Class Members cannot make an informed decision about whether to remain, opt-out, or object to the Settlement Agreement. They cannot make this informed choice precisely because they do not actually know *all* of the terms of the Settlement Agreement.

The Settlement Agreement is an integrated agreement. *Id.* at ¶76. While the Side Deal is secret, it addresses the same subject-matter as the Settlement Agreement, and presumably includes a cross-reference to the Settlement Agreement. That integration clause and the cross reference means that the Side Deal and the Settlement Agreement must be "construed together as constituting one contract." *Ameritrust Co., N.A. v. White*, 73 F.3d 1553, 1560 (11th Cir. 1996) (quoting *Irvindale Farms v. W.O. Pierce Dairy*, 78 Ga. App. 670, 684, 51 S.E.2d 712, 721 (1949)).

The Side Deal, being a part of the Settlement Agreement, must be available to the absent Settlement Class Members or the notice under Rule 23 will be insufficient and render any release ineffectual. The quality of notice required under Rule 23 has been a stable point of class action law for decades. As the Fifth Circuit held in 1977,

> Absentee class members will generally have had no knowledge of the suit until they receive the initial class notice. This will be their primary, if not exclusive, source of information for deciding how to exercise their rights under rule 23. Although absentee class members are customarily encouraged to make inquiry of the clerk of the district court where the case is filed if they have further questions, this worthwhile advice cannot justify omitting material information. This is particularly plain in a case such as the one at bar where class members are numerous and widely dispersed. Not only must the substantive claims be adequately described but the notice must also contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment or opt out of the action. The standard then is that the notice required by subdivision (c)(2) must contain information that a reasonable person would consider to be material in making an informed, intelligent decision of whether to opt out or remain a member of the class and be bound by the final judgment.

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977). This rule is binding precedent as it is a Fifth Circuit decision handed down prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

11

Additionally, the rule has been adopted across the country and no Circuit Court of Appeal has ever disagreed with this formulation of the Rule 23 notice requirements. *See Sanders v. John Nuveen & Co., Inc.*, 463 F.2d 1075, 1082 (7th Cir. 1972) ("The purpose of the mandatory notice and disclosure requirements of Rule 23(c)(2) is to advise all class members of their rights and privileges under the close supervision of the court."); *Erhardt v. Prudential Group, Inc.*, 629 F.2d 843, 846 (2d Cir. 1980).

Having not disclosed the Side Agreement, the absent Settlement Class Members have been unable to adequately consider the Settlement Agreement. Without this opportunity before deciding whether to file a claim, object, or opt-out, absent Settlement Class Members have had their due process rights violated. Thus, the Settlement Agreement cannot be approved without disclosure of the Side Agreement and new notice drawing absent Settlement Class Members' attention to the additional terms and granting an additional opportunity to file a claim, object, or opt-out.

C. Class Counsel's engagement in the Side Deal demonstrates his conflict of interest with his supposed clients: the absent Settlement Class Members.

The secrecy of the Side Deal is even more outrageous because it was expressly negotiated for and agreed-to by Class Counsel. Since the only available

12

information suggests that the Side Deal only provides Defendants additional rights, there is no reason to believe that the secrecy of the Side Deal could have any purpose except to harm absent Settlement Class Members. What other purpose could there be to keep such an arrangement secret? By engaging in such activity, Class Counsel has shown a conflict which requires his dismissal.

The analysis of this argument should begin with the ABA Model Rules of Professional Conduct and Model Code of Professional Responsibility. *Lazy Oil Co. v. Witco Corp.*, 166 F.3d 581, 588-89 (3d Cir. 1991). Rule 1.7 of the ABA Model Rules of Professional Conduct requires "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if: (1) the representation of one client will be directly adverse to another client[.]" American Bar Association, *Model Rules of Professional Conduct*, § 1.7 (2016). In this case, the combination of the existence of the Side Deal and its secrecy is directly adverse to the absent Settlement Class Members. Assuming the Consumer Plaintiffs knew the terms of the Side Deal and consented to it and its secrecy, then it becomes likely that Class Counsel negotiated the Settlement Agreement and the Side Deal in a manner which was beneficial to the Consumer Plaintiffs and Class Counsel at the expense of the absent Settlement Class

Members. (The kicker and clear sailing provisions discussed *infra* seem to confirm this suspicion).

Immediately upon demonstrating this conflict of interest, Class Counsel should have been removed from the representation. The Third Circuit explained, citing its prior case law, why it removed a plaintiffs' counsel who found himself adverse to the interests of many of his supposed absent clients:

> We focused on the policies underlying the rules against an attorney representing a party in a matter in which a former client is now an adversary, including preventing "even the potential that a former client's confidences and secrets may be used against him"; maintaining "public confidence in the integrity of the bar"; and upholding the duty of loyalty that a client has the right to expect.

*Lazy Oil*, 166 F.3d at 589. The Third Circuit then set forth their standard for maintaining class counsel in the face of objections,

> We therefore hold that, in the class action context, once some class representatives object to a settlement negotiated on their behalf, class counsel may continue to represent the remaining class representatives and the class, as long as the interest of the class in continued representation by experienced counsel is not outweighed by the actual prejudice to the objectors of being opposed by their former counsel.

*Id.* at 590. Put simply, once Settlement Class Members object, the Court must always be on alert for whether the interests of the absent Settlement Class

14

Members are best protected by Class Counsel. If the objections show Class Counsel to be adverse to the best interest of the class, he must be removed.

D. Consumer Plaintiffs' agreement to the Side Deal demonstrates either their breach of their duty to police the actions of Class Counsel or their inadequacy to represent the absent class members.

As the Second Circuit held in *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072 (2nd Cir. 1995), once a class action has been certified, the class representative "must be alert for, and report to the court, any conflict of interest on the part of class counsel, as for example, counsel's greater concern for receiving a fee than for pursuing the class claims." *Id.* at 1078 (*citing* A C. Wright, A. Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 1769.1, at 386–87 (1986)). While this case is a pre-certification settlement, the Settlement Agreement asks for the class to be certified for the purposes of effectuating the Settlement Agreement and the release. Consequently, the same duty applies to the Consumer Plaintiffs in policing the negotiation and approval of the Settlement Agreement.

The Side Deal is clearly adverse to the interests of the class, and yet, one presumes Class Counsel did not agree to it without also securing the agreement of each of the Consumer Plaintiffs. Since Class Counsel has made no showing that the Side Deal is good for absent Settlement Class Members, in fact, he has

15

tried to hide it from them, there is no basis in the record for the Court to infer anything except the Side Deal being bad for absent Settlement Class Members.

However, there is also the chance that the Settlement Class Members are also unaware of the Side Deal. This is the case because there is no evidence Consumer Plaintiffs participated whatsoever in the negotiation of the Settlement Agreement or the Side Deal. If true (and Class Counsel bears the burden to prove it is not true), this dereliction of duty would prove that the Consumer Plaintiffs are not adequate representatives of the absent class members. On that basis, the Court should refuse to grant final approval to the Settlement Agreement as it does not meet the requirements of Rule 23(a)(4).

While Mr. Miorelli cannot know which is the case, certainly Consumer Plaintiffs had to have either known about the Side Deal or not known about it. Knowledge of a secret deal is a binary choice, after all. But in the context of the Settlement Agreement the difference between those two possibilities only changes how the Settlement Agreement should be rejected. Both answers require its rejection. Either the Consumer Plaintiffs knew about the Side Deal and consented to it and to keeping it a secret from the absent Settlement Class Members, which would be a breach of their fiduciary duty, or they were unaware of the Side Deal and are thus not adequate representatives under Rule

16

23(a)(4). Whichever the answer, Class Counsel and Consumer Plaintiffs' handling of the Side Deal leaves no option but for the Court to deny final approval.

**IV.   The primary "benefit" to absent Settlement Class Members is something absent Settlement Class Members already have and which is not useful in duplicate.**

    A.   <u>The Identity Guard service is entirely duplicative of the previously-provided AllClear ID service Home Depot offered its customers and the two $1 million insurance policies cannot be used in combination.</u>

When the Home Depot data breach was first revealed in 2014, Home Depot offered free AllClear ID monitoring service to its customers for a year. Teresa Dixon Burray, *Should you sign up for Home Depot's identity theft protection with AllClear ID?*, The Plain Dealer (Sept. 10, 2014 12:35 PM), http://www.cleveland.com/business/index.ssf/2014/09/should_you_sign_up_for_home_de.html. AllClear ID is very similar to Identity Guard in that it also provides a $1 million insurance policy (the similarities in underwriting information, including the fact that both policies are placed by American International Group (AIG), strongly suggests they may actually offer *the same* $1 million insurance policy). *Compare* Summary Description of Benefits for the Personal Internet & Identity Coverage Master Policy, AllClear ID (last visited July 18, 2016), https://www.allclearid.com/insurance/ *with* Benefits of Identity

Theft   Coverage,   Identity   Guard   (last   visited   July   18,   2016),
http://www.identityguard.com/how-identity-guard-works/id-
insurance/summary1/.   Both services also provide credit and identity theft
monitoring. *Compare* Monitoring Services: Stay Informed of Important Activity,
AllClear   ID   (last   visited   July   18,   2016),
https://www.allclearid.com/personal/services/monitoring-services/ *with* How
Identity   Guard   Works,   Identity   Guard   (last   visited   July   18,   2016),
http://www.identityguard.com/how-identity-guard-works/. Both services also
provide alerts in the event they detect an attempt to fraudulently use your
identity information. *Id*. The Privacy Rights Clearinghouse calls services such as
AllClear ID and Identity Guard "identity theft monitoring services." *Fact Sheet
33: Identity Theft Monitoring Services,* Privacy Rights Clearinghouse (June 2016),
https://www.privacyrights.org/identity-theft-monitoring-services.

Because both AllClear ID and Identity Guard provide insurance from AIG,
the "Duplicate Coverages" exclusion of the policy would prevent a Settlement
Class Member who already has coverage from one of the many data breaches
over the past several years using the coverage from this Settlement Agreement as
excess. *See* Summary Description of Benefits for Personal Internet & Identity
Coverage   Master   Policy,   AllClear   ID   (last   visited   June   16,   2016),

https://www.allclearid.com/insurance/ ("Should you be enrolled in more than one Membership Program insured by us, or any of our affiliates, we will reimburse you under each Membership Program: . . . c. in no event shall the Limit of Insurance under all Membership Programs exceed the largest Limit of Insurance available to you under any Membership Program provided by us.") *and* Benefits of Identity Theft Coverage, Identity Guard (last visited June 16, 2016), https://www.identityguard.com/how-identity-guard-works/id-insurance/summary1/ ("Should you be enrolled in more than one Membership Program insured by us, or any of our affiliates, we will reimburse you under each Membership Program: . . . C. In no event shall the Limit of Insurance under all Membership Programs exceed the largest Limit of Insurance available to you under any Membership Program provided by us.").  This applies to the many other data breaches which happen almost constantly since it appears that the AIG policy is used by nearly every identity theft monitoring service that includes insurance.[1] Except for the fact that this is providing an additional 18 months of

---

[1] MyIDCare is an identity theft monitoring service which offers essentially-identical services as AllClear ID and Identity Guard: the same $1 million policy from AIG, credit and cyber monitoring, alerts, and assistance recovering from an identity theft event. ID Experts, *MyIDCare Credit Edition Terms of Service (TOS)*, (last visited June 16, 2016) https://www.idexpertscorp.com/TOSPF.aspx?ParticipantID=808413. Equifax

Credit Watch Gold is another identity theft monitoring service which is virtually identical to AllClear ID, Identity Guard, and MyIDCare: it provides monitoring, alerts, support in the event of an identity theft event, and either a $25,000 or a $1 million insurance policy written by AIG. *See* Letter to Customers, Mark Emery, Director of Integrated Services, Project Management Institute, 3 (filed with the California Attorney General on July 14, 2016), https://oag.ca.gov/system/files/Standard%20Notice%20%284%29_1.pdf *and* Letter to Employees and Former Employees, Mitchell R. Creem, CEO, Verity Health System, 5 (filed with the California Attorney General on May 31, 2016), https://oag.ca.gov/system/files/Verity%20Health%20System%20-%20Sample%20Notice_0.pdf. Experian ProtectMyID identity theft monitoring service is also nearly identical to AllClear ID, Identity Guard, MyIDCare, and Equifax Credit Watch Gold: it provides monitoring, alerts, and support in the event of an identity theft event as well as a $1 million insurance policy from AIG whose Summary Description of Benefits is essentially identical to the ones offered by the other services discussed herein. Identity Theft Protection Service | Protect My ID, (last visited June 16, 2016), http://www.protectmyid.com/our-product-benefits *and* Summary Description of Benefits for the Experian Identity Theft Coverage (last visited June 16, 2016), http://www.protectmyid.com/summary-of-benefits. Kroll Essential Monitoring Service is an identity theft monitoring service that provides less publicly-available information about its service, but it appears to offer substantially the same monitoring, alerts, and support in the event of an identity theft event as well as a $1 million insurance policy. Submitted Breach Notification Sample | State of California – Department of Justice – Kamala D. Harris Attorney General ("California Attorney General Data Breach List"), Rite Aid Corp., 4-5 (last visited June 16, 2016), https://oag.ca.gov/system/files/Rite%20Aid%20Notification%20Letter_0.pdf. While Kroll does not identify the carrier of the insurance policy, its description closely matches the AIG policy used by the other services. *Id.* at 5. Identity Fraud, Inc. provides an identity theft monitoring service called Identity Fraud Gold which is also essentially the same as AllClear ID, Identity Guard, MyIDCare, Experian ProtectMyID, and Equifax Credit Watch Gold in its services, including its provision of a $1 million insurance policy underwritten by AIG. *See* Identity Theft Protection Plan | Protection Against Company, Computer, Internet & Insurance Identity Theft & Credit Card Fraud – Identity Fraud, Identity Fraud,

service (commencing roughly two years after the credit cards were compromised

and replaced by the various issuers), the Identity Guard service is no different

from the identity theft monitoring service Home Depot customers already got for

---

Inc. (last visited July 16, 2016), https://my.identityfraud.com/protection.html;
*and* Summary Description of Benefits for the Personal Internet & Identity
Coverage Master Policy, Identity Fraud Insurance Services (last visited July 16,
2016), https://my.identityfraud.com/pub/IFI1MMSummaryOfBenefits.pdf.
InfoArmor Privacy Armor is another identity theft monitoring service which
provides essentially the same features as AllClear ID, Identity Guard, MyIDCare,
Equifax Credit Watch Gold, and Identity Fraud Gold, including a provision of a
$1 million insurance policy underwritten by AIG. *See* PrivacyArmor, Identity
Theft Restoration Services | MyPrivacyArmor, InfoArmor, Inc. (last visited July
16, 2016), https://www.myprivacyarmor.com/, *and* Terms & Conditions, 3
Terms and conditions applicable to all Infoarmor products, InfoArmor, Inc., ¶N
(last visited July 16, 2016), https://www.myprivacyarmor.com/terms-
conditions/. FraudScout is an identity theft monitoring service from IDT911
which provides essentially the same features as AllClear ID, Identity Guard,
MyIDCare, Equifax Credit Watch Gold, Identity Fraud Gold, and PrivacyArmor
except that FraudScout does not appear to offer an insurance policy. FraudScout
Identity Monitoring and Protection | IDT911, IDT911, LLC. (last visited July 16,
2016), http://idt911.com/products/fraudscout. LifeLock Standard is an identity
theft monitoring service from LifeLock, Inc. which provides essentially the same
features as AllClear ID, Identity Guard, MyIDCare, Equifax Credit Watch Gold,
Identity Fraud Gold, and PrivacyArmor and includes a $1 million insurance
policy. LifeLock Standard | LifeLock, LifeLock, Inc. (last visited July 16, 2016),
https://www.lifelock.com/products/lifelock-standard/. While LifeLock's
insurance policy summary has very similar terms and conditions to those shown
from identity theft monitoring services using AIG, their policy is issued by
United Specialty Insurance Company. Evidence of Coverage: All Members
Except NY and WA State Residents Stolen Identity Event Insurance, LifeLock,
Inc. (last visited July 16, 2016), https://www.lifelock.com/legal/united-
specialty-insurance-company/.

free before this litigation and have also gotten from their involvement in many other data breaches.

B. Identity theft monitoring services such as Identity Guard are of little or no value to consumers.

Much of the privacy and security community is skeptical of the value of identity theft monitoring services such as Identity Guard and AllClear ID. Brian Krebs, one of the first reporters of the Home Depot data breach, has dedicated an entire article to whether these monitoring services have any value. Brian Krebs, *Are Credit Monitoring Services Worth It?*, Krebs on Security (Mar. 19, 2014), http://krebsonsecurity.com/2014/03/are-credit-monitoring-services-worth-it/. According to Mr. Krebs' reporting:

> Avivah Litan, a fraud analyst at Gartner Inc., said offering credit monitoring has become the de facto public response for companies that experience a data breach, whether or not that breach resulted in the loss of personal information that could lead to actual identity theft (as opposed to mere credit card fraud).

> "These are basically PR vehicles for most of the breached companies who offer credit report monitoring to potentially compromised consumers," Litan said. "Breached companies such as Target like to offer it as a good PR move even though it does absolutely nothing to compensate for the fact that a criminal stole credit card mag stripe account data. My advice for consumers has been – sure get it for free from one of the companies where your data has been compromised (and surely these days there is at least one).  But don't expect it to

help much -- by the time you get the alert, it's too late, the damage has been done."

[. . .]

"In short, they only give consumers limited help with a very small percentage of the crimes that can be inflicted on them," Litan said. "And consumers can get most of that limited help for free via the government website or free monitoring from a breached entity where their data inevitably was compromised."

[. . .]

While most plans offer identity theft insurance — usually advertised as up to $1 million — most of that is coverage consumers already have under existing laws and Visa/MC zero liability rules, Litan says.

"On top of that they reimburse ID theft victims for some legal fees and some minor expenses like postage stamps," Litan said. "But if someone takes out a mortgage in your name and now you owe the bank $100k or more – nobody covers that, and that's what they need to cover."

