**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| _____ ) | |
| In re: The Home Depot, Inc., Customer ) | Case No.: 1:14-md-02583-TWT |
| Data Security Breach Litigation ) | |
| ) | |
| This document relates to: ) | |
| ) | |
| CONSUMER CASES ) | |
| _____ ) | |

**CONSUMER PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT
OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT[1]**

---

[1] In accordance with the Court's July 25, 2016 order (ECF No. 236), on or before August 5, Consumer Plaintiffs will reply separately to Home Depot' Inc.'s Objection to Consumer Plaintiffs' Motion for Service Awards, Attorneys' Fees and Litigation Expense Reimbursement (ECF No. 234).

# TABLE OF CONTENTS

TABLE OF CONTENTS………………………………………….. i

TABLE OF AUTHORITIES…………………………………… i

I.   THE UPDATED DATA RELATED TO CLAIMS, OBJECTIONS AND OPT-OUTS SUPPORTS FINAL APPROVAL OF THE SETTLEMENT……………………….. 1

II.  THE OBJECTIONS LACK MERIT…………………………...

A. Objections Related to the Value of the Settlement and Benefits Conferred on the Class……………………………. 4

    1. The Monetary Value of the Settlement is Within the Range of Possible Recoveries and is Fair, Adequate and Reasonable……………………………………… 4

    2. The Identity Guard Monitoring Service Offers Additional and Valuable Relief to the Class…………. 8

    3. The Injunctive Relief Provides Valuable Relief to the Class…………………………………………………. 11

    4. There is no "Reversion"……………………………... 12

B. Objections to the Procedure Related to Implementing the Settlement………………………………………………... 13

    1. There is No "Secret" Side Deal Agreement between Plaintiffs and Home Depot…………………………... 13

    2. Class Counsel and Class Representatives Adequately Represent the Interests of Settlement Class Members.. 15

    3. The Burdens of Objecting are Reasonable…………… 19

        a. Objectors Are Not Overly Burdened by Being Required to Mail Four Copies of Their Objections.. 19

b. Those Who Appear by Counsel are Not Overly Burdened When Objecting to the Settlement…….. 20

c. The Disclosures Requested of Objectors are Not Overly Burdensome……………………………… 20

d. Requiring an Objector to Personally Sign their Objection is Reasonable…………………………….. 21

C. Objections Related to the Payment of Service Awards and Attorneys' Fees…………………………………………….. 22

1. This Court and Consumer Class Counsel Have Complied with Rule 23(h)…………………………… 23

2. There is No "Clear Sailing" Provision……………….. 26

3. Objectors Should Not be Entitled to Discover Class Counsel's Billing Records…………………………… 27

4. The Service Awards are Appropriate……………….... 28

III.    CONCLUSION……………………………………………... 28

## TABLE OF AUTHORITIES

*Barnes v. Fleetboston Fin. Corp.*,
2006 WL 6916834 (D. Mass. Aug. 22, 2006) ........................................................ 9

*Bennett v. Behring Corp.*,
737 F.2d 982 (11th Cir. 1984) .......................................................... 5, 11

*Brown v. Hain Celestial Grp., Inc.*,
2016 WL 631880 (N.D. Cal. Feb. 18, 2016) ........................................................ 10

*Camden I Condominium Ass'n v. Dunkle,*
946 F.2d 768 (11th Cir. 1991) .............................................................. 30

*Columbus Drywall & Insulation, Inc. v. Masco Corp.*,
   258 F.R.D. 545 (N.D. Ga. 2007) .................................................................. 18, 22

*DeHoyos v. Allstate Corp.*,
   240 F.R.D. 269 (W.D. Tex. 2007) ...................................................................... 31

*Dewey v. Volkswagen Aktiengesellschaft*,
   681 F.3d 170 (3d Cir. 2012) ............................................................................... 23

*Galloway v. Kansas City Landsmen, LLC*,
   2012 WL 4862833 (W.D. Mo. Oct. 12, 2012) .................................................... 23

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*,
   789 F. Supp. 2d 935 (N.D. Ill. 2011) .................................................................. 26

*In re Checking Account Overdraft Litig.*,
   830 F. Supp. 2d 1330 (S.D. Fla. 2011) ............................................................... 26

*In re Checking Account Overdraft Litig.*, No. 1:08-CV-23323-JLK,
   2012 WL 456691 (S.D. Fla. Feb. 14, 2012) ...................................................... 8, 9

*In re Cmty. Bank of N. Virginia Mortgage Lending Practices Litig.*,
   795 F.3d 380 (3d Cir. 2015) ............................................................................... 20

*In re Domestic Air Transp. Antitrust Litigation*,
   148 F.R.D. 297 (N.D. Ga. 1993) ..................................................................Passim

*In re Elec. Books Antitrust Litig.*,
   639 F. App'x 724 (2d Cir. 2016) .......................................................................... 9

*In re First Capital Holdings Corp. Fin. Prods. Sec. Litig.*,
   33 F.3d 29 (9th Cir. 1994) ................................................................................... 10

*In re HealthSouth Corp. Securities Litig.*,
   334 Fed. App'x 248 (11th Cir. 2009) .................................................................. 18

*In re High Sulfur Content Gasoline Prods. Liab. Litig.*,
   517 F.3d 220 (5th Cir. 2008) ........................................................................ 29, 30

*In re Remeron End–Payor Antitrust Litig.*,
  2005 WL 2230314 (D. N.J. 2005) ........................................................................ 19

*In re Skelaxin (Metaxalone) Antitrust Litig.*,
  2015 WL 1486709 (E.D. Tenn. 2015) ................................................................... 19

*In re Target Corp. Customer Data Sec. Breach Litig.*,
  2016 WL 259676 (D. Minn. Jan. 21, 2016) ......................................................... 25

*In re UnitedHealth Grp. Inc. PSLRA Litig.*,
  643 F. Supp. 2d 1107 (D. Minn. 2009) ................................................................ 25

*In re: Target Corp. Customer Data Security Breach Litigation*,
  2015 WL 7253765 (D. Minn. Nov. 17, 2015) ............................................ 7, 8, 12

*Ingram v. The Coca-Cola Co.*,
  200 F.R.D. 685 (N.D. Ga. 2001) ........................................................................... 7

*Lipuma v. Am. Express Co.*,
  406 F. Supp. 2d 1298 (S.D. Fla. 2005) ................................................................. 6

*Lobatz v. U.S. West Cellular of Cal., Inc.*,
  222 F.3d 1142 (9th Cir. 2000) ............................................................................. 31

*Murray v. GMAC Mortg. Corp.*,
  434 F.3d 948 (7th Cir. 2006) ............................................................................... 11

*Nelson v. Mead Johnson & Johnson Co.*,
  484 Fed. Appx. 429 (11th Cir. 2012) ................................................................... 25

