**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

———————————————————— )
                                                       )
In re: The Home Depot, Inc., Customer      )    Case No.: 1:14-md-02583-TWT
Data Security Breach Litigation                  )
                                                       )
This document applies to:                         )
FINANCIAL INSTITUTION CASES           )
———————————————————— )

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY
APPROVAL OF CLASS ACTION SETTLEMENT, PRELIMINARY
CERTIFICATION OF SETTLEMENT CLASS, APPROVAL OF NOTICE
PROGRAM, AND SCHEDULING OF FINAL APPROVAL HEARING**

After several years of contentious litigation, the parties have reached a settlement that, if approved, will bring this litigation to an end. Under the settlement, Home Depot will pay $25 million into a non-reversionary fund to be distributed to financial institutions that have not already released their claims; spend up to $2.25 million to compensate certain sponsored entities whose claims were released after they received misleading communications; separately pay the costs of notice, administration, and attorneys' fees and expenses; and implement enhanced security measures to reduce the risk of a future data breach.

Plaintiffs have moved for an order: (1) preliminarily approving the proposed settlement; (2) certifying the proposed settlement class; (3) approving the proposed

notice program; and (4) scheduling a final approval hearing.  Plaintiffs request that the motion, which Home Depot does not oppose, be granted.  The settlement meets all of the standards for preliminary approval.  The settlement class satisfies the requirements of Rule 23.  And the notice program – consisting of individualized mailed notice, a reminder notice, and a website maintained by the settlement administrator – comports with both Rule 23 and due process.

In support of their motion, Plaintiffs submit a proposed preliminary approval order (attached as Exhibit 1); the proposed settlement agreement and its various attachments (attached as Exhibit 2); and the Declaration of Kenneth S. Canfield (attached as Exhibit 3).

## FACTUAL BACKGROUND

### The Data Breach

In September, 2014, Home Depot announced that its payment data systems had been breached.  Investigation revealed hackers placed malware on Home Depot's self-checkout kiosks in stores across the country, allowing them to steal customers' personal financial information, including names, payment card numbers, expiration dates, and security codes.  The stolen information was then sold over the internet to thieves who made massive numbers of fraudulent transactions using the payment cards that financial institutions had issued to Home

Depot's customers.  Financial institutions were forced to cancel and reissue the compromised payment cards to mitigate the damage, reimburse their customers for fraudulent transactions, and otherwise incur substantial out of pocket expenses in responding to the data breach.

### The Resulting Litigation and Home Depot's Motion to Dismiss

In the fall of 2014, financial institutions filed more than twenty five class action lawsuits alleging that the data breach and the resulting losses were caused by Home Depot's failure to have adequate data security measures.  On December 11, 2014, the Judicial Panel on Multidistrict Litigation centralized all of these cases, along with others brought by Home Depot's customers, before this Court. The Court created separate tracks for the consumer and financial institution cases and appointed separate leadership to prosecute the cases in each track.

On May 27, 2015, the financial institution plaintiffs – fifty financial institutions from 44 states – filed a consolidated amended complaint asserting on behalf of themselves and a national class claims for negligence, negligence per se, violations of various unfair and deceptive trade practices statutes, and equitable relief.  The Credit Union National Association and sixteen state credit union associations and leagues joined as plaintiffs to seek equitable relief for their members.  On July 1, 2015, Home Depot moved to dismiss the amended

complaint.  After hearing oral argument on October 22, 2015, the Court issued an order on May 18, 2016 that denied the motion almost in its entirety.

