**Plaintiffs' Motion for Attorneys' Fees,
Expense, and Service Awards to the
Class Representatives**

# Exhibit 1
## Joint Declaration of Co-Lead Counsel

*In re: The Home Depot, Inc. Customer Data Security Breach Litigation*
*This Document applies to Financial Institution Cases*
U.S.D.C., N.D. Georgia, Atlanta Division
Civil Action No. 1:14-md-02583-TWT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

_____

|  |  |  |
|---|---|---|
| | ) | |
| In re: The Home Depot, Inc., Customer | ) | Case No.: 1:14-md-02583-TWT |
| Data Security Breach Litigation | ) | |
| | ) | |
| This document applies to: | ) | |
| FINANCIAL INSTITUTION CASES | ) | |
| _____ | ) | |

## <u>JOINT DECLARATION OF CO-LEAD COUNSEL</u>

(1)     This declaration is filed jointly by Ken Canfield, Joseph Guglielmo, and Gary Lynch in support of Plaintiffs' application for fees, expenses, and service awards to the class representatives.  We serve as co-lead counsel in the financial institutions track of this litigation.  Plaintiffs' application is also supported by the Declaration of Kenneth S. Canfield, which was submitted along with Plaintiffs' preliminary approval motion.

(2)     This declaration is based upon our personal knowledge.

(3)     We previously submitted to the Court information about our backgrounds and firm profiles. (Doc. 50)  For easy reference, we summarize our qualifications below.

(4)     Ken Canfield is a partner at Doffermyre Shields Canfield & Knowles, LLC.  After graduating from Dartmouth College in 1974 and Yale Law School in

1

1977, he was a law clerk for Frank M. Johnson, Jr., then chief judge of the United States District Court for the Middle District of Alabama.  He later served in Washington, D.C. during the Carter Administration as a special assistant to the head of the Civil Division in the United States Justice Department and as a special assistant to the head of the United States Environmental Protection Agency. Following four years of private practice in Denver, Colorado, he moved to Atlanta to become counsel to the firm now known as Kilpatrick Townsend for several years before forming his current firm in 1990.  Mr. Canfield's practice has always focused on complex civil litigation.  For at least the last twenty years, he has spent the bulk of his time representing plaintiffs in complex class actions and has served and is currently serving as lead counsel, co-lead counsel, or in other leadership positions in numerous federal and state class actions and MDL proceedings.  He has also written and lectured extensively on class actions.

(5)     Mr. Guglielmo is a partner at Scott + Scott, Attorneys at Law, LLP in New York, which has successfully prosecuted some of the country's largest and most complex class actions.  He has been appointed to leadership positions in numerous class actions and MDLs, including two data breach cases that were recently settled on terms favorable to the financial institution plaintiffs: *WinSouth v. Mapco Express, Inc.,* (M.D. Tenn. 2014), in which he was lead counsel, and *In*

*re Target Corporation Customer Data Security Breach Litigation,* MDL No. 14-2522 (D. Minn.)*,* in which he served on the steering committee.  Mr. Guglielmo is an expert on electronic discovery, a subject on which he frequently lectures, and is a member of the Steering Committee of Working Group 1 of the Sedona Conference®, an organization devoted to providing guidance and information concerning discovery issues involved in litigation.

(6)     Mr. Lynch is a founder of Carlson Lynch Sweet & Kilpela, LLP, a leading national class action firm with extensive experience litigating complex cases across the country.  He has more than twenty years' experience representing plaintiffs in complex matters, including many class actions.  Mr. Lynch has particular expertise in data breach cases, serving on the overall executive committee in the *Target* litigation*;* as plaintiffs' counsel in *First NBC Bank v. Kmart Corp.,* No. 1:14-cv-10088 (N.D. Ill.); as co-lead counsel in *Dittman v. UPMC*, (Allegheny Cty., Pa. No. GD-14-003285); and as chair of the executive committee in *In re Arby's Restaurant Group, Inc. Data Security Breach Litigation,* Lead Case No. 1:17-MI-55555-AT (N.D. Ga.).   Additionally, Mr. Lynch has assisted the Massachusetts Bankers' Association in drafting proposed legislation setting standards for cyber security in the payment card industry.

