**Joint Declaration of Co-Lead Counsel**

# Exhibit B
**Defendant's Response to Financial Institution
Plaintiffs' Statement Regarding Local Rule 23.1**

*In re:  The Home Depot, Inc. Customer Data Security Breach Litigation*
*This Document applies to Financial Institution Cases*
U.S.D.C., N.D. Georgia, Atlanta Division
Civil Action No. 1:14-md-02583-TWT

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| Midwest American Federal Credit Union, *on behalf of itself and others similarly situated*,<br><br>        Plaintiff,<br><br>v.<br><br>Arby's Restaurant Group, Inc.,<br><br>        Defendant. | Civil Action No. 1:17-CV-514-AT |
| In re: Arby's Restaurant Group, Inc. Data Security Litigation<br><br>CONSOLIDATED FINANCIAL INSTITUTION CASE | Case No. 1:17-cv-514-AT |

## DEFENDANT'S RESPONSE TO FINANCIAL INSTITUTION PLAINTIFFS' STATEMENT REGARDING LOCAL RULE 23.1

## I.    INTRODUCTION

Defendant Arby's Restaurant Group, Inc. ("Arby's") hereby responds to the brief ("Pls.' Stmt." or "Statement") filed by counsel for the Financial Institution Plaintiffs (the "Banks") on June 23, 2017.  The Statement asks the Court to enter an order under Local Rule 23.1 restricting settlement communications they speculate *might* someday be made by Arby's to members of their putative, as-yet uncertified class consisting of banks, credit unions and financial institutions.   The Banks, however, have adduced no evidence whatever that these sophisticated entities are somehow in need of a Rule 23.1 Order protecting them against hypothetical settlement communications by Arby's.  And, indeed, in prior financial institution class actions of this sort, *no such injunction has ever been entered*.

Local Rule 23.1(C)(2) is clear: an order limiting communications must be based on a showing that "imminent and irreparable injury to one of the parties" is "likely."  The reason for that extremely high bar is obvious:  a Rule 23.1 Order imposes a prior restraint on speech that impacts the First Amendment rights of the parties.   The Supreme Court has specifically cautioned against the "potential interference with the rights of the parties" to speak freely that orders restricting communications with absent class members may impose.  *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 101 (1981).  Where as here no such communication is imminent, no

such restraint may be imposed.  And even if such a communication *were* imminent here (which it is not), the Banks make no showing that the surmised future communication is "likely" to be misleading or coercive or (even if it were) also "likely" to cause any injury that would be "irreparable."  Absent a showing of "injury" that is "likely" *and* "imminent" *and* "irreparable," no restraint on communications with absent class members may be imposed and, accordingly, no Rule 23.1 Order should be entered.

## II.   FACTUAL BACKGROUND

The basic scenario before the Court – where a merchant like Arby's suffers a payment card data security incident – arises hundreds of times each year and triggers a contractual process under rules set by Visa and MasterCard in which (i) Visa and MasterCard collect information about the incident and about incident-related financial losses allegedly incurred by issuers of Visa- and MasterCard-branded payment cards like the Banks; (ii) Visa and MasterCard then may contractually impose on and collect from the merchant "assessments" purportedly representing their issuers' financial losses from the incident; and (iii) Visa and MasterCard then distribute those assessments to their issuers pursuant to their contracts with them. Here, the Banks seek to assert direct claims against Arby's, independently of those contractual Visa and MasterCard processes, claiming damages above and beyond

whatever distributions they may receive by means of those processes.

Moreover, the Banks assert these claims not only on behalf of themselves, but on behalf of a putative class consisting of *every Visa and MasterCard issuer in the United States* (including financial giants like Bank of America, Citibank, JPMorgan Chase, and Capital One) and other large payment card issuers as well (like American Express and Discover).  The Banks now request an injunction prohibiting Arby's from having *any* settlement communications with *any* of those absent class members without prior Court approval.  They base that request not on the actual facts in *this* case, but on the fact that in just *four* of the thousands of *other* payment card breaches during the last ten years (namely the four largest payment card breaches in history, each of which involved more than 40 million payment cards), the affected issuers received settlement offers *en masse* that if accepted by an issuer would release the issuer's claims against the breached merchant.  But *this* case bears no resemblance to those four *sui generis* cases and even if it did, in none of those four cases did the court issue an order like the one sought here, because the law does not permit it.

A.  **The Post-Incident Card Brand Processes.**

The Visa and MasterCard Operating Regulations each include a program that, according to Visa and MasterCard (the "Card Brands"), allows them to impose monetary assessments on a merchant (via its acquiring bank) following an "account

data compromise event" if certain criteria are met.[1]  The stated objective of these programs is to provide issuers of Visa- and MasterCard-branded payment cards, such as the Banks, with compensation for operational and fraud losses they may incur as a result of such an event.  MC Rules 10.2.5.3; Visa Rules 10.11.

