**Plaintiffs' Motion for Attorneys' Fees,
Expense, and Service Awards to the
Class Representatives**

# Exhibit 3
### Declaration of Brian T. Fitzpatrick

*In re:  The Home Depot, Inc. Customer Data Security Breach Litigation*
*This Document applies to Financial Institution Cases*
U.S.D.C., N.D. Georgia, Atlanta Division
Civil Action No. 1:14-md-02583-TWT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

*In re: The Home Depot, Inc., Customer Data Security Breach Litigation*
*(Financial Institution Cases)*

*MDL No. 2583*

## DECLARATION OF BRIAN T. FITZPATRICK

I.  Background and qualifications

1.        My name is Brian Fitzpatrick and I am a Professor of Law at Vanderbilt University in Nashville, Tennessee.  I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006.  I graduated from Harvard Law School in 2000.   After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP.  My C.V. is attached as Appendix 1.

2.        Like my research at New York University before it, my teaching and research at Vanderbilt have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, Complex Litigation, and Comparative Class Actions courses at Vanderbilt.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, the Vanderbilt Law Review, the NYU Journal of Law & Business, and the University of Arizona Law Review.  My work has been cited by numerous courts, scholars, and media outlets such as the New York Times, USA Today, and Wall Street Journal.  I have also been invited to speak at symposia and other events about class action litigation, such as the ABA National Institute on Class Actions in 2011, 2015,

1

2016, and 2017, and the ABA Annual Meeting in 2012.  Since 2010, I have also served on the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies.  In 2015, I was elected to the American Law Institute.

3.        In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "Empirical Study").  Unlike other studies of class actions, which have been limited to certain subject areas or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study sought to examine *every* class action settlement approved by a federal court over a two-year period, 2006-2007.  *See id*. at 812-13.  As such, not only is my study not biased toward particular settlements, but the number of settlements included in my study is several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements, including 54 from the Eleventh Circuit alone.  *See id*. at 817.  This study has been relied upon by a number of courts, scholars, and testifying experts.  *See*, *e.g.*, *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (relying on article to assess fees); *Good v. W. Virginia-Am. Water Co.,* 2017 WL 2884535, at *23, *27 (S.D.W. Va. July 6, 2017) (same); *McGreevy v. Life Alert Emergency Response, Inc.*, 2017 WL 1534452, at *3 (S.D.N.Y. Apr. 28, 2017) (same); *Brown v. Rita's Water Ice Franchise Co. LLC*, 2017 WL 1021025, at *9 (E.D. Pa. Mar. 16, 2017) (same); *In re: Urethane Antitrust Litig.*, 2016 WL 4060156, at *7 (D. Kan. July 29, 2016) (same); *In re Credit Default Swaps Antitrust Litig.*, 2016 WL 1629349, at * 17 (S.D.N.Y. Apr. 24, 2016) (same); *In re Pool Products Distribution Mkt. Antitrust Litig.*, 2015 WL 4528880, at *19-20 (E.D. La. July 27, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 2147679, at *2-4 (N.D. Ill. May 6,

2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, 2015 WL 1399367, at *3-5 (N.D. Ill. Mar. 23, 2015) (same); *In re Capital One Tel. Consumer Prot. Act Litig.*, 2015 WL 605203, at *12 (N.D. Ill. Feb. 12, 2015) (same); *In re Neurontin Marketing and Sales Practices Litigation*, 2014 WL 5810625, at *3 (D. Mass. Nov. 10, 2014) (same); *Tennille v. W. Union Co.*, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (same); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F.Supp.3d 344, 349-51 (S.D.N.Y. 2014) (same); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F.Supp.2d 437, 444-46 & n.8 (E.D.N.Y. 2014) (same); *In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation*, 4 F.Supp.3d 94, 111-12 (D.D.C. 2013) (same); *In re Vioxx Products Liability Litigation*, 2013 WL 5295707, at *3-4 (E.D. La. Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litigation*, 953 F.Supp.2d 82, 98-99 (D.D.C. 2013) (same); *In re Southeastern Milk Antitrust Litigation*, 2013 WL 2155387, at *2 (E.D. Tenn., May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

4.      I have been asked by class counsel to opine on whether the attorneys' fees they have requested are reasonable in light of my study and the other empirical studies on class action fees.  In order to formulate my opinion, I reviewed a number of documents provided to me by class counsel; I have attached a list of these documents (and noted how I refer to these documents herein) in Appendix 2.  As I explain, based on my study of settlements across the country and in the Eleventh Circuit in particular, in my professional opinion, I believe the fees here are reasonable.

3

II.  Case background

5.        In September 2014, Home Depot announced that its payment systems had been hacked and its customers' credit- and debit-card information stolen.  The financial institutions that had issued the cards thereafter had to cancel and replace the compromised cards, reimburse their customers' fraud losses, and otherwise respond.  This cost a great deal of money and the financial institutions sought to be made whole from Home Depot.   Visa and MasterCard administer merchant-bank dispute-resolution programs for these types of incidents; the programs have generally been designed, however, to offer partial compensation to financial institutions without requiring them to release their legal claims.  Home Depot initially challenged that it owed any money under these extra-judicial dispute-resolution programs.

