**Plaintiffs' Motion for Attorneys' Fees,
Expense, and Service Awards to the
Class Representatives**

# Exhibit 7
**Excerpts from Deposition of Michael Williams**

*In re:  The Home Depot, Inc. Customer Data Security Breach Litigation*
*This Document applies to Financial Institution Cases*
U.S.D.C., N.D. Georgia, Atlanta Division
Civil Action No. 1:14-md-02583-TWT

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

In re: The Home Depot, Inc.,
Customer Data Security Breach
Litigation

No.: 1:14-MD-02583-TWT

This Document Relates to:
All Financial Institution
Cases

VIDEOTAPED DEPOSITION OF MICHAEL WILLIAMS
AS 30(b)(6) WITNESS FOR HOME DEPOT

February 24, 2016
9:04 A.M.
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia
Lee Ann Barnes, CCR-1852, RPR, CRR

```
                                                    Page 14
 1    associated with my prior deposition.
 2         Q.    Okay.  Other than that, that's the only
 3    list you've ever seen of -- of requests?
 4         A.    That's the only one I can recall.
 5              (Plaintiffs' Exhibit 1 was marked for
 6         identification.)
 7         Q.    (By Mr. Lynch)  I'm showing you what we've
 8    marked as Exhibit 1 to your deposition and I would
 9    ask you to take a look at that document, if you
10    could.
11              Have you ever seen that document before?
12         A.    Yes, I have.
13         Q.    What do you -- what do you know it to be?
14         A.    This is the notice of the deposition that
15    I'm appearing for today, along with topics related
16    to the deposition.
17         Q.    Okay.  You see that this is the notice of
18    videotaped deposition for a representative of Home
19    Depot.
20              My question to you, Mike, was:  Are you
21    that representative designated by Home Depot to
22    speak to the topics listed on Schedule A of
23    Exhibit 1?
24         A.    Yes, I am.
25         Q.    We talked last time a little bit more
```

Page 43

```
 1    any significant feedback from the brands.
 2            So I do not recall anything material
 3    occurring for some period of time until the point at
 4    which a preliminary assessment was ready and we
 5    engaged again for discussion.
 6        Q.   So there wasn't very much interaction with
 7    MasterCard or Visa prior to their preliminary
 8    assessment?
 9        A.   There was general conversations that
10    continued to occur, but I don't recall anything
11    material.
12        Q.   Okay.  After having reviewed the PFI
13    report, did you have an opinion as to whether or not
14    MasterCard or Visa were going to be issuing an
15    assessment?
16            In other words, did you have an opinion as
17    to how likely it would be that you would be
18    receiving an assessment from the brands?
19        A.   Home Depot had our opinion, yes.
20        Q.   What was your opinion at that point?
21        A.   Our opinion was that we had arguments that
22    there shouldn't be an assessment.
23        Q.   So that there should not be an assessment
24    at all?
25        A.   Correct.
```

1   Q.   Okay.  What were those arguments?
2          MS. DAWSON:  And I would instruct the
3   witness not to answer to the extent the
4   testimony would be called to disclose contents
5   of the PFI report.
6          Subject to that instruction, you can
7   answer the question.
8          THE WITNESS:  I think it's subject to the
9   contents of the PFI report.
10  Q.   (By Mr. Lynch)  Okay.
11         MR. LYNCH:  Cari, just so I'm clear, what
12  is the basis for instructing the witness not to
13  testify about the contents of the PFI report?
14         MS. DAWSON:  Well, this witness is here to
15  testify regarding Topics 1 through 11, not
16  Topic 12, the PFI report.  As you all know, we
17  submitted for in camera review the PFI report
18  on February the 8th.  The Court has not yet
19  made a decision as to whether or not we would
20  be required to disclose it and, you know, that
21  is the position that we are taking.
22         MR. LYNCH:  Okay.  So just -- I just want
23  to make sure I'm clear, then.  It's your
24  position that because Judge Thrash has asked to
25  have an in camera review of that document, that