*Id.*

Additionally, consumers are skeptical of the value of these services as evidenced by their infrequent use of them even when they are offered for free. According to the Ponemon Institute, 32% of consumers who were notified of a data breach ignored the notification and only 29% of consumers accepted the offer of free identity theft monitoring services. *The Aftermath of a Mega Data Breach: Consumer Sentiment*, Ponemon Inst., 5 (April 2014) ("Ponemon Consumer

Sentiment          Survey"),          http://www.experian.com/assets/p/data-breach/experian-consumer-study-on-aftermath-of-a-data-breach.pdf.

Finally, Consumer Plaintiffs and Class Counsel themselves do not believe identity theft monitoring services has any value to customers. In the Consumer Plaintiffs' Consolidated Class Action Complaint (the "Complaint"), paragraph 201 argues, "[C]redit monitoring is of no actual value to customers. . ." (Dkt 93 at ¶ 201). The Complaint elaborates on this point in paragraph 202:

> Prior to the Home Depot breach, the *Chicago Tribune* published an article entitled, "Why credit monitoring will not help you after a data breach." The article noted that retailers offering credit monitoring services and instructing their customers to check their credit reports in the wake of a data breach is "bad advice" because "[p]ayment card breaches have nothing to do with credit reports." As one security expert noted, offering credit monitoring "seems to be the knee-jerk reaction" after a breach but "makes no sense at all." The biggest concern is that credit monitoring offers customers a false sense of security but in reality offers little protection once the customer's personal information is exposed.

*Id.* at ¶202. It is remarkable, in light of Class Counsel's obvious understanding of the worthlessness of identity theft monitoring services, that in supporting their motion for Preliminary Approval of the Settlement Agreement, Liaison Counsel Roy E. Barnes called the Identity Guard service a "Settlement benefit" being exchanged for Home Depot's release. (Dkt. 181-3 at ¶12). This is particularly

24

troubling as it was Mr. Barnes who signed the Complaint. (Dkt. 93 at 187). Mr. Barnes appears to have either experienced an astounding and unexplained change of opinion on the value of these services or made a self-serving and false representation to the Court. Certainly this glaring inconsistency demonstrates, at the very least, that Class Counsel has not met his burden to demonstrate the fairness, reasonableness, and adequacy of the Settlement Agreement.

C. Even if Identity Guard has non-zero value to an individual consumer, it is unlikely that the 18-month service offered by this settlement is a consumer's only avenue to such service for free, meaning it has zero marginal value to absent Settlement Class Members.

According to the Ponemon Institute, approximately half of the respondents in their nationwide survey reported they had at some point in the past been a victim of a data breach. Ponemon Consumer Sentiment Survey at 1. This statistic is confirmed by the 2015 Identity Theft Resource Center Data Breach Reports of 780 publicly-reported consumer data breaches exposing over 177 million records. *2015 ITRC Breach Report*, Identity Theft Resource Ctr., 5 (Dec. 29, 2015), http://www.idtheftcenter.org/images/breach/DataBreachReports_2015.pdf. Considering that the United States Bureau of Labor Statistics reports that there are approximately 127 million consumer units in the United States, it seems reasonable to assume that approximately all American consumers had their data

25

compromised in a data breach in the past year. *Table 1300, Age of reference person: Annual expenditure means, shares, standard errors, and coefficients of variation, Consumer Expenditure Survey, 2014*, U.S. Bureau of Labor Statistics, 1 (2014), http://www.bls.gov/cex/2014/combined/age.pdf.

It is likely that every single Settlement Class Member (a) has an existing offer for free use of an identity theft monitoring service, (b) is presently enrolled in a free identity theft monitoring service, or (c) is not enrolled because they are part of the 32% of consumers who ignored an offer previously made to them. Just in 2015, high-profile data breaches reported in the media where the company offered identity theft monitoring service totaled more than 141,020,000 Americans' personal information stolen.[2] Many if not most data breaches are

---

[2] Anthem, Inc. lost social security numbers, names, birthdays, and addresses of about 80 million Americans. Anna Wilde Mathews & Danny Yadron, *Health Insurer Anthem Hit by Hackers*, Wall St. J. (Feb. 4, 2015, 9:39 PM), http://www.wsj.com/articles/health-insurer-anthem-hit-by-hackers-1423103720. Anthem responded by providing two years of free AllClear ID coverage. Press Release, Anthem, Inc. (June 10, 2015), https://www.anthemfacts.com/pdf/Revised+Subsitute+Notice+(6-10-15).pdf. The U.S. Office of Personnel Management (OPM) lost 25.7 million social security numbers, names, addresses, and birth dates in two breaches in 2015. OPM, *Cybersecurity Resource Center CYBERSECURITY INCIDENTS What Happened*, (last visited June 16, 2016) https://www.opm.gov/cybersecurity/cybersecurity-incidents/. OPM responded by procuring 10 years of a service called MyIDCare, from ID Experts. OPM, *Cybersecurity Resource Center SIGN UP FOR SERVICES*, (last visited June 16, 2016) https://www.opm.gov/cybersecurity/. In May 2015,

the IRS discovered a flaw in their "Get Transcript" application which had exposed tax returns of at least 720,000 people. Marilyn Malara, *IRS data breach worse than first reported, 720k accounts hacked*, UPI (Feb. 27, 2016), http://www.upi.com/Top_News/US/2016/02/27/IRS-data-breach-worse-than-first-reported-720K-accounts-hacked/9351456585762/. The IRS responded to this breach by offering "a free Equifax identity theft protection product for one year." IRS Statement on "Get Transcript," (Feb. 26, 2016), https://www.irs.gov/uac/newsroom/irs-statement-on-get-transcript. While the IRS did not define the name of the Equifax product, Equifax Credit Watch Gold's features resemble the IRS's description of their offering. In July 2015, a breach at PNI Digital Media, a subsidiary of Staples, Inc. that runs online photo services, affected the customers of Rite Aid, Costco, Sam's Club, and CVS. Adam Greenberg, *PNI Digital Media investigates potential credit card 'issue' as more photo center websites go down*, SC Magazine (July 20, 2015), http://www.scmagazine.com/pni-digital-media-investigates-potential-credit-card-issue-as-more-photo-center-websites-go-down/article/427406/. CVS reported that the breach involved customer names, addresses, phone numbers, e-mail addresses, credit card numbers, expiration dates, and login passwords. Letter to New Hampshire Attorney General, CVS Pharmacy, Inc., Notice Pursuant to N.H. Rev. Stat. Ann. § 359-C:20 (Sept. 10, 2015), http://doj.nh.gov/consumer/security-breaches/documents/cvs-20150910.pdf. CVS provided affected customers one year of Experian ProtectMyID service. *Id.* at 3. As part of the same breach, Rite Aid reported similar data losses and offered their customers one year of Kroll Essential Monitoring Service. California Attorney General Data Breach List, Rite Aid Corp. (last visited June 16, 2016), https://oag.ca.gov/system/files/Rite%20Aid%20Notification%20Letter_0.pdf. Costco also reported similar data losses and offered their customers one year of MyIDCare service. California Attorney General Data Breach List, Costco (Sept. 21, 2015), https://oag.ca.gov/system/files/Costco%20General%20Notice%20Sample_0.pdf. Trump Hotel Collection has suffered two data breaches in the past year: one discovered in July 2015 and another in April 2016. Brian Krebs, *Sources: Trump Hotels Breached Again*, Krebs on Security (April 4, 2016), http://krebsonsecurity.com/2016/04/sources-trump-hotels-breached-again/. Trump Hotel Collection is investigating the second data breach and offering customers affected by the first data breach one year of free Experian ProtectMyID

service. Trump Hotel Collection – Incident FAQS, Trump Hotel Collection, ¶5 (last visited July 16, 2016), https://www.trumphotelcollection.com/cc-security-faq. Experian suffered a data breach reported in 2015 that compromised 15 million T-Mobile customers and potential customers' names, dates of birth, addresses, and social security numbers. Reem Nasr, *Experian data breach hits more than 15M T-Mobile customers, applicants*, CNBC (Oct. 1, 2015 4:35 PM), http://www.cnbc.com/2015/10/01/experian-reports-data-breach-involving-info-for-more-than-15m-t-mobile-customers.html. T-Mobile offered two years of free ProtectMyID service to anyone who believed they were affected by the breach – whether they personally received notice their data was involved or not. Letter to Consumers, T-Mobile CEO on Experian's Data Breach, John Legere, CEO, T-Mobile USA, Inc. (Oct. 1, 2015), http://www.t-mobile.com/landing/experian-data-breach.html. Scottrade announced in October 2015 that a data breach in its system that targeted the names and addresses but also may have affected Social Security numbers, e-mail addresses and other data, all of 4.6 million customers. Robert Hackett, *Scottrade data breach affects millions of customers*, Fortune (Oct.2, 2015), http://fortune.com/2015/10/02/scottrade-data-breach/. Scottrade offered its customers a year of free AllClear ID service. Cyber Security Update, Scottrade, Inc. (Oct. 1, 2015), https://about.scottrade.com/updates/cybersecurity.html. Excellus BlueCross BlueShield lost 10.5 million customers' names, birthdates, Social Security numbers, mailing addresses, phone numbers, and medical and financial records in a breach it discovered August 5, 2015. Andrew Blake, *Excellus BlueCross BlueShield hacked; 10.5M patients affected*, The Washington Times (Sept. 10, 2015), http://www.washingtontimes.com/news/2015/sep/10/excellus-bluecross-blueshield-hacked-105m-patients/. Excellus BlueCross BlueShield offered its customers two years of free Kroll identity theft monitoring service. Information Announcement Excellus BlueCross BlueShield Cyberattack Identity Theft Protection Services & Credit Monitoring, N.Y. Office of General Services (Sept. 21, 2015), https://bsc.ogs.ny.gov/sites/default/files/Excellus_Cyberattack.pdf. UCLA Health discovered May 5, 2015 that servers containing names, dates of birth, Social Security numbers, medical information, and Medicare and health plan identification numbers had been hacked, exposing 4.5 million patients. Chad Terhune, *UCLA Health System data breach affects 4.5 million patients*, L.A. Times (July 17, 2015), http://www.latimes.com/business/la-fi-ucla-medical-data-

reported without a number of affected people announced, so it is likely that the actual number of data records on Americans whose breach was discovered in 2015 and to whom identity theft monitoring service was offered was far greater. We know that not every victim of a data breach is offered free identity theft monitoring service, so we know that the actual number from 2015 is somewhere between the 141 million itemized in footnote 2 and the 177 million records breached reported by the Identity Theft Resource Center. Either way, however, this entire range is above the number of consumer units reported by the U.S. Bureau of Labor Statistics for the same timeframe, so even if there is some overlap, the odds remain high of pre-existing 100% coverage.

A review of the California Attorney General's Data Security Breaches database shows that data breaches are happening so often and so many companies are offering free identity theft monitoring service for periods exceeding one year as a *mea culpa*, that it is likely that Americans are eligible for about 20% more identity theft monitoring service than they could possibly use! There were 76 reported data breaches in the first half of 2016. (Exhibit A). Of

---

20150717-story.html. UCLA Health offered those affected a year of free MyIDCare identity theft monitoring service. Press Release, UCLA Health Victim of a Criminal Cyber Attack, UCLA Health (July 17, 2015), https://www.uclahealth.org/pages/data2015.html.

those breaches, 74 notification letters were available. *Id.* Reviewing those notification letters, 79.7% offered free identity theft monitoring services to the victims of the data breach. *Id.* Those offers averaged to 1.5 years. *Id.* Even including the letters that did not offer identity theft monitoring service, the average letter in the database offered 1.2 years of monitoring service. *Id.*

Extrapolating that representative data set, we can see that if the average American consumer is a victim of a data breach at least once per year (as estimated *supra* from the Bureau of Labor Statistics and Identity Theft Resource Center data), and on average they are offered 1.2 years of monitoring service for each breach, then they are getting offered free identity theft monitoring service faster than they can use it!

Regardless of the prevalence of offering identity theft monitoring service in 2014, what matters for absent Settlement Class Members is today's value of such a service. As data breaches and the free offers of low/no-value identity theft monitoring services like Identity Guard and AllClear ID have proliferated, the marginal value of a Settlement Agreement like this one offering such service (which has absolutely-zero value in duplicate) has plummeted. Class Counsel has made no showing that for his clients, the absent Settlement Class Members,

there is desire for Identity Guard service or that any absent Settlement Class Member will get any actual utility from Identity Guard service.

As explained *infra*, since the injunctive relief is worthless to all Settlement Class Members, those Settlement Class Members who cannot document losses in accordance with the Settlement Agreement will receive nothing for the release since the Identity Guard service is valueless. Consequently, the Settlement Agreement cannot be approved as it is not reasonable, fair, and adequate.

## V.     The injunctive relief is illusory.

Just like how Home Depot already had provided their customers identity theft monitoring service before the Settlement Agreement, Home Depot also already implemented the so-called Injunctive Relief before and independent from the Settlement Agreement.

### A.  The "Injunctive Relief" was either already implemented by Home Depot in 2014 or 2015 or much more specific versions of its requirements are already required by the credit card industry's binding standards.

Class Counsel has made no showing that the list of requirements in paragraph 31 of the Settlement Agreement have not already been implemented by Home Depot and/or were not already required with much greater specificity by the Payment Card Industry Data Security Standard v3.2 (PCI DSS). Paragraph 31.a. of the Settlement Agreement requires Home Depot to maintain a Chief

Information Security Officer for at least two years. (Dkt 181-2 at ¶ 31). However, this is not changing any of Home Depot's behavior – they hired their first Chief Information Security Officer in March 2015 – over a year ago. Steven Norton, *Home Depot Names Jamil Farshchi Chief Information Security Officer*, Wall St. J. (Mar. 30, 2015 2:44 PM), http://blogs.wsj.com/cio/2015/03/30/home-depot-names-jamil-farshchi-chief-information-security-officer/.

Paragraphs 31.b to 31.g of the Settlement Agreement requires Home Depot to make changes in how it conducts its internal business regarding IT system and employee security practices. (Dkt 181-2 at ¶ 31). However, none of these requirements are different from the requirements Home Depot is already bound to as part of PCI DSS v3.2. Requirements and Security Assessment Procedures Version 3.2, Payment Card Industry (PCI) Data Security Standard, 5 (April 2016), https://www.pcisecuritystandards.org/documents/PCI_DSS_v3-2.pdf ("PCI DSS 3.2"). Many of the requirements in the Settlement Agreement are actually less stringent than those already required by PCI DSS 3.2.

Paragraph 31.b, requires "a risk assessment that identifies material internal and external risks to the security of customers' Personal Information stored on Home Depot's systems." (Dkt 181-2 at ¶ 31). It requires they be performed "on a routine basis" and consider risks relating to "(i) employee training and

management; (ii) software design and testing, and (iii) vendor data management and safety practices." *Id.* Paragraph 31.c and 31.d require that those risk assessments result in safeguards that are implemented both internally and with vendors. *Id.* Compare that to the PCI DSS 3.2 requirement: "12.2 Implement a risk-assessment process that: is performed at least annually and upon significant changes to the environment (for example, acquisition, merger, relocation, etc.), Identifies critical assets, threats, and vulnerabilities, and Results in a formal, documented analysis of risk." PCI DSS 3.2 at 105. Testing procedures are also required: "12.2.a Verify that an annual risk-assessment process is documented that: Identifies critical assets, threats, and vulnerabilities; Results in a formal, documented analysis of risk. 12.2.b Review risk-assessment documentation to verify that the risk-assessment process is performed at least annually and upon significant changes to the environment." *Id.*

The PCI DSS 3.2 risk assessment requirement also includes 37 additional requirements and 44 testing procedures relating to risk assessments. PCI DSS 3.2 at 105-14. PCI DSS 3.2 specifically applies them to an overall requirement that "[a]ll personnel should be aware of the sensitivity of data and their responsibilities for protecting it." *Id.* at 105-14. PCI DSS 3.2 requires "a formal security awareness program to make all personnel aware of the cardholder data

33

security policy and procedures." *Id.* at 109. That requirement has two sub-requirements and six testing procedures. *Id.* at 109-10. PCI DSS 3.2 also has six requirements and six testing procedures relating to outside vendor compliance with data management and security practices. *Id.* at 110-112. With regard to "software design and testing," PCI DSS 3.2 has 13 pages of requirements and testing procedures. *Id.* at 53-65. In every possible respect, PCI DSS 3.2 is dramatically more specific and burdensome than Settlement Agreement paragraphs 31.b, 31.c, and 31.d.

Paragraph 31.e requires Home Depot to

> evaluate and adjust as reasonably necessary its systems on which and by which customers' Personal Information is stored in light of: (i) the results of the testing and monitoring required by this Agreement; (ii) any material changes to its operations or business arrangements; or (iii) any other circumstances that it knows or has reason to know may have a material impact on the effectiveness of its security program.

(Dkt 181-2 at ¶ 31.e). This is a fancy way to say "Home Depot has to update its security program as things change." PCI DSS 3.2 requires the same thing, except with 139 pages of specific requirements and standards.

Paragraph 31.h claims to hold Home Depot to "Enhanced Security Measures." (Dkt 181-2 at ¶ 31.h). However, Home Depot completed implementing payment card data encryption (required in Settlement Agreement

paragraph 31.h(i)) at all U.S. stores by September 13, 2014. Press Release, The Home Depot Completes Malware Elimination and Enhanced Encryption of Payment Data in All U.S. Stores, The Home Depot, 2 (Sept. 18, 2014), http://ir.homedepot.com/tools/viewpdf.aspx?page={1005034F-3E31-41AF-81A9-14FC3BAD1CBF} ("September 18 Home Depot Press Release"). Paragraph 31.h(ii) requires non-retention of credit card information for more than 48 hours after the transaction was authorized. (Dkt 181-2 at ¶ 31.h). Yet PCI DSS 3.2 requires Home Depot to "[d]o not store sensitive authentication data after authorization (even if encrypted). If sensitive authentication data is received, render all data unrecoverable upon completion of the authorization process." PCI DSS 3.2 at 37. PCI DSS 3.2 also prohibits storage of the full contents of any track of magnetic stripe data after the card has been authorized. *Id.* at 38. Requiring this data to be deleted immediately after authorization instead of 48 hours later is much more stringent than 48 hours later as permitted by the so-called Injunctive Relief in the Settlement Agreement. Finally, use of EMV chip card technology (required by Settlement Agreement paragraph 31.h(iii)) was already implemented by Home Depot by the end of 2014. September 18 Home Depot Press Release at 2.