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999) ............................................................................................. 20

*Paterson v. Texas*,
  308 F.3d 448 (5th Cir. 2002) ............................................................................... 24

*Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*,

678 F.3d 640 (8th Cir. 2012) ........................................................... 20

*Rodriguez v. W. Publ'g Corp.,*
   563 F.3d 948 (9th Cir. 2009) ...................................................... 23

*Sandoval v. Ali,*
   34 F. Supp. 3d 1031 (N.D. Cal. 2014) ........................................ 23

*Spann v. J.C. Penney Corp.,*
   314 F.R.D. 312 (C.D. Cal. 2016) ................................................ 19

*Valley Drug Co. v. Geneva Pharm., Inc.,*
   350 F.3d 1181 (11th Cir. 2003) ............................................ 21, 23

*Ward v. Dixie Nat'l Life Ins. Co.,*
   595 F.3d 164 (4th Cir. 2010) ...................................................... 23

Rules

Fed. R. Civ. P. 11 ................................................................... 26, 30

Fed. R. Civ. P. 23(c)(2)(B) ......................................................... 15

Fed. R. Civ. P. 23(e)(1) .......................................................... 26, 27

Fed. R. Civ. P. 83(b) .................................................................. 26

Rule 23(e)(3) ....................................................................... 18, 19

Rule 23(h) ................................................................................ 27

Other Authorities

Newberg on Class Actions § 13:21 (5th ed. 2012) ...................... 9

*Newberg on Class Actions* § 3:75 .......................................... 23

Consumer Plaintiffs, through Consumer Plaintiffs' Lead Counsel, respectfully file this Reply memorandum in support of their Motion for Final Approval (ECF No. 226). Based on the overwhelming support of the class, and the comparatively small number of insufficient and unfounded objections, the Court should (1) grant final approval of the settlement; (2) finally certify the Settlement Class; and (3) enter a final judgment in this action. An objective assessment of the benefits conferred to the class establishes this settlement as a new benchmark for data breach cases, and the meritless objections fail to establish the settlement is anything other than "fair, adequate and reasonable." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). In support of this memorandum, Consumer Plaintiffs submit herewith the Declaration of Kenneth Jue on behalf of Settlement Administrator Regarding Requests for Exclusion and Claims as Exhibit 1 ("Jue Dec."); the Declaration of Gerald W. Thompson on behalf of Intersections Inc. d/b/a Identity Guard ("Identity Guard") as Exhibit 2 ("Thompson Dec."); and the Declaration of John R. Bevis as Exhibit 3 ("Bevis Dec.").

## I.  THE UPDATED DATA RELATED TO CLAIMS, OBJECTIONS AND OPT-OUTS SUPPORTS FINAL APPROVAL OF THE SETTLEMENT.

As a preliminary matter, the reaction of the class continues to be very strong. Only 45 members of the Settlement Class have timely requested to be excluded from the Settlement Class and only five objections[2] have been lodged against the

---

[2] Timely objections were lodged by Maureen Connors, Sam Miorelli, Steven Toleos, Stephen Weinstein, and Jonathan Daley. Class Counsel have moved to strike Mr. Miorelli's objection, and this motion remains pending. (ECF No. 239.) A copy of

Settlement. (*See* Declaration of Kenneth Jue at ¶ 2.) Moreover, class members continue to make claims under the settlement. With approximately three months remaining in the claims period, the pace of claims is *accelerating* and class members have now filed over 100,000 claims for relief under the settlement. (*Id.* at 3.)

In light of the miniscule number of objections and opt-out requests (combined about .00000001% of the class), and, more importantly, because the objections lack merit, the strong positive reaction of the Class to the Settlement further supports final approval. *See Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005); *see also Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 691, 692 n.7 (N.D. Ga. 2001) (approving settlement and stating that "[b]oth the substance and amount of opposition to this settlement are small" and "[w]hile the number of objectors is not controlling,… a relatively small number of objectors can be taken as some indication that the class members as a group did not think the settlement was unfair.") (citations omitted); *c.f. in re: Target Corp. Customer Data Security Breach Litigation*, 2015 WL 7253765, at \*2 (D. Minn. Nov. 17, 2015) ("The settlement administrator reports that 386 people timely requested exclusion from the class, and

---

the timely objection submitted by Jonathan Daley (but not filed with the Court) is attached as Exhibit A to the Bevis Dec. Mr. Weinstein subsequently represented to Consumer Counsel that he has withdrawn his objection and is sending a copy of his withdrawal to the Court. (*See* Bevis Dec., ¶4.) This Reply addresses all objections raised in these filings.

11 individuals objected to the settlement. . . . This ***infinitesimally small amount*** of opposition weighs in favor of approving the settlement.") (emphasis added).

## II.    THE OBJECTIONS LACK MERIT.

The procedural history of the case and the mediation among the parties that lead to the settlement are well documented in motions and memoranda previously filed with this Court. (*See, e.g.*, ECF Nos. 181 and 226.) In the face of the overwhelming factual and legal support for the settlement, the five objections lodged against the settlement are individually and collectively without merit. At least two of the objections – those filed by Sam Miorelli ("Miorelli")[3] and Maureen Connors ("Connors")[4] – reflect efforts of so-called professional objectors. Their objections

---

[3] The most scattershot objection was filed by Sam Miorelli, a member of The Florida Bar who, in a relatively short legal career, has become a prolific professional objector. He has objected to at least five settlements, including the *Target* data breach settlement. There, the Court rejected his objection as he was found not to be a member of the class and on other substantive grounds. *In re: Target Corp. Customer Data Security Breach Litigation*, 2015 WL 7253765, at **1-2, fn. 1-2 ("Sam Miorelli, is not a member of the class.") Nor is this his first objection that grossly exceeded the page limits. *See, e.g., Zepeda v. PayPal, Inc.*, 10-CV-02500-SBA (N.D. Ca.). After filing an objection to the class settlement in *Legg v. Laboratory XCorp. of America Holdings*, No. 14-61543-CIV 9 (S.D. Fla.), Miorelli withdrew his objection because he was not a member of the class.