### Home Depot's Efforts to Obtain Releases from Class Members

In November, 2015, while its motion to dismiss was pending, Home Depot moved for leave to communicate with absent class members about settling their claims.  Unbeknownst to Plaintiffs and without mentioning what it was doing in the motion, Home Depot already had been communicating with absent class members for several months.  Plaintiffs first learned of Home Depot's efforts the day before Thanksgiving, 2015, when several class representatives reported they were offered payments in exchange for a release and were given only a few days to make a decision.  Plaintiffs immediately sought to enjoin the communications and sought to invalidate any releases Home Depot obtained.  Agreeing that misleading and coercive communications had occurred, the Court opened discovery for several months to enable Plaintiffs to find out what was happening, but allowed Home Depot's settlement efforts to continue.  (*Canfield Decl.,* ¶ 4)

Discovery revealed Home Depot had embarked on an effort to obtain releases from class members in late summer or early fall, 2015, principally by taking advantage of the card brand recovery processes provided by MasterCard and Visa.  These processes provide partial compensation to issuers from data breaches,

but do not require issuers to release their civil claims.  While initially expressing unwillingness to fund the processes as demanded by Visa and MasterCard and inviting litigation, Home Depot settled with them on terms that allowed it to offer issuers a small premium over the amount they would otherwise receive in exchange for a release of their legal claims in this litigation.  (*Id.,* ¶ 5)

Home Depot's offers were made in two phases.  In Phase I, which began in late September or early October, 2015, Home Depot negotiated releases directly with the nation's largest payment card issuers, which in many cases also released the claims of smaller issuers that they sponsored.  In Phase II, which began in January, 2016, Home Depot extended offers to smaller issuers.  Separately, Home Depot negotiated settlements with American Express and Discover, which as independent entities do not participate in the MasterCard and Visa recovery processes.  (*Id.,* ¶ 6)

Mostly by virtue of Home Depot's success in settling with the largest issuers, roughly between 70 to 80 percent of the payment cards compromised in the data breach are subject to a release.  Relatively few financial institutions accepted Home Depot's offers in Phase II.  Home Depot has paid out approximately $14.5 million in premiums to MasterCard and Visa issuers in exchange for releases.  Combined with payments to the larger issuers, including

American Express and Discover, and payments under the card brand recovery processes to issuers that refused to release their claims, Home Depot already has spent more than $140 million to compensate financial institutions in the class defined in Plaintiffs' complaint. (*Id.,* ¶ 7)

### Settlement Discussions

In early July, 2016, before Home Depot answered the amended complaint, full blown discovery had begun, and Plaintiffs had moved forward in challenging releases Home Depot had obtained, the Court stayed proceedings to allow the parties to pursue settlement through mediation.  The first mediation occurred on July 28, 2016 in Chicago with Wayne Andersen, a former federal judge and experienced mediator.  Little progress was made and the parties remained far apart, both with regard to their views of liability and damages.  Another unsuccessful mediation with Judge Andersen occurred in Atlanta on August 22, 2016.  On September 9, 2016, at the parties' request, the Court agreed to lift the stay because the prospects of a settlement were slight.  Nevertheless, the parties kept talking and agreed to try mediation again with a different mediator.  (*Id.,* ¶ 8)

On October 6, 2016, the parties conducted a second mediation session in Atlanta presided over by Edward Infante, a former federal magistrate who has been successful in resolving countless complex class actions as a long time mediator

with the San Francisco office of JAMS.   No settlement was reached, but
negotiations continued by telephone.  When an impasse was reached, Judge Infante
made a "mediator's proposal" to settle the major issues in dispute and gave the
parties until October 24, 2016 to accept or reject it.   Each side accepted the
proposal.    Thereafter, the parties negotiated the other matters needed for a
comprehensive settlement, and, on January 10, 2017, entered into a terms sheet
containing the key provisions.  The terms sheet was turned into a comprehensive
settlement agreement, which was executed on March 8, 2017.  (*Id.,* ¶ 9)

## Terms of the Proposed Settlement

### The Settlement Class

The proposed settlement class is defined as follows:

All banks, credit unions, financial institutions, and other entities in the
United States (including its Territories and the District of Columbia)
that issued an Alerted-On Payment Card.  Excluded from the class are
entities that have released all of their claims against Home Depot, but
not excluded from the class are independent sponsored entities whose
claims were released in connection with Alternative Recovery Offers
made by MasterCard.