3

## Creation and Organization of this MDL

(7)     After the Home Depot data breach was discovered in September, 2014, financial institutions filed at least twenty six class actions naming as class representatives twenty-eight different financial institutions. Approximately eighty-six lawyers entered their appearances in the cases. On December 11, 2014, the Judicial Panel on Multidistrict Litigation centralized the cases, along with more than 25 others brought by customers, before this Court. Shortly thereafter, the Court entered CMO No. 1, which set an initial hearing for January 16, 2015, required the parties to file preliminary reports, hold a Rule 26(f) conference before the hearing, and propose a case management plan.

(8)     Mr. Canfield took the lead in corralling the more than 130 plaintiffs' lawyers involved in both the consumer and financial institution cases through numerous mass conference calls and follow up emails, and once the group was organized, complying with the Court's order. Counsel prepared the requested reports and, working cooperatively with plaintiffs' counsel in the consumer cases, held a Rule 26(f) conference with lawyers from Alston & Bird and King & Spalding, who represented Home Depot. The lawyers agreed on a proposed CMO No. 2 to establish a structure for the litigation and direct counsel's continuing efforts.

(9)     At the initial hearing, the Court adopted the parties' proposed CMO No. 2, which established separate tracks for the consumer and financial institution cases; provided for filing consolidated complaints in each track and a schedule for the attendant briefing; required the parties to negotiate several case management orders; and set a deadline for plaintiffs' counsel to apply for leadership positions. The Court also decided to hold monthly status conferences.

(10)   After spirited debate that literally lasted until the last hour before the deadline for submission of applications for leadership positions, all counsel in the financial institutions track agreed to a leadership structure of three co-lead counsel, an 11 member steering committee, and co-liaison counsel.  The Court approved the leadership structure.   An additional lawyer was later added to the steering committee at our request.

(11)   Once the leadership structure was approved, co-lead counsel organized our team to share and most efficiently handle the work.  We appointed six committees -- law and briefing; experts and damages; investigation; plaintiffs' coordination and discovery; defendant discovery; and third-party discovery -- to avoid duplication and enable steering committee members to focus on a particular task.   (An organizational chart showing the committees' membership was submitted *in camera* to the Court by Ranse Partin, co-liaison counsel, along with

the first quarterly time report.)  We also adopted a series of management policies and worked with the plaintiffs' lawyers in the consumer track to agree upon standardized hourly rates for all timekeepers to use.  And we implemented weekly steering committee conference calls to ensure that the case was efficiently prosecuted and keep steering committee members informed of what others were doing.  These calls were held consistently throughout the litigation, except when there were good reasons not to do so.  The committees held their own conference calls as needed to coordinate their work.

(12)   Once our team was organized, we turned to matters that were needed to lay the foundation for prosecution of the case.  For example, in consultation with the consumer lawyers, we interviewed and selected an eDiscovery vendor to handle the voluminous data and documents we anticipated would need to be gathered from our 67 financial institution and association plaintiffs and would be produced by Home Depot and numerous third-parties.  We also interviewed, selected and retained the experts we anticipated needing, including those with expertise in data security, the payment card industry, forensic accounting, and calculating and establishing damages in complex litigation.

### The Consolidated Complaint and Motion to Dismiss

(13)   A huge focus of our work during the spring of 2015 was preparing the

consolidated complaint, which was filed on May 27, 2015.  The complaint was the culmination of a massive team effort and reflected several decisions we made early on.  We knew a key issue in the litigation would be whether a class could be certified.  To improve the chances for success, we decided to seek certification of a national class and, in the alternative, state-specific classes in as many states as we had class representatives. That way, if the Court declined to certify a national class, the case would remain viable.  Working with the Credit Union National Association ("CUNA") and several of its state affiliates, we spent several months identifying banks and credit unions that were willing to serve as class representatives.  The plaintiffs' coordination and discovery committee vetted roughly one hundred financial institutions and in so doing developed a common questionnaire, gathered client-specific data and documents, and interviewed key employees.  Ultimately fifty banks and credit unions in 44 states were named as class representatives.  We also decided to name as plaintiffs CUNA and 16 state associations and leagues to pursue injunctive relief for their members and provide expertise and logistical support.