Before any assessment is issued, the Card Brands follow a multi-step process that may or may not result in an assessment, depending on the facts of the individual case.  *See* MC Rules 10.2; Visa Rules 10.10.  Following a security event, the Card Brands send alerts to their issuers identifying payment cards they believe may have been at risk of compromise in the event.[2]  The Card Brands also investigate the event and solicit information from their issuers regarding any fraudulent activity on the alerted-on cards.  ADC Guide 22–23, 32–34; Visa Rules 10.3.1; Visa GCAR Summ. 2–3.  Based on that information, the Card Brands consider whether an assessment is merited and, if so, calculate and collect the amount.  ADC Guide 37–49; Visa GCAR

---

[1] Decl. of Mark P. Szpak ("Decl."), Ex. B (ECF No. 57-3), MasterCard Security Rules and Procedures, Merchant Edition (Sept. 20, 2016) ("MC Rules") 10.2.5; Decl., Ex. A (ECF No. 57-2), Visa Core Rules and Visa Product and Service Rules (Apr. 15, 2015) ("Visa Rules") 10.11.

[2] MasterCard Account Data Compromise User Guide (Feb. 4, 2016) 25 ("ADC Guide"), *available at* https://www.mastercard.us/content/dam/mccom/en-us/ documents/account-data-compromise-manual.pdf; Visa Rules Glossary-740 (defining "CAMS Alert"); *see also* Visa Global Compromised Account Recovery Program (Sept. 12, 2013) 2 ("Visa GCAR Summ."), *available at* http://www.paymentworld.com/docs/training/visa/what-every-merchant-should-know-GCAR-VOL-091213-final.pdf.

Summ. 2–3.  The Card Brands then distribute the collected assessment to their issuers.  ADC Guide 52–53; Visa GCAR Summ. 3.

### B.  Status of Post-Incident Card Brand Process as to Arby's.

Here, the Card Brands issued alerts earlier this year listing approximately ███████ MasterCard accounts and approximately ██████████ Visa accounts that they believed may have been put at risk of compromise in the Arby's incident. Paniagua Decl. ¶ 3.[3]  The Card Brands have not yet issued any assessments, *id.* ¶ 4; under the Card Brands' procedures, Arby's is still several steps and multiple months away from that point in the process.  Thus, currently it is unknown whether either brand will issue an assessment or what might follow if that happens.

### C.  Cases in Which the Settlement of Visa or MasterCard Assessments Included Requests for Issuer Releases.

This case contrasts dramatically with the cases that the Banks point to as the basis for a Rule 23.1 Order.  As noted, there have been only four instances out of the thousands of payment card security events during the last ten years in which settlement offers were communicated *en masse* to the issuers of the Visa and MasterCard accounts believed to have been placed at risk by the event.  *These were the four largest payment card breaches in history*: TJX, Heartland, Target, and

---

[3] Arby's disputes that as many as ██████████ Visa- and MasterCard-branded cards were put at risk, but that dispute is immaterial to the issue now before the Court.

Home Depot – each involving more than 40 million at-risk cards. Here, by comparison, Visa and MasterCard issued alerts on only ▮▮▮▮▮ cards total.

Moreover, in the four other cases the settlement offers were communicated to the issuers not by the merchant in question, but by Visa and MasterCard, pursuant to settlements resolving Visa and MasterCard assessments. There has never been an instance in which a breached merchant directly made *en masse* settlement offers to the issuers affected by the breach; nor could that ever happen because the merchant (unlike Visa and MasterCard) is not in privity with the issuers and has no ability to reach out to them directly *en masse*. Further, neither Visa nor MasterCard has ever entered into a settlement calling for it to make an *en masse* settlement offer to its issuers where the event involved fewer than 10 million cards. Nor is there any reason to expect that Visa or MasterCard would ever enter into such a settlement here, as the administrative burden involved in agreeing to such a settlement, then sending out settlement offers to thousands of issuers, and then communicating back and forth with those issuers as to those offers, makes it cost-prohibitive to do so unless the event is a mega-breach of the sort that occurred in *Target* and *Home Depot*.

Moreover, in the four cases where settlement offers *were* made *en masse* to the affected issuers, the Card Brand assessments had already been imposed, and the merchant and the Card Brands had thereafter negotiated a settlement of those

6

assessments that provided for the Card Brands to make *en masse* settlement offers to their issuers.  Here, in contrast, no Card Brand assessment has occurred, much less any settlement of any such assessment, nor is any such assessment likely to be imposed any time soon.  At this juncture then, it is sheer speculation as to whether such an assessment will even occur and as to what may thereafter ensue.

Finally, and most fundamentally, in *none* of these four cases did the court issue an order restricting settlement communications to the issuers:

1.     In *TJX*, the issuing bank plaintiffs did not even argue that the proposed *en masse* settlement offer to the absent class members should be limited, and no such order was entered.  *See* Decl. of Mark P. Szpak ("Szpak Decl."), Ex. A, Tr. of Mot. Hr'g, *In re TJX Cos. Retail Sec. Breach Litig.*, No. 07-10162 (D. Mass. Dec. 21, 2007), ECF No. 300 ("*TJX* Tr.").  The *TJX* Court in fact praised TJX's settlement with Visa and the *en masse* settlement offer to Visa issuers called for by that settlement as a "bold, innovative, and . . . important" step in resolving disputes of this sort with minimal transaction costs for the banks involved.  *Id*. 29.