6.        Many financial institutions filed class actions against Home Depot in the fall of 2014.  These lawsuits were consolidated before this court pursuant to the federal Multidistrict Litigation Act in December 2014.  The present case is the culmination of these lawsuits.  It is a nationwide class action on behalf of financial institutions that were negatively impacted by the Home Depot data breach; it seeks compensation under various state law theories.  It has been litigated for almost three years, including limited discovery and motions' practice.

7.        As this litigation unfolded, Home Depot changed its position on the dispute-resolution programs.  It decided to pay the assessments after all (and in full) and those payments have now totaled over $120 million.  Indeed, Home Depot offered to pay not only the assessments but also "premiums" on top of those amounts to any financial institutions that would release their rights to recover in this litigation.  The parties disputed whether Home Depot appropriately made such solicitations while the litigation was pending and whether the releases were valid.  But before

4

Plaintiffs could challenge Home Depot's efforts, financial institutions responsible for roughly 70 to 80% of the compromised cards accepted Home Depot's offer, collecting some $14.5 million in these premium monies in exchange for a release.

8.      The parties have now decided to settle any remaining claims with a class-wide settlement.  With minor exceptions, the settlement class includes "[a]ll banks, credit unions, financial institutions, and other entities" that have not already released their claims as well as so-called "independent-sponsored entities" that released their claims through MasterCard's merchant-bank dispute resolution program.[1]  Settlement Agreement ¶ 36.  The settlement class will release Home Depot from "any and all liabilities" that result from the data breach including, among other things, those resulting from "Home Depot's information security policies and practices," its "response to and notices about the Data Breach," or "the fraudulent use of any Compromised Payment Card."  *Id.* at ¶ 56.  In exchange, Home Depot will pay class members up to $27.25 million in cash.  *See id.* at 39-40 & Ex. 1.  Twenty-five million dollars will be distributed to the class members that have not already released their claims; they will receive $2 per compromised card plus up to 60% of their documented losses.  If the total claims exceed or are less than $25 million, the payment of each class member will be adjusted upwards or downwards on a *pro rata* basis.  None of this money will revert to Home Depot.  *See id.*  The remaining $2.25 million will be distributed to the independent-sponsored entities that file claims and attest that their releases resulted from misleading or coercive information.  The sponsored entities will receive $2.00 per card unless the claims exceed $2.25 million, in which case the payments will be reduced *pro rata.* If the claims are less than $2.25 million, Home Depot will retain what is leftover.  *See id.*  In addition to the cash relief, Home Depot has agreed to implement three new data-security practices

---

[1] The independent-sponsored entities are included in the class because the solicitations they received seeking release of their claims were especially misleading.

for at least the next two years, s*ee id*. at ¶ 41, to pay for the cost to notify the class and administer

the settlement, *see id*. at ¶ 46, and to pay class counsel's reasonable attorneys' fees and expenses,

*see id*. at ¶ 62.

9.     The court certified a settlement class and preliminarily approved the settlement on

March 10, 2017.  The class is now moving for final approval and class counsel are moving for an

award of fees equal to $18 million.  Based on my study of class action settlements across the

country and in the Eleventh Circuit in particular, it is my opinion that the fee request is reasonable.


III. Assessment of the reasonableness of the request for attorneys' fees

10.     At one time, courts that awarded fees in class action cases did so using the familiar

"lodestar" approach.  *See* Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U.

Pa. L. Rev. 2043, 2051 (2010) (hereinafter "Class Action Lawyers").  Under this approach, courts

awarded class counsel a fee equal to the number of hours they worked on the case (to the extent

the hours were reasonable), multiplied by a reasonable hourly rate as well as by a discretionary

multiplier that courts often based on the risk of non-recovery and other factors.  *See id.*  Over time,

however, the lodestar approach fell out of favor in class actions.  It did so largely for two reasons.

First, courts came to dislike the lodestar method because it was difficult to calculate the lodestar;

courts had to review voluminous time records and the like.  Second—and more importantly—

courts came to dislike the lodestar method because it did not align the interests of class counsel

with the interests of the class; class counsel's recovery did not depend on how much the class

recovered, but, rather, on how many hours could be spent on the case.  *See id.* at 2051-52.

According to my empirical study, the lodestar method is now used to award fees in only a small

percentage of class action cases, usually those involving fee-shifting statutes or those where the

relief is predominantly injunctive in nature (and the value of the injunction cannot be reliably calculated).  *See* Fitzpatrick, *Empirical Study*, *supra*, at 832 (finding the lodestar method used in only 12% of settlements).