1  that correct?
2      A.   Yes, that's a fair characterization.
3      Q.   Okay. And then I was -- then I asked you,
4  and I'm going to ask you now so she state this
5  clearly: Can you tell me what the basis was for
6  your opinion that Home Depot should not be assessed
7  by MasterCard or Visa for this -- this data breach?
8      MS. DAWSON: And I'll instruct the witness
9      that to the extent your answer would require
10     you to disclose contents of the PFI report, you
11     are not to testify regarding the contents of
12     that report.
13     If your response is outside of the
14     contents of the PFI report, you can answer the
15     question.
16     THE WITNESS: My response would be it
17     would include details of the PFI report.
18     Q.   (By Mr. Lynch) So there isn't any
19 information that you can give me that would be
20 outside of the PFI report as to why Home Depot
21 believed it should not be assessed by MasterCard and
22 Visa back in this time frame that we're talking
23 about?
24     A.   I don't believe I can answer that
25 question.

Page 49

1  preliminary assessment from -- let's start with
2  MasterCard?
3       A.  MasterCard I believe was in June of 2015.
4       Q.  Then how did you receive that?  Was that
5  given to you in writing?  Orally?  In person?  Over
6  a phone?
7       A.  We had a meeting on site at their offices
8  in June where they provided in writing and conveyed
9  to us verbally the preliminary assessment.
10      Q.  And that's the first time that you
11 received from MasterCard any hard information in
12 terms of financial viability that was being assessed
13 by MasterCard?
14      A.  That -- that's the first time that we
15 received formal documentation of the assessment,
16 yes.
17      Q.  Or even on an informal basis, it's the
18 first time you received actual numbers; is that
19 correct?
20      A.  As I recall, Dwaine Kimmet had a
21 conversation with MasterCard a day or two maybe -- I
22 mean, very, very close to the -- the meeting where
23 they gave him, I think, some sizing of what they
24 were going to show us when we attended in person.
25      Q.  In terms of the financial -- the actual

Page 63

1  a concern that maybe these releases, if we seek them
2  and get them through this vehicle, the assessment
3  process, maybe they won't stick, maybe they won't be
4  valid.
5          Was that a concern at all?
6     A.   No.
7     Q.   Okay.  Was there a concern that
8  plaintiffs' counsel that are handling litigation
9  like the one we're handling might seek out
10 attorneys' fees from the issuers that gave releases?
11    A.   At that point in time, no.
12    Q.   Was that ever a concern?
13    A.   Eventually it became a topic of
14 discussion.
15    Q.   Who did that become a topic of discussion
16 with?
17    A.   As we were attempting to finalize the
18 settlement agreement with the brands, the brands
19 raised it as a potential indemnification clause
20 in -- in the agreement.
21    Q.   Did you have any question in your mind
22 back then, as you were considering these options, as
23 to why the brands would want to assist you in
24 obtaining a release for civil litigation?
25          MS. DAWSON:  Object to the form of the

Page 65

1      A.    Right.
2      Q.    And then that's the end of the process,
3  from the brands' perspective; correct?
4      A.    Not necessarily.
5      Q.    It doesn't really involve seeking a
6  release from all the financial institutions, though,
7  does it?
8      A.    Their normal process doesn't, but they are
9  also at risk of litigation and as part of the
10 settlement, they also obtained a release.
11     Q.    So litigation from who?
12     A.    From a variety of different parties.
13     Q.    From Home Depot?
14     A.    It's -- I'm sure it's a potential risk to
15 them.
16     Q.    Did you or anyone else at Home Depot make
17 that known to them, that they had that potential
18 risk?
19     A.    Not at the point before the preliminary
20 assessments were raised.
21     Q.    Okay.  How about later?
22     A.    Sure.  Once we got the preliminary
23 assessment, we had a discussion with them that we
24 knew what our options were.
25     Q.    And so one option was potentially

```
                                                  Page 66
 1    instituting litigation against the brands?
 2         A.    One option was fighting it through
 3    litigation --
 4         Q.    Okay.
 5         A.    -- yes.
 6         Q.    When you say "fighting it through
 7    litigation," would that include an appeal process
 8    that's built into the assessment process or you're
 9    talking about something in addition to that?
10         A.    It would include the appeal, but could
11    potentially be even more than that.
12         Q.    Okay.  So one option would be appealing
13    the assessment; correct?
14         A.    Sure.
15         Q.    Another option might be additional
16    litigation against the brands beyond just the
17    appeal; correct?
18         A.    Yes.
19         Q.    Okay.  Was there any -- what was the goal
20    of the option that we've been talking about, which
21    is to seek a civil litigation release as part of the
22    assessment resolution?  What was Home Depot's goal
23    in considering that option?
24         A.    The goal was to potentially put the issue
25    to rest.
```