Similarly, compliance with section 31.f is already required with regard to internet transactions by many state laws, such as California Business and Professions Code §2257, which require websites to post privacy policies.

> B. <u>Since the various measures in the "Injunctive Relief" section of the Settlement Agreement were already implemented by Home Depot prior to and independent from the Settlement Agreement, they have no value to the Settlement Class Members.</u>

Class Counsel has presented no evidence suggesting Home Depot has not already fully-implemented the much-more stringent PCI DSS 3.2 measures, which would obviate the need for the "Injunctive Relief." They also have presented no evidence to suggest any of Home Depot's other actions which brought them into compliance with Paragraph 31 of the Settlement Agreement have a but-for nexus to the Settlement Agreement and not Home Depot's other obligations or business judgments.

It is reasonable to assume that Home Depot is in compliance with the PCI DSS 3.2 measures as compliance is required to accept credit cards. This also directly contradicts Class Counsel's assertion that "consumers' personal information maintained by Home Depot will be significantly more secure once the injunctive relief goes into effect and Home Depot is contractually obligated to implement the data security measures" since Home Depot is already today obligated by virtue of their ongoing business activities in compliance with PCI

36

DSS 3.2 to implement more stringent measures than the Settlement Agreement demands. (Dkt 226-1 at 27). Without any evidence that the Injunctive Relief affords Settlement Class Members something they do not already have completely independent of this litigation, the Court must find that the Injunctive Relief actually provides no value to Settlement Class Members.

Even if, *arguendo*, the Injunctive Relief has *some* generalized value to the public, that value would only be to future Home Depot customers or their credit card issuing banks. The question of value in a class action settlement is related to its value *to the class members*. Since the Settlement Class Members' data has already been stolen and is already being used by criminals, no injunctive relief changing Home Depot's future handling of consumer Personal Information could provide the Settlement Class Members any relief. "The fairness of the settlement must be evaluated primarily based on how it compensates class members for these past injuries." *Synfuel Technologies, Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) (rejecting settling parties' estimate of the value of an injunction requiring changes to DHL's business practices because "[i]t is future customers who are not plaintiffs in this suit who will reap most of the benefit from these changes."). Just as in *Synfuel*, even if the Injunctive Relief is

not worthless, it only benefits future Home Depot customers, not the past ones who are the plaintiffs in this case.

**VI.    The class cannot be certified because Rule 23(a)(4) and (g)(4) require separate representation for subclasses with competing interests.**

      A.   <u>The settling parties bear the burden of proof that the class is properly certified.</u>

The settling parties bear the burden of proving that the class is appropriately certified. *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003). *See also Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 380-81 (3d Cir. 2013). The prerequisites of Rule 23 adequacy "demand undiluted, even heightened, attention in the settlement context." *Amchem*, 521 U.S. at 620; *In re Dry Max Pampers Litig.*, 724 F.3d 713, 721 (6th Cir. 2013). Class certification is "dispositive" of whether any other issues even merit consideration. *See Georgine v. Amchem Prods.*, 83 F.3d 610, 623 (3d Cir. 1996) *aff'd Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ("Absent the class certification, there is no need for a determination of jurisdiction over futures claims, the justiciability of such claims, the adequacy of notice, or the propriety of a nationwide protective injunction.").

That Consumer Plaintiffs "will fairly and adequately protect the interests of the class" is a necessary element of class certification. Fed. R. Civ. P. 23(a)(4). That Class Counsel "must fairly and adequately represent the interests of the

class" is another. Fed. R. Civ. P. 23(g)(4). These paired requirements aim to stop conflicts of interest between absent class members and their named representatives or class counsel. *See Amchem*, 521 U.S. at 625 ("The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent."). "This requirement encompasses two distinct inquiries designed to protect the interests of absentee class members: 'it considers whether the named plaintiffs' interests are sufficiently aligned with the absentees', and it tests the qualifications of the counsel to represent the class.'" *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277, 303 (3d Cir. 2005) (quoting *GM Trucks*, 55 F.3d at 800)).

  B. <u>The Settlement Agreement creates two different subclasses which are improperly both represented by Class Counsel.</u>

   The Settlement Agreement creates two *de facto* subclasses. The first subclass consists of those Settlement Class Members who can provide Reasonable Documentation of Substantiated Losses. (Dkt 181-2 at ¶¶ 17, 24, 32-36). These are the only Settlement Class Members who will have pecuniary gain from the Settlement Agreement. *Id.* The second subclass are all of the Settlement Class Members who are not in the first – namely Settlement Class Members who cannot provide Reasonable Documentation of a Substantiated Loss (regardless of whether they actually suffered a Substantiated Loss). The second subclass has no

pecuniary gain from the Settlement Agreement, and, as explained *supra*, actually recovers nothing of any value whatsoever from the Settlement Agreement.

Class Counsel represents both *de facto* subclasses. However, when a settlement involves multiple subclasses, each subclass must have separate representation "to eliminate conflicting interests of counsel." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999).

C. <u>Class Counsel's statements show that these subclasses' interests became adverse to each other when Identity Guard was introduced.</u>

Class Counsel admits that the provenance of the worthless Identity Guard identity theft monitoring service was from the Plaintiffs' side of the mediation table, not Home Depot's. (Dkt 181-1 at 7-8 and 226-2 at ¶ 11). According to Class Counsel, the introduction of this additional "form of possible relief" was one of the key breakthroughs in the mediation process. *Id.* One is left to imagine what the parties were discussing in the months of mediation leading up to this melodramatic turn of events (though the presence of the clear-sailing agreement and the kicker provision strongly suggests a self-serving direction).

We know that defendants are ambivalent as how a settlement is split and only care about its total cost. *Stanton*, 327 F.3d at 964 (citing *GM Pickup Truck*, 55 F.3d at 819 (citing *Prandini v. National Tea Co.*, 557 F.2d 1015, 1020 (3d Cir. 1977))). The Supreme Court also teaches that "[m]ost defendants are unlikely to settle

40

unless the cost of the predicted judgment, discounted by its probability, plus the transaction costs of further litigation, are greater than the cost of the settlement package." *Evans v. Jeff D.*, 475 U.S. 717, 734 (1986) (Stevens, J.). Thus, if the parties could not settle the case prior to the introduction of the Identity Guard option, it stands to reason that its introduction reduced the overall cost of the Settlement Agreement to Home Depot. Home Depot also presumably would have been extremely unlikely to settle with a class which did not include *everyone* – why would they risk getting hit with another suit? Additionally, it seems likely that Home Depot assigned at least some publicity value to the Identity Guard element of the Settlement Agreement.

While Class Counsel insists that fees were not discussed at this phase of the negotiation, the kicker and clear-sailing provision (discussed *infra*) show that, at the very least, they were not beyond Class Counsel's consideration. Thus, since the common fund analysis directly affects Class Counsel's ability to recover a fee, Class Counsel must have believed that the Court would afford at least a dollar-for-dollar value to the $6.5 million Home Depot proposes to pay for Identity Guard. As shown in their filings, Class Counsel even attempts to convince the Court to value Identity Guard at its retail price and assign that

supposed value to 40 million people rather than the number of people who eventually sign up for Identity Guard. (Dkt 227-1 at 34).

The introduction of this option changed the dynamics of a negotiation dramatically: instead of all class members being in the same boat together, now only the ones with piles of documents would get cash, the others would get an identity theft monitoring service which only has value to Class Counsel's motion for fees and Home Depot's public relations department. This also reduced the probability that the Net Settlement Fund would be exhausted – increasing the probability that the kicker would reduce Home Depot's net cost for Identity Guard. What a convenient solution for everyone except the absent Settlement Class Members!

D. <u>The Consumer Plaintiffs are not members of the second subclass so cannot represent them.</u>

Each of the Consumer Plaintiffs has Substantiated Losses that they can provide Reasonable Documentation for as demonstrated by the facts recited in the Complaint. (Dkt 93 at ¶¶ 4-11, 18-94). Consequently, they are not part of the second, nonpecuniary subclass.

Since none of the Consumer Plaintiffs are members of the subclass, and since the subclasses have adverse interests, the Consumer Plaintiffs cannot be adequate representatives of the nonpecuniary subclass. *Ratcliffe v. Experian*

42

*Information Solutions, Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013). "Adequate representation depends upon an absence of antagonism and a sharing of interests between representatives and absentees. Where, as here, the class representatives face significantly different financial incentives than the rest of the class . . . we cannot say that the representatives are adequate." *Id.* (quoting *Molski,* 318 F.3d at 955) (internal quotations and citations omitted).

Without adequate representation from the Consumer Plaintiffs, the nonpecuniary sub-class cannot be certified, and thus the Settlement Agreement cannot be approved. *See Juris v. Inamed Corp.*, 685 F.3d 1294, 1323 (11th Cir. 2012) (rejecting a due process-based collateral attack on a class action settlement for its lack of formal subclasses because at the settlement negotiation stage, representative plaintiffs from the purported but undeclared subclasses participated, knew they represented only other plaintiffs in their particular position, and where there was representation by separate counsel).

**VII.   The Settlement is a tiny percentage of the value of the Class' damages, demonstrating that Class Counsel and the Consumer Plaintiffs sold out the absent Settlement Class Members and proving the Settlement Agreement does not satisfy the *Bennett* factors.**

A. The total recovery is a fraction of the class' injury.

Even if the Court agrees with Class Counsel that the entire $6.5 million cost of Identity Guard "Essentials" benefits absent Settlement Class Members

43

(despite Mr. Miorelli's contention *supra* that it does not) and even if the entire $13 million is paid to Settlement Class Members, that is a fraction of the damages to which the class is entitled.

Mr. Miorelli agrees with Class Counsel's view that a reasonable valuation of the data lost would consider the price the black market was paying for it: $50 to $100 per record. (Dkt 93 at ¶189 and 254-255). Across 53 million affected people, that means the overall value of the actual damages are in the range of $2.65 billion to $5.3 billion. That amount would be exclusive of attorneys' fees and costs since Counts I and II (for the nationwide class) and VII for the California Class and VIII for the Maryland Class each seek damages plus attorneys' fees and costs. (Dkt 93 at ¶¶ 292, 303, 349, and 355). Since many of the data breach notification statutes provide for treble damages, the value of the case could have theoretically reached as high as $15.9 billion plus attorneys' fees and costs. It is important to compare the recovery with the Complaint since the release extinguishes all of the claims raised in the Complaint or which could have been raised in the Complaint related to the data breach. (Dkt 181-2 at § XI). Mr. Miorelli believes a reasonable estimate of the full-value of the case to consumers tracks the black-market valuation of the stolen data, so a range of $2.65 billion to $5.3 billion.

Under the most-favorable analysis for the Settlement Agreement, its recovery of $19.5 million is 0.736% of the class' damages. In other words, if the recovery was only "a penny on the dollar" if the case went to trial, that would be 1 / 3 better than the Settlement Agreement. Considering Mr. Miorelli's demonstration that the "Identity Guard" part of the settlement is worthless, the actual percentage recovered in the Settlement Agreement is more approximately 0.245-0.491% of the class' damages. Either way, the recovery is miniscule compared to the damages which absent Settlement Class Members were entitled to at law.

> B. <u>This miniscule settlement is either a sellout by Class Counsel and the Consumer Plaintiffs or a nuisance settlement whose only purpose is the generation of legal fees and incentive awards.</u>

Basic economic theory teaches that rational actors settling litigation matters agree to an amount of money approximating their estimation of the amount of their damages discounted by their probability of success at trial. *See Evans*, 475 U.S. at 734 ("Most defendants are unlikely to settle unless the cost of the predicted judgment, discounted by its probability, plus the transaction costs of further litigation, are greater than the cost of the settlement package.") (Stevens, J.). Either this Settlement Agreement is the veiled admission of Class Counsel that the case is frivolous, with 99.264% chance of failure at trial, or, more

likely, Class Counsel seeks only a nuisance settlement to justify his outrageous fee and pay off the Consumer Plaintiffs.

The Seventh Circuit addressed a situation like this in *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 952 (7th Cir. 2006) (Easterbrook, J.). In *Murray*, the defendant and class representative proposed to settle the case for single-digit percentage of the value of their damages in payments that were in the range of $1 per absent class member, while the lawyers received enormous fees and the representative plaintiff received thousands of times more money than the absent class members. *Id.* Judge Easterbrook said "[s]uch a settlement is untenable. We don't mean by this that all class members must receive [full compensation]; risk that the class will lose should the suit go to judgment on the merits justifies a compromise that affords a lower award with certainty." *Id.* at 952. However,

> if the chance of success really is only 1%, shouldn't the suit be dismissed as frivolous and no one receive a penny? If, however, the chance of success is materially greater than 1%, as the proposed payment [of an incentive award to representative plaintiff] Murray implies, then the failure to afford effectual relief to any other class member makes the deal look like a sellout.

*Id.* This Settlement Agreement is much the same as that rejected in *Murray*. Just as in *Murray*, here the lawyers will receive a huge fee while an entire sub-class of absent Settlement Class Members receive nothing. Also, just as in *Murray*, the 88

Consumer Plaintiffs will receive at least $1,000 each while an entire sub-class of absent Settlement Class Members get nothing.

No rational actor would pursue millions of dollars in litigation which they and their lawyers all agreed had less than 1% chance of success on the merits. This absurdity demonstrates how obviously this Settlement Agreement fails the second and third *Bennett* factors. Class Counsel appears to understand how silly the Settlement Agreement is on a numerical basis by his strict avoidance, in more than three pages of analysis, of any actual comparison of the outcome in this case to the potential maximum recovery. (Dkt 226-1 at 22-25).

The closest thing Class Counsel can find to legal authority for a settlement of (depending on your view) 0.245% to 0.736% of the potential recovery at trial is a citation to dicta in *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 542 (S.D.Fla 1988). *Behrens* is 28 years old and its affirmance without opinion is not binding precedent in the 11th Circuit. U.S. Ct. App. 11th Cir. R. 36-2. Additionally, its mention of a settlement being satisfactory with "a hundredth or even a thousandth of a single percent of the potential recovery" is dicta since the actual recovery in *Behrens* was 20¢ per share compared to a potential of $3.50 per share – 5.71%. *Behrens,* 118 F.R.D. at 542. To make this Settlement Agreement as good a recovery as *Behrens*, the recovery would have to increase by 7.8X to 23.3X.

47

### C. Class Counsel's analysis of the fourth *Bennett* factor lends further evidence that the Settlement Agreement is aimed more at Class Counsel's pocketbook than the Settlement Class Members'.

Class Counsel's analysis of the fourth *Bennett* factor should further convince the Court of their conflicted and self-dealing motives in presenting this Settlement Agreement. Class Counsel argues this factor weighs in favor of approving the Settlement Agreement for two reasons: (a) the ongoing litigation would be expensive and (b) the supposed immediacy value of Identity Guard and the injunctive relief. However, as explained *supra*, Identity Guard and the injunctive relief both have *zero* value to absent Settlement Class Members. There certainly is no increased benefit of getting something that is worthless quicker.

All that remains of Class Counsel's argument is the expense of ongoing litigation. Yet that is a cost and a risk borne by Class Counsel, not the absent Settlement Class Members since he "undertook this litigation on a wholly contingent basis." (Dtk 227-1 at 32). An analysis of the Settlement Agreement's fairness looks at its *fairness to the Settlement Class Members*, not its fairness to Class Counsel. *Bennet v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984); *see also* Fed. R. Civ. P. 23(e)(2). Class Counsel attempts to convince the Court that the high ongoing cost of further litigation merits this early-stage settlement. Yet since this

risk is only borne by Class Counsel, that cost is irrelevant to the question of the fairness of the Settlement Agreement to the absent Settlement Class Members.

What Class Counsel's attempt does achieve, however, is to provide yet more evidence that this Settlement Agreement is really aimed at Class Counsel's best interests, not the absent Settlement Class Members'. Once again showing that the Settlement Agreement is a sellout.

D. Class Counsel's analysis of the final *Bennett* factor also shows that the real purpose of settling at this point is avoidance of risk to the lawyers, not to the Settlement Class Members.

Class Counsel accurately expresses the purpose of the final *Bennett* factor: "to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Lipuma v. American Express Co.*, 406 F.Supp.2d 1298, 1324 (S.D. Fla. 2005). Yet once again after stating the rule, their analysis goes into a completely self-serving direction. Class Counsel admits that *no discovery of Home Depot has yet taken place!* (Dkt 226-1 at 29). None!

Nonetheless, they claim "Counsel had a sufficient understanding of the facts and legal merits of the case, including its strengths and weaknesses, when

negotiating the Settlement."[3] *Id.* How is that possible? Without any discovery, Class Counsel's only available information in the case would have been the publicly-available news reports, SEC filings, their vague references in the Complaint to interviews with unnamed former Home Depot employees, and press releases. Yet many of the allegations in the Complaint could only be proved or disproved with specific knowledge of internal Home Depot workings, decision making, and the obvious question of "who knew what, and when?" Class Counsel does not claim clairvoyance, yet they claim that they pursued the Settlement Agreement with sufficient information to adequately evaluate the merits of the case. It is highly doubtful that such a thing is possible on the current facts and certainly if it is possible, Class Counsel's single-sentence assertion does not meet his burden to prove such.

---

[3] It bears pointing out that Class Counsel devotes only two sentences to describing how he appraised himself of the information *Lipuma* and *Bennett* require: "As explained above, before filing the Complaint, Plaintiffs' Counsel devoted significant time to investigating the facts related to the data breach and Home Depot's subsequent response, including interviewing dozens of witnesses with knowledge about Home Depot's data security practices." (Dkt 226-1 at 28). And "Counsel also extensively researched potential claims under the laws of the various U.S. states and territories." *Id.* at 29. The remainder of his discussion focuses on issues unrelated to the ability of plaintiffs, at this stage of the litigation, to adequately evaluate the case's merits. This is yet another attempt to confuse the issue and obfuscate the Settlement Agreement's clear deficiencies under the final *Bennett* factor.

## VIII. The extensive and unreasonable burdens on objecting violate Rule 23 and make Class Counsel's claims regarding the substance and degree of opposition to the Settlement Agreement spurious.