[4] Maureen Connors is another lawyer appearing *pro se* who has a history of objecting to class settlements. In addition to her objection to *Stroud v. eMachines*, No. CJ-2003-968 (OK Dist. Ct., Cleveland County), Connors has represented serial objector Jonathan E. Fortman in his objection to *In re: Southwest Airlines Voucher Litigation*, 11-cv-08176 (N.D. Ill.). Fortman himself is a lawyer and a prolific objector, as he has acted as counsel to objectors in over two dozen cases. In a role reversal of *Southwest*, Fortman represented Connors as an objector in *eMachines* and *In re: Groupon, Inc., Marketing and Sales Practices Litig.*, No. 3:11-md-2238-DMS-RBB

3

are made not out of a concern for the welfare of the Settlement Class; their irrelevance reveals they are made for the sole purpose of obtaining their own fee. *See In re Checking Account Overdraft Litig.*, No. 1:08-CV-23323-JLK, 2012 WL 456691, at *2 (S.D. Fla. Feb. 14, 2012).[5] Class Counsel responds to the objections grouped by (A) Objections to the Value of the Settlement and Benefits Conferred to the Class; (B) Objections to the Procedure Related to Implementing the Settlement and (C) Objections to Attorneys' Fees and Service Awards.

### A. Objections Related to the Value of the Settlement and Benefits Conferred on the Class.

#### 1. The Monetary Value of the Settlement is Within the Range of Possible Recoveries and is Fair, Adequate and Reasonable.

_____

(S.D. Cal.). Connors has also represented objectors in *In re: Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. 4:02-md-01486-PJH (N.D. Cal.).

[5] The problems associated with professional objectors are well documented. Often they appeal the denial of their objections in the hope of extracting a payment to drop what would otherwise be a lengthy delay in delivering the settlement benefits to the class. Although the class process depends on the opportunity for class members to lodge legitimate objections, these professional objectors work against the class by effectively taxing the class in terms of both money and time. *See In re Checking Account Overdraft Litig.*, 2012 WL 456691, at *2 (quoting *Barnes v. Fleetboston Fin. Corp.*, CA 01-10395-NG, 2006 WL 6916834, at *2 (D. Mass. Aug. 22, 2006)) ("[P]rofessional objectors can levy what is effectively a tax on class action settlements, a tax that has no benefit to anyone other than to the objectors. Literally nothing is gained from the cost: Settlements are not restructured and the class, on whose benefit the appeal is purportedly raised, gains nothing."); *In re Elec. Books Antitrust Litig.*, 639 F. App'x 724 (2d Cir. 2016) ("The District Court observed that [objector's] arguments were made by a 'professional objector,' not by someone 'who ha[s] a stake in the enterprise in a way that a class member would.'"); *see also generally*, Newberg on Class Actions § 13:21 (5th ed. 2012).

Miorelli argues that the recovery is a fraction of the recoverable damages by claiming that Class Counsel should have recovered $2.65 to 5.3 billion – the range of what he describes as an aggregated black market value for the stolen data. (*See* ECF No. 237 at 44) ("[A] reasonable valuation of the data lost would consider the price the black market was paying for it: $50 to $100 per record.")). He presents no damages expert supporting this theory. Moreover, Miorelli does not claim that the monetary relief is insufficient to compensate his loses arising out of the data breach. In fact, because the claim he filed with the class administer does not reveal that he suffered any damages; thus, he may lack standing to even advance an objection as to the inadequacy of the monetary relief. *See Brown v. Hain Celestial Grp., Inc*., No. 3:11-cv-03082-LB, 2016 WL 631880, at *10 (N.D. Cal. Feb. 18, 2016) ("None of the objectors contends that the monetary relief is insufficient to compensate him or her — or any class member — for harm caused by [defendant's] alleged wrongs. . . . It is consequently hard to see how they are aggrieved by this main settlement element) (citing *In re First Capital Holdings Corp. Fin. Prods. Sec. Litig*., 33 F.3d 29 (9th Cir. 1994)).

Although there may be some intrinsic value in the loss of a credit card number, the more direct damages suffered here are the losses each class member incurred due to credit card and/or financial fraud, and the time and cost associated with such fraud. (*See generally* Compl., ECF No. 93, ¶¶ 4-95). The Settlement addresses exactly these losses. It provides for reimbursement for "any consequential expenses related

to fraud or identity theft, such as late fees, declined payment fees and overdraft fees." (ECF No. 226-1 at 9). In addition, "Settlement Class Members with supporting documentation may also submit a claim for time spent remedying issues fairly traceable to the data breach to be compensated at $15 per hour for up to five hours." (*Id.* at 10). Indeed, the Settlement reimburses out-of-pocket damages fully. Given that the low range of possible recoveries at trial was $0, this reflects relief well within the range of reasonableness. *See Bennett*, 737 F.2d at 987.

Miorelli cites *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948 (7th Cir. 2006) to argue there is too great a disparity between the awards to the named plaintiffs and the relief to the class. (ECF No. 237 at 46). But in *Murray*, the Seventh Circuit actually vacated the lower court's ***denial*** of class certification, remanded the action, and strongly suggested certification was appropriate. *See id.* The *Murray* court noted that, under the rejected settlement, the class members would each receive only $1 while the class representative would receive $3000. This was too large a disparity given the minimum remedies of the FCRA. *See id.* at 952.

Here, however, class members may claim their actual damages based upon their out-of-pocket losses up to ***$10,000***. Class members may also be reimbursed for time spent of up to 5 hours at $15 per hour (or for those who self-certify, up to 2 hours at $15 per hour). Plus they receive the Identity Guard protection, with a retail value of approximately $180. Thus, the disparity in *Murray* has no relationship to this Settlement.

Miorelli also argues that the immediacy of the Settlement benefits only Class Counsel. (ECF No. 237 at 48-49.) As noted in Consumer Plaintiffs' Memorandum in Support of Final Approval, however, identity theft protection provides real and immediate benefits to consumers, and in fact Miorelli filed a claim seeking the benefit of this service. (*See* ECF No. 226-1 at 27) ("[t]he longer this litigation drags on, the more likely consumers are to suffer identity theft or fraud without having this additional protection in place"). The *Target* court rejected this same objection, finding that early settlement of that data breach case weighed heavily ***in favor*** of approval. *Target*, 2015 WL 7253765 at *2. This Court has previously noted that:

> This scenario must be weighed against the certainty of the settlement benefits. The Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere probability of relief in the future, after protracted and expensive litigation. In this respect, it has been held proper to take the bird in the hand instead of a prospective flock in the bush.

*In re Domestic Air Transp. Antitrust Litigation*, 148 F.R.D. 297, 325-26 (N.D. Ga. 1993) (citations and internal quotations omitted).

Here, despite the relatively early resolution of the case, Class Counsel understood the factual basis for the claims and had conducted an extensive investigation before filing their Consolidated Complaint. The timing of the settlement, particularly given the sweeping nature of relief afforded the class, strongly weighs in favor of rejecting this objection.

### 2. The Identity Guard Monitoring Service Offers Additional and Valuable Relief to the Class.

Miorelli and Connors (and more ambiguously Daley) challenge the value of Identity Guard monitoring service offered through the settlement. They argue that Identity Guard is duplicative of the AllClear ID monitoring services Home Depot offered in the immediate aftermath of the breach, or is otherwise not a benefit. Connors wildly speculates that Identity Guard will be used to facilitate debt collection. All of these objections are without merit.