Also excluded from the class are Home Depot and any financial institutions that
opt out.   (Settlement Agt., ¶¶ 36-37)  The term "Alert-On Payment Card" means
any payment card identified as having been at risk as a result of the Data Breach in
an alert issued by Visa, MasterCard, Discover or American Express.  (*Id.* at ¶ 1)

## The Direct Settlement Benefits for the Class

The settlement compensates financial institutions that have not already released their claims and sponsored entities whose claims were released by their sponsors in connection with MasterCard's ADC program.   Except for those sponsored entities, financial institutions that already have released their claims are not in the class.  The direct benefits of the settlement include a $25 million fund to go to those with unreleased cards, up to $2.25 million to eligible sponsored entities, and new data security measures to be implemented by Home Depot.

### (1)     The $25 Million Settlement Fund

Home Depot will pay $25 million into a fund to be distributed to financial institutions that have not released all of their claims.  Under the Distribution Plan that governs payments from the fund, a copy of which is attached as Exhibit 1 to the Settlement Agreement, class members that file a valid claim will receive a "fixed payment award" estimated to be $2.00 per compromised card without having to prove their losses and regardless of whether the amount of compensation they already have received from another source.  (Settlement Agt., ¶ 39)

Class members that submit proof of their losses and the compensation they already have received, if any, are eligible for an additional "documented damages award" from the fund of up to 60 percent of their uncompensated losses from the

data breach.  (*Id.*)  Documented damages awards will be paid from the money remaining after payment of all fixed payment awards.  If there is not enough money remaining, each documented damages award will be reduced pro rata.  If there is money available after all fixed payment and documented damages awards have been funded, all awards will be increased pro rata.  No money in the fund will revert to Home Depot.  (*Id.*)

### (2)   <u>$2.25 Million to Sponsored Entities</u>

Home Depot has also agreed to pay up to $2.25 million to sponsored entities whose claims were released by their sponsor in connection with MasterCard's ADC program.  Plaintiffs have challenged the validity of these releases on the grounds that the sponsors lacked authority to enter into them and that the communications sent to the sponsored entities were misleading and coercive. Eligible sponsored entities that submit a valid claim will be entitled to a payment of $2.00 per compromised card.  If the valid claims exceed the $2.25 million cap, the actual payments will be reduced pro rata so that the cap is not exceeded.   No fund will be created.  So if the valid claims are less than $2.25 million, Home Depot will only be obliged to pay the amount of the valid claims.  (*Id.* at ¶ 40)

### (3)   <u>Additional Security Measures</u>

For at least two years, Home Depot has agreed to implement the following

data security measures, which are in addition to those measures Home Depot

agreed to adopt in the settlement in the Consumer Track:

     a. *Safeguard Design Resulting From Risk Exception Process*. Home Depot will design and implement reasonable safeguards to manage the risks identified through its data security risk assessments. Home Depot will track and manage its data security risk assessments utilizing a risk exception process that involves Home Depot's leadership and will be reviewed periodically to evaluate the current risk of a data breach.

     b. *Vendor Program*. Home Depot will develop and use reasonable steps to select and retain information technology vendors capable of maintaining appropriate and conduct assessments to ensure that vendors having access to payment card information comply with Home Depot's security practices.

     c. *Industry Standard Adoption*. Home Depot will implement an appropriate industry recognized security control framework.

(Settlement Agt., ¶ 41)

## **Proposed Notice Program**

Subject to the Court's approval, the parties propose to individually notify

each class member through U.S. Mail and a website to be established and

maintained by the settlement administrator. Class members will be able to file

claims both electronically and by mail. During the claims period, class members

that have not filed claims will receive a post-card reminder. The parties do not

believe that publication notice or internet banner ads are necessary because the

street addresses of all class members are generally available and, if any notices are

returned, the settlement administrator will take appropriate steps to update the addresses and re-mail the notices.  (Settlement Agt., ¶¶ 47-50)

**The Costs of Notice and Administration**

Home Depot will pay all costs of notifying the class and administering the settlement.  These costs will be paid separately and will not reduce the other benefits going to the class.  (*Id.* at ¶¶ 45, 52)