(14)  The consolidated complaint also reflected the efforts of the investigation committee, whose work allowed us to plead specific and compelling factual allegations.  The committee, along with in-house investigators employed by

steering committee members, surveyed all of the publicly available information about the data breach, such as news articles, online posts, and Home Depot's announcements and securities filings; researched Home Depot's data security practices, prior data breaches, and warnings and alerts issued by Visa, MasterCard, the FBI, and others; located and interviewed those knowledgeable about industry practices and standards; and perhaps most importantly located and interviewed Home Depot's former employees. The results of its investigation were reported to the steering committee in a "white paper" that was routinely updated and used by other committees in planning their activities. For example, the white paper was used by the third-party discovery committee to identify the third-parties and specific documents we would need to subpoena. And the defendant discovery committee used the white paper to develop a comprehensive discovery plan.

(15) The consolidated complaint also reflected the efforts of the law and briefing committee, which prepared a chart of what had happened in prior data breach cases; analyzed the statutes and common law of all 50 states; drafted memos reflecting the key authorities; identified the elements we needed to prove; and using the white paper assessed whether we likely would have the needed evidence. The committee also consulted with academics in data security law to ensure that we did not overlook any developing theories; evaluated the likely

defenses Home Deport would assert; and studied the unique challenges we would face in certifying a class.  Based on the committee's work, we were able to focus the complaint on the best claims and forego many others that we believed were not as strong.  In the end, we asserted claims for negligence, negligence per se based on a violation of Section 5 of the FTC Act, and violations of various statutes in eight states.  We believe the negligence per se claim was novel, but well-founded on existing precedent.

(16)   Home Depot moved to dismiss the consolidated complaint on July 1, 2015 and served a 50 page supporting brief attacking every aspect of Plaintiffs' claims.  Plaintiffs filed a 50 page opposition on August 19, 2015.  Our brief was the result of another team effort, made easier by the vast effort that had gone into preparing the consolidated complaint.  After Home Depot replied, the Court heard the motion on October 22, 2015 along with Home Depot's motion to dismiss the consumers' complaint.  On May 18, 2016, the Court denied the motion in the financial institutions track in virtually all respects.

### Other Work before the Ruling on the Motion to Dismiss

(17)   Even before the filing of the consolidated complaint and continuing through and after the Court's ruling on the motion to dismiss, Class Counsel worked on other aspects of the litigation.  We filed initial disclosures on behalf of

all 67 plaintiffs, a Herculean effort because of the need to communicate with employees for each plaintiff to locate the necessary information and identify the information they possessed. That effort was led by the plaintiffs' coordination and discovery committee. Co-lead counsel also negotiated a joint preliminary report and discovery plan and comprehensive scheduling order with defense counsel and prepared for and attended monthly status conferences.

(18) While discovery was formally stayed in accordance with the local rules, we moved aggressively to do as much of the preliminary work as possible so that once the stay was lifted meaningful discovery could begin immediately. Working with the consumers' lawyers, we had numerous meet and confer sessions with defense counsel from Alston & Bird and King & Spalding to negotiate a discovery protocol and case management orders governing confidentiality, production of documents, electronically stored information, expert discovery and authenticity of documents.

(19) Our defendant discovery committee, in conjunction with the consumers' lawyers, served more than 120 requests for production on Home Depot, which led to lengthy negotiations with defense counsel regarding Home Depot's objections, the scope of the requests, the search terms that would be used in assembling the requested documents, and the custodians whose files would be

searched. The plaintiffs' coordination and discovery committee developed a protocol to respond to document requests from Home Depot. And our third-party discovery committee prepared and served informational subpoenas on nearly 40 third-parties to ensure that documents were not destroyed before the discovery period opened. These subpoenas, in turn, led to extensive discussions with lawyers representing those who received them.