2.     In *Heartland*, the issuing bank plaintiffs strove mightily to prevent the *en masse* settlement offer by Visa to its issuers called for by Visa's settlement with Heartland, by bringing an emergency motion to "stay" the communication just as it was about to go out.  Emergency Mot., *In re: Heartland Payment Sys. Inc. Customer*

7

*Data Sec. Breach Litig.*, No. 09-MD-2046 (S.D. Tex. Jan. 11, 2010), ECF No. 61-1. The *Heartland* Court, however, rejected the challenge, ruling that the communication was neither misleading nor coercive, which allowed the settlement communication to proceed. Order, *Heartland* (Jan. 19, 2010), ECF No. 66; Szpak Decl., Ex. B, Tr. of Mot. Hr'g 36–37, 39–41, *Heartland* ("*Heartland* Tr.").

3. In ***Target***, after MasterCard and Target reached a settlement under which MasterCard agreed to make an *en masse* settlement offer to its issuers, the issuing bank plaintiffs sought an injunction barring that offer from being communicated, which the court *denied*. *In re Target Corp. Customer Data Sec. Breach Litig.*, No. MDL 14-2522, 2015 WL 2165432, at *1 (D. Minn. May 7, 2015) ("The law permits a defendant or a non-party to communicate with and to settle with putative class members at any time before class certification without Court approval or input as long as those communications are not misleading or coercive."). The Banks assert that the communications at issue in *Target* were inaccurate and misleading, but they cite to no finding by the court – instead they cite to the *brief filed by the plaintiffs* in that action, omitting reference to the *order of the* Target *court* denying their request and expressly finding that the communications at issue were not misleading or coercive. *See* Pls.' Stmt. 10 (citing *Target* ECF No. 389); *cf. Target*, 2015 WL 2165432, at *1 ("The statements MasterCard communicated to the

8

putative class are not misleading.  And the record is bereft of any evidence of coercion.").[4]

4.    In **Home Depot**, Home Depot itself proposed an order acknowledging that settlement discussions with issuing banks were underway, but the plaintiff financial institutions requested (much as the Banks do here) that the court instead proscribe any such communication that requested a release, as well as any "mass offer of settlement"[5] to issuers that had not been pre-approved by the plaintiffs or the court.  However, despite what the Banks say in the Statement, the plaintiffs' proposed order in *Home Depot* was *not entered* and the court did not impose

---

[4] During the conference in this case on June 28, 2017, the Banks further misdescribed the ruling in *Target*, telling the Court that "[T]he *Target* court did not find that it was okay for them to do what they were doing.  What the *Target* court said is there is not enough information in the record.  And the *Target* court also said that it looked like the offers were unfair there."  Tr. of June 28, 2017 Conf. ("Conf. Tr.") 13:10–13. To the contrary, while Judge Magnuson in *Target* expressed displeasure with the substantive terms of MasterCard's *en masse* settlement offer to its issuers, he clearly recognized that any order intervening in such communications was subject to a very high standard that had not been met.  *See Target*, 2015 WL 2165432, at *1–3 (noting that "[t]he court has almost no authority to oversee" settlements with putative class members prior to class certification and holding that the "standard [was] simply too high to allow the Court to intervene").  The Banks imply the case settled "[b]efore plaintiffs could supplement the record" regarding these issues, Pls.' Stmt. 12, but the case did not settle for several months, with plenty of time for the plaintiffs to submit evidence if they had any.  *See* Settlement Agreement and Release, *Target*, No. MDL 14-2522, (Dec. 2, 2015), ECF No. 653-1.

[5] Pls.' Resp. to Defs.' Mot. 3–4, *Home Depot*, No. 14-MD-2583 (N.D. Ga. Nov. 6, 2015), ECF No. 142.

plaintiffs' requested restrictions.  *See* Ex. 2 to Pls.' Stmt. ("*Home Depot* Tr.") 59–60.  Rather, Judge Thrash entered *Home Depot's* proposed order *acknowledging*, but *without restricting*, the communications with putative class members then underway.  *Home Depot* Tr. 59:12–15; Order 2, *Home Depot*, ECF No. 154.

In the Banks' attempt to argue that *Home Depot* supports entry of a Rule 23.1 Order *in this case* (even though the same order was *not entered* in *Home Depot*), they fundamentally mischaracterize Judge Thrash's comments.  According to the Banks, at a hearing in *Home Depot*,

> Chief Judge Thrash commented: "[I]t's **clearly coercive** in giving people two days to either accept or reject or opt in or opt out … over the Thanksgiving holidays."; and "[I]t's clear to me that the communications that [Home Depot] attached to [its] papers are **misleading and coercive** in not giving [HD FI plaintiffs] the information they would need to make a decision about whether or not to release their claims against Home Depot."