11.     The more popular method of calculating attorneys' fees today is known as the "percentage" method.  Under this approach, courts select a percentage that they believe is fair to class counsel, multiply the settlement amount by that percentage, and then award class counsel the resulting product.  The percentage approach became popular precisely because it corrected the deficiencies of the lodestar method: it is less cumbersome to calculate, and, more importantly, it aligns the interests of class counsel with the interests of the class because the more the class recovers, the more class counsel recovers.  *See* Fitzpatrick, *Class Action Lawyers, supra,* at 2052.

12.     In light of the well-recognized disadvantages of the lodestar method and the well-recognized advantages of the percentage method, it is my opinion that courts should generally use the percentage method whenever the value of the settlement can be reliably calculated and the lodestar method is not required by a fee-shifting statute.  Only where the value of the settlement cannot be reliably calculated (and the percentage method is therefore not feasible) or a fee-shifting statute is applicable is it my opinion that courts should use the lodestar method.  This is not just my opinion.  It is the consensus opinion of class action scholars.  *See* American Law Institute, Principles of the Law of Aggregate Litigation § 3.13(b) (2010) ("[A] percentage-of-the-fund approach should be the method utilized in most common-fund cases.").

13.     In this case, I believe a sufficient amount of the settlement can be reliably valued and therefore the percentage method should be used.  Nonetheless, because the court used the lodestar method on the consumer side of this litigation and may choose to do so again, or may choose to crosscheck the percentage method with the lodestar method, I will assess the

reasonableness of the fee request under the lodestar method as well. In my opinion, the request here is reasonable under either the percentage method or the lodestar method.

Percentage method

14.     Under the percentage method, courts must 1) calculate the value of the benefits created by class counsel and then 2) select a percentage of that value to award to class counsel. When calculating the value of the benefits, courts usually include any cash compensation to class members, cash the defendant must pay to third parties, non-cash benefits that can be reliably valued, attorneys' fees and expenses, and administrative costs paid by the defendant. *See, e.g.*, *In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation*, 851 F.Supp.2d 1040, 1080 (S.D. Tex. 2012). Courts usually examine a number of factors when deciding what percentage to award class counsel under the percentage approach. *See* Fitzpatrick, *Empirical Study, supra*, at 832. In the Eleventh Circuit, courts start with 25% as the "'bench mark' percentage fee award" and then adjust it upward or downward "in accordance with the individual circumstances of each case." *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 775 (11th Cir. 1991). Although "[t]he factors which will impact upon the appropriate percentage . . . in any particular case will undoubtedly vary," the Eleventh Circuit has identified sixteen factors that it has said may be "appropriate[]" or "pertinent" to consider. *Camden I*, 946 F.2d at 775. These factors include "[1] the time required to reach a settlement, [2] whether there are any substantial objections . . ., [3] any non-monetary benefits conferred upon the class . . ., and [4] the economics involved in prosecuting a class action," *id*., as well as the twelve factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974): "[5] the time and labor required; [6] the novelty and difficulty of the questions involved; [7] the skill requisite to perform the legal service properly; [8] the preclusion of other employment by the attorney due to

8

acceptance of the case; [9] the customary fee; [10] whether the fee is fixed or contingent; [11] time limitations imposed by the client or the circumstances; [12] the amount involved and the results obtained; [13] the experience, reputation, and ability of the attorneys; [14] the 'undesirability' of the case; [15] the nature and length of the professional relationship with the client; [and] [16] awards in similar cases." *Camden I*, 946 F.2d at 772 n.3.

*Valuation of the benefits created by class counsel*

15.     In this case, the most challenging aspect of the inquiry is the first step—calculating the value of the benefits conferred by class counsel—because not all of those benefits have been quantified.  We know the requested attorneys' fees are $18 million, the requested expenses are $710,000, the notice and settlement administration expenses will be around $125,000, and the amount in premiums Home Depot paid to financial institutions to buy releases from this litigation have been $14.5 million.  But we do not the exact amount of cash that will be paid to class members from the settlement fund; we know it will be at least $25 million, but it may be as much as $27.25 million.  Nor have class counsel sought to definitively value the injunctive relief it secured in the settlement and it is not clear how much of the $120 million in dispute-resolution assessments Home Depot eventually agreed to pay would have been paid had it not been for class counsel's efforts in this litigation.  In my opinion, it is not necessary to calculate precisely how much value class counsel has conferred on the financial institutions in this case because, even if we count only the things we know, class counsel's fee request is reasonable.