Page 89

1   point between that meeting and the point at which we
2   finalized the settlement agreement.  So between June
3   and November.
4       Q.   Okay.  Sometime during that pro- -- that
5   time period, you were told by MasterCard what the
6   final assessment number would be?
7       A.   Yes.
8       Q.   Going back now to the discussions that
9   were happening internally at Home Depot about the
10  various options and ways that the assessment process
11  could play out, we talked about the one option a lot
12  already, which is the option that ultimately, I
13  believe, was selected, which was to seek a release
14  of civil litigation as part of the payment of the
15  assessment to the financial institutions.
16           When was the decision made to actually
17  employ that approach?
18       A.   I don't recall exactly when, but at some
19  point between the discussion of preliminary
20  assessment and the point at which we arrived at a
21  settlement agreement.  So that June/July time frame
22  through November.
23       Q.   And I want to ask you kind of the same
24  questions I asked you with regard to the time frame
25  prior to the preliminary assessment as it relates to

1   A. I don't remember the details of the
2   conversation, but we had general knowledge of the
3   approach that had been taken in the past with the
4   other cases that I mentioned, and we attempted to
5   get general feedback from the brands as to what the
6   current environment would look like should that be
7   the avenue that we chose.
8   Q. What was their indication in that regard?
9   A. Their indication was that historically,
10  these matters had been resolved with a release at a
11  discount to the assessment, but they did not feel
12  like a discount was achievable anymore.
13  Q. And what -- what -- what do you mean by
14  that?
15  A. I mean paying something less than
16  100 percent of the assessed amount and receiving a
17  release.
18  Q. So they, MasterCard -- I'm talking about
19  the June meeting with MasterCard -- MasterCard was
20  suggesting to do what?
21  A. MasterCard was suggesting that if we chose
22  to go down that path, that we probably needed to
23  consider at least 100 percent of the assessed
24  amount, if not more.
25  Q. Of course, at that point in time,

Page 92

1  100 percent of the assessed amount was in a bit of a
2  state of flux, correct, because they had announced a
3  number, but you had raised some questions as to
4  maybe why that number should fluctuate downward;
5  isn't that right?
6       A.   Yes.
7       Q.   Okay.  Was there any discussion at the
8  June meeting as to what the additional payment
9  should be about the assessed amount?
10      A.   I honestly do not recall at that point if
11 we talked about what amount they felt would be
12 necessary to secure releases.
13      Q.   Did they have any opinions at all about
14 whether this was a good or bad approach to take,
15 "they" being MasterCard?
16      A.   And help clarify the context of good or
17 bad.
18      Q.   Well, thinking that you're at the June
19 meeting and you -- and one of the options being
20 discussed is the option of seeking a release of the
21 civil litigation as part of the payment of the
22 assessment.
23           I'm just wondering -- and I'm really
24 asking -- everything that MasterCard said about that
25 approach, good, bad, indifferent.

Page 123

```
 1        Q.    Okay.  Is that what they mean by
 2   "waterfall"?
 3        A.    That's my understanding of the way they
 4   characterize it, yes.
 5        Q.    So the waterfall is just a reduction based
 6   upon a closer analysis of the affected cards?
 7        A.    Yes, affected cards attributable to our
 8   breach, yes.
 9        Q.    Okay.  What else was discussed at that
10   July meeting with Visa?
11        A.    Again, I think it's similar in the context
12   of the MasterCard discussion.  Essentially the same
13   data points.
14        Q.    Well, can you tell me what was discussed?
15   I mean, was there the same three options laid out?
16        A.    Same options were laid out, same questions
17   that had been posed, although we didn't go into the
18   details of the question because of the depth of
19   their assessment and what they showed through their
20   waterfall.
21        Q.    Okay.
22        A.    And then we again talked about the fines
23   and fees, should there be any --
24        Q.    Okay.
25        A.    -- that would be assessed.
```