The sole remaining *Bennett* factor is the substance and degree of opposition to the Settlement Agreement. Class Counsel infers the class' silence approximately three weeks prior to the objection and opt-out deadline as the equivalent to the class' thunderous applause. (Dkt 226-1 at 28). Yet that silence has been coerced by the collusion of Class Counsel, Consumer Plaintiffs, and Home Depot to impose unreasonable restrictions on objecting.

### A. The objection process unnecessarily requires four signed copies to be mailed to the settling parties and the Court.

There is only one reason to require four copies of an objection be signed and snail mailed to the Court as well as the Settling Parties: to increase the financial and administrative cost of objecting to the Settlement Agreement. In *Newman v. Americredit Financial Services*, the court explained that it was not "not inclined to approve a settlement which makes it unnecessarily burdensome to submit a claim or opt out." *Newman v. Americredit Financial Services*, 2014 U.S. Dist. LEXIS 15728, at *17 (S.D. Cal. Feb. 3, 2014). That court rejected the argument that mailing was required for the class member's affirmation because an affirmation could "be provided through an online form or by phone with adequate identification of the class member." *Id.; see also Galloway v. Kan. City*

51

*Landsmen*, No. 4:11-1020-CV-W-DGK, 2012 WL 4862833, at *6 (W.D. Mo. Oct. 12, 2012) (denying settlement in part because the opt-out requirement of e-mail and either first class mail or hand-delivery is "unnecessarily onerous"), *later proceeding reported at* 2013 WL 3336636, at *4 (W.D. Mo. Jul. 2, 2013) (pointing out favorably that "[t]he parties have simplified the opt-out provision so that in order to opt-out, class members need only send a single email to defense counsel."). The Settlement Agreement requires objectors to print and sign four copies of their Objection and mail it to four different locations without any explanation of there being any value to this exercise for Home Depot, Class Counsel, the Consumer Plaintiffs, or the absent Settlement Class Members. (Dkt 181-2 at ¶ 48).

This requirement only serves to increase the cost to object and its expense is unjustified in today's era of electronic filing – especially considering that the Court's discovery order expressly required the parties to exchange documents amongst themselves in an electronic manner to reduce cost. (Dkt 110 at ¶ 6). The legal academy is in agreement that electronic submission of objections is important, especially if their quantity is to be used in evaluating the fairness of the Settlement Agreement under a framework such as *Bennett*: "the ease and cost-efficiency of such direct internet submissions increases the likelihood of

absent class member participation." Robert H. Klonoff, *Making Class Actions Work: The Untapped Potential of the Internet*, 69 U. PITT. L. REV. 727, 766 n. 251 (2008); Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L. Rev. 71, 128-29 (Jan. 2007).

The Settlement Administrator estimates that 80.2% of the class received notice via his plan, with 74.5% of the class receiving notice via e-mail. (Dkt 181-2 at Ex. G 9, 13). This means that of the class members who received notice of the Settlement Agreement, 92.9% of them received notice via e-mail, yet absent class members' objections cannot be made in the same medium. Applying a more-expensive method of objecting than the parties used to exchange documents amongst each other shows yet again that Class Counsel's interests are in protecting his fee, and not the interests of absent Settlement Class Members.

Other courts have permitted electronic objection and opt-out. *See e.g., In re Motor Fuel Temperature Sales Practices Litig.* ("*Motor Fuel Temperature*"), No. 07-md-01840-KHV-JPO, Order (Dkt. No. 3019), at 2 (D. Kan. Nov. 10, 2011) ("If Costco plans to proceed with email notification, it must allow class members to opt out of the class and object to the settlement electronically"); *Boring v. Bed Bath & Beyond*, 2013 WL 6145706, at *9, No. 12-cv-05259-JST (N.D. Cal. Nov. 21, 2013) ("The Court notes that the filing of objections with the Court constitutes service

upon counsel for the parties, as the parties' counsel are registered to receive filings through the Court's Electronic Case Filing system."). Just as in those cases, there is no valid reason why a Settlement Class Member should receive notice via e-mail but have to print, sign, and mail an objection in quadruplicate.

Where electronic modes of objecting have been available, the "vast majority" of participating class members used it. *See, e.g. Motor Fuel Temperature*, 2012 WL 1415508, at *6 n.13 (D. Kan. Apr. 24, 2012) (2.6 times more people opted-out electronically than by mail); *Fraley v. Facebook, Inc.*, No. 11-cv-01726 RS (N.D. Cal. Jun. 7, 2013), Declaration of Jennifer M. Keough Regarding Settlement Administration (Dkt. 341) at ¶12 (6,884 of 6,946 opt-out requests (99.1%) were submitted electronically via the settlement website).

### B. Objectors who appear through counsel have unnecessary additional hurdles.

The Settlement Agreement puts additional unnecessary burdens on objectors who appear through counsel. (Dkt 181-2 at ¶ 48.e, 48.h, 48.i, and 48.l). The objector must identify "any former or current counsel who may be entitled to compensation for any reason related to the objection to the Settlement, the fee application, or the application for Service Awards." *Id.* at ¶ 48.e. Objectors must also document the number of times in the past five years his counsel and his counsel's firm have objected to a class action settlement, including the case

caption and copies of all orders relating to or ruling upon the objection at the trial or appellate level. *Id.* at ¶ 48.h. An objector must disclose "any and all agreements that relate to the objection or the process of objecting, whether written or verbal, between objector or objector's counsel and any other person or entity." *Id.* at ¶ 48.i.

The requirements for the class action pedigree of objectors (¶ 48.h) has no relevance to the content of the objection or the merits of the Settlement Agreement. *See Trabakoolas v. Watts Water Tech., Inc.*, No. 3:12-cv-01172-WHO (EDL) (Dkt. 276) (N.D. Cal. Feb. 14, 2013) (excising from class notice the requirement to list past suits in which the objector or his attorney has objected). Such burdens are also specifically prohibited by the Federal Judicial Center's Judge's Class Action Notice and Claims Process Checklist and Plain Language Guide. Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide, 5 (2010) (the "FJC Judge's Class Notice Guide") (last visited July 17, 2016), http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf. The FJC Judge's Class Notice Guide directs courts to avoid notice language that places "burdensome hurdles in the way of responding and exercising rights" and to "[w]atch for notice language that restricts free exercise of rights, such as

onerous requirements to submit a 'satisfactory' objection or opt-out request." *Id.* It also directs judges to review the inside content of detailed notices to "[w]atch for burdensome requirements that might inhibit objections, opt outs, or claims." *Id.* at 9.

The requirements in paragraphs 48.e and 48.i improperly intrude on the agreement between an objector and his attorney in a way which Class Counsel does not similarly bind himself. Throughout this litigation, all details of Class Counsel's representation agreement with his clients, as well as the fee split amongst the various lawyers in this litigation, have either not been provided to the Court or only been provided for *in camera* review. (Dkt 60 ¶¶ 8-9). Class Counsel admits that he intends no judicial or Settlement Class Member oversight of his allocation of any awarded expenses or fees. (Dkt 227-1 at 39-40). As with so much of this case, Class Counsel holds himself to one standard, and holds absent Settlement Class Members, particularly ones who object, to a much higher one. That is not his role, that is not fair, and the presence of such terms makes Class Counsel's arguments about the degree and substance of objections irrelevant: those objections have been suppressed not by the quality of the deal, but by the onerousness of the restrictions on making an objection created by Class Counsel.

56

### C. The requirements of burdensome disclosure of prior objections demands irrelevant materials whose only purpose is to fuel an *ad hominem* attack on an objector.

Beyond the chilling nature of the disclosure requirements for objectors and the unreasonable extra expense from the objection procedures, the Court should examine their purpose. Class Counsel will surely argue in reply that their purpose is to dissuade unmeritorious objections. But obviously additional reporting requirements make it more expensive and burdensome to object for *anyone* who has experience objecting to class action settlements, regardless of their motives. Additionally, such dissuasion is itself an improper purpose – a Settlement Class Member has the absolute right to object for any non-frivolous reason pursuant to Rule 23(e)(5). There is no "professional-objector" exception to Rule 23.

In reality, the only purpose of the disclosure requirements is so that Class Counsel can launch *ad hominem* attacks at objectors. Whether an objector is making his debut objection in this case or this case is his hundredth of thousandth objection has no bearing on whether his objection raises legitimate problems with the Settlement Agreement. At all times and against any objector the proponents of a Settlement Agreement always have the burden of proving its merit. *Faught*, 668 F.3d at 1239. Class Counsel should not be allowed to ease his

own burden by demanding objectors give him arrows to sling at them personally.

Since the only reason to include the additional requirements in paragraph 48.e, 48.i, and 48.l are so that Class Counsel can use that information for an improper purpose, the inclusion of the requirement *ab initio* is improper. Such improper inclusion of restrictions on filing objections renders the Settlement Agreement ineligible for approval as the notice is unreasonable and inadequate, violating Rule 23(e)(2) and the objection restrictions improperly limit class member rights in a manner not allowed by Rule 23(e)(5). These can only be remedied but the issuance of a new notice to the class excluding these restrictons.

> ### D. The requirement that an objector personally sign the objection, even if he is represented by counsel, violates Federal Rule of Civil Procedure 11.

The Settlement Agreement requires an objector sign the objection personally, "an attorney's signature is not sufficient." *Id.* at ¶ 48.l. This requirement facially violates Federal Rule of Civil Procedure 11. "Unless a rule or statute specifically states otherwise, a pleading need not be verified or accompanied by an affidavit." Fed. R. Civ. P. 11(a). No rule or statute specifically requires a represented objector to sign or verify their objection. Consequently, this requirement makes the objection requirements facially illegal under Rule 11.

Federal Rule of Civil Procedure 23 requires notice be given to the class "in a reasonable manner." Fed. R. Civ. P. 23(e)(1). While there is much debate on the margins about what constitutes reasonable notice, certainly a provision in a notice which restricts the rights of absent Settlement Class Members in a facially illegal manner, cannot be called "reasonable." There is no reason for the Court to excuse this and must deny final approval, at least, on this basis alone.

Because of these extensive, unreasonable, and illegal restrictions on objections, the Court should hold that the fifth *Bennett* factor expressly weighs *against* final approval in addition to finding that final approval cannot be granted at this time due to deficiencies in the notice arising as a result of these restrictions on objectors.

## IX.    The Settlement Agreement violates Rule 23(h).

In addition to its many other flaws, the Settlement Agreement violates Federal Rule of Civil Procedure 23(h) by impermissibly delegating awards of attorneys' fees to a committee of private attorneys, without review by the Court or the Settlement Class. Rule 23(h) establishes procedures for Class Counsel to make an application for fees and expenses, rules which are designed to protect the Settlement Class. Instead, Class Counsel reports that Lead Counsel "will carefully evaluate and scrutinize Consumer Case Counsels' time and expense

reports in allocating any fee and expense award." (Dkt 227-1 at 39). This impermissibly relieves the Court of its responsibility to determine attorneys' fees and allocates it to a group of attorneys who themselves have a large stake in the outcome of those proceedings.

*In re High Sulfur Content Gasoline Prods. Liab. Litig.,* 517 F.3d 220 (5th Cir. 2008), is directly on point. The Fifth Circuit held that "the appointment of a committee does not relieve a district court of its responsibility to closely scrutinize the attorneys' fee allocation, especially when the attorneys recommending the allocation have a financial interest in the resulting awards." *Id.* at 227. "[T]he district court abdicated its responsibility to ensure that the individual awards recommended by the Fee Committee were fair and reasonable." *Id.* For a district court to allocate fees in an *ex parte* proceeding was "inconsistent with well-established class action principles and basic judicial standards of … fairness." *Id.* The only apparent difference between *High Sulfur* and this case is that the committee allocating the attorneys' fees is called "Lead Counsel" (which despite its name, apparently consists of three law firms: Harris Penn Lowry, LLP, Morgan & Morgan Complex Litigation Group, and Stueve Siegel Hanson LLP) instead of a "Fee Committee."

The Fifth Circuit's *High Sulfur* decision had its roots in an opinion of Judge Ambro of the Third Circuit regarding Rule 23(h). In *Diet Drugs Prods. Liab. Litig.*, 401 F.3d 143 (3d Cir. 2005), the Third Circuit considered the appeal of several class counsel challenging a district court's award and allocation of attorneys' fees. *Diet Drugs*, 401 F.3d at 145. Judge Ambro's concurring opinion asked whether it was appropriate for the district court to defer to class counsel's proposed allocation of attorneys' fees because "counsel have inherent conflicts." *Id.* at 172-3. Because class counsel "make recommendations on their own fees and thus have a financial interest in the outcome," Mr. Miorelli joins Judge Ambro in asking: "how much deference is due the fox who recommends how to divvy up the chickens?" *Id.* at 173.

Class Counsel's plan to divvy up the fees also cannot be reconciled with *High Sulfur* because such allocation would be made as part of an out of court, secret deal among the lawyers without any judicial or Settlement Class Member involvement. This secrecy also suggests probable violation of Rule 23(e)(3). An enormous number of law firms have been involved in this case, so many that Mr. Miorelli is not exactly sure of the number, but it is definitely more than a dozen. It is unimaginable that each firm has agreed to having its fees determined in the sole discretion of the troika of Lead Counsel without first reaching an agreement

about whether and how much they would be paid. Recall from Rule 23, "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal." Fed. R. Civ. P. 23(e)(3). Whatever these fee-split agreements are, they should be filed with the Court and disclosed to the Settlement Class. Class Counsel should be required to disclose any and all arrangements which have been made with other plaintiffs' attorneys pursuant to this litigation overall and the Settlement Agreement specifically.

The Court also must be involved in allocating the fees because if one law firm has secretly agreed to accept less than its lodestar or a smaller multiplier than is being requested from the Court, it is the Settlement Class that is entitled to that giveback, not the law firm that has secretly extracted a greater return than approved by the Court. *Cf. Bluetooth*, 654 F.3d at 949 (a giveback going to someone other than the class is a sign of self-dealing because "there is no apparent reason the class should not benefit from the excess allotted for fees"); *cf. also* Fed. R. Civ. P. 23(e)(3) (forbidding secret agreements in class action settlements).

Finally, putting control of the fee split in the hands of Lead Counsel creates an enormous incentive for the other attorneys in the case to not oppose this unfair Settlement Agreement. As explained throughout this objection, the

Settlement Agreement violates the law in numerous ways, each at the expense of Settlement Class Members. Yet not a single law firm has raised an objection lest they alienate their paymasters.[4]

### X.   Mr. Miorelli should be allowed to depose the Consumer Plaintiffs to test their adequacy of representation.

Class Counsel claims that the Consumer Plaintiffs "remained committed to and actively participated in this significant litigation of public importance against a formidable defendant on behalf of millions of similarly situated customers." (Dkt 227-1 at 11). Class Counsel further claims, in support of $1,000 each awards to the Consumer Plaintiffs that they have "monitored the litigation through continued contact with counsel." *Id.* Yet, Class Counsel has offered no evidence to support these blanket assertions.

In fact, there is no evidence in the record even from Class Counsel himself that each Consumer Plaintiffs reviewed and approved the Settlement Agreement before it was presented to the Court. Reviewing the Settlement Agreement is the most basic possible task for the Consumer Plaintiffs, let alone their ongoing duty over the past two years to actively monitor the conduct of the lawyers.

---

[4] This may actually not be the case if there are further secret side deals limiting Lead Counsels' discretion in divvying up the fees. However, if such secret side deals do exist, they create yet another ground on which Class Counsel has not complied with Federal Rule of Civil Procedure 23(e)(3).

The silence of the Consumer Plaintiffs is deafening and troublesome. Consequently, Mr. Miorelli doubts that all or any of them were actively and substantively involved in the settlement negotiations, review of Class Counsel's billing statements, review of court filings, or the supposed negotiations between the Consumer Plaintiffs and Home Depot regarding discovery. As a result, Mr. Miorelli requests leave of the Court to conduct discovery of the Consumer Plaintiffs regarding each's involvement in this case to determine the adequacy of their representation and the level of their oversight of the case to-date. Objectors such as Mr. Miorelli are entitled to "discovery relevant to the objections." *In re Mercury Interactive Corp. Securities Litig.*, 618 F.3d 988, 994 (9th Cir. 2010).

**XI.**   **Even if the class can be certified, the Settlement Agreement is objectively unfair and a class action settlement should not be approved when the primary beneficiaries are the Consumer Plaintiffs and Class Counsel.**

A. The "clear sailing" provision of the Settlement Agreement shows self-dealing by Class Counsel.

The Settlement Agreement has a "clear sailing" provision providing that Home Depot will not appeal Class Counsel's application for an award of no more than $8.475 million. (Dkt 181-2 at ¶ 61). A "clear sailing" agreement is a provision of a class action settlement agreement where the parties agree not to oppose an attorneys' fee award. *Bluetooth*, 654 F.3d at 947. Class Counsel will

surely argue that Home Depot's reservation of the right to object before the Court to an award no matter the amount makes their waiver of a right to appeal not a "clear sailing" provision. However, the behavior of the parties, particularly Class Counsel's request for exactly the maximum attorneys' fee to avoid a Home Depot appeal, $8.475 million, shows that this distinction is a sham to avoid the "clear sailing" label but not its effect.

The clear sailing "clause by its very nature deprives the court of the advantages of the adversary process." *Weinberger v. Great Northern Nekoosa Corp.*, 925 F.2d 518, 525 (1st Cir. 1991). The clause "suggests, strongly," that its associated fee request should go "under the microscope of judicial scrutiny." *Id.* at 518, 525. The clear sailing clause lays the groundwork for lawyers to "urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *Id.* at 524; *accord Bluetooth*, 654 F.3d at 948.

"Provisions for clear sailing clauses 'decouple class counsel's financial incentives from those of the class, increasing the risk that the actual distribution will be misallocated between attorney's fees and the plaintiffs' recovery. They potentially undermine the underlying purposes of class actions by providing defendants with a powerful means to enticing class counsel to settle lawsuits in a manner detrimental to the class." *Vought v. Bank of America, N.A.*, 901 F. Supp.2d

1071, 1100 (C.D. Il. 2012) (quoting *Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223, 1224 (2000) (O'Connor, J., *respecting the denial of the petition for a writ of certiorari*); *accord* William D. Henderson, *Clear Sailing Agreements: A Special Form of Collusion in Class Action Settlements*, 77 Tul. L. Rev. 813, 816 (2003) (urging courts to "adopt a *per se* rule that rejects all settlements that include clear sailing provisions.").