The AllClear ID services offered by Home Depot in the aftermath of the breach was a form of *credit* monitoring. This a service limited to monitoring credit activity on an individual's credit reports (typically with one or more of the "big three" credit reporting agencies of Experian, Equifax and TransUnion), and notifying the individual when new credit activity occurs. (*See* Thompson Dec., ¶ 5.) Thus, when fraudulent accounts are being opened in an individual's name, the prompt notice allows the individual to take steps to close the account. (*See id.*) Because opening new lines of credit requires an individual's name and social security number, credit monitoring is most effective to combat breaches where social security numbers are compromised. (Thompson Dec., ¶ 6.)

In this case, debit and credit cards were compromised. Credit monitoring is therefore largely ineffective because the credit reporting agencies have no ability to detect fraudulent charges made on consumers' financial accounts. (*See* Thompson Dec., ¶ 6; Compl., ECF No. 93, ¶ 202) Because of the nature of the breach, Plaintiff's

counsel have been consistent in their belief that the AllClear ID credit monitoring was of limited value to the class. The Identity Guard services offered as part of this settlement, on the other hand, are specifically designed to mitigate fraud on compromised financial accounts—the harm actually caused by *this* breach. (Thompson Dec., ¶ 7.) Morielli's opinion that Plaintiff's counsel—and in particular Mr. Barnes—had an "astounding and unexplained change of opinion on the value of these services" is one borne of ignorance.

After enrolling in Identity Guard, Class Members have the option to enter their personal bank account and credit and debit card number information so that it can be monitored in real time, a feature that AllClear ID does not offer. (Thompson Dec., ¶ 7.) For example, Identity Guard provides online "black market" monitoring that notifies users if their registered bank account numbers or credit card numbers are being sold on underground markets. It also provides ID verification and account takeover alerts that notify users if someone attempts to open new accounts or gain access to their existing financial accounts. (*See* Thompson Dec., ¶ 3.) Plaintiff's counsel selected Identity Guard after soliciting bids from multiple industry leaders because it was one of the highest-rated services on the market and included the most extensive set of services available to mitigate the specific type of harm caused by this breach. (*See* Siegel Declaration in Support of Final Approval; ECF No. 226-2, ¶ 11; Thompson Dec., ¶ 3.)

For the same reason, Miorelli's assertion that the Identity Guard service is not a benefit because Home Depot customers "already got" monitoring services from Home Depot or "from their involvement in many other data breaches" relies on a faulty factual premise. (ECF No. 237 at 20-21.) As explained above, Home Depot's offer of credit monitoring services did not address the specific harm caused by this breach. Moreover, Home Depot's notification of the availability of AllClear ID monitoring was not made pursuant to a Court-approved notice program (including direct notice) in compliance with the stringent requirements of Fed. R. Civ. P. 23(c)(2)(B). Morielli's assertion that over 60 million Class Members were made aware of the Home Depot offer or may have signed up for (likely dissimilar) monitoring services as part of other free offers has no support in the record and should be disregarded.

Further, even if Class Members signed up for monitoring from other sources or Home Depot, Class Members now have the ability to enroll in an *additional* 18 months of service for a product that has a retail value of $9.99 per month. (Thompson Dec., ¶ 8.) This benefit is especially important in the context of the $1 million insurance policy offered as part of the Identity Guard package which adds an additional layer of protection to recover for future identity theft of fraud. Morielli's suggestion that the AllClear ID policy is similar to the Identity Guard policy is irrelevant – that policy expired for those (likely limited number of persons) who enrolled on September 19, 2015. (*See id.*)

Morielli further argues "it is likely" that every single Class Member already has an existing offer for free use of identity theft monitoring; is presently enrolled in another service; or has elected not to sign up. Obviously, Miorelli fits into none of these categories as he signed up for this service (ECF No. 237 at 26.) Even so, his conclusion relies on a number of faulty or unverifiable assumptions, including that (a) all 60 million plus Class Members have been breached before (which is demonstrably untrue); (b) all monitoring services are the same (also demonstrably untrue); (c) consumers do not benefit from enrolling in more than one service; (d) consumers enrolled in one service would not want to extend coverage for an additional 18 months; and (e) those who have declined free monitoring services previously would do so again in the context of a different breach. These assumptions are not supported by any evidence in record or elsewhere. Plaintiff's counsel carefully selected monitoring services appropriate for *this* breach, and the services objectively provide a significant benefit to Class Members.

Finally, Connors's objection that Identity Guard will be involved in class members' debt collection is erroneous. Identity Guard and its parent company do not engage in debt collection and have no relationship to debt collection entities. (Thompson Dec., ¶ 9.)

### 3. The Injunctive Relief Provides Valuable Relief to the Class.

Miorelli and Connors both argue, without any foundation in fact, that the injunctive relief component of the settlement is illusory, and assert that the relief was

already in place at the time of the settlement. Much of Miorelli's objection is based on the erroneous assumption that Home Depot was compliant with Payment Card Industry standards at the time of the settlement – Consumer Plaintiffs allege it was not. Moreover, Connors' objection that the elements of injunctive relief "are items that the Defendant ought to be engaged in anyway" belies the purpose of including such terms in a settlement: Now, Home Depot is **bound** to comply with security measures developed by the leading experts in the field. (*See* Declarations of Ponemon and Jorgenson, Docs. 227-4 and 227-5.) The injunctive relief is an additional, valuable element of the relief provided to the Class to protect their important privacy interests.

### 4.  There is no "Reversion."

Connors argues that "the bulk of the funds will revert back to the Defendant." (*See* ECF No. 238 at 1.) This reflects a fundamental misunderstanding of the settlement. Home Depot will be obligated to pay the full settlement fund ($13 million) and must *separately* pay costs associated with notice, administration, costs related to Identity Guard and fees and costs awarded by the Court. If the claims do not exhaust the cash fund, Home Depot will receive a credit for notice, administration and the cost of Identity Guard, but no reversion or reimbursement related to attorneys' fees or costs. (*See* Settlement Agreement, ECF No. 181-2, ¶ 36). If there are excess funds, such money will be distributed *pro rata* to those class

members submitting claims. *Id.* Connors's misreading of the Settlement Agreement should be rejected.