**Attorneys' Fees and Expenses**

Class Counsel will apply to the Court for an award of attorneys' fees and expenses, which will be paid by Home Depot separately from the other settlement relief.  There is no agreement regarding the amount of any award.  Home Depot has the right to object to the request and appeal any award.  (*Id.* at ¶ 62)  The class will be notified that Class Counsel may request up to $18 million in fees, which amounts to less than 30 percent of the total of the $25 million settlement fund, the $2.25 million for sponsored entities, the costs of notice and administration, the fees and expenses of Class Counsel, and the $14.5 million in premiums that Home Depot paid to obtain releases from financial institutions under the MasterCard and Visa card brand recovery processes.  (*Canfield Decl.,* ¶ 10)

**Service Awards**

Class Counsel will apply for, and Home Depot agrees not to oppose, service

awards of up to $2500 for each class representative to compensate them for their efforts and commitment.  Any service awards approved by the Court will be paid from the $25 million settlement fund.  (Settlement Agt., ¶ 61)

**Releases**

The class and the Association Plaintiffs will release Home Depot from claims relating to the issues in this case.  In turn, Home Depot will release the class and the Association Plaintiffs from any claims relating to the institution, prosecution or settlement of this matter.  (*Id.* at ¶¶ 56-59)

## ARGUMENT

### I.     The Proposed Settlement Warrants Preliminary Approval

A court must approve any class action settlement that releases the claims of absent class members.  Fed. R. Civ. P. 23(e).  Approval is a two-step process.  First, the Court conducts a preliminary review to determine whether the proposed settlement is "within the range of possible approval."  *Fresco v. Auto Data Direct, Inc.*, 2007 WL 2330895, at *4 (S.D. Fla. May 11, 2007) (internal citations omitted); *see Melanie K. v. Horton*, 2015 WL 1799808, at *2 (N.D. Ga. Apr. 15, 2015).  "[T]he court's primary objective at th[is] point is to establish whether to direct notice of the proposed settlement to the class, invite the class's reaction, and schedule a final fairness hearing." 4 W.  Rubenstein, *Newberg on Class Actions* §

13:10 (5th ed. 2015).  Second, after preliminary approval and notice to the class, the Court assesses the settlement's strengths and weaknesses at the final approval hearing and determines whether the settlement is fair, reasonable, and adequate to those who are affected.  *See, e.g, Id.*

The law generally encourages the settlement of class actions.  *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) ("our judgment is informed by the strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement."); *see also, e.g., Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977); *Meyer v. Citizens and Southern Bank,* 677 F. Supp. 1196, 1200 (M.D. Ga. 1988).  "Settlements conserve judicial resources by avoiding the expense of a complicated and protracted litigation process and are highly favored by the law." *In re Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d 1329, 1333 (N.D. Ga. 2000).  The Court has broad discretion in approving a settlement.  *Id*.

At this stage, there is no need to "conduct a trial on the merits." *Id.*  Instead, a "district court may rely upon the judgment of experienced counsel for the parties . . . [and] [a]bsent fraud, collusion, or the like, the district court 'should be hesitant to substitute its own judgment for that of counsel.'" *Nelson v. Mead Johnson & Johnson Co.*, 484 F. App'x 429, 434 (11th Cir. 2012) (*quoting Cotton v. Hinton*,

559 F.2d 1326, 1330 (5th Cir. 1977)); *see also Columbus Drywall & Insulation, Inc. v. Masco Corp.*, 258 F.R.D. 545, 558 (N.D. Ga. 2007).

Courts within the Eleventh Circuit use two different standards in considering whether to preliminarily approve a proposed settlement. Some courts find that preliminary approval is appropriate "where the proposed settlement is the result of the parties' good faith negotiations, there are no obvious deficiencies and the settlement falls within the range of reason." *In re Checking Account Overdraft Litig.*, 275 F.R.D. 654, 661 (S.D. Fla. 2011) (internal quotations omitted). Other courts apply the factors used for final approval, known as the *Bennett* factors:

> (1) the likelihood of success at trial; (2) the range of possible recoveries; (3) the point on or below the range of possible recoveries at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and degree of opposition to the settlement; and (6) the stage of the proceedings at which the settlement was achieved.