(20)   Another major effort was to determine the best method for proving damages on a class wide basis, one that would survive a *Daubert* challenge, support class certification, and be persuasive to a jury. This effort, which was led by our expert and damages committee, required us to invest a substantial amount of time and money. Our experts, along with representatives of the experts and damages committee and the plaintiffs' coordination and discovery committee, conducted in-depth interviews of a sampling of named plaintiffs across the country to determine how they and their customers were impacted by the data breach. Using the knowledge they gained, the experts then developed a protocol of the information needed to quantify the resulting financial losses, which they refined over time. Their work on a common methodology for proving damages continued through the summer of 2016.

## The Card Brand Recovery Processes

(21)   During the summer of 2015, knowing that Target had used the card brand recovery processes to solicit releases in an attempt to gut the class, we expressed concern to defense counsel that Home Depo would adopt a similar strategy.  Defense counsel initially refused to reveal Home Depot's plans.  Then, in September, 2015, defense counsel told us that while Home Depot had not solicited releases from any financial institutions, it intended to do so going forward.  To deal with our concerns, defense counsel proposed that the parties agree to an order authorizing Home Depot to communicate with class members so long as Home Depot satisfied certain reporting requirements.  We objected to Home Depot's proposed order because in our opinion it did not adequately protect the interests of the class and had no mechanism for addressing the accuracy of Home Depot's communications until after they had occurred.  On October 23, 2015, after the parties could not agree, Home Depot moved for approval of its proposed order. We opposed the motion in a brief filed November 6, 2015.

(22)  Unbeknownst  to  Class  Counsel,  Home  Depot  was  already communicating with class members, both directly with the largest banks and indirectly with smaller financial institutions through Visa and MasterCard.  On November 25, 2015, the day before Thanksgiving, we learned that financial

institutions were being told they had a few days to decide whether to release their claims, but were not given basic information needed for an informed decision, such as the amount they would be paid for a release.  We immediately sought relief, triggering another round of briefs leading up to a hearing on December 14, 2015. At the hearing, the Court decided to approve Home Depot's proposed order, agreed with us that the communications we brought to its attention were coercive and misleading, and opened discovery so Plaintiffs could learn what was happening and, if appropriate, seek to invalidate the releases Home Depot obtained.

(23)   Class Counsel immediately served discovery requests and deposition notices on Home Depot, Visa, MasterCard and others involved.  Home Depot and most of the third-parties resisted vigorously, delaying responses, opposing depositions, objecting to virtually every one of our requests, and failing to provide much of the information and documents we sought on the ground that allegedly it was outside the scope of what the Court had allowed.  We were forced to repeatedly seek relief from the Court, which held several telephone conferences and an in-person hearing on January 28, 2016 during which the Court ordered Home Depot to provide most of the discovery to which it had objected.   Home Depot also took some aggressive steps to complicate the process.  For example, Home Depot moved to depose co-lead counsel, arguing that our communications

with absent class members were relevant to the issue of whether they were being coerced or misled.  Home Depot also moved to quash a subpoena in the Southern District of New York, which they refused to transfer here until the Court intervened.  We responded to these motions.  Over the course of an intense several months, Class Counsel took seven depositions in four states; filed at least five briefs; engaged in lengthy negotiations with counsel for Home Depot and third-parties; and reviewed thousands of documents, all under time pressure, because of the limited time for discovery.

(24)   While discovery proceeded, Home Depot continued to obtain releases from financial institutions through the card brand recovery processes.  To ensure that financial institutions had adequate information about their options, we directly advised each of the 50 class representatives and 17 association plaintiffs, conducted mass conference calls with hundreds of additional banks and credit unions, worked with industry associations to educate their members, and responded to questions from putative class members.  After we began these efforts, relatively few financial institutions chose to release their claims.