Pls.' Stmt. 14 (emphasis and alterations in original).  In fact, the document referenced by Judge Thrash was attached to the *plaintiffs'* papers, not Home Depot's, but more importantly, it was *not* a communication by Home Depot.  *Home Depot* Tr. 60:14–19.  Rather, it was a communication *from one class member to another* (specifically, from one issuing bank to another issuing bank that it sponsored).  Email from Shirley Davis at Phenix-Girard Bank to MasterCard issuers, *Home Depot*, No. 14-MD-2583 (N.D. Ga. Dec. 1, 2015), ECF No. 149-7.  Moreover, Judge

10

Thrash deferred any action with respect to that communication until after discovery as to it was complete, *Home Depot* Tr. 59:18–24 – and no order was ever entered.[6]

In short, far from demonstrating that a Rule 23.1 Order should enter here, *TJX*, *Heartland*, *Target*, and *Home Depot* demonstrate the opposite, as no such order was entered in any of those cases, or, indeed, in any of the other data security cases in which financial institution plaintiffs have initiated putative class action litigation.[7] And, of course, even if those four cases supported entry of *some sort* of Rule 23.1 Order here (which they do not), those cases would not support entry of *the Banks' proposed* Rule 23.1 Order, as that proposed order is not limited to *en masse* settlement communications such as occurred in *TJX*, *Heartland*, *Target*, and *Home Depot*, but rather would prohibit *any* settlement communication between Arby's and *any* absent class member without prior Court approval. Proposed Order 3 (restricting "[a]ny communication seeking the resolution or release of any claims").

---

[6] The Banks further assert that Judge Thrash "indicated a willingness to entertain . . . invalidation of the releases"; agreed with the plaintiffs' assessment of the purported "deceptive communications scheme," Pls.' Stmt. 14; and suggested that communications from Home Depot itself were misleading and deceptive, *id.* at 16. In fact, none of the communications discussed as potentially abusive was found to have been sent or "overseen" by Home Depot or its counsel, despite the Banks' contentions, *see* Conf. Tr. 13:14–23, and Judge Thrash rendered no ruling and offered no opinion about any communication actually from Home Depot.

[7] *See, e.g.*, *SELCO Cmty. Credit Union v. Noodles & Co.*, No. 16-cv-2247 (D. Colo.); *First Choice Fed. Credit Union v. The Wendy's Co.*, No. 16-cv-506 (W.D. Pa.); *Greater Chautauqua Fed. Credit Union v. Kmart Corp.*, No. 15-cv-2228 (N.D. Ill.).

## III.   LEGAL STANDARD

The Local Rules provide for a Rule 23.1 Order only in the rare circumstance when "the record before the court" establishes that the absence of an order limiting communication between the parties and members of a putative class not yet certified "would likely result in imminent and irreparable injury to one of the parties."  L.R. 23.1(C)(2); *see Abdallah v. Coca-Cola Co.*, 186 F.R.D. 672, 675 (N.D. Ga. 1999). Similarly, Fed. R. Civ. P. 23(d) permits an order limiting communication only upon "a specific record showing by the moving party of the particular abuses by which it is threatened."  *Gulf Oil*, 452 U.S. at 102; *see Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1205 (11th Cir. 1985) ("an order limiting communications" must be "grounded in good cause and issued with a heightened sensitivity for first amendment concerns") (internal quotation marks and citation omitted).

Because "[p]re-certification communications to potential class members by both parties are generally permitted, and also considered to constitute constitutionally protected speech," *Bennett v. Advance Cable Contractors, Inc.*, No. 12-CV-115, 2012 WL 1600443, at *10 (N.D. Ga. May 7, 2012) (citation omitted), Rule 23(d) restrictions on such communications are permitted only to prevent serious misconduct and "must be based on 'a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the

rights of parties,' or run the risk of imposing an unconstitutional prior restraint on speech." *Maddox v. Knowledge Learning Corp.*, 499 F. Supp. 2d 1338, 1342 (N.D. Ga. 2007) (quoting *Gulf Oil*, 452 U.S. at 101); *see Abdallah*, 186 F.R.D. at 675 ("[L]imitations on communications with the putative class must be narrowly drawn to have the least impact on the parties' First Amendment freedoms.") (citing *Bernard v. Gulf Oil Co.*, 619 F.2d 459, 476 (5th Cir. 1980)). Moreover, before such an order can issue, such "serious misconduct" must *in fact* be threatened or imminent. L.R. 23.1(C)(2). "[C]ourts have routinely recognized that the moving party must present an evidentiary showing of actual or threatened abuse by the party sought to be restrained." *Mey v. Interstate Nat'l Dealer Servs., Inc.*, No. 14-CV-01846, 2015 WL 12978151, at *2 (N.D. Ga. Apr. 29, 2015); *see also Gulf Oil*, 452 U.S. at 104 ("the mere possibility of abuses does not justify routine adoption of a communications ban . . . in the absence of a clear record and specific findings of need").