16.     Under Supreme Court and Eleventh Circuit precedent, the court is permitted to base class counsel's fee percentage on the face value of the benefits conferred by class counsel—even if not all of them are ultimately paid out by Home Depot.  *See, e.g.*, *Boeing Co. v. Van Gemert*, 444 U.S. 472, 479-81(1980); *Waters v. Int'l Precious Metals Corp.,* 190 F.3d 1291, 1295-97 (11th

9

Cir. 1999).  If the court chooses to do this, it would count the entire cash settlement fund ($27.25 million), the requested attorneys' fees ($18 million) and expenses ($710,000), the notice and settlement administration expenses ($125,000), and the premiums Home Depot paid to financial institutions to buy releases ($14.5 million).  This would make the total benefits conferred by class counsel at least $60.585 million and class counsel's fee request 29.7% of the total known benefits.  Some scholars and courts have suggested moving away from the Supreme Court's and Eleventh Circuit's face-value approach and believe that attorney's fees should be based only on monies actually paid by defendants, not on monies that might be paid.  This is in order to incentivize class action lawyers to generate actual compensation and deterrence rather than theoretical compensation and deterrence.  *See* Principles of the Law of Aggregate Litigation, *supra*, at §§ 3.13, cmt. a & 3.13(b).  If the court adopts this approach in contrast to Supreme Court and Eleventh Circuit precedent, it would count only the portion of the cash settlement fund it knows for sure at this point will be paid out ($25 million) in addition to the other items, making the total benefits at least $58.335 million; class counsel's fee request would therefore amount to 30.9%.  As I explain below, no matter which number is used—29.7% or 30.9%—the percentage requested here is reasonable.

17.     Before I get to the percentage-selection component of the percentage method, however, I want to emphasize why I believe it is reasonable to include in the benefits conferred by class counsel the $14.5 million in premiums paid by Home Depot to induce financial institutions to release their rights in this litigation.  After all, these institutions are (mostly) not members of the settlement class; is it reasonable to award class counsel a percentage of the benefits they conferred on non-class members?  In my opinion, it is absolutely reasonable to do so.  First of all, these entities would have been class members had they not released their claims.  Moreover, as I noted

above, it is customary to include in the denominator of the percentage method cash the defendant pays to third parties on account of class counsel's efforts.  For example, it has long been the case that courts count payments defendants make in *cy pres* to charities to resolve class action litigation. *See* Principles of the Law of Aggregate Litigation, *supra*, at § 3.13(a) ("Attorneys' fees in class actions . . . should be based on . . . the value of cy pres awards . . . .").  The reason for this is clear as a policy matter: *cy pres* awards further the compensatory, and, especially, the deterrent function of the class action; as such, we want to incentivize class counsel to pursue such relief.

18.     Even more analogous may be the common-benefit fee awards that are often made in multidistrict litigation.  In these situations, courts order parties who resolved their own cases using the litigation work product of the court-appointed leadership lawyers to pay a percentage of their settlements to the leadership lawyers.  *See* Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 La. L. Rev. 371, 376 (2014) ("The theoretical bases for the application of the common fund concept to MDLs are the same as for class actions—namely, equity and her blood brother, quantum meruit.").  Again, the reason for this is clear as a policy matter: if some parties could free-ride off the work of others, no one would have the incentive to do the work to begin with: everyone would wait around for someone else to do it and then try to free ride off it. In economics, we call this a "collective action problem."

19.     Much the same sort of collective-action problem would ensue in situations like this one if class counsel do not share in the premiums they created for the financial institutions who released their claims: if putative class members know they can free ride off of the leverage created by a class action lawsuit by never paying for it, this will obviously make class action lawyers reluctant to create the leverage to begin with by filing class actions and investing their time and money to prosecute them.  In this case, 70% to 80% of the value of the case was settled out from

under class counsel.  If class counsel had thought before they filed suit that they would not be compensated for the leverage they created for these putative class members, class counsel may very well have decided it was not worth bringing this case at all; 20% of an already risky case does not sound nearly as appealing as 100% of a risky case.  It is not in the interest of class members or society to discourage class action lawyers from filing meritorious class action lawsuits.  If there were substantial doubt whether the premiums here were paid because of this litigation, I might feel differently.  But there is no such doubt.  *See* Fee Motion p 10.

20.      I should note that I have relied in part on policy arguments in the proceeding paragraphs and it is worth asking whether it is permissible for courts to consider public policy when they decide what fees are reasonable in class actions.  At bottom, that is a matter for the court to decide for itself and I will not try to intrude upon the court's domain by giving it my opinion on the matter.  I will note, however, that there is a long history of considering public policy when awarding fees in class action cases.  As I noted above, courts jettisoned the lodestar method in favor of the percentage method largely for law-and-economics reasons many years ago.  *See* Fitzpatrick, *Class Action Lawyers, supra*, at 2053 ("[J]udges relied on what was essentially normative economic theory in switching from the lodestar to the percentage method in awarding fees.").  Moreover, in the Eleventh Circuit, district courts are explicitly asked to consider such policies when they award fees.  *See Camden I*, 946 F.2d at 775 (asking district courts to consider "the economics involved in prosecuting a class action.").  The Eleventh Circuit is not alone in this regard.  *See, e.g., Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009) (instructing courts to consider "society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others").

*Selecting the percentage*

21.     As I have said, fee request here is either 29.7% or 30.9% of the benefits that can be valued (and much less than the total benefits class counsel conferred).  In my opinion, either number is reasonable in light of the Eleventh Circuit's factors.