B. The segregated fees fund of the Settlement Agreement demonstrates self-dealing by Class Counsel.

The attorneys' fees will be paid "separate from and in addition to the Settlement Fund." (Dkt 181-2 at 16). This arrangement, called a "kicker," causes the "fees not awarded to revert to defendants rather than be added to the class fund." *Bluetooth*, 654 F.3d at 947. A "kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger" that is "already suggested by a clear sailing provision." *Id.* at 949. "The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Id.* Unlike a typical common-fund case, when a kicker exists, objectors such as Mr. Miorelli, if they successfully argue for a smaller fee award, only serve to save the defendant money, not improve the recovery for absent Settlement Class Members.

The "kicker" has other self-serving impacts that benefit only Class Counsel: (a) it will reduce the incentive for objectors to scrutinize the Settlement Agreement, thus improving their argument on the fifth *Bennett* factor and (b) it reduces the incentive for the Court to scrutinize the fee award because any reversion will only go to Home Depot, rather than to the Settlement Class. Charles Silver, *Due Process and the Lodestar Method*, 74 Tul. L. Rev. 1809, 1839 (2000) (calling a clear sailing provision and kicker fee arrangement "a strategic effort to insulate a fee award from attack"); Lester Brickman, *Lawyer Barons*, 522-25 (2011) (arguing that it should be *per se* unethical to use a clear sailing provision and kicker fee arrangement).

When, in a case such as this, "class counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class." *Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1147 (9th Cir. 2000). This litigation, which benefits Class Counsel and Consumer Plaintiffs, but not the absent Settlement Class Members, cannot satisfy the adequacy requirement of Rule 23(a)(4), and the class should not be certified nor the fee award made.

C. <u>A large disparity between the recovery of the Consumer Plaintiffs</u>
   <u>and the absent Settlement Class Members is not permitted under</u>
   <u>Eleventh Circuit precedent.</u>

Under the Settlement Agreement the non-pecuniary subclass Settlement
Class Members will get no recovery while the Consumer Plaintiffs will receive
up to $11,000 and Class Counsel will receive $8.475 million. Just as the Settlement
Agreement shows self-dealing by Class Counsel, the disparity of recovery
between non-pecuniary subclass Settlement Class Members and Consumer
Plaintiffs shows that the Consumer Plaintiffs are the other primary beneficiary of
the Settlement Agreement, also to the detriment of the Settlement Class
Members.

While the absent non-pecuniary subclass Settlement Class Members have
their damages (which, as discussed *supra*, are at least $50-100 per card
compromised) discounted to *zero*, the Consumer Plaintiffs are secure in a near-
complete recovery of their documented losses plus an additional $1,000.
Compared to the non-pecuniary subclass Settlement Class Members, Consumer
Plaintiffs are infinitely better off.

Courts around the country, including the Eleventh Circuit, while often
approving incentive awards to class representatives regularly reverse when
those awards represent a large disparity when compared to the absent

Settlement Class Members. In *Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013), the Ninth Circuit reversed an approved settlement due to a 6.67-192.3 times disparity between class representatives' recovery and that of absent class members. The Ninth Circuit reasoned that "the significant disparity between the incentive awards and the payments to the rest of the class members further exacerbated the conflict of interest caused by the conditional incentive awards." *Id.* "There is a serious question whether class representatives could be expected to fairly evaluate whether awards ranging from $26 to $750 is a fair settlement value when they would receive $5,000 in incentive awards." *Id.*

The Sixth Circuit has also rejected a large disparity between the named plaintiffs and absent class members' treatment in *Vassalle v. Midland Funding, LLC*, 708 F.3d 747 (6th Cir. 2013). In *Vassalle*, the settlement provided for absent class members to receive $17.38 each while the named plaintiffs would be paid $2,000 each plus, in the case of one named plaintiff, have $4,516.57 in debt forgiven. *Id.* at 755-56. In total, this resulted in named plaintiffs receiving approximately 374 times as much benefit from the settlement as absent class members. The Sixth Circuit found the settlement was unfair and that the district court abused its discretion by approving it. *Id.* at 756.

The Second Circuit also is skeptical of the fairness of incentive payments. In *Plummer v. Chemical Bank*, 668 F.2d 654 (2d Cir. 1982), the Second Circuit affirmed the Southern District of New York's denial of a proposed class action settlement where absent class members received $1,000 each while the four representative class members received between $8,500 and $17,500 each. The district court held that "where representative plaintiffs obtain more for themselves by settlement than they do for the class for whom they are obligated to act as fiduciaries, serious questions are raised as to the fairness of the settlement to the class." *Plummer v. Chemical Bank*, 91 F.R.D. 434, 441-42 (S.D.N.Y. 1981), *aff'd*, 668 F.2d 654 (2d Cir. 1982).

The Eleventh Circuit directly cited that same district court language in *Plummer* when it rejected a class settlement which allocated approximately 6.25% of a lump sum settlement to the eight representative class members, while the absent class members each received, on average, approximately 0.42% of the settlement. *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1146, 1148 (11th Cir. 1983). The court found the 14.75 times disparity between representative and absent class member recovery was facially unfair and reversed the district court's approval of the settlement. *Id.* at 1151.

In *Radcliffe* the disparity between the class representatives and the absent members of the class was about 6 to 192 times, in *Vassalle* it was 374 times, in *Plummer* it was 8.5 to 17.5 times, and in *Holmes* the disparity was 14.75 times. In each of those cases, the appellate court rejected the settlement as unfair.

In this case the disparity is infinite. That disparity is literally as far above the levels which the Ninth, Second, and Eleventh Circuits have all rejected as mathematically possible. This Court would invite error to approve this disparity. Class certification is not appropriate when the class representative and class counsel bring a lawsuit to benefit not the class, but themselves. *See In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011). This Settlement Agreement, with its enormous attorneys' fee and infinite difference in recovery between the Consumer Plaintiffs and absent nonpecuniary subclass Settlement Class Members appears to be just such a self-serving case and should be rejected.

71

XII.   **Class Counsel should not get more than the 25% benchmark attorneys' fee calculated on the basis of the benefit to the class, not the gross recovery, much of which is actually a benefit to the Defendant instead of the class.**

A.   The basis for a contingent fee should exclude costs of class notice, Class Counsel's costs, and any incentive payments.

Mr. Miorelli believes that the baseline recovery to calculate any contingent fee should exclude the costs of class notice, any reversion to Home Depot, any *cy pres* awards, and, to the extent they are awarded, any incentive payments.

While the Eleventh Circuit does not have a rule regarding whether to use a net-based analysis or gross-based, the Seventh Circuit requires a net-based common fund analysis. *Redman v. RadioShack Corp.*, 768 F.3d 622, 633 (7th Cir. 2014) ("Those [administrative] costs are part of the settlement but not part of the value received from the settlement by the members of the class. The costs therefore shed no light on the fairness of the division of the settlement pie between class counsel and class members.") Since the Eleventh Circuit does not have a rule, the reasoning of the Seventh Circuit should be persuasive to the Court.

Additionally, there is no benefit to the absent Settlement Class Members in the mechanical delivery of the class notice. In reality, notice costs are a benefit to *the defendant*, not the class, because in the event of insufficient notice, it is the

defendant who bears the risk of the class action release being unenforceable as a due process violation. *Hecht v. United Collection Bureau*, 691 F.3d 218, 224 (2d Cir. 2012). In fact, the defendant has an incentive to spend additional amounts on notice as less expensive means of notice, such as constructive notice by a single publication, may be sufficient to satisfy due process only "as to persons whose whereabouts or interests cannot be determined through due diligence." *Id.* (quoting *In re Agent Orange Prod. Liab. Litig. MDL No. 381*, 818 F.2d 145, 168 (2d Cir. 1987). *See also, Redman*, 768 F.3d at 630, *Bluetooth*, 654 F.3d at 944, *and Twigg v. Sears, Roebuck & Co.*, 153F.3d 1222, 1228-9 (11th Cir. 1998). Similarly, Settlement Class Members have had no opportunity to review or object to the amount of money spent in the notice process, further showing that it should not be accounted to them.

Applying this analysis to the facts in this case, even if the Court accepts Class Counsel's argument to value the Identity Guard service at 100% of its cost to Home Depot, then the initial common fund is $19.5 million, from which $88,000 in incentive awards should be deducted, and to which Class Counsel's costs and Home Depot's notice costs should not be added.[5] Consequently, a 25%

---

[5] That results in an initial recovery common fund (representing the net recovery to absent Settlement Class Members excluding attorneys' fees) of $19,412,000.

benchmark attorneys' fee in this case would be $6,470,666.67.[6] Class counsel's request for $8.475 million would constitute a 30.4% fee, significantly above the benchmark for no good reason, especially considering the blatant unfairness of the Settlement Agreement to the nonpecuniary recovery subclass.

However, as discussed *supra*, the Identity Guard service is actually worthless to most if not all absent Settlement Class Members. Consequently, the Court should discount the $6.5 million either to zero or refuse to award attorneys' fees until the number of absent Settlement Class Members who actually sign up for the Identity Guard service (that is, do not just get an access code from the Settlement Administrator, but who complete activation of the service) is known and then assign a value based on the lesser of $6.5 million or the retail value of the service. Mr. Miorelli, however, contends that no matter how many absent Settlement Class Members sign up for Identity Guard, it is actually or effectively worthless, meaning that Class counsel should get no credit for it in their fee calculation. On that basis the starting place should be $13

---

[6] $\frac{\$19,412,000}{3}$ = $6,470,666.67 resulting in a constructive common fund of $19,412,000 + $6,470,666.67 = $25,882,666.67, of which $6,470,666.67 constitutes 25%.

million minus $88,000 in service awards, yielding a 25% benchmark fee of $4,304,000. On this calculation, Class Counsel's request would be a 39.6% fee.

While Class Counsel has not provided sufficient information to meet his burden of requesting a lodestar-based fee award, it is notable that the 25% benchmark would recommend a fee in the vicinity of the claimed lodestar. Since that is likely to go down under scrutiny of absent Settlement Class Members like Mr. Miorelli, this analysis would suggest that $4,304,000 would be an appropriate fee if one were to be awarded.

To the extent that the Court agrees with Mr. Miorelli's fee analysis, Mr. Miorelli further requests that the Court award any difference between the fee requested and the fee awarded to all Settlement Class Members as a *pro rata* distribution.

B. Class Counsel has not provided the required support for his attorneys' fee lodestar calculation, and as such, his fee should not be awarded on the basis of a lodestar analysis.

While Class Counsel has apparently provided his hourly billing statements to the Court for *in camera* review, that does not subject them to an adversarial setting to test their reasonableness. Class Counsel's actual client are the absent Settlement Class Members, and they have the right to scrutinize his billings, not rely on the Court to do it for them.

Class Counsel claims to have worked an amazing 10,186 hours on the case as of June 15, 2016. (Dkt 227-1 at 19). This enormous number of hours is particularly shocking since *there has been no discovery of the defendant!* (Dkt 226-1 at 29). Yet every single hour of billing records related to this amount of time, which surely is inflated, has only been submitted to the Court for *in camera* review, away from the watchful eye of Class Counsel's actual clients.

Just as the proponents of the Settlement Agreement bear the burden of proving its fairness, reasonableness, and adequacy, Class Counsel bears the burden of proving his lodestar is reasonable. Yet he has provided zero information in the record of the case to support even an inference of reasonableness, let alone to prove reasonableness.

Class Counsel will surely claim that he cannot provide these records publicly as they are privileged. While some portion of the record for some portion of the hours worked may be privileged, certainly not *all* of the records for *each* of the 10,186 hours Class Counsel claims were worked on this case are privileged. "[M]atters involving the receipt of fees from a client are not normally within the attorney-client privilege." *U.S. v. Leventhal*, 961 F.2d 936, 940 (11th Cir. 1992) (internal citations and quotations omitted). "In fact, Courts have specifically held that billing records, hourly statements, and fee arrangements

which do not reveal client communications are not protected by the attorney-client privilege." *F.T.C. v. Cambridge Exchange, Ltd., Inc.*, 845 F.Supp 872, 874 (S.D. Fla. 1993) (citing *P & B Marina, Ltd. Partnership v. Logrande*, 136 F.R.D. 50 (E.D.N.Y. 1991) *aff'd* 983 F.2d 1047 (2d Cir. 1992); *Real v. Continental Group, Inc.*, 116 F.R.D. 211 (N.D. Cal. 1986); *Thomas v. F.F. Financial, Inc.*, 128 F.R.D. 192 (S.D.N.Y. 1989)).

Mr. Miorelli thus requests that Class Counsel be required to submit detailed billing records, subject to limited redaction, for review by the Settlement Class. A recent decision of the Sixth Circuit is particularly instructive. In *Shane Group, Inc. v. Blue Cross Blue Shield of Michigan*, ___ F.3d ___, 2016 WL 3163073 (6th Cir. June 7, 2016), the Sixth Circuit vacated a class action settlement agreement, in part, because too much of the record was sealed from view of absent class members. *Shane*, 2016 WL 3163073 at *3-4. The Sixth Circuit explained:

> The courts have long recognized, therefore, a strong presumption in favor of openness as to court records. The burden of overcoming that presumption is borne by the party that seeks to seal them. The burden is a heavy one: only the most compelling reasons can justify non-disclosure of judicial records. Moreover, the greater the public interest in the litigation's subject matter, the greater the showing necessary to overcome the presumption of access. For example, in class

actions—where by definition some members of the public are also parties to the case—the standards for denying public access to the record should be applied with particular strictness. And even where a party can show a compelling reason why certain documents or portions thereof should be sealed, the seal itself must be narrowly tailored to serve that reason. The proponent of sealing therefore must analyze in detail, document by document, the propriety of secrecy, providing reasons and legal citations.

[. . .]

Class members cannot participate meaningfully in the process contemplated by Federal Rule of Civil Procedure 23(e) unless they can review the bases of the proposed settlement and the other documents in the court record. All of the named parties to this case signed on to the proposed settlement only after reviewing the expert report and other sealed documents in the record. The unnamed class members are entitled to do the same, subject to the rights of the parties and third parties to make the showings necessary to seal.

*Id.* at \*3-4 (internal citations and quotations omitted).

Mr. Miorelli also objects to Class Counsel not providing lists of the attorneys whose work constitutes the astounding 10,186 hours claimed thus far and their résumés. While Class Counsel has managed to find a colleague to provide a predictable endorsement of the fee schedule Class Counsel used, the hourly rates proposed are eye-popping. One of the most common ways to determine whether an attorney's self-declared hourly rate is reasonable is to

compare it to that year's *Laffey* Matrix and then adjust to the local geographic cost of living.[7] *See Chanel, Inc. v. Doan*, 2007 WL 781976, *6-7 (N.D. Cal. 2007) (citing *Laffey v. Northwest Airlines, Inc.*, 572 F.Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984)).

This analysis is made impossible since all of the billing records, and thus the names, levels of experience, hours worked, and geographic locality are not available to absent Settlement Class Members. However, an approximation using Atlanta shows Class Counsel's fee schedule is wildly inflated. According to the Judicial Salary Plan Effective January 11, 2016, the locality pay for Atlanta is 19.58% and the locality pay for Washington, D.C. is 24.78%. (Exhibit B and C).

---

[7] Beginning with the 2015-2016 year, the U.S. Department of Justice stopped maintaining the *Laffey* Matrix and replaced it with the U.S. Attorney's Office Fees Matrix, which is calculated on a slightly different methodology than the *Laffey* Matrix. (Exhibit D at n.3 to n.5). The U.S. Attorney's Office does not object to the use of numbers calculated from the *Laffey* Matrix method going forward as long as that method is properly executed. (Exhibit D at n.5). Taking the final U.S. Department of Justice published *Laffey* Matrix and updating it for 2016 requires multiplying the values by the CPI-U for Washington, D.C. reported in the 2015 and 2016 U.S. Bureau of Labor Statistics CPI-U report. (Exhibit E at n.3, F and G). Those values are .4% and 1.2%, respectively, so the relevant multiplier is 1.004 * 1.012 = 1.016048.

This means that converting the *Laffey* Matrix to Atlanta rates is accomplished by subtracting 4.17% from the Washington, D.C. rate.[8]

| Experience | Class Counsel Fee Rate | *Laffey* Matrix 2016-2017 |
|---|---|---|
| 30+ years | $400 (Associate) / $750 (Partner/Counsel) | $507.90 |
| 20-30 years | $400 (Associate) / $675 (Partner/Counsel) | $507.90 |
| 11-19 years | $400 (Associate) / $600 (Partner/Counsel) | $450.40 |
| 8-10 years | $400 (Associate) / $550 (Partner/Counsel) | $359.36 |
| 5-7 years | $400 (Associate) / $550 (Partner/Counsel) | $292.28 |
| 4-5 years | $400 (Associate) / $475 (Partner/Counsel) | $292.28 |
| 1-3 years | $350 (Associate) / $475 (Partner/Counsel) | $249.16 |
| Paralegals & Law Clerks | $165 | $143.75 |

As can be seen from the table, at every single level of experience, except Associates with more than 11 years of experience, the *Laffey* Matrix strongly suggests that Class Counsel's fee schedule is exaggerated.

C. <u>The value of any reversion of the Settlement Fund to Home Depot or any *cy pres* award should not be included in the calculation of an attorneys' fee.</u>

Finally, to the extent a *cy pres* award is made or a reversion from the Settlement Fund is returned to Home Depot, that should also not be counted as a benefit to the class for the purpose of calculating an attorneys' fee. Class Counsel should only be able to claim against a portion of the money the class actually

---

[8] Following the math from *Chanel* at fn 1 and 2: (119.58 - 124.78) / 124.78 = -0.0417 or -4.17%

receives. "[N]umerous courts have concluded that the amount of the benefit conferred logically is the appropriate benchmark against which a reasonable common fund fee charge should be assessed." *In re Prudential Ins. Co. America Sales Practices Litig.*, 148 F.3d 283, 338 (3d Cir. 1988) (*quoting* Conte, 1 Attorney Fee Awards § 2.05, at 37). The "key consideration in determining the appropriate fees is reasonableness in light of the benefit actually achieved." *In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013). *See generally In re Cendant Corp. Litig.*, 264 F.3d 201, 254-60 (3d Cir. 2001) (the court should ensure that the incentives of class counsel and class members are aligned). *See also Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 952 (7th Cir. 2006); *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004) ("There is no indirect benefit to the class from the defendant's giving the money to someone else.").