## B. Objections to the Procedure Related to Implementing the Settlement:

### 1. There is No "Secret" Side Deal Agreement between Plaintiffs and Home Depot.

Miorelli also posits that because Paragraph 65 of the Settlement Agreement provides there is a separate agreement regarding Home Depot's right to terminate the Settlement Agreement if a certain percentage of the Settlement Class Members opt out, "[t]here is no reason to believe from the record that this is the only additional right Defendants maintain in the Side Deal." (ECF No. 237 at 9.) Such an argument is frivolous, demonstrating both Miorelli's failure to review the docket entries as well as his misapplication of Rule 23(e)(3)'s requirement that "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the proposal." *Id.* As the record clearly reflects, Miorelli's so-called secret "Side Deal" is nothing more than the "Confidential Supplemental Agreement Regarding Requests for Exclusion" which has been disclosed to and filed with the Court for *in camera* review. (ECF No. 187.) The Supplemental Agreement confers no undisclosed rights to Home Depot, and it cannot possibly compete with the interests of the absent Settlement Class Members.

Moreover, the agreement merely sets a threshold level of opt-outs which, if reached, permits Home Depot to withdraw from the Settlement Agreement. The Court is well-equipped to evaluate whether the opt-out percentage is reasonable.

Both the Northern District of Georgia and the Eleventh Circuit have expressly recognized that an opt-out threshold agreement "is typically not disclosed and is kept confidential to encourage settlement and discourage third parties from soliciting class members to opt out." *In re HealthSouth Corp. Securities Litig.,* 334 Fed. App'x 248, 250, n.4 (11th Cir. 2009); *see also Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 560 (N.D. Ga. 2007) (holding that "termination agreement" did not "bargain[ ] away rights of the class in return for advantages of others" and denying objection on basis that agreement was not made public); *accord Spann v. J.C. Penney Corp.*, 314 F.R.D. 312, 329 (C.D. Cal. 2016) ("[O]pt-out threshold is reasonable, and, given the circumstances of this case and the parties involved, they need not disclose it to the class.") (citing *In re Skelaxin (Metaxalone) Antitrust Litig.,* 2015 WL 1486709, *2 (E.D. Tenn. 2015)) (sealing opt-out threshold); *In re Remeron End–Payor Antitrust Litig.*, 2005 WL 2230314, *18 (D. N.J. 2005) (sealing opt-out threshold); *In re Warfarin Sodium Antitrust Litig.,* 2012 F.R.D. 231, 253 (D. Del. 2002) (holding that opt-out threshold was "irrelevant to members' opt-out decision").

The Supplemental Agreement fully complies with Rule 23(e)(3)'s disclosure requirements, and there is no conflict of interest between Class Counsel and absent class members.

14

### 2. Class Counsel and Class Representatives Adequately Represent the Interests of Settlement Class Members.

Miorelli also contests the fairness and adequacy of Class Counsel by arguing that separate counsel is needed to represent supposedly adverse subclasses. (ECF No. 237 at 39-40.) To support his claim that each "*de facto* subclass"[6] requires separate counsel, Miorelli cites a single case for the proposition "when a settlement involves multiple subclasses, each subclass must have separate representation 'to eliminate conflicting interests of counsel.'" (ECF No. 237 at 40) (citing *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) ("*Ortiz*")). Reductionist interpretation notwithstanding, subsequent case law has distinguished *Ortiz* on its facts:

> *Ortiz* and *Amchem* were massive tort "class action[s] prompted by the elephantine mass of asbestos cases" that "defie[d] customary judicial administration." The Supreme Court found the exceedingly divergent interests of present and future claim holders in those cases required separate counsel to address adequately the conflict. But the need for separate representation under the atypical circumstances of *Ortiz* and *Amchem* does not make appointing separate counsel the only acceptable means of "addressing any conflicting interests of class members," and providing "structural assurance of fair and adequate representation" for the entire class.

*Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 646–48

---

[6] The Settlement Agreement does not provide for separate subclasses—it provides for a single nationwide class. Miorelli provides no legal support for his claim that the Settlement Class is comprised of so-called *de facto* subclasses.

15

(8th Cir. 2012) (internal citations omitted).[7]

As discussed below, there are no conflicts between any alleged "de facto sub-classes." Importantly, even potentially minor conflicts cannot defeat class certification:

> [T]he conflict must be a "fundamental" one going to the specific issues in controversy. A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class. In such a situation, the named representatives cannot "vigorously prosecute the interests of the class through qualified counsel" because their interests are actually or potentially antagonistic to, or in conflict with, the interests and objectives of other class members.

*Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003) (internal citations omitted).

Miorelli articulates no cogent theory of conflict. All Class Settlement Members have claims arising from the same conduct, *i.e.*, the disclosure of personally identifying information in a data breach first disclosed by Home Depot in 2014. In support of an alleged conflict, Miorelli claims, "[t]he first [*de facto*] subclass consists of those Settlement Class Members who can provide Reasonable Documentation of Substantiated Losses…[and] [t]he second [*de facto*] subclass are [sic] all of the Settlement Class Members who are not in the first…." (ECF No. 237

---

[7] *See also In re Cmty. Bank of N. Virginia Mortgage Lending Practices Litig.*, 795 F.3d 380, 393 (3d Cir. 2015), *cert. denied sub nom. PNC Bank v. Brian W.*, 136 S. Ct. 1167, 194 L. Ed. 2d 241 (2016).

at 39.) But these alleged *de facto* subclasses are not mutually exclusive. Indeed, a Settlement Class Member may obtain a distribution from the Settlement Fund by submitting a valid Claim Form, and likewise obtain Identity Guard Monitoring Services. (ECF No. 181-2, ¶¶ 37-38.)[8] Critically, the amount of money in the Settlement Fund available for distribution is not contingent upon the number of Settlement Class Members who obtain Identity Guard monitoring services. Nor is the money allocated for the purchase of Identity Guard monitoring services contingent upon the number of Settlement Class Members who submit Claim Forms for distribution from the Settlement Fund. (*See* ECF No. 181-2, ¶ 28.) The Settlement Agreement even provides that if the number of Settlement Class Members eligible to enroll in Identity Guard Monitoring Services exceeds 40 million persons, the cost of monitoring services will increase, to be paid by Home Depot. (ECF No. 181-2, ¶ 38.)[9]

Because these avenues of relief are completely independent from one another, the recovery of one "*de facto* subclass member" does not cut directly into recovery of another "*de facto* subclass member." The "*de facto* subclasses" are not competing

---

[8] The Settlement Class includes approximately 40 million individuals who had their payment card data stolen, and 52-53 million individuals who had their email address stolen, with some overlap between the groups.

[9] In this event, "the cost of the Identity Guard Monitoring Services shall increase at a rate of $16,250 for every 100,000 eligible Settlement Class Members above 40 million, to be paid by Home Depot." (ECF No. 181-2 ¶ 38.)

for a common pool of funds. Indeed, "the fact that the named plaintiffs may have suffered greater damages does not indicate that named plaintiffs possess interests antagonistic to other plaintiffs." *Columbus Drywall*, 258 F.R.D. at 555.