*Columbus Drywall*, 258 F.R.D. at 558-59 (*quoting Bennett,* 737 F.2d at 986). The proposed settlement warrants preliminary approval under both standards.

## A.   The Proposed Settlement is the Result of Good Faith Negotiations, is Not Obviously Deficient, and Falls within the Range of Reason

The proposed settlement was negotiated at arm's length, without collusion, and with the assistance of two respected mediators. *See, e.g., In re Checking Acct. Overdraft Litigation*, 275 F.R.D. 654, 661 (S.D. Fla. 2011) ("Settlement

negotiations that involve arm's length, informed bargaining with the aid of experienced counsel support a preliminary finding of fairness"); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("The fact that the entire mediation was conducted under the auspices of … a highly experienced mediator lends further support to the absence of collusion").  Indeed, the settlement terms were recommended by Judge Infante after the parties had reached an impasse and were only reluctantly accepted. (*Canfield Decl.,* ¶ 9)

The settlement is not deficient and within the range of reason.  Class members are eligible for substantial cash benefits totaling $27.25 million and have the potential to recover up to 60 percent of their proven, uncompensated losses. Home Depot is also required to take additional security measures to protect its customers' data.  These benefits compare favorably with settlements approved in similar data breach cases.  *See In re Target Corporation Customer Data Security Breach Litigation,* 2016 WL 2757692 (D. Minn. May 12, 2016) (approving settlement with a $20,250,000 fund giving class members an option of $1.50 per compromised card or up to 60 percent of proven losses); Final Judgment and Order of Dismissal, *WinSouth Credit Union v. Mapco Express, Inc*., No. 3:14-cv-01573 (M.D. Tenn. Jan. 12, 2017) (approving settlement with a $700,000 fund giving class members up to $3.00 per card or up to 60 percent of proven losses).

**B.**   **The *Bennett* Factors Support Preliminary Approval**

     **(1)**   **The Benefits Outweigh the Risks at Trial**

The trial court weighs the first *Bennett* factor, the likelihood of success at trial, "against the amount and form of relief contained in the settlement." *Saccoccio v. JP Morgan Chase Bank*, N.A., 297 F.R.D. 683, 692 (S.D. Fla. 2014) (quotation omitted).  This factor weighs in favor of approval where "success at trial is not certain for Plaintiff[s]."  *Burrows v. Purchasing Power, LLC*, No. 1:12-CV-22800, 2013 WL 10167232, at *6 (S.D. Fla. Oct. 7, 2013).  Although Plaintiffs are confident about their case, the risks involved cannot be disregarded.  Class certification is always challenging, and, assuming a class is certified, Plaintiffs risk losing on summary judgment, at trial, or on appeal.  *See generally In re Motorsports*, 112 F. Supp. 2d at 1334 ("[T]he trial process is always fraught with uncertainty.").  The proposed settlement avoids these uncertainties and provides the class with meaningful and certain relief.

     **(2)**   **The Settlement is Within the Range of Possible Recoveries and is Fair, Adequate, and Reasonable**

The second and third *Bennett* factors -- whether the settlement is within the range of possible recoveries and is fair, adequate, and reasonable -- can be considered together.  *Burrows*, 2013 WL 10167232, at *6.  "The Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but to evaluate the

16

proposed settlement in its totality." *Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005). The range of outcomes extends from no liability to total victory and must be considered in light of the attendant risks. Thus, even a minimal settlement can be approved. *See, e.g., Burrows*, 2013 WL 10167232, at *6; *Bennett*, 737 F.2d at 986; *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery.")