(25)   Mostly through settlements with the largest banks, Home Depot succeeded in obtaining releases that covered all but roughly 10 million of the 56 million cards that were reportedly compromised in the data breach.  Through the

14

card brand recovery processes, Home Depot paid more than $134 million to financial institutions, of which $14,528,000 was specifically paid for releases of the claims being asserted here.   Home Depot separately paid millions more to American Express and Discover, which are independent of Visa and MasterCard and thus do not participate in the recovery processes.

## **Mediation and Settlement**

(26) In May, 2016, once the Court largely denied Home Depot's motion to dismiss, we intensified our preparations for merits discovery, drafting written discovery and finalizing a comprehensive discovery plan during a two-day meeting of the steering committee.   Shortly after Home Depot answered the complaint on June 17, 2016, the parties agreed to discuss settlement, Home Depot moved for leave to pursue an interlocutory appeal, and further proceedings were stayed.   The parties also agreed to exchange needed information and selected former federal judge Wayne Andersen of the Chicago office of JAMS as the mediator.

(27)  Mediation was set for July 28, 2016 in Chicago.   We prepared extensively, analyzing the information received from Home Depot, gathering needed data and documents from our clients, and working with the experts to estimate class wide damages.   Little progress was made at the mediation.   A second mediation on August 22, 2016 was also unsuccessful.   At a status

conference on September 9, 2016, after the parties reported the prospects for settlement were slight, the Court lifted the stay so that discovery could proceed.

(28)   With the opening of discovery, Class Counsel immediately moved forward to implement our discovery plan.  The third-party discovery committee began serving subpoenas on dozens of third-parties. The defendants' discovery committee finalized a comprehensive set of interrogatories to Home Depot and restarted negotiations with defense counsel regarding the scope of our document requests, search terms, and custodians.  And the law and briefing committee drafted a response to Home Depot's motion for leave to file an interlocutory appeal from the Court's order on the motion to dismiss, a task that had been put off when the deadline had been stayed pending the outcome of settlement discussions.

(29)   During September, 2016, as the pace of the proceedings accelerated, the parties decided to renew settlement negotiations with a new mediator.  The parties selected Edward Infante, a former federal magistrate judge from San Francisco who has successfully mediated countless class actions.  The parties had a third mediation on October 6, 2016, which did not result in a settlement, but negotiations continued under Judge Infante's supervision.  After an impasse occurred, Judge Infante made a "mediator's proposal" to settle the major issues in the case and gave the parties until October 24, 2016 to respond.  Each side

accepted.   Thereafter, the parties negotiated the remaining issues (including the $2.25 million in compensation for sponsored entities), entered into a terms sheet on January 10, 2017, and executed a comprehensive settlement agreement on March 8, 2017.   The process of drafting the agreements and its numerous exhibits, including the allocation formula, notices and claim forms, was complex and detailed.   We also interviewed several firms to serve as the settlement administrator and together with counsel for Home Depot ultimately selected Angeion.

(30)   Since the settlement agreement was executed, Class Counsel have spent considerable time preparing the preliminary and final approval papers, overseeing the notice and claims process, communicating with our clients about the settlement, and assisting class members in filing claims.

(31)   Class Counsel faced substantial risk in bringing this case.   To our knowledge, as of the time this MDL was established, no financial institution had ever succeeded in recovering damages from a merchant as a result of a data breach and no court had ever certified a class in such claim.   The case thus involved a host of difficult and novel issues.   These issues included whether Home Depot owed financial institutions a duty to protect their customers' financial information; whether Plaintiffs could state a claim for negligence per se based on Section 5 of

the FTC Act (we believe the Court's decision to permit the claim is the first to do so); whether the economic loss rule bars Plaintiffs' claims; whether a merchant can circumvent Rule 23 by using the card brand recovery processes; and whether a national class of financial institutions can be certified.