## IV.   ARGUMENT

The Banks fail to meet the extremely high bar set by Local Rule 23.1(C)(2) and the applicable case law for obtaining the order they seek – an injunction restraining the content of Arby's speech. The Banks' ground for claiming that they are "likely" to suffer an "imminent and irreparable injury" if a Rule 23.1 Order does not enter here is "the history of what has occurred in cases substantially similar to

13

this one."  Pls.' Stmt. 5.  The Banks thus provide no evidence or facts *about this case*, but instead blithely assert based on *other cases* that Arby's "will likely seek to preclude class members from participating in this case by attempting a misleading classwide settlement *and release* of the class claims in this case under the guise that the settlement is part of the so-called Card Brand Recovery Processes."  *Id.*  They also claim without basis that any settlement communication from Arby's to any member of their uncertified putative class would necessarily be coercive and/or misleading.  *Id.* at 8–9.  But, the Banks offer no *evidence* that a coercive and/or misleading settlement communication is likely; that any such communication would likely injure the Banks; or that any such injury is imminent or would be irreparable.  They thus fall far short of the high bar set by federal law and Local Rule 23.1(C)(2) for entry of their requested order.

### A.     The Banks Make No Showing That Future Settlement Communications by Arby's Would Be Coercive or Misleading.

Settlements between defendants and absent putative class members, without the involvement of putative class counsel or the court, are a common pre-certification occurrence that courts recognize as routine.  *See Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 698–99 (S.D. Ala. Mar. 7, 2003) (noting that defendants have "the right to communicate settlement offers directly to putative class member[s]" and refusing to restrict settlement offers that required a

release of claims (citation omitted)); *Hinds Cty. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 125, 132 (S.D.N.Y. 2011) ("Prior to certification, court approval is not required to compromise the individual claims of potential class members."); *The Kay Co. v. Equitable Prod. Co.*, 246 F.R.D. 260, 263 (S.D. W. Va. 2007) ("Claims that the defendant merely communicated a settlement offer to a putative plaintiff will not provide the basis for a limitation."); *In re Baycol Prods. Litig.*, No. MDL 1431, 2004 WL 1058105, at *3 (D. Minn. May 3, 2004) (where no "class has yet been certified, Defendants have a right to negotiate settlements with prospective class members").

There is nothing inherently improper about a defendant requesting a release of claims from a putative class member in exchange for payment to settle the absent class member's claims, *see, e.g.*, *Cox*, 214 F.R.D. at 698–99, contrary to the Banks' unsupported assertion that doing so is "inherently coercive, misleading, and ripe for abuse," Pls.' Stmt. 7. Pre-certification, "prior judicial approval" of communications in Rule 23 class actions can only be required "to prevent serious misconduct." *Maddox*, 499 F. Supp. 2d at 1342 (noting also the analogous rule in collective actions and observing that *Hoffmann-La Roche*, relied on by the Banks, is not relevant to collective action cases that "have not yet reached the conditional certification/notice period"). Specifically, as noted below at Part IV.A.2, an order limiting a defendant's settlement communications with members of an uncertified putative class may enter

only where the communications would be misleading and/or coercive.

The Banks have not cleared this high bar because they have made no showing that any settlement offer Arby's might make would "likely" be misleading and/or coercive and would "likely" injure the Banks. Moreover, even had the Banks made such a showing, their Proposed Order is not "narrowly drawn to have the least impact on the parties' First Amendment freedoms," *Abdallah*, 186 F.R.D. at 675, because it would bar *all* settlement offers by Arby's to putative class members without prior Court approval, even without a finding that such communications were misleading or coercive, and even if they did not involve an *en masse* settlement communication of the sort that occurred in the cases relied upon by the Banks.

### 1. The Banks Cannot Invoke Rule 23(e)'s Requirements, Which Are Inapplicable at This Stage of Litigation.

The Banks state that "Rule 23 requires the Court to determine that any settlement is fair, reasonable and adequate to class members before it can be implemented" and accuse Arby's of "attempting to subvert and circumvent these protections," Pls.' Stmt. 23, by means of "an unsupervised, pseudo-class settlement," *id.* at 26. Rule 23(e), of course, requires court approval to settle claims of a "**certified** class." (emphasis added). By its terms, Rule 23(e) is *inapplicable* to pre-certification settlements; indeed, the Rule was specifically amended in 2003 to resolve any ambiguity and make clear that "court approval of settlements with

putative class representatives that resolve[] only individual claims" is not required. Fed. R. Civ. P. 23, Advisory Comm. Notes.

Since courts lack power under Rule 23 to affect the substance of private, pre-certification settlements, there is no basis for the Banks' assertion – without citation to authority – that this Court must approve any such future settlement and allow the Banks a chance to object, *see* Pls.' Stmt. 7, 23; *cf. Hinds Cty.*, 790 F. Supp. 2d at 133 ("[S]ince a district court may not prevent an extrajudicial settlement prior to class certification, there would be no point in conducting a full-blown inquiry into the fairness of such a private settlement or the process by which such a settlement was negotiated.");[8] *Bublitz v. E.I. DuPont de Nemours & Co.*, 196 F.R.D. 545, 549 (S.D. Iowa 2000) ("Plaintiffs have no right to participate in the presentation of the settlement proposal and related communications, nor do they have the right to analyze it before hand."); *In re Baycol*, 2004 WL 1058105, at *5 (denying "extraordinary relief" sought by plaintiffs to participate in private negotiations).