22.     Consider first the factors that go to the fee awards in other cases: "[9] the customary fee" and "[16] awards in similar cases."  According to my empirical study, there were 35 class action cases in 2006 and 2007 in which district courts in the Eleventh Circuit used the percentage method to award attorneys' fees.  *See* Fitzpatrick, *Empirical Study, supra*, at 836.  The average fee awarded in these cases was 28.1% and the median fee awarded was 30%.[2]  *See id.*  This means this fee request is *very* close to the typical Eleventh Circuit fee award.  This can be seen from Figure 1, which shows the distribution of all of the Eleventh Circuit percentage-method fee awards in my study.  In particular, the figure shows what fraction of fee awards (y-axis) fell within each five-point range of fee percentages (x-axis).  As the figure shows, *more than half (i.e., .5) of all*

---

[2] In their nationwide study of class action fees, Ted Eisenberg and Geoff Miller found mean and median fee awards in the Eleventh Circuit somewhat lower than those found in my study: 21% and 22%, respectively.  *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 260 (2010).  It should be noted, however, that their study was based on settlements dating back to 1993, and, as such, their data are older than mine.  Moreover, their study examined only a fraction of the settlements over this period, and the fraction examined was not designed to be representative of the whole.  *See id*. at 253 ("[O]ur data include only opinions that were published in some readily available form.  Obviously, therefore, we have not included the full universe of cases . . . .  [P]ublished opinions are not necessarily representative of the universe of all cases.").  Indeed, one of the reasons their study may have found lower numbers than mine is because it oversampled larger cases (where the fee percentages awarded are often smaller than in other cases).  *See* Fitzpatrick, *Empirical Study, supra*, at 829 (discussing the unrepresentative sampling in the Eisenberg-Miller studies).  Indeed, in an update to their study (which has not yet been published), Professor Miller and new co-authors (Professor Eisenberg passed away) examined more recent years (2009-2013) and more representative settlements (because the electronic databases have become more complete) and came to numbers closer—and even higher—than the ones I found.  *See* Ted Eisenberg, Geoff Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013, available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2904194, p. 12 (finding mean fee award of 30% and median of 33% in the Eleventh Circuit).

*Eleventh Circuit fee awards have been 30% or more.* Thus, these factors weigh in favor of class counsel's requested fee.

### Figure 1: Percentage-method fee awards in the Eleventh Circuit, 2006-2007



23.     Consider next some of the factors that go to the results obtained by class counsel in light of the risks class counsel faced: "[4] the economics involved in prosecuting a class action," "[6] the novelty and difficulty of the questions involved," "[10] whether the fee is fixed or contingent," "[12] the amount involved and the results obtained," and "[14] the 'undesirability' of the case." The results here appear to be excellent. Not only are all financial institutions receiving 100% of their $120 million in dispute-resolution assessments, but the class members will receive between $25 million and $27.25 million from the settlement fund on top of that and other financial institutions have already received $14.5 million on top of that. All told, then, the financial

institutions will receive some 35% more than their dispute-resolution assessments because of this litigation.

24.     I do not know how this number compares to the total losses suffered by the financial institutions.  Because so many financial institutions took the premium offer and released their claims before the class-wide settlement was reached, that information is not available.  But I do know that there has been other litigation by financial institutions against merchants who have had their payment systems breached.  Many of these cases foundered in light of the heavy legal barriers in this sort of litigation—a matter I address next—but a few cases resulted in settlements, and I examined each of them to see how much the financial institutions recovered there compared to here.  What did I find?  I find that I agree with class counsel: in no case was the recovery as rich as this one.  *See* Fee Declaration ¶ 47.  Thus, I think it is fair to say that the results in this case are superior to any other financial institution data breach case of which I am aware.

25.     These results look even better when they are compared to the risks class counsel faced in this case.  In an exhibit to class counsel's declaration in support of their fee petition, class counsel list all of the data-breach cases that have been brought by financial institutions of which we are aware.  *See* Exhibit A to Fee Declaration.  As one can see, many of them have been unsuccessful.  Why?  First, there is mixed precedent on whether merchants like Home Depot even have a legal duty to protect their customers' credit card data.  Second, it is not clear that merchants like Home Depot could have done something to prevent their breaches; computer hackers are a sophisticated bunch.  If they couldn't, then financial institutions may not be able prove the causation element of their claims.  Third, there is a legal defense called the "economic loss doctrine" which posits that, when something can be addressed with contracts, the common law should not create tort law to address it instead.  Many courts, including some in Georgia, have

found that this doctrine may bar suits like the one here.  *See* Fee Motion pp. 21-22.  If the economic loss doctrine applies, then financial institutions can recover only if they would be deemed third-party beneficiaries of the contracts merchants entered with Visa and MasterCard; yet, as the exhibit shows, many courts have rejected such third-party beneficiary status for card-issuing financial institutions.  Home Depot made all of these arguments in this case, but, because the case settled when it did, the court did not rule on any of them except at the motion to dismiss stage.  But, as the exhibit shows, it is easy to see how some of these arguments ultimately could have gone Home Depot's way.   Yet, class counsel obtained a better recovery here than in any of the previous financial institution cases.  As such, these factors, too, weigh in favor of class counsel's fee request.