## XIII. CONCLUSION

For the reasons set forth herein, the Settlement Agreement is legally defective and also inadequate, unreasonable, and unfair to the absent Settlement Class Members. Therefore, Mr. Miorelli prays this honorable court:

(a)     Sustain this Objection to Settlement Agreement and deny final approval; or,

(b)     If the Court chooses to approve the Settlement Agreement, to:

81

i.      Award no Attorneys' Fees on the basis of lodestar analysis for Class Counsel's failure to meet his burden by hiding his billing records;

ii.     Award Attorneys' Fees, if any, of no more than $4,304,000;

iii.    Refuse to award any incentive payments; and

iv.     Reserve jurisdiction to grant incentive awards, costs, and reasonable attorneys' fees to Mr. Miorelli.

DATED: July 18, 2016

_____

Sam A. Miorelli, E.I., Esq. *pro se*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing Objection and the Miorelli Declaration and their respective Exhibits were transmitted via U.S. First Class Certified Mail, Return Receipt Requested on July 18, 2016 to the following:

U.S. District Court for the Northern District of Georgia
Richard B. Russell Federal Building and United States Courthouse
75 Ted Turner Dr., SW
Atlanta, GA 30303-3309

The undersigned further certifies that the foregoing Objection and the Miorelli Declaration and their respective Exhibits were transmitted via U.S. First Class Certified Mail, Return Receipt Requested on July 18, 2016 to the following:

Norman E. Siegel
Barrett J. Vahle
STUEVE SIEGEL HANSON LLP
460 Nichols Road, Suite 200
Kansas City, MO 64112

Phyllis B. Sumner
S. Stewart Haskins
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, GA 30309

Roy E. Barnes
John R. Bevis
THE BARNES LAW GROUP, LLC
31 Atlanta Street
Marietta, GA 30060

Sam A. Miorelli, E.I., Esq. *pro se*

83

<u>**Exhibit A – California Attorney General Data Breach Database (Expanded to add the three right columns with details of each offering extracted manually from the publicly-filed documents)**</u>

| Company Name | Date(s) of Breach | Reported Date | Data Monitoring Offered | Term | Attorney General Record Link |
|---|---|---|---|---|---|
| Eastbay Equities | 12/02/2015, 05/18/2016 | 7/15/2016 | Kroll | At least 1 year, up to 3 if services are provided | https://oag.ca.gov/system/files/Website%20Posting%207-14_0.pdf |
| Opes Advisors | 5/26/2016 | 7/14/2016 | Experian ProtectMyID | 1 year | https://oag.ca.gov/system/files/Adult%20Notice_0.pdf |
| Project Management Institute | 04/23/2016, 04/24/2016 | 7/14/2016 | Equfax Credit Watch Gold | 1 year | https://oag.ca.gov/system/files/Standard%20Notice%20%284%29_1.pdf |
| Kaiser Permanente Northern California | 06/06/2010, 05/19/2016 | 7/12/2016 | None | N/A | https://oag.ca.gov/system/files/Member%20Notification%20letter%20for%20ClinTech%20theft%207.12.16%20-%20generic%20template%20-%20letterhead_0.pdf |
| Wendy's of Fresno, Inc. | 12/02/2015, 06/08/2016 | 7/7/2016 | Kroll | At least 1 year, up to 3 if services are provided | https://oag.ca.gov/system/files/Website%20Notification_5.pdf |
| Wencom LLC | 01/13/2016, 06/08/2016 | 7/7/2016 | Kroll | At least 1 year, up to 3 if services are provided | https://oag.ca.gov/system/files/Website%20Notification_6.pdf |
| Ronald L. Ross | 01/13/2016, 06/08/2016 | 7/7/2016 | Kroll | At least 1 year, up to 3 if services are provided | https://oag.ca.gov/system/files/Website%20Notification_3.pdf |
| RDR Foods, Inc. | 01/13/2016, 06/08/2016 | 7/7/2016 | Kroll | At least 1 year, up to 3 if services are provided | https://oag.ca.gov/system/files/Website%20Notification_2.pdf |
| Pirthipal Dhillon | 12/02/2015, 06/08/2016 | 7/7/2016 | Kroll | At least 1 year, up to 3 if services are provided | https://oag.ca.gov/system/files/Website%20Notification_1.pdf |
| Peninsula Foods, L.P. | 12/02/2015, 06/08/2016 | 7/7/2016 | Kroll | At least 1 year, up to 3 if services are provided | https://oag.ca.gov/system/files/Website%20Notification_0.pdf |
| Gil Moore Oil Company | 12/02/2015, 06/08/2016 | 7/7/2016 | Data unavailable | Data unavailable | Data unavailable |
| Desmond Foods, L.P. | 12/02/2015, 06/08/2016 | 7/7/2016 | Kroll | At least 1 year, up to 3 if services are provided | https://oag.ca.gov/system/files/Website%20Notification_10.pdf |
| Dependable Foods | 12/02/2015, 06/08/2016 | 7/7/2016 | Kroll | At least 1 year, up to 3 if services are provided | https://oag.ca.gov/system/files/Website%20Notification_9.pdf |
| Cotti Foods California, Inc. | 12/02/2015, 06/28/2016 | 7/7/2016 | Kroll | At least 1 year, up to 3 if services are provided | https://oag.ca.gov/system/files/Website%20Notification_8.pdf |

| BMP/Pennant Holdings, LLC | 01/13/2016, 06/08/2016 | 7/7/2016 | Kroll | At least 1 year, up to 3 if services are provided | https://oag.ca.gov/system/files/Website%20Notification_7.pdf |
|---|---|---|---|---|---|
| Amaash Corporation | 12/02/2015, 06/08/2016 | 7/7/2016 | Kroll | At least 1 year, up to 3 if services are provided | https://oag.ca.gov/system/files/Website%20Notification_11.pdf |
| CDCR - California Health Care Facility | 5/2/2016 | 7/6/2016 | None | N/A | https://oag.ca.gov/system/files/CHCF%20Privacy%20Breach%20Letter_0.pdf |
| Kool Kids Model & Talent Management | 2/16/2016 | 6/30/2016 | None | N/A | https://oag.ca.gov/system/files/Security%20Breach%20Filed_0.pdf |
| Noodles & Company | 01/31/2016, 06/02/2016 | 6/28/2016 | None | N/A | https://oag.ca.gov/system/files/Noodles%20Press%20Release%20-%2006%2028%202016%20Final-Final%20%282%29_0.pdf |
| Mercy Medical Center Redding | 06/01/2016, 06/13/2016 | 6/24/2016 | IDT911 | 1 year | https://oag.ca.gov/system/files/patient%20letter%20-%20final_0.pdf |
| Multi-Color Corporation | 05/15/2016, 05/14/2016 | 6/16/2016 | Experian ProtectMyID Elite | 1 year | https://oag.ca.gov/system/files/Notice%20-%20EXPERIAN_0.pdf |
| Momentum for Mental Health | 6/3/2016 | 6/13/2016 | InforArmor Privacy Armor | 3 years | https://oag.ca.gov/system/files/Crrnt%20Emply.MMH_.Data%20Breach%20Notice%20%283%29_0.pdf |
| LinkedIn Corporation | 5/17/2016 | 6/2/2016 | None | N/A | https://oag.ca.gov/system/files/2016.05.25%20Email%20Notification_Important%20information%20about%20your%20LinkedIn%20account_0.pdf |
| Verity Health System | 4/27/2016 | 5/31/2016 | Equfax Credit Watch Gold | 2 years | https://oag.ca.gov/system/files/Verity%20Health%20System%20-%20Sample%20Notice_0.pdf |
| A&A Ready Mixed Concrete, Inc. | 5/16/2016 | 5/24/2016 | Experian ProtectMyID Elite | 1 year | https://oag.ca.gov/system/files/A%26A%20Concrete%20redacted%205_24_16_0.pdf |
| Berkeley Endocrine Clinic | 4/22/2016 | 5/23/2016 | None | N/A | https://oag.ca.gov/system/files/Berkeley%20Endocrine%20Notice_0.pdf |
| The Paper Works | 3/30/2016 | 5/18/2016 | IDT911 | 3 years | https://oag.ca.gov/system/files/Paper%20Tree%20resubmit-%20adults%20only_0_0.pdf |

| | | | | | | |
|---|---|---|---|---|---|---|
| Solano Community College | 4/28/2016 | 5/16/2016 | | Experian ProtectMyID | 1 year | https://oag.ca.gov/system/files/Letter%20Proof%205.12.2016_0.pdf |
| California Correctional Health Care Services | 2/25/2016 | 5/15/2016 | None | None | N/A | https://oag.ca.gov/system/files/CCHCS%20Breach%20Notification_0.pdf |
| Imperial Valley Family Care Medical Group, APC | 3/21/2016 | 5/13/2016 | | Experian ProtectMyID | 1 year | https://oag.ca.gov/system/files/Breach%20Letter%2003-21-16%20Incident%20Credit%20%28eCW%20version%29_0.pdf |
| Lynn N. Talbott, Jr., CPA, CVA | 4/19/2016 | 5/11/2016 | AllClear ID | 1 year | https://oag.ca.gov/system/files/Talbott%20Notification_0.pdf |
| Hi Tec Sports USA, Inc | 1/24/2016 | 5/11/2016 | None | N/A | https://oag.ca.gov/system/files/HT_CA_Notice_0.pdf |
| Google Inc. | 3/29/2016 | 5/6/2016 | AllClear ID | 2 years | https://oag.ca.gov/system/files/Google%20-%20Individual%20Notification%20Letter%20%28California%29_0.pdf |
| Stonebridge Realty Advisors, Inc. | 11/08/2015, 03/26/2016 | 5/6/2016 | None | N/A | https://oag.ca.gov/system/files/49932072_6_1.pdf |
| CertifiKid LLC | 01/25/2016, 03/19/2016 | 5/5/2016 | Kroll | 1 year | https://oag.ca.gov/system/files/CertifiKid%20Sample%20Consumer%20Notice_0.pdf |
| Saint Agnes Medical Center | 5/2/2016 | 5/5/2016 | Experian ProtectMyID Elite | 1 year | https://oag.ca.gov/system/files/SAMC%20Data%20Breach%20Notification_0.pdf |
| Hume Lake Christian Camps | 02/29/2016, 03/04/2016 | 5/5/2016 | MyIDCare | 1 year | https://oag.ca.gov/system/files/Hume%20Lake%20-%20CA%20Notice%20Letter_Redacted%20%286105565x7AB84%29_1.pdf |
| Tribune Media | 4/4/2016 | 5/4/2016 | None | N/A | https://oag.ca.gov/system/files/Pro%20Sports%20Daily%20Security%20Breach%20Response%20Letter-Final_1.pdf |
| Areas | 04/04/2016, 04/29/2016 | 5/4/2016 | Experian ProtectMyID | 1 year | https://oag.ca.gov/system/files/CA%20Sample%20Notification_0.pdf |

| Company | Dates | | Provider | Duration | Link |
|---|---|---|---|---|---|
| Ken Waterman CPA, PC | 3/27/2016 | 5/3/2016 | Kroll | 1 year | https://oag.ca.gov/system/files/Ken%20Waterman%20CPA%20Notice%20Only_0.pd |
| Lafler Moore Connerty & Webb, LLC | 03/11/2016, 01/27/2016 | 5/3/2016 | AllClear ID | 1 year | https://oag.ca.gov/system/files/Lafler%20AllClear%20letter%20Proof_1.pdf |
| Advance International Marketing, Inc. | 4/4/2016 | 4/26/2016 | Experian ProtectMyID | 1 year | https://oag.ca.gov/system/files/CA_0.pdf |
| Berkeley Unified School District | 4/11/2016 | 4/22/2016 | Identity Fraud, Inc. | 1 year | https://oag.ca.gov/system/files/BerkeleyUSD-NotificationBANG-sample_0.pdf |
| Voya Financial Advisors, Inc. | 4/13/2016 | 4/21/2016 | Equfax Credit Watch Gold | 1 year | https://oag.ca.gov/system/files/BerkeleyUSD-NotificationBANG-sample_0.pdf |
| U Gym, LLC | 4/4/2016 | 4/20/2016 | None | N/A | https://oag.ca.gov/system/files/Data%20Breach%20Notice%20California%20Form_0.pdf |
| Academy of Art Unversity | 3/4/2016 | 4/13/2016 | Experian ProtectMyID | 2 years | https://oag.ca.gov/system/files/Academy%2oof%20Art%20Notice%20Letter%20%28002%29_0.pdf |
| Bristol Farms, Inc. | 3/30/2016 | 4/11/2016 | Experian ProtectMyID | 2 years | https://oag.ca.gov/system/files/Sample%20Notice_6.pdf |
| Staminus Communications | 3/10/2016 | 4/11/2016 | None | N/A | https://oag.ca.gov/system/files/Sample%20Customer%20Notice%20-%20CC%2C%20Username%2C%20and%20Password_0.pdf |
| Schwaab. Inc. | 01/22/2014, 08/21/2015, 11/30/2015, 02/04/2016 | 4/11/2016 | None | N/A | https://oag.ca.gov/system/files/Schwaab%20REVISED%20Customer%20Reporting%20Letter_1_0.pdf |
| OptumRx | 3/16/2016 | 4/8/2016 | LifeLock | 1 year | https://oag.ca.gov/system/files/individual%20notification%20letter%20optumrx%20vendor%20laptop%20matter%20-%20final_0.pdf |

| | | | | | |
|---|---|---|---|---|---|
| Essex Property Trust, Inc. | 3/17/2016 | 4/7/2016 | Data unavailable | Data unavailable | Data unavailable |
| The Whiting-Turner Contracting Company ("Whiting-Turner") | 3/8/2016 | 4/6/2016 | Identity Guard for Kids | 1 year | https://oag.ca.gov/system/files/Whiting%20Turner%20Contracting%20NOTICE%20only%20CA%20Regulator%20Notice%20Exhibits_0_1.pdf |
| Katherman Kitts & Co. LLP | 2/25/2016 | 4/5/2016 | AllClear ID | 1 year | https://oag.ca.gov/system/files/Katherman.CA_0.pdf |
| Pivotal Software, Inc. | 3/22/2016 | 3/30/2016 | AllClear ID | 3 years | https://oag.ca.gov/system/files/Sample%20of%20Notice%20to%20California%20residents_0.pdf |
| Sprouts Farmers Market | 3/14/2016 | 3/28/2016 | Experian ProtectMyID | 1 year | https://oag.ca.gov/system/files/Sprouts%20Farmers%20Market%20-%20Notice%20to%20Employees_0.pdf |
| Aspiranet | 3/21/2016 | 3/25/2016 | Experian ProtectMyID Elite | 2 years | https://oag.ca.gov/system/files/W2%20Incident%20-%20notice%20attachment_0.pdf |
| Lamps Plus and Pacific Coast Lighting | 2/11/2016 | 3/23/2016 | Kroll | 1 year | https://oag.ca.gov/system/files/Lamps%20Plus%20Notification_0.pdf |
| Laz Karp Associates, LLC | 2/17/2016 | 3/21/2016 | AllClear ID | 2 years | https://oag.ca.gov/system/files/Regulator%20Insert%20-%20CA_0.pdf |
| PerkinElmer, Inc. | 2/24/2016 | 3/16/2016 | LifeLock | 1 year | https://oag.ca.gov/system/files/PerkinElmer%2003152016%20California%20notice%20redacted_0.pdf |
| Advance Auto Parts, Inc | 3/7/2016 | 3/16/2016 | AllClear ID | 2 years | https://oag.ca.gov/system/files/ACID_PRINTERPROOFS.NOTICE%20LETTER_0.pdf |
| Laborers Funds Administrative Office of Northern California, Inc. | 2/17/2016 | 3/15/2016 | AllClear ID | 1 year | https://oag.ca.gov/system/files/Laborers%20Notice%20of%20Data%20Breach%20-%20Sample_0.pdf |
| Mitchell International, Inc. | 2/24/2016 | 3/14/2016 | AllClear ID | 2 years | https://oag.ca.gov/system/files/NoticeCA_0.pdf |

| | | | | | |
|---|---|---|---|---|---|
| Sequoia Union High School District | 2/3/2016 | 3/11/2016 | | | https://oag.ca.gov/system/files/Sequoia%20-%20CA%20Notice%20%286003570x7AB84%29_1.pdf |
| | | | Experian ProtectMyID | 1 year | |
| Seagate US, LLC | 3/1/2016 | 3/9/2016 | | | https://oag.ca.gov/system/files/Seagate%20CA%20Notice_0.pdf |
| | | | Experian ProtectMyID | 2 years | |
| 1-800-Flowers.com | 2/15/2016 | 3/8/2016 | | | https://oag.ca.gov/system/files/CA%20Notification_1.pdf |
| | | | None | N/A | |
| Billy Casper Golf | 2/26/2016 | 3/8/2016 | | | https://oag.ca.gov/system/files/B7655_ADULT_NOTIFICATION_PROOF_0.PDF |
| | | | Experian ProtectMyID Elite | 2 years | |
| Turner Construction Company | 3/2/2016 | 3/7/2016 | | | https://oag.ca.gov/system/files/Turner%20Construction%20Ad%20r4prf_1.pdf |
| | | | Kroll | 10 years | |
| Snapchat, Inc. | 2/26/2016 | 3/4/2016 | | | https://oag.ca.gov/system/files/Snapchat%20Inc%20updated%20Sample%20of%20Employee%20Notice%20of%20Data%20Breach_Redacted_0.pdf |
| | | | MyIDCare | 2 years | |
| Central Concrete Supply Co. Inc. | 2/23/2016 | 3/1/2016 | | | https://oag.ca.gov/system/files/Central%20Concrete%20Ad%20r1fin_0.pdf |
| | | | Kroll | 1 year | |
| Mercy Housing, Inc., Mercy Housing Management Group, Inc. | 2/19/2016 | 2/25/2016 | | | https://oag.ca.gov/system/files/Employee%20Letter%202015%2002%2022_0.pdf |
| | | | LifeLock | 3 years | |
| Incipio, LLC | 09/16/2015, 01/29/2016 | 2/22/2016 | | | https://oag.ca.gov/system/files/Incipio%20Ad%20r2prf_0.PDF |
| | | | Kroll | 1 year | |
| Calpine Corporation | 2/9/2016 | 2/16/2016 | | | https://oag.ca.gov/system/files/CPN%20Employee%20Notification%20-%20Template_0.pdf |
| | | | Experian ProtectMyID | 1 year | |
| Magnolia Health Corporation | 2/3/2016 | 2/12/2016 | | | https://oag.ca.gov/system/files/Breach%20Sample%20Letter_0.pdf |
| | | | Experian ProtectMyID Elite | 1 year | |
| The Brickman Group, Ltd. LLC | 2/3/2016 | 2/10/2016 | | | https://oag.ca.gov/system/files/Security%20Incident%20Notice_0.pdf |
| | | | Kroll | 1 year | |
| University of Central Florida | 12/30/2015, 01/06/2016 | 2/5/2016 | | | https://oag.ca.gov/system/files/Student%20Adult%20CA%20Notice_0.pdf |
| | | | Experian ProtectMyID | 1 year | |

| IATSE Local 134 | 1/4/2016 | 2/1/2016 | None | N/A | https://oag.ca.gov/system/files/IA%20134%20info%20notification_0.pdf |