Similarly, Weinstein suggests that customers who only had an email address compromised should be entitled to more compensation (he suggests $1) or eliminated from the class. But the settlement provides that such class members can recover damages actually incurred by reason of the email breach up to $10,000. And, of course, the injunctive relief applies to all members of the class providing a material benefit to even those not financially harmed by the breach.

These facts do not establish a conflict, fundamental or minor. And, assuming *arguendo*, the existence of a minor conflict, such is insufficient to deny class certification. *See Valley Drug Co.*, 350 F.3d at 1189.[10] The Class Representatives provided fair and adequate representation for the entire Settlement Class.

---

[10] *See also Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 184 (3d Cir. 2012) ("[N]ot all intra-class conflicts will defeat the adequacy requirement."); *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) ("For a conflict of interest to defeat the adequacy requirement, that conflict must be fundamental.") (internal quotation marks omitted); *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 959 (9th Cir. 2009) (finding that conflict must be material to destroy adequacy); *Sandoval v. Ali*, 34 F. Supp. 3d 1031 (N.D. Cal. 2014) ("[C]lass counsel may represent multiple sets of litigants… so long as the litigants' interests are not inherently opposed.") (citing *Newberg on Class Actions* § 3:75 (5th ed.)).

### 3.  The Burdens of Objecting are Reasonable.

The Court should reject Miorelli and Weinstein's complaints concerning the burden of objecting to the settlement.

### a.  Objectors Are Not Overly Burdened by Being Required to Mail Four Copies of Their Objections.

Miorelli and Weinstein argue that requiring objections to be mailed to the settling parties and this Court is unreasonable. Besides the minimal cost of mailing four copies of his objection, Miorelli does not state why requiring objectors to mail objections to counsel and the Court is unreasonable. In support of his argument, Miorelli cites *Galloway v. Kansas City Landsmen, LLC*, 2012 WL 4862833 (W.D. Mo. Oct. 12, 2012). In *Galloway*, as part of the settlement, each class member received a $5.00 discount coupon. *Id*. at *4. There, the opt-out procedure required the submission of "an exclusion form to both plaintiffs' counsel and defense counsel, and the form must be *both* emailed *and* either mailed first-class or hand-delivered." *Id.* at *5 (emphasis in original). That Court found the procedure "unnecessarily onerous." *Id*. Here, those seeking exclusion do not need to make this duplicative effort. The objectors only needed to mail their objections to counsel for the parties and the court. *Galloway* does not support Miorelli's argument.

There is nothing inherently unreasonable about the requirement to mail objections. Miorelli states that other courts have permitted transmitting objections by email. *See In re Motor Fuel Temperature Sales Practices Litig*., No 07-md-01840-KHV-JPO, Order (ECF No. No. 3019), at 2 (D. Kan. Nov. 10, 2011). But he

19

cites no authority *requiring* objections to be allowed to be filed via email. Miorelli relies on no authority outright rejecting regular mail as a method of transmitting objections.

### b. Those Who Appear by Counsel are Not Overly Burdened When Objecting to the Settlement.

Miorelli, who appears herein *pro se*, argues that other objectors, who may appear by and through counsel, are at a disadvantage because they must disclose, *inter alia*, whether such counsel is a serial objector and whether such counsel may be entitled to compensation. (ECF No. 237 at 54.) Miorelli has no standing to argue against a provision in the Settlement Agreement that does not impact him. *See, e.g.*, *Paterson v. Texas*, 308 F.3d 448, 451 (5th Cir. 2002) (finding State of Texas lacked standing to object to class action settlement in putative representative capacity).

### c. The Disclosures Requested of Objectors are Not Overly Burdensome.

Miorelli also argues that the disclosure requirements contained in the settlement notice to class members serve the "improper" purpose of dissuading frivolous objections to the Settlement. (ECF No. 237 at 57.) Federal courts routinely bemoan the unfortunate existence of professional objectors lodging frivolous objections: "[T]he Court treats with particular disapproval the objections and appeals of professional objectors' whose objections amount to a tax that has no benefit to anyone other than to the objectors' but serves to tie up the execution of a Settlement and further delay payment to the members of the Settlement Class." *In re Target*

*Corp. Customer Data Sec. Breach Litig.*, No. MDL142522PAMJJK, 2016 WL 259676, at *1 (D. Minn. Jan. 21, 2016) (quotations and internal citations omitted); *see also In re UnitedHealth Grp. Inc. PSLRA Litig.*, 643 F. Supp. 2d 1107, 1108–09 (D. Minn. 2009). Miorelli's voluminous (and at times inflammatory) briefing also demonstrates the heavy tax they impose on the courts.

Because class counsel has a right to know the motivation for a given objection, Miorelli's argument that settlement notices should not contain provisions designed to identify professional objectors to the Court and counsel is disingenuous. The disclosure requirements found in the court-approved Settlement Notice are proper. Indeed, the very presence of objections serve as evidence that notice was adequate and those who wished to opt-out or object were quite able to do so. *See, e.g.*, *Nelson v. Mead Johnson & Johnson Co.*, 484 Fed. Appx. 429, 435 (11th Cir. 2012) (noting that the objector's argument that notice was inadequate was "belied" by objections).

### d.  Requiring an Objector to Personally Sign their Objection is Reasonable.

Miorelli speciously argues that requesting objectors to sign their objection personally is a violation of Fed. R. Civ. P. 11. (ECF No. 237, at 58-59.) It is well within this Court's discretion to set reasonable guidelines for the objection process. Fed. R. Civ. P. 83(b) ("A judge may regulate practice in any manner consistent with federal law…."). The requirement that an objector personally sign their objection did not hinder Miorelli from filing an objection, nor has it hindered other objectors to the Settlement. In fact, requirements to make objectors available for deposition

21

have been upheld in similar class action settlements, a difficulty far more imposing than picking up a pen and signing one's name. *See In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 970 (N.D. Ill. 2011) ("[T]he objectors have not presented any evidence that [the deposition requirement] deterred anyone from objecting, including themselves.").

Miorelli also claims that forcing objectors to sign their objections is in violation of Fed. R. Civ. P. 23(e)(1). (ECF No. 237 at 58-59.) However, Fed. R. Civ. P. 23(e)(1) does not address the mechanics of objecting to a class action settlement. It does address providing notice to class members in a way that is reasonable to understand. *See In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1333-34 (S.D. Fla. 2011) (stating that the purpose of the notice requirement of Fed. R. Civ. P. 23(e)(1) was to "inform[] Settlement Class Members of the principle Settlement terms"). Miorelli does not argue that the notice given to the Class in this action fails to inform the class of the Settlement terms or was for the purpose of providing the Class Representatives with an unjust private settlement. His Rule 23(e)(1) argument is therefore unavailing.