The settlement is within the range of possible recoveries, considering the risks and the class's reduced leverage due to Home Depot's success in obtaining releases. *See In re Target,* 2016 WL 2757692 at *1. Class members can get $2.00 for unreleased cards and, with proof, can recover up to 60 percent of their proven losses from the $25 million fund; certain sponsored entities that have released their claims are eligible for an additional payment of $2.00 per card; and the risks of a future data breach will be reduced through added security measures. These benefits compare favorably to other settlements that have been approved, including those in data breach cases. *See Id.; WinSouth Credit Union, supra*; *Lipoma*, 406 F. Supp. 2d at 1323 (approving settlement despite arguments that it provided less than 10 percent of the potential recovery); *Behrens*, 118 F.R.D. at 542 (approving settlement providing approximately 6 percent of potential recovery).

### (3)   Continued Litigation Would Be Expensive and Lengthy

A settlement that "will alleviate the need for judicial exploration of ... complex subjects, reduce litigation costs, and eliminate the significant risk that individual claimants might recover nothing" merits approval. *Lipuma*, 406 F. Supp. 2d at 1324. Such is the case here. Approval will avoid complex, expensive, and lengthy litigation, saving resources of the parties and the Court. A national class action such as this one involves seemingly endless discovery; extensive expert involvement; argument and voluminous briefing over certification, summary judgment, and *Daubert* challenges; a lengthy trial; and appeals.

### (4)   The Degree of Opposition to the Settlement

Courts do not consider this factor until notice has not been provided to settlement class members. *See Columbus Drywall*, 258 F.R.D. at 560.

### (5)   The Stage of Proceedings

The purpose of this factor is "to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Lipuma*, 406 F. Supp. 2d at 1324. Class Counsel have lived with this case for several years, thoroughly invested the facts and law the results of which are reflected in the consolidated amended complaint, briefed the relevant legal issues, and conducted extensive, albeit limited, discovery.

As a result, combined with their experience in handling other data breach cases, Class Counsel can adequately analyze the strengths and weaknesses of the case.

## II.    The Court Should Certify the Proposed Settlement Class

When a settlement is reached before certification, a court must determine whether to certify the settlement class.  *See, e.g.,* Manual for Complex Litigation §21.632 (4th ed. 2014); *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 613-14 (1997).  Certification of a settlement class is proper when the requirements of Rule 23(a) and at least one subsection of Rule 23(b) are satisfied.  *See, e.g., Columbus Drywall & Insulation, Inc. v. Masco Corp.,* 258 F.R.D. 545, 553 (N.D. Ga. 2007). Courts have "broad discretion" in applying Rule 23 to a settlement class.  *Walco Investments, Inc. v. Thenen,* 168 F.R.D. 315, 323 (S.D. Fla. 1996).

The Court should certify the settlement class here.  Indeed, courts have recently certified similar classes in two data breach cases -- one for litigation purposes, *see In re Target,* 309 F.R.D. 482 (D. Minn. 2015), and one for purposes of settlement.  *See WinSouth Credit Union, supra.*

### A.    The Settlement Class Satisfies Rule 23(a)

***Numerosity:*** Rule 23(a)(1) requires that a proposed settlement class be "so numerous that joinder of all class members is impracticable."  The proposed class consists of thousands of financial institutions, which is more than sufficient.  *See,*

*e.g., James D. Hinson Elec. Contracting Co., Inc. v. BellSouth Telecommunications, Inc.,* 275 F.R.D. 638, 642 (M.D. Fla. 2011) (the 11th Circuit's general rule is that more than 40 class members satisfies numerosity).

**Commonality:** "[C]ommonality requires 'that there be at least one issue whose resolution will affect all or a significant number of the putative class members,'" *Williams v. Mohawk Industries, Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009) (internal citation omitted), and "is generally satisfied when a plaintiff alleges that defendants have engaged in a standardized course of conduct that affects all class members." *Terrill v. Electrolux Home Products, Inc.*, 295 F.R.D. 671, 685 (S.D. Ga. 2013), *vacated and remanded on other grounds*, *Brown v. Electrolux Home Prods.*, 817 F.3d 1225 (11th Cir. 2016) (internal quotations omitted).  In this case, all members of the proposed class assert the same legal claims, that they were injured in the same ways, and that their injuries resulted from Home Depot's common conduct.  Proving their claims thus will involve numerous common questions of law and fact that will be resolved in the same way for all class members.  The commonality requirement thus is met.