(32)   Proper case management and effective representation in any complex class action, particularly one seeking certification of a national class of financial institutions, requires the highest level of experience and skill. This case certainly was no different. Class Counsel had the necessary experience and skill.   The impressive qualifications of the leadership team appointed by the Court are set forth in the Application of the "Consensus Group" that we filed before our appointment.  (Doc. 50)  The leadership team is comprised of many of the nation's preeminent law firms that specialize in bringing class actions for plaintiffs, has vast experience in multidistrict litigation and data breach litigation, and includes lead counsel from all of the other data breach cases in which financial institutions have prevailed.

(33)   If Class Counsel had not taken on this case, we would have been able to spend the time on other matters.  And, for some of us, having undertaken the responsibility for prosecuting this action we ended up turning down other business.

(34)   Complex civil litigation of this magnitude, if brought at all, typically

is handled on a contingent fee because all but the largest businesses are unwilling to pay the substantial hourly rate fees involved, particularly when the potential returns for any one business do not justify the risk and a class action is the only viable option.   Such fees typically range from one-third to 40 percent of the recovery.   Consistent with this practice, some lawyers in the leadership group entered into agreements with named class representatives that provided for a contingent fee of one-third of any recovery.

(35)   This action was prosecuted entirely on a contingent basis.   If Class Counsel had not achieved a recovery, we would have received nothing and, in fact, we would have suffered a substantial out-of-pocket loss because we are advancing all the expenses and would not have been reimbursed if the case did not result in a recovery.   We anticipated that the total out-of-pocket expenses, if the case had gone through the discovery process and been tried, could exceed $5,000,000.

(36)   Class Counsel, at times, worked under considerable time pressure. That is often the case in complex litigation of this sort.   However, the time pressure was particularly and atypically intense during the period when Home Depot was using the card brand recovery processes to solicit releases from class members, we asked the Court to intervene, and the Court opened discovery to find out what was happening.   In 2015, Class Counsel had to work through the Thanksgiving

19

weekend to prepare the papers seeking immediate relief and over the Christmas holidays in the discovery effort.

(37)   In accordance with the Court's directive, each month during the course of this litigation, members of the leadership team have reported their time and expenses to Mr. Partin using a common methodology.  Each quarter, Mr. Partin consolidated the time and billing information and provided it to the Court for *in camera* inspection.

(38)   The value of the time shown on the reports is calculated using the same standardized rates that were used by the consumer lawyers and that the Court determined were reasonable in its order awarding them a fee. (Doc. 261 at 2-3) These rates are set forth in the declaration of Mr. Partin which is being submitted in support of Plaintiffs' fee application.   These rates are consistent with the rates typically approved in complex litigation of this nature.  And the rates are consistent with, if not below, the rates charged by competent lawyers in Georgia who handle such litigation.  For example, Mr. Canfield's customary hourly rate for work that he handles on an hourly basis is $750 per hour, a rate that private clients have paid in several matters during the last year.  That is the same rate at which his time is valued under the standardized rates set forth above.

(39)   At the outset, we established policies to prevent excessive and

inappropriate billing that, among other things, precluded anyone from billing time for work that had not been approved in advance by co-lead counsel, limited the number of people who could participate in certain tasks, and barred the use of contract lawyers.   For example, absent approval from co-lead counsel or compelling circumstances, only one person from each firm was allowed to bill for time on conference calls.  We also cautioned lawyers on the team that we would audit their time and we would not credit inappropriate or excessive billing in allocating any fee that resulted from the litigation.  As a result, lawyers had an incentive to be as efficient as possible.

(40)   In June, 2017, the three of us met face to face over a two day period in New York City to review the time reports that Mr. Partin furnished to the Court through the end of May, 2017.  The reports were collected in large binders.  To ensure the time was properly billed, we personally reviewed every entry by each timekeeper.   We excluded 680 hours valued at $333,012.50 as duplicative, unauthorized, or of insufficient benefit to the class. We created a spreadsheet of the excluded entries.  Mr. Partin will submit it *in camera* for the Court's inspection.