---

[8] The Banks, at page 26 n.6 of the Statement, cite the March 1, 2011 *Hinds County* order that preceded the published Decision and Order setting forth the basis on which the March 1 order was founded, conveniently bypassing the court's extensive discussion of its lack of authority over the terms of a pre-certification settlement. The *Hinds County* court, moreover, did not engage in the analysis required by Local Rule 23.1(C)(2) before ordering review of communications, 790 F. Supp. 2d at 134, and thus did not make a finding of threatened or imminent "irreparable injury" as is required in this District.

### 2. The Banks Have Not Shown Any Likelihood of a Misleading or Coercive Settlement Communication by Arby's.

The Eleventh Circuit and courts in this District have consistently interpreted *Gulf Oil*, Rule 23(d), and Local Rule 23.1(C)(2) to limit a court's ability to restrain communications with absent class members to those instances involving a high level of misconduct or risk of coercion. *See, e.g.*, *Kleiner*, 751 F.2d at 1208–09 (affirming sanctions on defendant and its counsel who devised a scheme to orally solicit exclusions during the opt-out period).[9] The Banks have made no "specific record showing . . . the particular abuses by which [they are] threatened," *Gulf Oil*, 452 U.S. at 102, 104 & n.18 (agreeing "with the Court of Appeals' refusal to give weight to [defendant]'s unsworn allegations of misconduct"), and have failed to identify any "good cause" that would overcome the serious "first amendment concerns" implicated by the Proposed Order, *see Kleiner*, 751 F.2d at 1205.

Rule 23.1 Orders have, as far as Arby's counsel has been able to find, been entered *only* where the putative class has consisted of *individuals*, and even then *only* where those individuals were in a position of vulnerability and/or were unable to

---

[9] While the Banks extensively cite *Kleiner*, *Kleiner* is clearly distinguishable. *Kleiner* involved a certified class and a carefully constructed court approved class notice that the defendant Bank sought to impede by communications to class members from their loan officers.

protect their own rights (such as claims asserted by employees against their current employers), and even then *only* upon an evidentiary record evincing *actual* coercion or deception on the defendant's part.[10]  By contrast, here, the Banks and the putative class members they purport to represent *are not* individuals but rather are sophisticated financial institutions; the putative class members *are not* situated so as to suspect they have any vulnerability to Arby's or inability to protect themselves against Arby's; and the Banks *have not* presented a shred of evidence that even tends to suggest – much less establishes – actual coercion or deception by Arby's.[11]

The Banks offer no basis for their assertion that any settlement communication from Arby's to a putative class member is likely to be coercive or misleading because it would come "through [Arby's] own biased filter" or because "Arby's inherent self-interest" will necessarily "undercut[] its ability" to

---

[10] *See e.g.*, *Wilson v. Regions Fin. Corp.*, No. 14-CV-105, 2015 WL 615528 (N.D. Ga. Feb. 9, 2015) (employee Fair Labor Standards Act ("FLSA") action); *Maddox*, 499 F. Supp. 2d at 1344 (employee FLSA action); *Abdallah*, 186 F.R.D. at 678–79 (employee discrimination action).

[11] The putative class of payment card issuers as alleged here includes all of the largest banks in the country, such as Citibank, JPMorgan Chase, Bank of America, and Capital One, which all have in-house counsel and access to top private counsel from whom putative plaintiffs can seek advice regarding any future communication.  *See* Order 2, *Home Depot*, No. 14-MD-2583 (N.D. Ga. Dec. 14, 2015), ECF No. 154. Ignoring this reality, the Banks improperly attempt to insert themselves between Arby's and putative class members on the ground that those entities, such as Citibank, might be misled by an Arby's settlement offer unless the Banks first can review and object to it.

communicate "in an even-handed way."  Pls.' Stmt. 8.  If communications to putative class members were considered abusive merely because they came from the defendant, no defendant could ever make a settlement offer to a member of a putative uncertified class, a position flatly contradicted by case law.  *See supra* 14–17.

The Banks point to the *en masse* settlement communications that the Card Brands made to their issuers in *Target* and *Home Depot* as evidence that coercive and/or misleading settlement communications are "likely" here.  Pls.' Stmt. 7, 22.  But *Target* specifically held that the settlement communications at issue there were *not* misleading, 2015 WL 2165432, at \*1, and *both* courts refused to restrain the Card Brand settlement communications being challenged in those cases.  Moreover, there is no evidence that the business relationship between the Card Brands and the sophisticated financial institutions that issue their cards is inherently coercive, *see* Pls.' Stmt. 21.[12]  Nor is there evidence for the Banks' speculation that Visa and MasterCard would or could leverage their influence to strong-arm issuers into accepting any settlement offers they might make to their issuers here, Pls.' Stmt. 24.