26.     Consider next the factor "[3] any non-monetary benefits conferred upon the class." As I noted above some of the benefits class counsel conferred on the class here—the injunctive relief and some portion of the dispute-resolution assessments that Home Depot eventually agreed to pay rather than contest—could not be valued and included in the denominator of the percentage method.  This is all the more reason to award class counsel a higher fee percentage of the benefits that *can* be valued.  In my empirical study of all class action settlements in federal court, I found that only one quarter of all settlements included injunctive relief.  *See* Fitzpatrick, *Empirical Study, supra*, at 824.  Thus, in most of the fee awards in Figure 1, above, class counsel did *not* secure extra benefits for the class like class counsel did here.  Yet, as I noted above, class counsel is seeking only the same, typical fee percentage that most courts award.  This factor, too, then, weighs in favor of the fee request.

27.     Consider next the factors that go to the time it took to litigate and resolve these lawsuits: "[1] the time required to reach a settlement" and "[5] the time and labor required."  This case has transpired about as long as the typical class action case does before it reaches settlement.

16

*See* Fitzpatrick, *Empirical Study, supra*, at 820 (finding average and median times to final settlement approval of around three years). As such, these factors, too, weigh in favor of class counsel's fee request. It is true that not many litigation mileposts were reached in this case before settlement was reached; the parties did not complete discovery and, while Home Depot did file a motion to dismiss, it had not yet filed a motion for summary judgment. I do not think this is reason enough to lower class counsel's fee percentage. As a policy matter, so long as the settlement is a strong one on the merits, it makes no sense to punish class counsel because they reached a good result more quickly. It is in everyone's interest—the class's, the defendant's, and the court's—to resolve litigation as quickly as possible. So long as the case has been litigated long enough that the court has enough information to assess whether the result here is a good one, there is no reason to give class counsel the incentive to drag things out longer by dangling higher fee percentages in front of them for cases that take longer to settle. As I explained above, the settlement in this case is excellent. As such, in my opinion, there is no reason to slash class counsel's fee percentage because class counsel achieved an excellent result more quickly than other class action lawyers.

28. Consider finally the other *Camden* factors. With respect to "[2] whether there are any substantial objections," there are no objections at all, let alone any substantial ones; this factor, too, then, weighs in favor of class counsel's fee request. The other factors go to the skills of class counsel and their relationship with the plaintiffs: "[7] the skill requisite to perform the legal service properly," "[8] the preclusion of other employment by the attorney due to acceptance of the case," "[11] time limitations imposed by the client or the circumstances," "[13] the experience, reputation, and ability of the attorneys," and "[15] the nature and length of the professional relationship with the client." Although I was not privy to the attorney-client relationships here, I

can say that class counsel count among their number some of the most experienced and highly regarded lawyers in the United States.  These are not mere "benchmark" lawyers.

29.      For all these reasons, I believe the fee award requested here is reasonable under the percentage method.

## Lodestar Method

30.      As I noted above, although I do not favor it, the court may choose to use the lodestar method instead of the percentage method or to crosscheck the percentage method with class counsel's lodestar.  For this reason, I will assess the reasonableness of the fee request here under the lodestar method.  As I said, the lodestar is calculated by multiplying the number of hours they worked on the case (to the extent the hours were reasonable) by a reasonable hourly rate.  The court then evaluates whether any multiplier over the lodestar that the fee request would produce is reasonable in light of the same factors it looks to under the percentage method.  *See Dikeman v. Progressive Exp. Ins. Co.*, 312 Fed.Appx. 168, 172 (11th Cir. 2008).

31.      In this case, class counsel have reported a lodestar of some $11.7 million.  The multiplier that would result would therefore be 1.53.  In my opinion, this multiplier would be reasonable.

32.      I will not repeat what I said above with respect to most of the factors because almost everything I said applies with equal force under the lodestar method.  But the factors that go to how the fee request measures up against other cases—"[9] the customary fee for similar work in the community" and "[16] awards in similar cases"—should be reassessed because now the court must compare the multiplier here with the multipliers awarded in other lodestar-method cases.  This comparison shows the fee request is still reasonable.

33.      First, there is the lodestar multiplier that resulted in the consumers' companion case in this very litigation.  The court awarded a lodestar multiplier of 1.3 there.  The multiplier that would result here would be slightly higher.  But, in my opinion, it would be more than justified by the greater risks financial-institution cases face.  Although consumer cases face challenges with respect to standing, there is less doubt that consumers have a cause of action against the merchants that let their credit card information fall into the wrong hands.  But, as I explained above, it is not at all clear that the financial institutions even enjoy a cause of action.  This is, again, why, many of the financial-institution cases have foundered.  In light of these risks, it is not unreasonable to award class counsel here a modest multiplier and one slightly better than the consumer side of the case.