<u>**Exhibit B – Judicial Salary Plan Atlanta — Athens-Clarke County — Sandy
Springs, GA-AL – Table ATL Effective January 11, 2016**</u>

# JUDICIARY SALARY PLAN
## Atlanta--Athens-Clarke County--Sandy Springs, GA-AL - Table ATL
### 19.58% Locality Payment Included
### Effective January 11, 2016

| Grade | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $21,935 | $22,668 | $23,397 | $24,123 | $24,852 | $25,279 | $26,000 | $26,727 | $26,756 | $27,433 |
| 2 | $24,661 | $25,248 | $26,065 | $26,756 | $27,060 | $27,856 | $28,653 | $29,449 | $30,245 | $31,042 |
| 3 | $26,908 | $27,805 | $28,702 | $29,598 | $30,495 | $31,392 | $32,289 | $33,186 | $34,083 | $34,980 |
| 4 | $30,207 | $31,214 | $32,221 | $33,228 | $34,235 | $35,241 | $36,248 | $37,255 | $38,262 | $39,269 |
| 5 | $33,796 | $34,922 | $36,049 | $37,175 | $38,301 | $39,428 | $40,554 | $41,681 | $42,807 | $43,934 |
| 6 | $37,672 | $38,928 | $40,184 | $41,439 | $42,695 | $43,950 | $45,206 | $46,462 | $47,717 | $48,973 |
| 7 | $41,864 | $43,259 | $44,655 | $46,050 | $47,446 | $48,841 | $50,237 | $51,632 | $53,028 | $54,423 |
| 8 | $46,362 | $47,907 | $49,452 | $50,997 | $52,542 | $54,087 | $55,632 | $57,177 | $58,722 | $60,267 |
| 9 | $51,208 | $52,914 | $54,621 | $56,327 | $58,033 | $59,740 | $61,446 | $63,153 | $64,859 | $66,565 |
| 10 | $56,392 | $58,271 | $60,151 | $62,031 | $63,911 | $65,791 | $67,670 | $69,550 | $71,430 | $73,310 |
| 11 | $61,956 | $64,021 | $66,086 | $68,151 | $70,216 | $72,281 | $74,346 | $76,412 | $78,477 | $80,542 |
| 12 | $74,260 | $76,736 | $79,211 | $81,686 | $84,162 | $86,637 | $89,112 | $91,588 | $94,063 | $96,538 |
| 13 | $88,305 | $91,249 | $94,193 | $97,137 | $100,081 | $103,025 | $105,969 | $108,913 | $111,858 | $114,802 |
| 14 | $104,349 | $107,828 | $111,306 | $114,785 | $118,263 | $121,742 | $125,221 | $128,699 | $132,178 | $135,656 |
| 15 | $122,744 | $126,836 | $130,928 | $135,020 | $139,112 | $143,204 | $147,296 | $151,388 | $155,480 | $159,572 |
| 16 | $143,955 | $148,754 | $153,553 | $158,351 | $163,150 | $167,949 | $170,400 * | $170,400 * | $170,400 * | $170,400 * |
| 17 | $165,329 | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * |
| 18 | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * |

* Rate limited to the rate for Level III of the Executive Schedule.

**Exhibit C – Judiciary Salary Plan Washington-Baltimore-Arlington, DC-MD-VA-WV-PA – Table DCB Effective January 11, 2016**

# JUDICIARY SALARY PLAN
## Washington-Baltimore-Arlington, DC-MD-VA-WV-PA - Table DCB
### 24.78% Locality Payment Included
### Effective January 11, 2016

| Grade | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | $22,888 | $23,653 | $24,414 | $25,172 | $25,933 | $26,378 | $27,131 | $27,890 | $27,920 | $28,626 |
| 2 | $25,733 | $26,346 | $27,198 | $27,920 | $28,236 | $29,068 | $29,899 | $30,730 | $31,561 | $32,392 |
| 3 | $28,078 | $29,014 | $29,950 | $30,886 | $31,821 | $32,757 | $33,693 | $34,629 | $35,565 | $36,501 |
| 4 | $31,521 | $32,571 | $33,622 | $34,673 | $35,723 | $36,774 | $37,825 | $38,875 | $39,926 | $40,977 |
| 5 | $35,265 | $36,441 | $37,616 | $38,792 | $39,967 | $41,142 | $42,318 | $43,493 | $44,669 | $45,844 |
| 6 | $39,311 | $40,621 | $41,931 | $43,241 | $44,551 | $45,862 | $47,172 | $48,482 | $49,792 | $51,102 |
| 7 | $43,684 | $45,140 | $46,597 | $48,053 | $49,509 | $50,965 | $52,421 | $53,878 | $55,334 | $56,790 |
| 8 | $48,378 | $49,991 | $51,603 | $53,215 | $54,827 | $56,439 | $58,051 | $59,664 | $61,276 | $62,888 |
| 9 | $53,435 | $55,215 | $56,996 | $58,776 | $60,557 | $62,338 | $64,118 | $65,899 | $67,679 | $69,460 |
| 10 | $58,844 | $60,805 | $62,767 | $64,728 | $66,690 | $68,651 | $70,613 | $72,575 | $74,536 | $76,498 |
| 11 | $64,650 | $66,805 | $68,960 | $71,115 | $73,270 | $75,425 | $77,579 | $79,734 | $81,889 | $84,044 |
| 12 | $77,490 | $80,073 | $82,656 | $85,238 | $87,821 | $90,404 | $92,987 | $95,570 | $98,153 | $100,736 |
| 13 | $92,145 | $95,217 | $98,289 | $101,361 | $104,433 | $107,505 | $110,578 | $113,650 | $116,722 | $119,794 |
| 14 | $108,887 | $112,517 | $116,146 | $119,776 | $123,406 | $127,036 | $130,666 | $134,296 | $137,926 | $141,555 |
| 15 | $128,082 | $132,352 | $136,622 | $140,892 | $145,162 | $149,432 | $153,702 | $157,971 | $160,300 ** | $160,300 ** |
| 16 | $150,215 | $155,223 | $160,230 | $165,237 | $170,245 | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * |
| 17 | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * |
| 18 | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * | $170,400 * |

* Rate limited to the rate for Level III of the Executive Schedule.
** Rate limited to the rate for Level IV of the Executive Schedule.

## Exhibit D – USAO Attorney's Fee Matrix – 2015-2016

# USAO ATTORNEY'S FEES MATRIX – 2015 – 2016

*Revised Methodology starting with 2015-2016 Year*

Years (Hourly Rate for June 1 – May 31, based on change in PPI-OL since January 2011)

| Experience | 2015-16 |
|---|---|
| 31+ years | 568 |
| 21-30 years | 530 |
| 16-20 years | 504 |
| 11-15 years | 455 |
| 8-10 years | 386 |
| 6-7 years | 332 |
| 4-5 years | 325 |
| 2-3 years | 315 |
| Less than 2 years | 284 |
| Paralegals & Law Clerks | 154 |

*Explanatory Notes*

1.  This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared by the Civil Division of the United States Attorney's Office for the District of Columbia (USAO) to evaluate requests for attorney's fees in civil cases in District of Columbia courts. The matrix is intended for use in cases in which a fee-shifting statute permits the prevailing party to recover "reasonable" attorney's fees. *See, e.g.,* 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412(b) (Equal Access to Justice Act). The matrix has not been adopted by the Department of Justice generally for use outside the District of Columbia, or by other Department of Justice components, or in other kinds of cases. The matrix does **not** apply to cases in which the hourly rate is limited by statute. *See* 28 U.S.C. § 2412(d).

2.  A "reasonable fee" is a fee that is sufficient to attract an adequate supply of capable counsel for meritorious cases. *See, e.g., Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010). Consistent with that definition, the hourly rates in the above matrix were calculated from average hourly rates reported in 2011 survey data for the D.C. metropolitan area, which rates were adjusted for inflation with the Producer Price Index-Office of Lawyers (PPI-OL) index. The survey data comes from ALM Legal Intelligence's 2010 & 2011 Survey of Law Firm Economics. The PPI-OL index is available at www.bls.gov/ppi/#data. On that page, under "PPI Databases," and "Industry Data (Producer Price Index - PPI)," select either "one screen" or "multiple screen" and in the resulting window use "industry code" 541110 for "Offices of Lawyers." The average hourly rates from the 2011 survey data are multiplied by the PPI-OL index for May in the year of the update, divided by 176.6, which is the PPI-OL index for January 2011, the month of the survey data, and then rounding to the nearest whole dollar (up if remainder is 50¢ or more).

3.  The PPI-OL index has been adopted as the inflator for hourly rates because it better reflects the mix of legal services that law firms collectively offer, as opposed to the legal services that typical consumers use, which is what the CPI-Legal Services index measures. Although it is a national index, and not a local one, *cf. Eley v. District of Columbia,*

793 F.3d 97, 102 (D.C. Cir. 2015) (noting criticism of national inflation index), the PPI-OL index has historically been generous relative to other possibly applicable inflation indexes, and so its use should eliminate disputes about whether the inflator is sufficient.

4.  The methodology used to compute the rates in this matrix replaces that used prior to 2015, which started with the matrix of hourly rates developed in *Laffey v. Northwest Airlines, Inc.* 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C. Cir. 1984), *cert. denied*, 472 U.S. 1021 (1985), and then adjusted those rates based on the Consumer Price Index for All Urban Consumers (CPI-U) for the Washington-Baltimore (DC-MD-VA-WV) area.  Because the USAO rates for the years 2014-15 and earlier have been generally accepted as reasonable by courts in the District of Columbia, see note 9 below, the USAO rates for those years will remain the same as previously published on the USAO's public website.  That is, the USAO rates for years prior to and including 2014-15 remain based on the prior methodology, *i.e.*, the original *Laffey* Matrix updated by the CPI-U for the Washington-Baltimore area.  *See Citizens for Responsibility & Ethics in Washington v. Dep't of Justice*, --- F. Supp. 3d ---, 2015 WL 6529371 (D.D.C. 2015) and Declaration of Dr. Laura A. Malowane filed therein on Sept. 22, 2015 (Civ. Action No. 12-1491, ECF No. 46-1) (confirming that the USAO rates for 2014-15 computed using prior methodology are reasonable).

5.  Although the USAO will not issue recalculated *Laffey* Matrices for past years using the new methodology, it will not oppose the use of that methodology (if properly applied) to calculate reasonable attorney's fees under applicable fee-shifting statutes for periods prior to June 2015, provided that methodology is used consistently to calculate the entire fee amount.  Similarly, although the USAO will no longer issue an updated *Laffey* Matrix computed using the prior methodology, it will not oppose the use of the prior methodology (if properly applied) to calculate reasonable attorney's fees under applicable fee-shifting statutes for periods after May 2015, provided that methodology is used consistently to calculate the entire fee amount.

6.  The various "brackets" in the column headed "Experience" refer to the attorney's years of experience practicing law.  Normally, an attorney's experience will be calculated starting from the attorney's graduation from law school.  Thus, the "Less than 2 years" bracket is generally applicable to attorneys in their first and second years after graduation from law school, and the "2-3 years" bracket generally becomes applicable on the second anniversary of the attorney's graduation (*i.e.*, at the beginning of the third year following law school).  *See Laffey* 572 F. Supp. at 371.  An adjustment may be necessary, however, if the attorney's admission to the bar was significantly delayed or the attorney did not otherwise follow a typical career progression.  *See, e.g., EPIC v. Dep't of Homeland Sec.*, 999 F. Supp. 2d 61, 70-71 (D.D.C. 2013) (attorney not admitted to bar compensated at "Paralegals & Law Clerks" rate); *EPIC v. Dep't of Homeland Sec.*, 982 F. Supp. 2d 56, 60-61 (D.D.C. 2013) (same).  The various experience levels were selected by relying on the levels in the ALM Legal Intelligence 2011 survey data.  Although finer gradations in experience level might yield different estimates of market rates, it is important to have statistically sufficient sample sizes for each experience level.  The experience categories in the current USAO Matrix are based on statistically significant sample sizes for each experience level.

7.  ALM Legal Intelligence's 2011 survey data does not include rates for paralegals and law clerks.  Unless and until reliable survey data about actual paralegal/law clerk rates in the D.C. metropolitan area become available, the USAO will compute the hourly rate for Paralegals & Law Clerks using the most recent historical rate from the USAO's former *Laffey* Matrix (*i.e.*, $150 for 2014-15) updated with the PPI-OL index.  The formula is $150 multiplied by the PPI-OL index for May in the year of the update, divided by 194.3 (the PPI-OL index for May 2014), and then rounding to the nearest whole dollar (up if remainder is 50¢ or more).

8.  The USAO anticipates periodically revising the above matrix if more recent reliable survey data becomes available, especially data specific to the D.C. market, and in the interim years updating the most recent survey data with the PPI-OL index, or a comparable index for the District of Columbia if such a locality-specific index becomes available.

9.  Use of an updated *Laffey* Matrix was implicitly endorsed by the Court of Appeals in *Save Our Cumberland Mountains v. Hodel*, 857 F.2d 1516, 1525 (D.C. Cir. 1988) (en banc).  The Court of Appeals subsequently stated that parties may rely on the updated *Laffey* Matrix prepared by the USAO as evidence of prevailing market rates for litigation counsel in the Washington, D.C. area.  *See Covington v. District of Columbia*, 57 F.3d 1101, 1105 & n.14, 1109 (D.C. Cir. 1995), *cert. denied*, 516 U.S. 1115 (1996).  Most lower federal courts in the District of Columbia have relied on the USAO Matrix, rather than the so-called "*Salazar* Matrix" (also known as the "LSI Matrix" or the

"Enhanced *Laffey* Matrix"), as the "benchmark for reasonable fees" in this jurisdiction. *Miller v. Holzmann*, 575 F. Supp. 2d 2, 18 n.29 (D.D.C. 2008) (quoting *Pleasants v. Ridge*, 424 F. Supp. 2d 67, 71 n.2 (D.D.C. 2006)); *see, e.g., CREW v. U.S. Dep't of Justice*, --- F.Supp.3d ---, 2015 WL 6529371 (D.D.C. 2015); *McAllister v. District of Columbia*, 21 F. Supp. 3d 94 (D.D.C. 2014); *Embassy of Fed. Republic of Nigeria v. Ugwuonye*, 297 F.R.D. 4, 15 (D.D.C. 2013); *Berke v. Bureau of Prisons*, 942 F. Supp. 2d 71, 77 (D.D.C. 2013); *Fisher v. Friendship Public Charter School*, 880 F. Supp. 2d 149, 154-55 (D.D.C. 2012); *Sykes v. District of Columbia*, 870 F. Supp. 2d 86, 93-96 (D.D.C. 2012); *Heller v. District of Columbia*, 832 F. Supp. 2d 32, 40-49 (D.D.C. 2011); *Hayes v. D.C. Public Schools*, 815 F. Supp. 2d 134, 142-43 (D.D.C. 2011); *Queen Anne's Conservation Ass'n v. Dep't of State*, 800 F. Supp. 2d 195, 200-01 (D.D.C. 2011); *Woodland v. Viacom, Inc.*, 255 F.R.D. 278, 279-80 (D.D.C. 2008); *American Lands Alliance v. Norton*, 525 F. Supp. 2d 135, 148-50 (D.D.C. 2007). *But see, e.g., Salazar v. District of Columbia*, 123 F. Supp. 2d 8, 13-15 (D.D.C. 2000). The USAO contends that the *Salazar* Matrix is fundamentally flawed, does not use the *Salazar* Matrix to determine whether fee awards under fee-shifting statutes are reasonable, and will not consent to pay hourly rates calculated with the methodology on which that matrix is based.

## Exhibit E – *Laffey* Matrix – 2014-2015

# LAFFEY MATRIX – 2014-2015

Years (Rate for June 1 – May 31, based on prior year's CPI-U)

| Experience | 14-15 |
|---|---|
| 20+ years | 520 |
| 11-19 years | 460 |
| 8-10 years | 370 |
| 4-7 years | 300 |
| 1-3 years | 255 |
| Paralegals & Law Clerks | 150 |

*Explanatory Notes:*

1.  This matrix of hourly rates for attorneys of varying experience levels and paralegals/law clerks has been prepared by the Civil Division of the United States Attorney's Office for the District of Columbia. The matrix is intended to be used in cases in which a "fee-shifting" statute permits the prevailing party to recover "reasonable" attorney's fees. *See, e.g.,* 42 U.S.C. § 2000e-5(k) (Title VII of the 1964 Civil Rights Act); 5 U.S.C. § 552(a)(4)(E) (Freedom of Information Act); 28 U.S.C. § 2412(b) (Equal Access to Justice Act). The matrix does **not** apply to cases in which the hourly rate is limited by statute. *See* 28 U.S.C. § 2412(d).