### C. Objections Related to the Payment of Service Awards and Attorneys' Fees.

Objectors Miorelli, Connors, Teleos and Daley argue in one way or another that the requested attorneys' fee is excessive. Weinstein does not oppose the requested fee. Because Class Counsel will be filing its Reply in Support of its Motion for Service Awards, Attorneys' Fees and Litigation Expense Reimbursement on

August 5, 2016, Class Counsel confines its response here solely to structural objections as to the compliance with Rule 23(h), the alleged "clear sailing" provision, and the motion for service awards. Arguments as to the appropriate amount of fees will be deferred to avoid repetition.

### 1. This Court and Consumer Class Counsel Have Complied with Rule 23(h).

As a preliminary matter this Court has, in no way, "abdicated its responsibility" under Fed. R. Civ. P. 23(h). (*See* ECF No. 237 at 60.) To the contrary, this Court has put in place strict procedures to monitor counsel's time litigating this case. For example, on February 13, 2015, this Court ordered that "[a]ll counsel must keep a daily record of their time spent and expenses incurred in connection with this litigation, and must report on a monthly basis their expenses and hours worked to Co-Lead and Liaison Counsel for consumer plaintiffs." (ECF No. 60 at 6, ¶ 8; *see also* ECF No. 227-2 at 4, ¶ 5.) Further, the court has required quarterly (*in camera*) submissions of reports reflecting hours billed in this matter by all consumer plaintiffs' counsel. (*Id.* at 6, ¶ 9; *see also* ECF No. 227-2 at 4-5, ¶ 5.) To comply with these directives, Liaison Counsel for the Consumer Cases, Barnes Law Group, "undertook and had the primary responsibility of collecting and compiling the monthly time and expenses submitted by 26 different law firms, 96 attorneys and 33 support staff . . . in order to prepare and submit the quarterly reports required by the

Court in ECF No. 60." (ECF No. 227-2 at 5, ¶ 6).[11] Every time and expense "[e]ntry was reviewed by at least two attorneys from different firms, with no attorney reviewing any submissions from his/her own firm." (*Id.* at 8, ¶ 11.) Thereafter, Liaison Counsel submitted five quarterly reports for the Court's *in camera* review for time through March 31, 2016. (*Id.* at 7, ¶ 9.)

Furthermore, "the Court-Appointed Liaison and Lead Counsel undertook to research and analyze historic public data available in order to develop a standardized hourly rate schedule suitable for similar complex litigation matters in the Atlanta legal market." (*Id.* at 5-6, ¶ 7.) On June 27, 2016, Lead and Liaison Counsel also publicly disclosed all counsel's cumulative time and expenses, delineated by law firm name, each firm's hours, lodestar, and expenses, through June 15, 2016. (*See* ECF No. 227-2 at Ex. B.) Each firm's publicly disclosed pre-appointment totals, along with the quarterly reports and an intended supplemental *in camera* submission on July 29, 2016, reflect plaintiffs' counsel's lodestar when applied against the standardized rates. (*Id.* 5-10 ¶¶ 6-15, Ex. B.)

---

[11] Despite Liaison Counsel's clear disclosures regarding the number of law firms, attorneys and support staff involved in this litigation, fee schedule, lodestar methodology, and submissions to the Court, Morelli confusingly claims that the allocation of fees may be part of a "secret deal" and that "Morelli is not exactly sure of the number" of law firms in this case. (*See* ECF No. 237 at 61.) Rather than engage in any "secrecy" or side deals entered, Lead and Liaison Counsel have fully disclosed their billing information in accordance with this Court's instruction.

Additionally, Morielli's cited authority *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220 (5th Cir. 2008) has no application here. That case stated:

> Lead Plaintiffs' Counsel in this class action case persuaded the district court to divide up a $6.875 million lump sum attorneys' fee award among more than six dozen plaintiffs' lawyers according to Lead Counsel's proposed allocation. This might be permissible, except that the court was so persuaded in an ex parte hearing and apparently without benefit of supporting data. The court further accepted Lead Counsel's proposed order sealing the individual awards; preventing all counsel from communicating with anyone about the awards; requiring releases from counsel who accepted payment; and limiting its own scope of review of objections to the allocation.

*Id.* at 223-24.

The *ad hoc* procedure used by the *High Sulfur* lower court in no way comports with procedures established by this Court and followed by Liaison and Lead Counsel as outlined above and in more detail in plaintiffs' moving papers. Indeed, the requested attorneys' fees are based on the "lodestar method" approved by the Eleventh Circuit in non-common fund cases. *See Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 773-74 (11th Cir. 1991). Moreover, unlike in *High Sulfur*, this Court will not decide the Consumer Plaintiffs' Motion for, *inter alia*, attorneys' fees, at an *ex parte* hearing based on a "[r]ecord lack[ing] attorneys' time and expense statements, letters, comments, hourly billing rates, and other materials[.]" (*Id.* at 229-30.) Rather, any award of attorneys' fees will be based on the lodestar method after

25

review of extensive billing submissions and an established billing schedule, and after full briefing and a publicly noticed hearing on August 12, 2016.

### 2.  There is No "Clear Sailing" Provision.

Without any foundation in fact, Miorelli asserts that the attorneys' fees sought by class counsel are tainted because of the presence of a "clear sailing" provision. No such provision exists in the settlement agreement, and, in fact, Defendant has filed objections to the motion for attorneys' fees submitted by Class counsel. (*See* ECF No. No 233.)

As a lawyer licensed in Florida, Miorelli knows and understands the obligations of Rule 11 of the Federal Rules of Civil Procedure and its requirement that arguments or contentions which he made in his filings with this Court have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation. Despite the dictates of this rule and the professional obligations imposed upon him as a licensed lawyer, Miorelli attacks the ethics of Class counsel and claims Class counsel subordinated their interests to the class and breached their fiduciary obligations in exchange for lucre. Nothing could be farther from the truth. Class Counsel in this case have always kept the interest of the class of paramount importance, and have advocated strenuously to achieve the best outcome possible. Aside from this Court's own knowledge of the reputations of the lawyers who have appeared before it, this Court has presided over the hearings that have been conducted in this case, and had the opportunity to review the time

records of Class Counsel which were submitted regularly to the Court *in camera*. The contention that Class counsel engaged in self-dealing and breached their fiduciary duties is unfounded and completely misguided.