**Typicality:** The typicality requirement primarily focuses on whether the named plaintiffs' claims "have the same essential characteristics" as claims of other class members. *See, e.g., Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir.

1985).  The requirement is undemanding*, In re Disposable Contact Lens Anti. Lit.,* 170 F.R.D. 524, 532 (M.D. Fla. 1996*),* requiring only some nexus between the named plaintiffs' claims and the common questions uniting the class*.  See, e.g., Hines v. Widnall*, 334 F.3d 1253, 1256 (11th Cir. 2003).  A sufficient nexus exists if the claims arise from the same pattern of conduct and there is a similarity of legal theories.  *See, e.g., Williams,* 568 F.3d at 1357.  Here, the claims of all class members arise out of the same alleged misconduct by Home Depot and are based on the same legal theories.  Thus, the typicality requirement is satisfied.

*Adequacy of Representation***:**  In assessing the adequacy requirement, courts employ "a two-part test: (1) whether plaintiffs have interests antagonistic to the interests of other class members; and (2) whether the proposed class' counsel has the necessary qualifications and experience to lead the litigation."  *Columbus Drywall*, 258 F.R.D. at 555.  Plaintiffs do not have any interests antagonistic to other class members and have retained lawyers who are abundantly qualified and experienced.  (*Canfield Decl.,* ¶ 11)   The requirement is thus met.

**B.**     **Rule 23(b)(3) is Satisfied**

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that class treatment is "superior to other available methods for fairly and efficiently

adjudicating the controversy."   One part of the superiority analysis -- that is whether the case, if tried as a class action, would be manageable -- is irrelevant for purposes of certifying a settlement class.  *Amchem*, 521 U.S. at 620.

     ***Predominance:*** "Common issues of fact and law predominate if they have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief."  *Carriuolo v. GM Co.*, 823 F.3d 977, 985 (11th Cir. 2016).  Predominance does not require that all questions be common, but rather that "a significant aspect of the case . . . can be resolved for all members of the class in a single adjudication."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (internal quotations omitted).  The requirement is met here because the overwhelming issues of law and fact are common to all class members.  *See, e.g., In re Target,* 309 F.R.D. at 486-89.  The only real individual issue relates to damages, which does not defeat predominance. *Brown v. Electrolux Home Products, Inc.,* 817 F.3d 1225, 1239 (11th Cir. 2016) ("The 'black letter rule' recognized in every circuit is that 'individual damage calculations generally do not defeat a finding that common issues predominate.'")

     **Superiority:** "The inquiry into whether the class action is the superior method for a particular case focuses on increased efficiency."  *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692 (S.D. Fla. 2004) (internal quotations omitted).

Litigating the claims of thousands of class members, requiring presentation of the same evidence and expert opinions over and over again, would obviously be inefficient. *See Terrill*, 295 F.R.D. at 697 ("A single, coordinated proceeding is superior to hundreds of discrete and disjointed suits addressing the same facts and legal issues.")  Because class treatment is superior to individual litigation, superiority is satisfied.

## III.   <u>The Notice Program Should be Approved</u>

Rule 23(e) provides that "notice of the proposed ... compromise shall be given to all members of the class in such manner as the court directs."  Due process likewise requires that class members be given notice and an opportunity to be heard.  *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).  The method and manner of notice process is "left to the discretion of the court subject only to the broad 'reasonableness' standards imposed by due process."  *Grunin v. Int'l House of Pancakes,* 513 F.2d 114, 121 (8th Cir. 1975), *cert. denied*, 423 U.S. 864 (1975).  There is no single way in which the notice must be transmitted.  However, "mail is the preferred means for notifying identified members of a class," W. Rubenstein, *Newberg on Class Actions,* §8:28 at 310 (5th ed. 2013), and is sufficient when the class members are known.  7B C. Wright & A. Miller, *Federal Practice and Procedure* § 1797.6 at 200 (3rd ed. 2005).