(41)   According to Mr. Partin, as of July 31, 2017, the last date for which time has been collected, Class Counsel have collectively reported having spent 21,975.22 hours on this litigation, and the value of this time, calculated using the

standardized rates set forth above, is $11,856,944.85.   Subtracting the lodestar of

$333,012.50 that we disallowed based on our audit in June, Class Counsel's total

lodestar as of July 31, 2017 is $11,523,932.35.   This time was reasonably and

necessarily incurred in prosecuting this case, particularly considering how the case

was defended and the results obtained.

(42)   Since July 31, 2017, we have continued to work on this matter and

have been engaged in such tasks as overseeing the settlement administration,

assisting class members in filing claims, communicating with clients, working on

the papers to be submitted before the final approval hearing, and other settlement-

related matters.   We also anticipate that we will do more work on this matter

between now and when the settlement is consummated preparing for and attending

the final approval hearing; finalizing all of the attendant papers, including a

proposed order; working with the settlement administrator; communicating with

clients; overseeing payment of benefits to class members; and otherwise wrapping

up the litigation.   We estimate that this additional time already spent and to be

spent after July 31, 2017 will have a value of $250,000.

(43)   Consequently, Class Counsel's cumulative lodestar – reflecting all

time recorded through July 31, 2017, the value of the time that we have spent to

date and the value of the time we anticipate spending in the future minus the time

that we excluded in our audit – is $11,773,932.35.

(44)   We believe that a higher multiplier than the 1.3 multiplier applied by the Court in awarding a fee to the consumer lawyers is appropriate because our risk and investment were significantly larger.  Among other things, when these cases were filed, to our knowledge there had never been a successful data breach case brought by financial institutions while consumers had succeeded in previous data breach cases.  (See Doc. 226-2)  Further, the consumer lawyers did not face the prospect that Home Depot would use the card brand recovery processes to solicit releases, potentially causing the remaining claims to be financially unviable if Home Depot had obtained releases covering a large enough percentage of the compromised cards.  That would have happened if the damages suffered by the financial institutions that did not release their claims were not enough to justify the risk and expense of continued litigation.  Moreover, because Home Depot in fact attempted to obtain releases outside the MDL, Class Counsel had to spend substantial time on discovery and legal issues that the consumer lawyers did not. Finally, the financial institutions' claims are inherently more complex and costly than those brought by individual consumers.

(45)   To date, Class Counsel have incurred $710,257.86 in expenses in connection with this litigation, according to Mr. Partin.  These expenses include

23

those paid out of the litigation account that we established at the beginning of the litigation.  The account, which has been maintained under Mr. Partin's control, has been funded by periodic assessments made by co-lead counsel and been used to pay common expenses, such as the fees of expert witnesses, court reporters, and the like.  The expenses discussed above do not include items typically billed by many lawyers, such as in-house copying, computerized legal research, long distance telephone calls, and postage.  We decided at the beginning of the litigation not to authorize such expenses.

(46)   We strongly support the proposed service awards of $2,500 to the class representatives.  The awards are both modest and justified.  Each financial institution class representative devoted substantial time to this litigation by participating in drafting and reviewing pleadings; assembling documents and other information needed by class counsel for their initial disclosures and to otherwise prosecute the litigation; gathering information and data needed by the damages experts; and communicating with counsel regarding the status of the litigation and settlement efforts.  Moreover, but for their service, other class members would receive nothing.

(47)  We are aware of eight data breach cases brought by financial institutions that have been resolved, including this one.  The cases are summarized