---

[12] The Banks' reliance on cases such as *Kleiner* is misplaced, as *Kleiner* involved a situation, not present here, of lopsided bargaining power, in which the party with the stronger position sought not settlements but non-participation. *See Kleiner*, 751 F.2d 1193; *cf. In re Currency Conversion Fee Antitrust Litig.*, 224 F.R.D. 555, 569 (S.D.N.Y. 2004) (refusing to enforce arbitration clauses added by issuing banks to agreements with cardholders after putative class action was filed).

To the contrary, as recognized by the judges presiding over the *TJX* and *Heartland* MDLs, banks that issue payment cards are sophisticated businesses fully capable of declining settlement offers if they so choose.[13]  Indeed, in the *Target* litigation the financial institutions in the putative class did just that.[14]  The context of the *en masse* settlement offers the Card Brands made to their issuers in *Home Depot, Target, TJX* and *Heartland* is thus a far cry from contexts – such as employer-employee relationships – that courts have found to create a risk of coercion.[15]

---

[13] *TJX* Tr. 28 (statement by court that private dispute resolution "works when you have entities of more or less equal bargaining power," such as "large retailers" on one side and "*banks on the other*" (emphasis added)); *see also Heartland* Tr. 40 (statement by the court that "this is a group of sophisticated financial entities themselves who have every ability, in a very practical sense, to read the information and make a decision as to whether they want to [click] on the links, pick up the phone and talk to the lawyers who draft the master complaint in this case and who are proceeding with the litigation").

[14] Many of the banks that were solicited in *Target* to join in a MasterCard settlement *declined the offer*, such that minimum participation requirements for the settlement were not met.  Pls.' Stmt. 11.  When a different offer was made for a settlement with Visa, enough banks found those offers acceptable that the settlement was finalized. *See* Letter, *Target*, No. MDL 14-2522 (D. Minn. Aug. 25, 2015), ECF No. 562.  The Banks have offered no basis to assume here that the issuing banks – many of whom are likely the same entities as in *Target* – would be incapable of weighing their own interests in the exact same way were an offer eventually to be extended.

[15] *See Ojeda-Sanchez v. Bland Farms*, 600 F. Supp. 2d 1373, 1380–81 (S.D. Ga. 2009) (employer communication limited in part due to "employment relationship" but noting even employer communications are not per se coercive); *Longcrier v. HL-A Co.*, 595 F. Supp. 2d 1218, 1226, 1227, 1229–32 (S.D. Ala. 2008) (striking declarations obtained by employer through "misleading statements" in intimidating environment but emphasizing "that mere inherent coerciveness in the employment relationship is insufficient, in and of itself," to limit employer speech pre-

The Banks also fail to show that *any* such *en masse* settlement communications (much less a misleading or coercive one) are "likely" to occur here.[16]  As discussed above, the dramatic differences between this case and *Home Depot, Target, TJX* and *Heartland* suggest that any such communication here is *extremely unlikely*.[17]  And even if those communications were likely, those other

_____

certification); *Pacheco v. Aldeeb*, 127 F. Supp. 3d 694, 698 (W.D. Tex. 2015) (enjoining employer communications with conditionally certified class after employer used paychecks to bargain for admissions); *Belt v. Emcare*, 299 F. Supp. 2d 664, 668 (E.D. Tex. 2003) (misleading employer letter suggested that collective "action could affect the potential class members' employment").

[16] *See Cox*, 214 F.R.D. at 698 n.3 ("[T]here cannot be a likelihood of serious abuse unless there is a likelihood that the feared communication will in fact occur.") (citation and internal quotation marks omitted); *Edwards v. Accredited Home Lenders, Inc.*, No. CV 07-160, 2008 WL 1756364, at *3 (S.D. Ala. Apr. 11, 2008) (refusing to limit future communications in part because there was no showing that plaintiffs had even attempted any contact and noting that "Plaintiffs have a general right to contact putative members of a class").

[17] An *en masse* settlement communication is made even more unlikely here as to MasterCard by the release of claims that *now exists* under the MasterCard Rules (but did not exist at the time of those four other cases).  Contrary to the Banks' assertion that an issuer's participation in the Card Brands' "Recovery Processes . . . do[es] *not* require release of class action claims," Pls.' Stmt. 24, MasterCard does in fact now require issuers to elect annually whether to participate in its post-incident compensation program, which election requires, in advance, a release of all claims relating to any account data compromise event that occurs under the program.  MC Rules 10.2.5.3 ("Each Issuer that chooses to participate in the reimbursement component, as a condition of such participation, must agree to hold harmless and release MasterCard and, as applicable, each responsible Customer and each Agent of each responsible Customer from financial and other liability directly or indirectly related to an ADC Event that Mastercard deems to have occurred during that calendar year."); *id.* 10.2 ("Customer" includes acquiring banks and "Agent" includes merchants).

four cases suggest that any such *en masse* settlement communication that theoretically might occur here likewise would not be found coercive or misleading.