34.      And there is no doubt that the multiplier here is modest.  In my empirical study, the mean and median lodestar multipliers were 1.45 and 1.19, respectively (combining both lodestar-method awards and percentage-method awards crosschecked with the lodestar method).  *See* Fitzpatrick, *Empirical Study, supra*, at 834.  These numbers are in line with the other large-scale academic study of class action fees.  *See* Eisenberg & Miller, *supra*, at 273 (finding mean lodestar multiplier of 1.81).  Thus, the multiplier that would result here would be right at what is typical in other class action cases.

35.      For all these reasons, it is my opinion that the fee requested is reasonable under the lodestar method as well.

36.      My compensation in this matter has been $795 per hour.

Nashville, TN

August 22, 2017

Brian T. Fitzpatrick

# Appendix 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *Professor*, 2012-present
- *FedEx Research Professor*, 2014-15; *Associate Professor*, 2010-12; *Assistant Professor*, 2007-10
- Classes: Civil Procedure, Federal Courts, Complex Litigation
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## ACADEMIC ARTICLES

*An Empirical Look at Compensation in Consumer Class Actions,* 11 NYU J. L. & BUS. 767 (2015) (with Robert Gilbert)

*The End of Class Actions?*, 57 ARIZ. L. REV. 161 (2015)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure,* 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered*, 87 NOTRE DAME L. REV. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards,* 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment*, 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)

## BOOK CHAPTERS

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, 2016)

*Is the Future of Affirmative Action Race Neutral?* in A NATION OF WIDENING OPPORTUNITIES: THE CIVIL RIGHTS ACT AT 50 (Ellen Katz & Samuel Bagenstos, eds., Michigan University Press, 2016)

## ACADEMIC PRESENTATIONS

*The Next Steps for Discovery Reform: Requester Pays,* Lawyers for Civil Justice Membership Meeting, Washington, DC (May 5, 2015)

*Private Attorney General: Good or Bad?*, 17th Annual Federalist Society Faculty Conference, Washington, DC (Jan. 3, 2015)

*Liberty, Judicial Independence, and Judicial Power*, Liberty Fund Conference, Santa Fe, NM (Nov. 13-16, 2014) (participant)

*The Economics of Objecting for All the Right Reasons,* 14th Annual Consumer Class Action Symposium, Tampa, Florida (Nov. 9, 2014)

*Compensation in Consumer Class Actions: Data and Reform*, Conference on The Future of Class Action Litigation: A View from the Consumer Class, NYU Law School, New York, New York (Nov. 7, 2014)

*The Future of Federal Class Actions: Can the Promise of Rule 23 Still Be Achieved?*, Northern District of California Judicial Conference, Napa, California (Apr. 13, 2014) (panelist)

*The End of Class Actions?*, Conference on Business Litigation and Regulatory Agency Review in the Era of Roberts Court, Institute for Law & Economic Policy, Boca Raton, Florida (Apr. 4, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, University of Missouri School of Law (Mar. 7, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, George Mason Law School (Mar. 6, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, Roundtable for Third-Party Funding Scholars, Washington & Lee University School of Law (Nov. 7-8, 2013)

*Is the Future of Affirmative Action Race Neutral?*, Conference on A Nation of Widening Opportunities: The Civil Rights Act at 50, University of Michigan Law School (Oct. 11, 2013)

*The Mass Tort Bankruptcy: A Pre-History*, The Public Life of the Private Law: A Conference in Honor of Richard A. Nagareda, Vanderbilt Law School (Sep. 28, 2013) (panelist)

*Rights & Obligations in Alternative Litigation Financing and Fee Awards in Securities Class Actions*, Conference on the Economics of Aggregate Litigation, Institute for Law & Economic Policy, Naples, Florida (Apr. 12, 2013) (panelist)

*The End of Class Actions?*, Symposium on Class Action Reform, University of Michigan Law School (Mar. 16, 2013)

*Toward a More Lawyer-Centric Class Action?,* Symposium on Lawyering for Groups, Stein Center for Law & Ethics, Fordham Law School (Nov. 30, 2012)

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability*,* Corporate Law Center, Fordham Law School (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote*, University of Iowa Law School (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law (Apr. 3, 2007) (panelist)

## OTHER PUBLICATIONS

*Lessons from Tennessee Supreme Court Retention Election*, THE TENNESSEAN (Aug. 20, 2014)

*Public Needs Voice in Judicial Process*, THE TENNESSEAN (June 28, 2013)

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

## OTHER PRESENTATIONS

*The New Business of Law: Attorney Outsourcing, Legal Service Companies, and Commercial Litigation Funding*, Tennessee Bar Association, Nashville, TN (Nov. 12, 2014)

*Hedge Funds + Lawsuits = A Good Idea?*, Vanderbilt University Alumni Association, Washington, DC (Sep. 3, 2014)

*Judicial Selection in Historical and National Perspective*, Committee on the Judiciary, Kansas Senate (Jan. 16, 2013)