2.  This matrix is based on the hourly rates allowed in *Laffey v. Northwest Airlines, Inc.,* 572 F. Supp. 354 (D.D.C. 1983), *aff'd in part, rev'd in part on other grounds,* 746 F.2d 4 (D.C. Cir. 1984), *cert. denied,* 472 U.S. 1021 (1985). It is commonly referred to by attorneys and federal judges in the District of Columbia as the "Laffey Matrix" or the "United States Attorney's Office Matrix." The various "brackets" in the column headed "Experience" refer to the years following the attorney's graduation from law school, and are intended to correspond to "junior associates" (1-3 years after law school graduation), "senior associates" (4-7 years), "experienced federal court litigators" (8-10 and 11-19 years), and "very experienced federal court litigators" (20 years or more). Thus, the "1-3 years" bracket is generally applicable to attorneys in their first, second, and third years after graduation from law school, and the "4-7 years" bracket generally becomes applicable on the third anniversary of the attorney's graduation (*i.e.,* at the beginning of the fourth year following law school). *See Laffey,* 572 F. Supp. at 371; *but cf. EPIC v. Dep't of Homeland Sec.,* No. 11-2261, ___ F. Supp. 2d ___, 2013 WL 6047561, *6 -*7 (D.D.C. Nov. 15, 2013) (attorney not admitted to bar compensated at "Paralegals & Law Clerks" rate); *EPIC v. Dep't of Homeland Sec.,* 982 F. Supp.2d 56, 60-61 (D.D.C. 2013) (same).

3.  The hourly rates approved in *Laffey* were for work done principally in 1981-82. The matrix begins with those rates. *See Laffey,* 572 F. Supp. at 371 (attorney rates) & 386 n.74 (paralegal and law clerk rate). The rates for subsequent yearly periods were determined by adding the change in the cost of living for the Washington, D.C. area to the applicable rate for the prior year, and then rounding to the nearest multiple of $5 (up if within $3 of the next multiple of $5). The result is subject to adjustment if appropriate to ensure that the relationship between the highest rate and the lower rates remains reasonably constant. Changes in the cost of living are measured  by the Consumer Price Index for All Urban Consumers (CPI-U) for Washington-Baltimore, DC-MD-VA-WV, as announced by the Bureau of Labor Statistics for May of each year.

4.  Use of an updated Laffey Matrix was implicitly endorsed by the Court of Appeals in *Save Our Cumberland Mountains v. Hodel,* 857 F.2d 1516, 1525 (D.C. Cir. 1988) (en banc). The Court of Appeals subsequently stated that parties may rely on the updated *Laffey* Matrix prepared by the United States Attorney's Office as evidence of

prevailing market rates for litigation counsel in the Washington, D.C. area. *See Covington v. District of Columbia*, 57 F.3d 1101, 1105 & n.14, 1109 (D.C. Cir. 1995), *cert. denied*, 516 U.S. 1115 (1996). Most lower federal courts in the District of Columbia have relied on the United States Attorney's Office Matrix, rather than the so-called "Updated Laffey Matrix," as the "benchmark for reasonable fees" in this jurisdiction. *Miller v. Holzmann*, 575 F. Supp. 2d 2, 18 n.29 (D.D.C. 2008) (quoting *Pleasants v. Ridge*, 424 F. Supp. 2d 67, 71 n.2 (D.D.C. 2006)); *see, e.g., Berke v. Bureau of Prisons*, 942 F. Supp. 2d 71, 77 (D.D.C. 2013); *Heller v. District of Columbia*, 832 F. Supp. 2d 32, 40-49 (D.D.C. 2011); *American Lands Alliance v. Norton*, 525 F. Supp. 2d 135, 150 (D.D.C. 2007). *But see Salazar v. District of Columbia*, 123 F. Supp. 2d 8, 14-15 (D.D.C. 2000). The United States Attorney's Office does not use the "Updated Laffey Matrix" to determine whether fee awards under fee shifting statutes are reasonable.

**Exhibit F – May 2015 U.S. Bureau of Labor Statistics Table 10. Consumer Price Index for All Urban Consumers (CPI-U): Selected areas, all items index**

**Table 10. Consumer Price Index for All Urban Consumers (CPI-U): Selected areas, all items index**

(1982-84=100, unless otherwise noted)

| Area | Pricing schedule [1] | Indexes | | | | Percent change to May 2015 from— | | | Percent change to Apr. 2015 from— | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Feb. 2015 | Mar. 2015 | Apr. 2015 | May 2015 | May 2014 | Mar. 2015 | Apr. 2015 | Apr. 2014 | Feb. 2015 | Mar. 2015 |
| U.S. city average | M | 234.722 | 236.119 | 236.599 | 237.805 | 0.0 | 0.7 | 0.5 | -0.2 | 0.8 | 0.2 |
| **Region and area size[2]** | | | | | | | | | | | |
| Northeast urban | M | 250.619 | 251.451 | 251.760 | 252.770 | -.3 | .5 | .4 | -.3 | .5 | .1 |
| Size A - More than 1,500,000 | M | 253.614 | 254.348 | 254.614 | 255.534 | .1 | .5 | .4 | .1 | .4 | .1 |
| Size B/C - 50,000 to 1,500,000 [3] | M | 147.585 | 148.225 | 148.482 | 149.237 | -1.4 | .4 | .5 | -1.3 | .6 | .2 |
| Midwest urban | M | 222.301 | 223.550 | 223.797 | 224.732 | -.8 | .5 | .4 | -1.1 | .7 | .1 |
| Size A - More than 1,500,000 | M | 222.441 | 223.624 | 224.088 | 225.022 | -.8 | .6 | .4 | -1.1 | .7 | .2 |
| Size B/C - 50,000 to 1,500,000 [3] | M | 143.184 | 144.018 | 143.982 | 144.577 | -.8 | .4 | .4 | -1.0 | .6 | .0 |
| Size D - Nonmetropolitan (less than 50,000) | M | 219.279 | 220.708 | 220.790 | 221.748 | -.7 | .5 | .4 | -1.1 | .7 | .0 |
| South urban | M | 227.944 | 229.337 | 229.957 | 230.886 | -.4 | .7 | .4 | -.6 | .9 | .3 |
| Size A - More than 1,500,000 | M | 229.901 | 231.496 | 231.908 | 232.903 | .0 | .6 | .4 | -.2 | .9 | .2 |
| Size B/C - 50,000 to 1,500,000 [3] | M | 144.591 | 145.392 | 145.939 | 146.482 | -.7 | .7 | .4 | -.9 | .9 | .4 |
| Size D - Nonmetropolitan (less than 50,000) | M | 234.283 | 235.612 | 235.764 | 236.888 | -.5 | .5 | .5 | -.8 | .6 | .1 |
| West urban | M | 239.748 | 241.690 | 242.302 | 244.227 | 1.2 | 1.0 | .8 | 1.0 | 1.1 | .3 |
| Size A - More than 1,500,000 | M | 245.027 | 247.110 | 247.510 | 249.766 | 1.3 | 1.1 | .9 | 1.0 | 1.0 | .2 |
| Size B/C - 50,000 to 1,500,000 [3] | M | 143.005 | 143.887 | 144.426 | 145.346 | .8 | 1.0 | .6 | .9 | 1.0 | .4 |
| **Size classes** | | | | | | | | | | | |
| A [4] | M | 214.804 | 216.096 | 216.439 | 217.646 | .3 | .7 | .6 | .1 | .8 | .2 |
| B/C [3] | M | 144.386 | 145.186 | 145.579 | 146.236 | -.6 | .7 | .5 | -.6 | .8 | .3 |
| D | M | 229.805 | 231.539 | 232.060 | 233.025 | .1 | .6 | .4 | -.1 | 1.0 | .2 |
| **Selected local areas[5]** | | | | | | | | | | | |
| Chicago-Gary-Kenosha, IL-IN-WI | M | 225.763 | 227.405 | 227.704 | 228.494 | -.5 | .5 | .3 | -.9 | .9 | .1 |
| Los Angeles-Riverside-Orange County, CA | M | 241.297 | 243.738 | 243.569 | 246.093 | 1.1 | 1.0 | 1.0 | .5 | .9 | -.1 |
| New York-Northern N.J.-Long Island, NY-NJ-CT-PA | M | 259.240 | 259.647 | 259.959 | 261.066 | -.1 | .5 | .4 | .0 | .3 | .1 |
| Boston-Brockton-Nashua, MA-NH-ME-CT | 1 | . | 257.013 | . | 256.839 | .6 | -.1 | | | | |
| Cleveland-Akron, OH | 1 | . | 220.444 | . | 221.277 | -.1 | .4 | | | | |
| Dallas-Fort Worth, TX | 1 | . | 217.487 | . | 218.484 | -.5 | .5 | | | | |
| Washington-Baltimore, DC-MD-VA-WV [6] | 1 | . | 154.984 | . | 155.880 | .4 | .6 | | | | |
| Atlanta, GA | 2 | 218.123 | . | 219.567 | . | | | | -.5 | .7 | |
| Detroit-Ann Arbor-Flint, MI | 2 | 216.488 | . | 219.005 | . | | | | -1.9 | 1.2 | |
| Houston-Galveston-Brazoria, TX | 2 | 210.283 | . | 212.439 | . | | | | -.4 | 1.0 | |
| Miami-Fort Lauderdale, FL | 2 | 243.283 | . | 245.195 | . | | | | .5 | .8 | |
| Philadelphia-Wilmington-Atlantic City, PA-NJ-DE-MD | 2 | 242.424 | . | 243.717 | . | | | | .0 | .5 | |
| San Francisco-Oakland-San Jose, CA | 2 | 254.910 | . | 257.622 | . | | | | 2.4 | 1.1 | |
| Seattle-Tacoma-Bremerton, WA | 2 | 245.496 | . | 247.611 | . | | | | .4 | .9 | |

[1] Foods, fuels, and several other items priced every month in all areas; most other goods and services priced as indicated:
  M - Every month.
  1 - January, March, May, July, September, and November.
  2 - February, April, June, August, October, and December.
[2] Regions defined as the four Census regions.  See map in technical notes.
[3] Indexes on a December 1996=100 base.
[4] Indexes on a December 1986=100 base.
[5] In addition, the following metropolitan areas are published semiannually and appear in Tables 34 and 39 of the January and July issues of the CPI Detailed Report: Anchorage, AK; Cincinnati-Hamilton, OH-KY-IN; Denver-Boulder-Greeley, CO; Honolulu, HI; Kansas City, MO-KS; Milwaukee-Racine, WI; Minneapolis-St. Paul, MN-WI; Phoenix-Mesa, AZ; Pittsburgh, PA; Portland-Salem, OR-WA; St. Louis, MO-IL; San Diego, CA; Tampa-St. Petersburg-Clearwater, FL.
[6] Indexes on a November 1996=100 base.
  - Data not available.

NOTE: Local area indexes are byproducts of the national CPI program. Each local index has a smaller sample size than the national index and is, therefore, subject to substantially more sampling and other measurement error. As a result, local area indexes show greater volatility than the national index, although their long-term trends are similar.  Therefore, the Bureau of Labor Statistics strongly urges users to consider adopting the national average CPI for use in their escalator clauses.

NOTE: Index applies to a month as a whole, not to any specific date.

**Table 10. Consumer Price Index for All Urban Consumers (CPI-U): Selected areas, all items index**

(1982-84=100, unless otherwise noted)

| Area | Pricing schedule [1] | Indexes | | | | Percent change to May 2016 from— | | | Percent change to Apr. 2016 from— | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Feb. 2016 | Mar. 2016 | Apr. 2016 | May 2016 | May 2015 | Mar. 2016 | Apr. 2016 | Apr. 2015 | Feb. 2016 | Mar. 2016 |
| U.S. city average | M | 237.111 | 238.132 | 239.261 | 240.236 | 1.0 | .9 | .4 | 1.1 | .9 | .5 |
| **Region and area size[2]** | | | | | | | | | | | |
| Northeast urban | M | 252.250 | 252.654 | 254.270 | 255.021 | .9 | .9 | .3 | 1.0 | .8 | .6 |
| Size A - More than 1,500,000 | M | 255.301 | 255.905 | 257.322 | 258.004 | 1.0 | .8 | .3 | 1.1 | .8 | .6 |
| Size B/C - 50,000 to 1,500,000 [3] | M | 148.466 | 148.834 | 149.693 | 150.261 | .7 | 1.0 | .4 | .8 | .8 | .6 |
| Midwest urban | M | 223.196 | 224.621 | 225.609 | 226.478 | .8 | .8 | .4 | .8 | 1.1 | .4 |
| Size A - More than 1,500,000 | M | 223.726 | 224.768 | 225.918 | 226.853 | .8 | .9 | .4 | .8 | 1.0 | .5 |
| Size B/C - 50,000 to 1,500,000 [3] | M | 143.334 | 144.410 | 144.973 | 145.494 | .6 | .8 | .4 | .7 | 1.1 | .4 |
| Size D -  Nonmetropolitan  (less than 50,000) | M | 220.259 | 222.932 | 223.418 | 224.110 | 1.1 | .5 | .3 | 1.2 | 1.4 | .2 |
| South urban | M | 229.646 | 230.977 | 231.975 | 232.906 | .9 | .8 | .4 | .9 | 1.0 | .4 |
| Size A - More than 1,500,000 | M | 232.826 | 233.897 | 234.864 | 235.767 | 1.2 | .8 | .4 | 1.3 | .9 | .4 |
| Size B/C - 50,000 to 1,500,000 [3] | M | 145.279 | 146.263 | 146.907 | 147.507 | .7 | .9 | .4 | .7 | 1.1 | .4 |
| Size D -  Nonmetropolitan  (less than 50,000) | M | 234.098 | 235.370 | 236.476 | 237.524 | .3 | .9 | .4 | .3 | 1.0 | .5 |
| West urban | M | 244.821 | 245.404 | 246.589 | 247.885 | 1.5 | 1.0 | .5 | 1.8 | .7 | .5 |
| Size A - More than 1,500,000 | M | 251.195 | 251.941 | 253.011 | 254.276 | 1.8 | .9 | .5 | 2.2 | .7 | .4 |
| Size B/C - 50,000 to 1,500,000 [3] | M | 144.128 | 144.264 | 145.128 | 145.942 | .4 | 1.2 | .6 | .5 | .7 | .6 |
| **Size classes** | | | | | | | | | | | |
| A [4] | M | 217.716 | 218.480 | 219.516 | 220.378 | 1.3 | .9 | .4 | 1.4 | .8 | .5 |
| B/C [3] | M | 145.083 | 145.838 | 146.538 | 147.156 | .6 | .9 | .4 | .7 | 1.0 | .5 |
| D | M | 232.147 | 233.617 | 234.644 | 235.726 | 1.2 | .9 | .5 | 1.1 | 1.1 | .4 |
| **Selected local areas[5]** | | | | | | | | | | | |
| Chicago-Gary-Kenosha, IL-IN-WI | M | 227.438 | 227.778 | 229.197 | 229.257 | .3 | .6 | .0 | .7 | .8 | .6 |
| Los Angeles-Riverside-Orange County, CA | M | 247.113 | 247.873 | 248.368 | 249.671 | 1.5 | .7 | .5 | 2.0 | .5 | .2 |
| New York-Northern N.J.-Long Island, NY-NJ-CT-PA | M | 260.875 | 261.508 | 262.619 | 263.310 | .9 | .7 | .3 | 1.0 | .7 | .4 |
| Boston-Brockton-Nashua, MA-NH-ME-CT | 1 | - | 258.587 | - | 260.809 | 1.5 | .9 | - | - | - | - |
| Cleveland-Akron, OH | 1 | - | 219.970 | - | 221.926 | .3 | .9 | - | - | - | - |
| Dallas-Fort Worth, TX | 1 | - | 218.877 | - | 220.717 | 1.0 | .8 | - | - | - | - |
| Washington-Baltimore, DC-MD-VA-WV [6] | 1 | - | 156.493 | - | 157.770 | 1.2 | .8 | - | - | - | - |
| Atlanta, GA | 2 | 221.658 | - | 223.820 | - | - | - | - | 1.9 | 1.0 | - |
| Detroit-Ann Arbor-Flint, MI | 2 | 218.360 | - | 221.412 | - | - | - | - | 1.1 | 1.4 | - |
| Houston-Galveston-Brazoria, TX | 2 | 214.505 | - | 215.513 | - | - | - | - | 1.4 | .5 | - |
| Miami-Fort Lauderdale, FL | 2 | 247.126 | - | 248.741 | - | - | - | - | 1.4 | .7 | - |
| Philadelphia-Wilmington-Atlantic City, PA-NJ-DE-MD | 2 | 243.132 | - | 245.300 | - | - | - | - | .6 | .9 | - |
| San Francisco-Oakland-San Jose, CA | 2 | 262.600 | - | 264.565 | - | - | - | - | 2.7 | .7 | - |
| Seattle-Tacoma-Bremerton, WA | 2 | 250.942 | - | 253.815 | - | - | - | - | 2.5 | 1.1 | - |

[1] Foods, fuels, and several other items priced every month in all areas; most other goods and services priced as indicated:
  M - Every month.
  1 - January, March, May, July, September, and November.
  2 - February, April, June, August, October, and December.
[2] Regions defined as the four Census regions.  See map in technical notes.
[3] Indexes on a December 1996=100 base.
[4] Indexes on a December 1986=100 base.
[5] In addition, the following metropolitan areas are published semiannually and appear in Tables 34 and 39 of the January and July issues of the CPI Detailed Report: Anchorage, AK; Cincinnati-Hamilton, OH-KY-IN; Denver-Boulder-Greeley, CO; Honolulu, HI; Kansas City, MO-KS; Milwaukee-Racine, WI; Minneapolis-St. Paul, MN-WI; Phoenix-Mesa, AZ; Pittsburgh, PA; Portland-Salem, OR-WA; St. Louis, MO-IL; San Diego, CA; Tampa-St. Petersburg-Clearwater, FL.
[6] Indexes on a November 1996=100 base.
  - Data not available.

NOTE: Local area indexes are byproducts of the national CPI program.  Each local index has a smaller sample size than the national index and is, therefore, subject to substantially more sampling and other measurement error.  As a result, local area indexes show greater volatility than the national index, although their long-term trends are similar.  Therefore, the Bureau of Labor Statistics strongly urges users to consider adopting the national average CPI for use in their escalator clauses.

NOTE: Index applies to a month as a whole, not to any specific date.

CPI Detailed Report-May 2016