### 3. Objectors Should Not be Entitled to Discover Class Counsel's Billing Records.

Miorelli argues that the motion for fees is unsupported by detailed information about how the attorneys spent their time. This is refuted by Class Counsel's detailed submissions to the Court on a regular basis. Courts do not require counsel to make their time records available to objectors, particularly given their highly confidential nature. *See, e.g.*, *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 336 (W.D. Tex. 2007) ("Even presuming the class members could fully comprehend the detailed time records, this objection fails to explain how these individuals are qualified to pass judgment on the daily time records of attorneys in a complex, national class action."); *see also Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1148 (9th Cir. 2000) (holding that "[t]he district court did not err in denying [the objector's] request for discovery of class counsel's contemporaneous time records" where the objector "failed to show any legitimate need for the records she sought"). These concerns are enhanced here because Class Counsel's time records reflect strategy and consultation with the financial institution plaintiffs – which litigation remains ongoing against Home Depot.

### 4.  The Service Awards are Appropriate.

Connors and Miorelli argue that the disparity between the service awards for Settlement Class Representatives and the distributions to other Class Members is too great. (Daley, on the other hand, argues that service awards are ***too small***). Connors focuses solely on the lost time component of the relief, and both Connors and Miorelli disregard the fact that Class Members may receive up to $10,000 for documented out-of-pocket losses compared to the requested $1,000 service award. Without asserting any facts, Connors argues that the disparity suggests that the Class representatives were "bought off" – an inflammatory and unwarranted accusation for a member of the Ohio Bar to make. In any event, Class Counsel demonstrated that all of the Settlement Class Representatives contributed to the prosecution and settlement of this case. Among other things, they provided documents and information about their purchases at Home Depot that formed the basis of the Consolidated Complaint, and they responded to follow-up inquiries related to Rule 26 disclosures and other preparations for discovery. Courts routinely approve service awards to plaintiffs who contribute in this way to the successful resolution of class action cases. (*See* ECF No. 227-1 at 9-11.)

## III.   CONCLUSION

Commenters have regarded the Consumer Case Settlement as the model for resolving data breach litigation. Among other reasons, they are an effective mechanism for advancing and protecting the privacy interests of consumers.

Likewise, the Settlement Class has demonstrated its overwhelming support for the settlement by the active participation of class members taking part in the settlement, and by the miniscule number of opt-outs and objections to the agreement. The objections are meritless and should be denied in their entirety. Based on the foregoing Class Counsel respectfully requests that the Court (1) grant final approval of the settlement; (2) finally certify the Settlement Class; and (3) enter a final judgment in this action.

Dated: July 29, 2016                          Respectfully Submitted,

David J. Worley                                _____ /s John R. Bevis _____
James M. Evangelista                      Roy E. Barnes
**HARRIS PENN LOWRY, LLP**       John R. Bevis
400 Colony Square                         **THE BARNES LAW GROUP, LLC**
1201 Peachtree Street, NE, Suite 900   31 Atlanta Street
Atlanta, GA 30361                          Marietta, GA 30060
Telephone: 404-961-7650               Telephone: 770-227-6375
Fax: 404-961-7651                          Fax: 770.227.6373
david@hpllegal.com                       roy@barneslawgroup.com
jim@hpllegal.com                          bevis@barneslawgroup.com

*Consumer Co-Lead Counsel*
*and Steering Committee Members*        *Consumer Liaison Counsel*
                                                       *and Steering Committee Members*

29

John A. Yanchunis, Sr.
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 N Franklin Street
Tampa, FL 33602
Telephone: 813-223-5505
Fax: 813-223-5402
jyanchunis@forthepeople.com

*Consumer Co-Lead Counsel*
*and Steering Committee Member*

Tina Wolfson
**AHDOOT AND WOLFSON, P.C.**
1016 Palm Avenue
West Hollywood, CA 90069
Telephone: 310-474-9111
Fax: 310-474-8585
twolfson@ahdootwolfson.com

*Consumer Plaintiffs'*
*Steering Committee Member*

William B. Federman
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Avenue
Oklahoma, OK 73120
Telephone: 405-235-1560
Fax: 405-239-2112
wbf@federmanlaw.com

*Consumer Plaintiffs'*
*Steering Committee Member*

Norman E. Siegel
Barrett J. Vahle
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, MO 64112
Telephone: 816-714-7100
Fax: 816-714-7101
siegel@stuevesiegel.com
vahle@stuevesiegel.com

*Consumer Co-Lead Counsel*
*and Steering Committee Members*

Daniel C. Girard
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: 415-981-4800
Fax: 415-981-4846
dcg@girardgibbs.com

*Consumer Plaintiffs'*
*Steering Committee Member*

Gary S. Graifman
**KANTROWITZ, GOLDHAMER**
**& GRAIFMAN, P.C.**
210 Summit Avenue
Montvale, NJ 07645
Telephone: 201-391-7600
Fax: 201-307-1086
ggraifman@kgglaw.com

*Consumer Plaintiffs'*
*Steering Committee Member*

Howard T. Longman
**STULL STULL & BRODY**
6 East 45th Street
New York, NY 10017
Telephone: 212-687-7230
Fax: 212-490-2022
hlongman@ssbny.com
*Consumer Plaintiffs'*
*Steering Committee Member*

## CERTIFICATE OF COMPLIANCE

In accordance with LR 7.1D, I hereby certify that this brief has been prepared with a 14 point Times New Roman font as approved by the Court in LR 5.1C.


_____*/s John R. Bevis*_____

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

_____
                                                    )
In re: The Home Depot, Inc., Customer    )      Case No.: 1:14-md-02583-TWT
Data Security Breach Litigation               )
                                                    )
This document relates to:                        )
                                                    )
CONSUMER CASES                            )
 _____  )

## CERTIFICATE OF SERVICE

I hereby certify that today I electronically filed the foregoing CONSUMER

PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF FINAL APPROVAL

OF CLASS ACTION SETTLEMENT with the Clerk of Court using the CM/ECF

system, which will automatically send email notification to all counsel of record,

and will serve the following by U.S. Regular Mail:

Maureen Connors
6625 Pearl Road
Parma Heights, OH  44129

Jonathan M. Daley
44 Church Street
Hillsboro, NH 03244

Andrew F. Johnson
514 East Capitol Street, NE
Washington, DC  20003

33

Sam A. Miorelli, Esq.
Law Office Sam Miorelli, P.A.
746 Ellwood Ave
Orlando, Florida 32804-7320

Steven Toleos
83 Bradstreet Avenue
Danvers, MA  01923

Stephen Andrew Weinstein
450 E. Daily Drive
Apartment 32
Camarillo, CA  93010

This 29th day of July, 2016.

BARNES LAW GROUP, LLC

/s John R. Bevis

_____

Roy E. Barnes
Georgia Bar No. 039000
John R. Bevis
Georgia Bar No. 056110
J. Cameron Tribble
Georgia Bar No. 754759
31 Atlanta Street

Marietta, Georgia 30060
T: 770-227-6375
F: 770-227-6373
bevis@barneslawgroup.com

*Consumer Liaison Counsel on behalf of*
*Consumer Case Leadership*

34