The parties, therefore, propose to notify class members individually by mail. The identity and addresses of individual class members are known from the records of Home Depot, Visa, MasterCard, and other sources.  And reasonable efforts will be made to re-mail notices to class members whose initial notice was returned as undeliverable. The notice itself is written in plain English; describes the litigation, the claims being made, and the terms of the settlement; and informs class members about the deadlines and their rights to opt out or object.  In addition, a website will be established where class members will be able to view and download copies of pleadings, orders, and the documents relating to the settlement and class members will be able to call a toll free number for further information.

This notice program satisfies the requirements of due process and Rule 23 and thus should be approved. *See, e.g., Grunin*, 513 F.2d at 121 (individualized mail notice sufficient when class members can be identified); *Holman v. Student Loan Xpress, Inc.*, 2009 WL 4015573, at *6 (M.D. Fla. Nov. 19, 2009) (approving notice by first class mail to most recent known address); *Neuberg v. Shapiro,* 110 F.Supp.2d 373, 377 (E.D. Pa. 2000) (same).

The Court should also approve Angeion Group to serve as the settlement administrator.   Angeion is a well-known firm with a history of successfully administering many class action settlements.  (*Canfield Decl.,* ¶12)  The parties

selected Angeion after obtaining proposals from four administration firms and believe that Angeion will be able to meet the obligations imposed on the settlement administrator under the settlement. (*Id.*)

## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiffs request that the Court grant their motion and enter the order proposed by the parties to: (1) preliminarily approve the proposed settlement; (2) certify the proposed settlement class; (3) approve the notice program; and (4) schedule a final approval hearing.

*/s/ Kenneth S. Canfield*
Kenneth S. Canfield
GA Bar No. 107744
Doffermyre Shields Canfield & Knowles, LLC
1355 Peachtree Street, Suite 1900
Atlanta, Georgia 30309
Phone: 404-881-8900
kcanfield@dsckd.com

*/s/ Joseph P. Guglielmo*
Joseph P. Guglielmo
SCOTT+SCOTT,
ATTORNEYS AT LAW, LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, New York 10169
Phone: 212-223-4478
jguglielmo@scott-scott.com

*/s/ Gary F. Lynch*
Gary F. Lynch
CARLSON LYNCH SWEET
KILPELA & CARPENTER, LLP
1133 Penn Ave, 5th Floor
Pittsburgh, Pennsylvania 15222
Phone:  412-322-9343
glynch@carlsonlynch.com

*Co-Lead Counsel for Financial Institution
Plaintiffs*

*/s/ James J. Pizzirusso*
James J. Pizzirusso
HAUSFELD, LLP
1700 K. Street, NW, Suite 650
Washington, DC 20006
Phone:  859-225-3731
jpizzirusso@hausfeldllp.com

*Chair, Plaintiffs' Steering Committee for the
Financial Institution Plaintiffs*

# **CERTIFICATION**

The Undersigned hereby certifies, pursuant to Local Civil Rule 7.1D, that the foregoing document has been prepared with one of the font and point selections (Times New Roman, 14 point) approved by the Court in Local Civil Rule 5.1C.

> */s/ Kenneth S. Canfield*
> Kenneth S. Canfield
> GA Bar No. 107744
> Doffermyre Shields Canfield & Knowles, LLC
> 1355 Peachtree Street, Suite 1900
> Atlanta, Georgia 30309
> Phone: 404-881-8900
> kcanfield@dsckd.com
>
> *Co-Lead Counsel for Financial Institution Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 8, 2017, I served all parties by causing a true and correct copy of the foregoing Memorandum of Law in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement, Preliminary Certification of Settlement Class, Approval of Notice Program, and Scheduling of Final Approval Hearing to be filed with the Clerk of Court using the CM/ECF system, which automatically sends a copy to all counsel registered to received service.

*/s/ Kenneth S. Canfield*
Kenneth S. Canfield

*Co-Lead Counsel for Financial Institution Plaintiffs*