24

in the chart attached to this declaration as Exhibit A.  Of the eight cases, four resulted in plaintiff defeats and four were settled.  As the chart demonstrates, we believe that the proposed settlement in this case exceeds in value the settlements in the three other cases that settled for several reasons.  First, the fund in this case is larger than the fund in *Target* and dwarfs the size of the funds in *Mapco* ($700,000) and *Kmart* ($5.2 million).  The *Target* settlement thus is the only true comparable.  Second, class members in this case are entitled to receive $2.00 per card ***and*** up to 60 percent of their unreimbursed, uncompensated losses if shown by documentation.  In contrast, in *Target,* class members were entitled to only $1.60 per card without documentation ***or*** up to 60 percent of their unreimbursed, uncompensated losses if shown by documentation.  Third, while class members in *Target* received 100 percent of the MasterCard assessment in its card brand recovery process because Target agreed to drop its objections to the assessment in exchange for releases from the class members as part of the settlement, financial institutions received less than 100 percent of the Visa assessment, even those that gave Target a release.  Here, Home Depot paid 100 percent of both assessments as well as a premium for releases.  Fourth, the settlement in this case is the only one that obtained relief for financial institutions that previously released their claims.

(48)    Ropes & Gray is a law firm that defends retailers in data breach cases

and represents them in connection with card brand recovery processes initiated by Visa and MasterCard.  The firm represented Home Depot in its dealings with the card brands following the data breach at issue in this action.  In defending another data breach case pending in this district, Ropes & Gray filed a brief entitled Defendant's Response to Financial Institution Plaintiffs' Statement Regarding Local Rule 23.1.  *In re: Arby's Restaurant Group, Inc. Data Security Litigation,* Case No. 1:17-CV-514-AT (Doc. 69 filed 7/11/17).  In the brief, which is attached as Exhibit B, Ropes & Gray makes the following statement:

> in just *four* of the thousands of *other* payment card breaches during the last ten years (namely the four largest payment card breaches in history, each of which involved more than 40 million payment cards), the affected issuers received settlement offers *en masse* that if accepted by an issuer would release the issuer's claims against the breached merchant.

*Id.* at 3 (emphasis in the original).  The four instances in which a merchant solicited mass releases through the card brand recovery processes are this case and those involving TJX, Target and Heartland.  *Id.* at 5-6.  In each instance, the solicitations occurred after financial institutions had filed class actions against the merchant similar to those we are prosecuting and an MDL had been established. *See* Exhibit A.

(49)  We received an email from Cari Dawson of Alston & Bird on behalf of Home Depot on December 16, 2015 forwarding to us the template offers that

26

Home Depot had used to solicit releases from the larger financial institutions in conjunction with the first phases of the card brand recovery processes.  The email and its template offers are attached as Exhibit C.  The templates show that the offers specifically referred to the claims in this litigation, contained a two-page, single spaced description of this litigation and the claims being asserted that was entitled "Information Regarding Putative Class Action," and attached a copy of the consolidated complaint that we filed.  The template release also referred to and specifically includes the claims asserted in the MDL.

(50)   On January 4, 2016, Cari Dawson sent a letter on behalf of Home Depot to the Court describing the substance of the communications that would accompany Home Depot's solicitations to financial institutions in the second phase of the Visa and MasterCard card brand recovery processes.  A copy of the letter is attached as Exhibit D.  In the letter, Ms. Dawson explains that the solicitations would contain the same two-page document sent to the large banks describing this litigation and that the releases would specifically cover the claims being asserted here.  Further, on January 8, 2016, Ms. Dawson sent a letter brief to the Court that states on its second page that Home Depot would be providing a copy of the consolidated complaint along with its solicitations.  A copy of that letter along with two of its exhibits containing the proposed solicitations packages is attached as

Exhibit E.

(51)   We anticipate that the final costs of notice and administration will be approximately $125,000 based on the latest information from the settlement administrator.

(52)   We had ample information to evaluate the strengths and weaknesses of the case and the merits of the settlement based upon our extensive experience, pre-suit investigations, interviews of Home Depot insiders and other witnesses, legal analysis, consultations with our experts and clients, the results of the discovery that was done, our analysis of the information produced by Home Depot during the mediation process, and the work done by us and our experts to determine damages.

(53)   We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge, information, and belief.

Dated:  August 23, 2017

/s/ Kenneth S. Canfield
Kenneth S. Canfield

/s/ Joseph P. Guglielmo
Joseph P. Guglielmo

/s/ Gary F. Lynch
Gary F. Lynch