Finally, even if the Banks could show that misleading or coercive *en masse* settlement communications were "likely" here, the Banks' proposed Rule 23.1 Order still would not be justified, because that proposed order is not limited to *en masse* settlement communications such as occurred in *Home Depot, Target, TJX* and *Heartland*, but instead extends to *any and all* settlement communications Arby's might have with putative class members. Proposed Order 2. No justification has been shown or even offered for a Rule 23.1 Order of that breadth.

### B.    The Banks Identify No Injury That Is Even Close to Imminent.

Local Rule 23.1 allows for an order to issue only following an evidentiary showing of a likelihood of "*imminent* and irreparable injury" to a party. L.R. 23.1(C)(2) (emphasis added). A threatened injury is "imminent" where it is "likely to occur and likely to do so immediately." *31 Foster Children v. Bush*, 329 F.3d 1255, 1265 (11th Cir. 2003) (analyzing imminence requirement for standing to seek prospective relief). "The mere chance of an injury occurring is not enough" to establish that it is "imminent." *Lyttle v. United States*, 867 F. Supp. 2d 1256, 1295–96 (M.D. Ga. 2012). The Banks offer no evidence – and do not even argue – that an injurious settlement communication from Arby's to members of the putative class is

23

imminent.  *Cf. Bowen v. First Family Fin. Servs., Inc.*, 233 F.3d 1331, 1340 (11th Cir. 2000) (finding "at most a 'perhaps' or 'maybe' chance" insufficient to establish imminent threat of harm).  Speculation that  misleading or coercive settlement offers might one day be communicated to putative class members falls well short of establishing "imminent" injury even to those absent class members, much less the imminent injury to "a party" required under Rule 23(C)(2).

### C.    The Banks' Contention That Any Injury, if Ever Incurred, Would Be "Irreparable" Is Both Conclusory and Defective.

Even if an eventual settlement communication by Arby's to a putative class member improperly coerced or misled  that bank into releasing its claims against Arby's – again, there is no evidence here of any chance of that happening – any resulting harm would be far from "irreparable."  In the *Home Depot* action on which the Banks heavily rely, the plaintiffs sought a simple legal remedy to rectify what they viewed as improper communications: setting aside the release.  *See* Mot. *2, *Home Depot*, No. 14-MD-2583 (N.D. Ga. Dec. 18, 2015), ECF No. 149 (seeking "remedy" for the alleged impact by "vacating any releases that were obtained, requiring a curative notice to be disseminated, and providing Class members with sufficient time and information to evaluate any proposed settlement").  "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of

irreparable harm." *United States v. Jefferson Cty.*, 720 F.2d 1511, 1520 (11th Cir. 1983) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). Moreover, the putative class members are sophisticated financial institutions that are more than capable of assessing and declining such offers, if made. *See supra* note 11. The Banks have identified no potential harm that – in the event it ever were incurred – would be irreparable so as to justify a Rule 23.1 Order here.

## V. CONCLUSION

For the reasons stated above, Arby's respectfully requests that the Court deny the Banks' request for entry of an order pursuant to Local Rule 23.1(C)(2).

Dated: July 11, 2017

Respectfully submitted,

*/s/ Robert B. Remar*
Robert B. Remar
Ga. Bar No. 600575
Joshua P. Gunnemann
Ga. Bar No. 152250
Cameron B. Roberts
Ga. Bar No. 599839

**ROGERS & HARDIN LLP**
2700 International Tower
229 Peachtree Street NE
Atlanta, Georgia 30303
Telephone:  (404) 522-4700
Facsimile:  (404) 525-2224
rremar@rh-law.com
jgunnemann@rh-law.com
croberts@rh-law.com

Douglas H. Meal (admitted *pro hac vice*)
Mark P. Szpak (admitted *pro hac vice*)
**ROPES & GRAY LLP**
Prudential Tower
800 Boylston Street
Boston, MA  02199-3600
Telephone:  (617) 951-7000
Facsimile:  (617) 951-7050
douglas.meal@ropesgray.com
mark.szpak@ropesgray.com

*Attorneys for Defendant Arby's Restaurant
Group, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that, pursuant to Local Rules 5.1C and 7.1D, this filing complies with the font and point selections approved in Local Rule 5.1C.  The filing was prepared using 14-point Times New Roman font.

<u>/s/ Cameron B. Roberts</u>
Cameron B. Roberts
Ga. Bar No. 599839
croberts@rh-law.com

*Attorney for Defendant Arby's Restaurant Group, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 11, 2017, I caused a copy of the foregoing **DEFENDANT'S RESPONSE TO FINANCIAL INSTITUION PLAINTIFFS' STATEMENT REGARDING LOCAL RULE 23.1** to be electronically filed with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification to the attorneys of record.

*/s/ Cameron B. Roberts*
Cameron B. Roberts
Ga. Bar No. 599839
croberts@rh-law.com

*Attorney for Defendant Arby's Restaurant Group, Inc.*