*The Practice that Never Sleeps: What's Happened to, and What's Next for, Class Actions*, ABA Annual Meeting, Chicago, IL (Aug. 3, 2012) (panelist)

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club of Nashville (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)

## PROFESSIONAL ASSOCIATIONS

Referee, Journal of Empirical Legal Studies
Reviewer, Oxford University Press

Reviewer, Supreme Court Economic Review
Member, American Law Institute
Member, American Bar Association
Fellow, American Bar Foundation
Member, Tennessee Advisory Committee to the U.S. Commission on Civil Rights, 2009-2015
Board of Directors, Tennessee Stonewall Bar Association
American Swiss Foundation Young Leaders' Conference, 2012
Bar Admission, District of Columbia

## COMMUNITY ACTIVITIES

Board of Directors, Nashville Ballet; Nashville Talking Library for the Blind, 2008-2009

# Appendix 2

Documents Reviewed:

- Docket Sheet in *In re: The Home Depot, Inc. Customer Data Security Breach Litigation*

- Opinion and Order in *In re: The Home Depot, Inc. Customer Data Security Breach Litigation* (document 211, filed 5/18/16) (on Home Depot's Motion to Dismiss)

- Home Depot's Objection to Consumer Plaintiffs' Motion for Service Awards, Attorneys' Fees and Litigation Expense Reimbursement in *In re: The Home Depot, Inc. Customer Data Security Breach Litigation* (document 233, filed 7/18/16)

- Order Granting Consumer Plaintiff's Motion for Service Awards, Attorneys' Fees and Litigation Expense Reimbursement in *In re: The Home Depot, Inc. Customer Data Security Breach Litigation* (document 261, filed 8/23/16)

- Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement, Preliminary Certification of Settlement Class, Approval of Notice Program, and Scheduling of Final Approval Hearing in *In re: The Home Depot, Inc. Customer Data Security Breach Litigation* (document 327, filed 3/8/17), and attachments thereto, including the Settlement Agreement and Release (document 327-3) ("Settlement Agreement")

- Preliminary Approval Order in *In re: The Home Depot, Inc. Customer Data Security Breach Litigation* (document 328, filed 3/10/17)

- Joint Motion for Preliminary Approval of a Modification to the Parties' Settlement Agreement and Revision of the Court's Preliminary Approval Order in *In re: The Home Depot, Inc. Customer Data Security Breach Litigation* (document 329, filed 4/18/17)

- Supplemental Order Relating to Preliminary Approval of Class Action Settlement in *In re: The Home Depot, Inc. Customer Data Security Breach Litigation* (document 330, filed 4/19/17)

- Joint Declaration of Co-Lead Counsel in *In re: The Home Depot, Inc. Customer Data Security Breach Litigation* (filed herewith) ("Fee Declaration")

- Plaintiffs' Motion for Attorneys' Fees, Expenses, and Service Awards to the Class Representatives in *In re: The Home Depot, Inc. Customer Data Security Breach Litigation* (filed herewith) ("Fee Motion")

- Settlement Agreement and Release in *In re Target Corporation Customer Data Security Breach Litigation* (document 653-1, filed 12/2/15)

- Financial Institution Plaintiffs' Memorandum of Law in Support of Motion for Attorneys' Fees in *In re Target Corporation Customer Data Security Breach Litigation* (document 724, filed 2/9/16)

- Memorandum of Law in Support of Financial Institution Plaintiffs' Motion for Final Approval in *In re Target Corporation Customer Data Security Breach Litigation* (document 745, filed 4/11/16)

- Memorandum and order in *In re Target Corporation Customer Data Security Breach Litigation* (document 758, filed 5/12/16) (on Motion for Final Approval)

- Stipulation of Settlement in *Winsouth Credit Union v. Mapco Express, Inc.* (document 47-1, filed 8/25/16)

- Memorandum of Law in Support of Plaintiff's Unopposed Motion for Final Approval of Settlement in *Winsouth Credit Union v. Mapco Express, Inc.* (document 52-1, filed 12/12/16)

- Memorandum of Law in Support of Plaintiff's Unopposed Motion for Attorneys' Fees in *Winsouth Credit Union v. Mapco Express, Inc.* (document 53-1, filed 12/12/16)

- Order in *Winsouth Credit Union v. Mapco Express, Inc.* (document 68, filed 1/12/17) (on Motion for Final Approval)

- Settlement Agreement and Release in *Greater Chautauqua Federal Credit Union v. Kmart Corp.* (document 96-1, filed 7/29/16)

- Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Attorneys' Fees in *Greater Chautauqua Federal Credit Union v. Kmart Corp.* (document 124-2, filed 11/21/16)

- Class Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Final Approval in *Greater Chautauqua Federal Credit Union v. Kmart Corp.* (document 143, filed 5/4/17)

- Notification of Docket Entry in *Greater Chautauqua Federal Credit Union v. Kmart Corp.* (document 147, filed 5/19/17) (on Motion for Final Approval)